**TAB 1**

LEXSEE 2007 US DIST LEXIS 51464

**ETHEL PANCOTTI, Plaintiff, v. BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., ET AL., Defendants.**

**Case No: 3:06cv1674 (PCD)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*2007 U.S. Dist. LEXIS 51464*

**July 14, 2007, Decided
July 17, 2007, Filed**

**COUNSEL:** [*1] For Ethel Pancotti, Plaintiff: Fern H. Paes, LEAD ATTORNEY, Paes & Paes, Sandy Hook, CT.

For Boehringer Ingelheim Pharmaceuticals, Inc., Plan Administrator, Boehringer Ingelheim Ltd & Affiliated Co Group Insurance Plan, Employee Benefits Plan Comm, Boehringer Ingelheim Ltd & Affiliated Co Group Insurance Plan, Boehringer Ingelheim Ltd & Affiliated Co Group Ins Plan, Defendants: Ashley B. Abel, LEAD ATTORNEY, Jackson Lewis LLP - SC, Greenville, SC; Edward M. Richters, LEAD ATTORNEY, Jackson Lewis - Htfd, CT, Hartford, CT.

For CIGNA Corp, Defendant: Ashley B. Abel, LEAD ATTORNEY, Jackson Lewis LLP - SC, Greenville, SC; Fred N. Knopf, LEAD ATTORNEY, Wilson, Elser, Moskowitz, Edelman & Dicker, White Plains, NY; Michelle M. Arbitrio, LEAD ATTORNEY, Wilson, Elser, Moskowitz, Edelman & Dicker-NY, White Plains, NY.

For Boehringer Ingelheim Ltd., Business Travel Accident Plan, Plan Administrator, Boehringer Ingelheim Ltd. Business Travel Accident Plain, Defendants: Edward M. Richters, LEAD ATTORNEY, Jackson Lewis - Htfd, CT, Hartford, CT.

For Connecticut General Life Ins Co, Defendant: Michelle M. Arbitrio, LEAD ATTORNEY, Wilson, Elser, Moskowitz, Edelman & Dicker-NY, White Plains, NY; Fred N. [*2] Knopf, Wilson, Elser, Moskowitz, Edelman & Dicker, White Plains, NY.

**JUDGES:** Peter C. Dorsey, U.S. District Judge, United States District Court.

**OPINION BY:** Peter C. Dorsey

**OPINION**

**RULING ON MOTION TO DISMISS**

Plaintiff Ethel Pancotti brought this action against Defendants: Boehringer Ingelheim Pharmaceuticals, Inc.; Plan Administrator, Boehringer Ingelheim Ltd. and Affiliated Companies Group Insurance Plan; Employee Benefits Plan Committee, Boehringer Ingelheim Ltd. and Affiliated Companies Group Insurance Plan; Boehringer Ingelheim Ltd. and Affiliated Companies Group Insurance Plan (collectively "Boehringer Defendants"); and CIGNA Corporation and Connecticut General Life Insurance Company ("CGLIC") (collectively "CIGNA Defendants") [1] under the Employee Retirement Income Security Act of 1974, *29 U.S.C. §§ 1001 et seq. (2000)* ("ERISA"). The CIGNA Defendants have filed, pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, a Motion to Dismiss Counts One through Five, Six, and Nine. For the reasons stated herein, the CIGNA Defendants' Motion to Dismiss [Doc. No. 41] is **granted**.

 1    As a background matter, the CIGNA Defendants urge that CIGNA is a parent corporation and not a proper litigant in this case. (Defs.' Mem. Supp. [*3] Mot. to Dismiss 6, n.2.) This issue is not relevant to this memorandum, however, as the CIGNA Defendants do not move to dismiss claims against CIGNA and CGLIC on that ground, and refer to themselves as the

"CIGNA Defendants" throughout their Reply Memorandum.

## I. BACKGROUND [2]

2  A court considering a motion to dismiss under *Rule 12(b)(6)* may consider only the allegations made in the complaint, documents attached to the complaint, documents incorporated into the complaint by reference, and any facts of which judicial notice may be taken. See *Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 662 (2d Cir. 1996); Brass v. Amer. Film Techn., Inc., 987 F.2d 142, 150 (2d Cir. 1993).* The statement of facts that follows is derived solely from Plaintiff's Complaint and the documents attached to it. See Part II, infra.

Rudy Pancotti worked for Boehringer Ingelheim Ltd. from 1976 until his death in 1992. (Second Amend. Compl. P 19.) Plaintiff, Mr. Pancotti's widow, is a beneficiary of certain of his employee benefits under Boehringer's Survivor Income Benefit Protection Plan (hereinafter "Plan"). (Id. PP 18, 20.) Defendants CIGNA and CGLIC are fiduciaries of the Plan and issue benefits under [*4] it. (Id. PP 21-22.)

In July of 2000, the CIGNA Defendants wrote a letter to Plaintiff informing her that she would continue to receive a monthly benefit "for the remainder of your life, unless you remarry." (Id. P 30; Ex. B.) This communication confused Plaintiff because Boehringer had, at some point between Mr. Pancotti's death and 2001, told her that her benefits would end at age sixty-five. (Second Amend. Compl. P 31.) Plaintiff wrote to the CIGNA Defendants and asked for clarification as to the extent of her survivor benefits. (Id. PP 32-33; Ex. C.) Plaintiff received an oral response from Michelle Black, an agent for the CIGNA Defendants, explaining that her benefits would continue for her entire life unless she remarried. (Second Amend. Compl. P 34.) Three days later, she received written confirmation from Ms. Black that her benefits would continue for the duration of her life unless she remarried. (Id. P 36; Ex. D.)

Plaintiff, upon the belief that she would receive lifetime benefits, relied on this information in deciding whether to pursue other sources of income. (Second Amend. Compl. P 39.) In addition, Plaintiff, a nursing assistant, terminated her employment so she could care [*5] for an ill friend. (Id. P 40.) In early February 2006,

the CIGNA Defendants notified Plaintiff in writing that because she had reached age sixty-five in 2004, her benefits should have terminated at that time. (Id. P 41; Ex. F.) The CIGNA Defendants subsequently terminated Plaintiff's benefits. (Second Amend. Compl. P 42.)

The CIGNA Defendants never provided Mr. Pancotti with relevant Plan documents, including the Plan Contract itself or a copy of the Summary Plan Description (hereinafter "SPD"). (Id. P 24.) They also did not provide Plaintiff with those documents until her counsel requested them to do so, at which point the CIGNA defendants provided her with an SPD that contained conflicting information as to when her benefits would end. (Id. P 23, 55, 60; Ex. A-1, A-2.) The CIGNA Defendants never corrected the conflicting information, and CIGNA's agent, Michele Black, relied on the allegedly defective SPD in explaining Plaintiff's benefits to her. (Second Amend. Compl. P 57.)

Plaintiff filed this action against the Boehringer Defendants and the CIGNA Defendants in October, 2006, alleging various violations in regards to her alleged benefits under her late husband's employee benefits [*6] plans. In her Second Amended Complaint [Doc. No. 44], Plaintiff asserts claims against the CIGNA Defendants for breach of fiduciary duty (Count One), failure to provide information summaries (Counts Two and Three), discrimination against her in retaliation for exercising her right to benefits (Count Four), promissory estoppel (Count Five), negligent misrepresentation (Count Six), and fraud (Count Nine). Plaintiff also alleges a violation of *Section 502(a) of ERISA* by both the Boehringer and CIGNA Defendants (Count Seven), and a violation of *Section 1024 of ERISA* by only the Boehringer Defendants (Count Eight).

## II. STANDARD OF REVIEW

The function of a motion to dismiss pursuant to *Rule 12(b)(6)* is "merely to assess the legal feasibility of the complaint, not to assay the weight of evidence that might be offered in support thereof." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir. 1984)* (citation omitted). Therefore, when considering such a motion, the court must accept the facts alleged in the complaint as true, draw inferences therefrom in the light most favorable to the plaintiff, and construe the complaint liberally. *Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001).* [*7] The district court may dismiss a claim under *Federal Rule of Civil Procedure*

12(b)(6) only if the plaintiff's factual allegations are not sufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. V. Twombly, U.S. , 127 S. Ct. 1955, 1960, 167 L. Ed. 2d 929 (2007)*. Although detailed factual allegations are not required, a plaintiff must provide the grounds of her entitlement to relief beyond mere "labels and conclusions"; "a formulaic recitation of the elements of a cause of action will not do." *Id. at 1964-65*. [3]

> 3    The Second Circuit recently questioned the extent to which Bell Atlantic applies outside of the antitrust context. See Iqbal v. Hasty, F.3d , 2007 U.S. App. LEXIS 13911, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007). The court in Iqbal adopted a "flexible plausibility standard," which "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Id. Here, because the Complaint is deficient even under the prior *Rule 12(b)(6)* pleading standard, the Court need not determine whether such amplification is required.

In ruling on a motion under [*8] *Rule 12(b)(6)*, the Court may consider only the allegations made in the complaint, documents attached to the complaint, documents incorporated into the complaint by reference, and any facts of which judicial notice may be taken. See *Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 662 (2d Cir. 1996)*; *Brass v. Amer. Film Techn., Inc., 987 F.2d 142, 150 (2d Cir. 1993)*. When a plaintiff "fails to introduce a pertinent document as part of his pleading, [a] defendant may introduce the exhibit as part of his motion attacking the pleading." *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991)* (internal citation omitted). The CIGNA Defendants have attached the Group Insurance Plan for Boehringer Ingelheim Ltd. (Ex. 2.) Plaintiff, however, argues that the CIGNA Defendants may not introduce this Plan document as an exhibit at the motion to dismiss stage. (Pl.'s Mem. 4.) Because Plaintiff's claim is based on an alleged misrepresentation as to the extent of Plaintiff's benefits under the Plan, the document is incorporated by reference in the Complaint and can be considered by this Court.

## III. DISCUSSION

### A. Count One (Breach of Fiduciary Duty)

Plaintiff brings Count [*9] One pursuant to *Section 1132 (a)(3) of ERISA*, which provides in relevant part:

> A civil action may be brought by a participant, beneficiary, or fiduciary (A) to enjoin any act of practice that violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

*29 U.S.C. § 1132 (a)(3)*. Plaintiff alleges that the CIGNA Defendants' actions "constitute arbitrary, capricious, and wrongful and grossly negligent conduct...in administering the Plan." (Second Amend. Compl. P 45.). Plaintiff also alleges that the CIGNA Defendants breached their fiduciary duty to inform by stating that Plaintiff's benefits would continue for the duration of her life unless she remarried. (Id. P 46.) In connection with these claims, Plaintiff requests the following relief:

> a) an equitable lien placed upon the profits and/or separate account assets from Defendants' CIGNA and CGLI policy number 0386511 and 2503630 and any other relevant policy in favor of Plaintiff; b) equitable restitution; c) reimbursement of all litigation expenses; and d) such other and further relief [*10] as this court may deem appropriate and equitable, including, if proper, reformation of the plan.

(Id. P 49.) The CIGNA Defendants move to dismiss Count One on the grounds that Plaintiff does not seek equitable relief as required of ERISA claims. (Defs.' Mem. Supp. Mot. to Dismiss 9.)

The United States Supreme Court has held that the text of ERISA leaves no doubt that Congress intended the phrase "other equitable relief" in *§ 1132 (a)(3)* to include only those types of relief that "were typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." *Mertens v. Hewitt Assocs., 508 U.S. 248, 256, 113 S. Ct. 2063, 124 L. Ed. 2d 161 (1993)*. Legal relief, such as monetary "make whole" relief, is therefore unavailable under ERISA. *Id. at 255*. Restitution is not an equitable remedy unless the action seeks "not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property

in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 210, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002)*; accord *Sereboff v. Mid Atl. Med. Servs., Inc., 126 S. Ct. 1869, 1874, 164 L. Ed. 2d 612 (2006)* (relief sought was equitable because it sought reimbursement through an equitable lien on [*11] a specifically identified fund and not on defendant's assets generally). Suits that seek to "compel the defendant to pay a sum of money to the plaintiff," however, are "almost invariably... suits for money damages... since they seek no more than compensation for loss resulting from the defendant's breach of a legal duty." *Great-West Life, 534 U.S. at 210*.

Here, Plaintiff seeks monthly benefit payments for life, notwithstanding her characterizing the relief as "equitable restitution" and "an equitable lien to satisfy the payment." (Second Amend. Compl. P 49.) But "any claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction." *Great-West Life, 534 U.S. at 211, n.1*. To grant Plaintiff the relief she seeks would be to order an injunction compelling the CIGNA Defendants to pay monetary damages, which are unavailable under ERISA. Moreover, the CIGNA Defendants correctly point out that Plaintiff fails to identify a particular sum of money in the CIGNA Defendants' possession that she is entitled to recover. (Defs.' Reply Mem. 3). Plaintiff merely seeks monthly payments for the remainder of her life, to be satisfied through "an equitable lien placed on the profits [*12] and/or separate account assets" from certain of the CIGNA Defendants policy numbers. (Second Amend. Compl. P 49.) As such, Plaintiff seeks neither equitable relief nor enforcement of the Plan's terms. Because ERISA allows only equitable relief to enforce the plan, Plaintiff has failed to state a claim under *§ 1132(a)(3)*, and Count One is hereby dismissed.

**B. Counts Two and Three (Failure to Provide Information Summaries)**

In Counts Two and Three, Plaintiff alleges that the CIGNA Defendants breached their fiduciary duty and violated *§§ 1022(b)* and *1024 of ERISA* by initially failing to provide an SPD, subsequently providing a defective SPD, and failing to disclose material modifications to the SPD. (Second Amend. Compl. PP 53, 60-61.) ERISA imposes a duty upon the administrator of a benefit plan to furnish a Summary Plan Description setting forth information such as the name and type of benefit plan, the plan's requirements with respect to eligibility for participation and benefits, and the circumstances that may result in disqualification, ineligibility, or denial or loss of benefits. *29 U.S.C. §§ 1022(b), 1024*.

The CIGNA Defendants argue that Counts Two and Three should be dismissed because [*13] Plaintiff has not alleged that she has been prejudiced as a result of the delay in receiving the SPD, the alleged defectiveness of the SPD, or by alleged changes in the SPD. (Defs.' Mem. Supp. Mot. to Dismiss 11.) They cite both *Burke v. Kodak Retirement Income Plan, 336 F.3d 103, 113 (2d Cir. 2003)*, and *Weinreb v. Hospital for Joint Diseases Orthopaedic Institute, 404 F.3d 167, 171 (2d Cir. 2005)*, in support of their argument that a showing of prejudice is required to state a claim under *§ 1132(a)(3)*. (Defs.' Mem. Supp. Mot. to Dismiss 11.) Both cases, however, involved claims for benefits due under *29 U.S.C. § 1132(a)(1)(B)*, and not *§ 1132 (a)(3)*. In Weinreb, the court specifically noted that an employer's failure to provide an SPD may be cognizable as a separate claim for breach of fiduciary duty. *Weinreb, 404 F.3d at 171* (citing *Lee v. Burkhart, 991 F.2d 1004, 1011 (2d Cir. 1993))*.

Contrary to Defendants' arguments, a showing of prejudice or harm is not a prerequisite to liability for failure to comply with ERISA's disclosure requirements or a violation of fiduciary duties under ERISA. *Cavallo v. Utica-Watertown Health Ins. Co., Inc., 3 F. Supp. 2d 223, 231-32 (N.D.N.Y. 1998)*; *James v. New York City Dist. Council of Carpenters' Benefits Funds, 947 F. Supp. 622, 634 (E.D.N.Y. 1996)*; [*14] *Pagovich v. Moskowitz, 865 F. Supp. 130, 137-38 (S.D.N.Y. 1994)* (collecting cases and noting that some earlier district courts in this circuit have found otherwise). Thus, Plaintiff is not required to show prejudice or harm to state a claim under *§ 1132 (a)(3)*, and Counts Two and Three cannot be dismissed on those grounds.

Counts Two and Three are hereby dismissed, however, because Plaintiff has not alleged that the CIGNA Defendants were plan administrators. ERISA requires that participants be furnished with a summary of the plan, but that duty is placed on the person designated under ERISA as the "administrator" of the plan, not on every fiduciary. See *Lee, 991 F.2d at 1010*. ERISA defines an "administrator" as "the person specifically so designated by the terms of the instrument under which

the plan is operated... [or] if an administrator is not so designated, the plan sponsor." *29 U.S.C. § 1002(16)(A)*. Plaintiff does not allege that either of the CIGNA Defendants is the plan administrator, and it appears that the SPD lists Boehringer Ingelheim Ltd. as the plan administrator. (Ex. A-2.) Therefore, Plaintiff has not alleged a necessary element of the claim, and Counts Two and Three must [*15] be dismissed.

Additionally, even assuming Plaintiff properly asserted a claim against the CIGNA Defendants as plan administrators, she seeks relief under Counts Two and Three which is unavailable under *Sections 1022* and *1024 of ERISA*. No substantive remedies are available for violations of ERISA's procedural requirements. *Gilbert v. Burlington Indus., Inc., 765 F.2d 320, 329 (2d Cir. 1985)*. See also *Lewandowski v. Occidental Chem. Corp., 986 F.2d 1006, 1009 (6th Cir. 1993)* (holding that nothing in *§ 1132* suggests that a beneficiary should receive a benefit award based on a failure to disclose required information). Plaintiff seeks recovery of the monthly benefits to which she is allegedly entitled, which is not only compensatory relief unavailable under ERISA (see supra 6-7), but also a substantive remedy which cannot redress a procedural violation. *Gilbert, 765 F.2d at 329*. Accordingly, Counts Two and Three are dismissed.

### C. Count Four (Retaliation Claim)

In Count Four of her Second Amended Complaint, Plaintiff brings a claim pursuant to *Section 1140 of ERISA*, which provides in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate [*16] against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan [or ERISA]... or for the purpose of interfering with the attainment of any right to which such participant may be entitled under the plan [or ERISA].

*29 U.S.C. § 1140*. Plaintiff alleges that the CIGNA Defendants' showed bias and prejudice by retaliating against her. (Second Amend. Compl. PP 69-77.) The CIGNA Defendants argue that Count Four should be dismissed because Plaintiff has failed to allege retaliation or that she was exercising any right to benefits under the

Plan. (Defs.' Mem. Supp. Mot. to Dismiss 12.)

As a preliminary matter, it is not clear that a cause of action is available to a non-employee beneficiary against a non-employer. *Kreinik v. Showbran Photo, Inc., No. 02 Civ. 1172(RMB)(DF), 2003 U.S. Dist. LEXIS 18276, 2003 WL 22339268, at *5 (S.D.N.Y. Oct. 14, 2003)*. It is well settled that *Section 1140* provides an employee with a cause of action against an employer who has retaliated against her, *2003 U.S. Dist. LEXIS 18276, [WL] at *3*, but a majority of circuits have adopted the view that *Section 1140* limits a cause of action to an employee who has been retaliated against by an employer. See, e.g., [*17] *Deeming v. American Standard, Inc., 905 F.2d 1124, 1127 (7th Cir. 1990)*; *Gavalik v. Continental Can Co., 812 F.2d 834, 851 (3d Cir. 1987)*. The Second Circuit Court of Appeals has not spoken directly to the issue, but has stated in dicta that the section "was designed primarily to prevent 'unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights.'" *Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1111 (2d Cir. 1988)* (quoting *West v. Butler, 621 F.2d 240, 245 (6th Cir. 1980)*). Two lower courts in the Second Circuit have opted to follow the minority of circuits that hold a non-employee beneficiary has a cause of action under *§ 1140*, but both cases involved claims against a former employer. *Straus v. Prudential Employee Sav. Plan, 253 F. Supp. 2d 438, 448 (E.D.N.Y. 2003)* (holding that former employees and non-employee beneficiaries are protected from retaliation by employer); *Kreinik, 2003 U.S. Dist. LEXIS 18276, 2003 WL 22339268 at *5* (post-employment retaliation by employer against former employee covered under *Section 1140*). Therefore, it is not clear that a cause of action exists in this case where Plaintiff is a non-employee beneficiary and, more significantly,, [*18] the CIGNA Defendants are the insurer of Plaintiff's husband's benefits rather than his former employer.

More importantly, even if this Court finds that a *Section 1140* claim may be brought by a non-employee beneficiary against a non-employer, Plaintiff has not pled retaliation and does not seek proper relief. In order to avoid dismissal, Plaintiff must allege that the CIGNA Defendants "interfered with the attainment of any rights" to which she was entitled under the terms of the Plan or ERISA. *Straus, 253 F. Supp. 2d at 448*. Plaintiff alleges only that the CIGNA Defendants stopped paying her a monthly benefit which they promised her would continue

for life. She does not allege that the CIGNA Defendants acted in such a way to deny Plaintiff of her rights, or interfere with her attainment of them, in retaliation against her attempts to clarify the extent of her benefits. Additionally, Count Four seeks essentially compensatory relief that is unavailable under ERISA. See supra 6-7. Accordingly, Count Four is dismissed.

### D. Count Five (Promissory Estoppel)

In Count Five, Plaintiff alleges that the CIGNA Defendants made repeated promises of lifetime benefits to her, that she reasonably relied [*19] upon these promises to her detriment, and that she "is entitled to compensation pursuant to *29 U.S.C. 1132 § (a)(3)*." (Second Amend. Compl. PP 79-85). The CIGNA Defendants move to dismiss Count Five for failure to seek equitable relief. (Defs.' Mem. Supp. Mot. to Dismiss 13.) Plaintiff counters that promissory estoppel may apply in ERISA cases under extraordinary circumstances. (Pl.'s Mem. 11.)

Principles of promissory estoppel can apply under "extraordinary circumstances" in ERISA cases arising under *§ 1132 (a)(1)(B). Schonholz v. Long Island Jewish Med. Center, 87 F.3d 72, 78 (2d Cir. 1996)*. The Second Circuit has not, however, held that promissory estoppel may apply in claims arising from violations of *§ 1132 (a)(3). Keiser v. CDC Inv. Mgmt. Corp. (Keiser III), No. 99 Civ. 12101(WHP), 2004 U.S. Dist. LEXIS 4109, 2004 WL 516212 at *1 (S.D.N.Y. Mar. 17, 2004)*. Because Plaintiff's promissory estoppel claim is not based on *§ 1132 (a)(1)(B)*, it is dismissed.

Further, in order to state a promissory estoppel claim under ERISA, a plaintiff must allege facts sufficient to satisfy an "extraordinary circumstances" requirement, in addition to the basic four elements of promissory estoppel: 1) a promise, 2) reliance on [*20] the promise, 3) injury caused by the reliance, and 4) an injustice if the promise is not enforced. *Aramony v. United Way Replacement Benefit Plan, 191 F.3d 140, 151 (2d Cir. 1999)*. Extraordinary circumstances are generally found only where an employer gains some benefit by intentionally inducing an employee to rely on a promise. See, e.g., *Schonholz, 87 F.3d at 79* (extraordinary circumstances where employer avoided terminating an employee by inducing her voluntary resignation with the promise of severance benefits, which were subsequently revoked); *Abbruscato v. Empire Blue Cross & Blue Shield, 274 F.3d 90, 101 (2d Cir. 2001)* (extraordinary

circumstances where employer offered early retirement incentive programs to reduce overall expenses); cf. *Straus, 253 F. Supp. 2d at 453* (no extraordinary circumstances where employer promised that employees could trade funds between savings accounts and received no consideration or potential reward from employees' reliance on promise).

Plaintiff has not sufficiently alleged the existence of extraordinary circumstances necessary to establish a promissory estoppel claim under ERISA. Plaintiff alleges that she was repeatedly assured she would be entitled [*21] to lifetime benefits, and that she relied on these statements to her detriment by quitting her job to care for a sick friend. (Second Amend. Compl. PP 79, 85.) Even accepting Plaintiff's allegations as true, she has merely alleged the basic elements of promissory estoppel: a promise of benefits, reliance on that promise in terminating her employment, an injury from a lack of fixed income, and an injustice if the promise were not enforced. Plaintiff's terminating her employment in order to care for an ill friend is not the type of situation that the Second Circuit has contemplated as "extraordinary." She does not allege that the CIGNA Defendants intentionally induced her to terminate her employment, or that they stood to gain from her resignation, allegations which might suggest extraordinary circumstances. Moreover, Plaintiff alleges that because the CIGNA Defendants did not keep their promise, she is entitled to compensation under *29 U.S.C. § 1132(a)(3)*. (Second Amend. Compl. P 85.) ERISA does not provide for such relief, however. See supra 6-7. Accordingly, Count Five is dismissed.

### E. Counts Six and Nine (Common Law Claims)

Counts Six and Nine set forth identical facts, couched in [*22] common law claims of negligent misrepresentation and fraud, respectively. (Second Amend. Compl. PP 87-89, 107-109.) They are essentially duplicative of the claims in Counts One and Five, and allege that: the CIGNA Defendants provided repeated written notice to Plaintiff stating that she would be entitled to benefits for the duration of her lifetime (id. P 87, 107); the CIGNA Defendants knew or should have known that the statements were false (id. P 88, 108); and Plaintiff reasonably relied on these statements to her detriment, for which she is entitled to compensation pursuant to *29 U.S.C. § 1132(a)(3)*. (Id. P 89, 109.) The CIGNA Defendants move to dismiss Counts Six and Nine on the grounds that the common law claims of

negligent misrepresentation and fraud are preempted under ERISA.

*Section 1144(a)*, ERISA's preemption provision, explicitly states that ERISA supersedes "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan..." *29 U.S.C. § 1144(a)*. ERISA preempts a state law cause of action when it is nothing more than an alternative theory of recovery for conduct actionable under ERISA and concerns the extent of benefits under an employee benefit [*23] plan. See *Aetna Health Inc. v. Davila, 542 U.S. 200, 214, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004)* (preemption of state law claim alleging misrepresentation of benefits promised under the terms of an ERISA plan); cf. *DaPonte v. Manfredi Motors Inc., 157 Fed. Appx. 328, 331 (2d Cir. 2005)* (no preemption because plaintiff's claims of negligent and fraudulent misrepresentation were not based on misrepresentation of benefits promised under terms of plan). Here, Plaintiff's negligent misrepresentation and fraud claims are based on the CIGNA Defendants'

alleged misrepresentations as to the extent of benefits under the terms of the Plan. Because these claims concern the extent of her benefits under the terms of the Plan, they are preempted by ERISA. Moreover, Plaintiff seeks relief which is unavailable under ERISA. See supra 6-7. Accordingly, Counts Six and Nine are dismissed.

## IV. CONCLUSION

For the foregoing reasons, the CIGNA Defendants' Motion to Dismiss [Doc. No. 41] is **granted**. Counts One through Five, Six, and Nine against the CIGNA Defendants are hereby dismissed.

SO ORDERED.

Dated at New Haven, Connecticut, July 14, 2007.

Peter C. Dorsey, U.S. District Judge

United States District Court

**TAB 2**

Slip Copy                                                                          Page 1
Slip Copy, 2006 WL 2482622 (S.D.N.Y.)
**(Cite as: Slip Copy)**

John v. New York City Dept. of Educ.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Dina JOHN, Plaintiff,
v.
NEW YORK CITY DEPARTMENT OF EDUCA-
TION, Defendant.
**No. 04 Civ. 5861(NRB).**

Aug. 29, 2006.

Kenneth W. Richardson, New York, NY, for
Plaintiff.

Daniel Chiu, Office of the Corporation Counsel,
City of New York, New York, NY, for Defendants.

MEMORANDUM AND ORDER
BUCHWALD, J.
**\*1** Plaintiff Dina John ("plaintiff") has brought this
action pursuant to Title VII of the Civil Rights Act
of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the
Americans with Disabilities Act of 1990, 42 U.S.C.
§ 12101 et seq. ("ADA"), 42 U.S.C. § 1981 ("Sec-
tion 1981"), the New York State Human Rights
Law, Executive Law § 250 et seq., and New York
City Administrative Code § 8-101 et seq., alleging
that she was discriminated against in her employ-
ment on the basis of race, national origin and per-
ceived disability. Defendant moves for summary
judgment on all of plaintiff's claims. For the reas-
ons set forth below, defendant's motion is granted
in its entirety.

BACKGROUND [FN1]

> FN1. Except where noted, the following
> facts are not disputed.

Plaintiff is an African-American female of
Guyanese descent. See Pl. Local Civil R. 56.1
Statement of Undisputed Facts ("Pl. 56.1 State-
ment") at ¶ 1; Def. Local Civil R. 56.1 Statement of
Undisputed Facts ("Def. 56.1 Statement") at ¶ 1. In
September 1999, plaintiff started working for de-
fendant New York City Department of Education,
also known as the New York Board of Education
("BOE" or "defendant"), when she was hired to
teach art as a regular substitute teacher at Interme-
diate School 183 ("IS 183") in the Bronx. See Pl.
56.1 Statement at ¶ 2, Def. 56.1 Statement at ¶ 1,
Ex. C at 103-4. Plaintiff resigned from this position
on June 11, 2001 in order to accept a fellowship.
See Def. 56.1 Statement, Ex. F. In either September
or October 2001, plaintiff resumed her employment
with BOE when she was hired to teach biology as a
regular substitute at Walton High School
("Walton") in the Bronx. See Pl. 56.1 Statement at
¶ 3; Def. 56.1 Statement, Ex. C.

Plaintiff apparently injured her back at Walton
while carrying a projector to a classroom on Febru-
ary 14, 2002. See Pl. 56.1 Statement, Ex. P; Def.
56.1 Statement, Ex. D at 52. She worked the next
day and then traveled to England for a week begin-
ning on or about February 16, 2002. See Def. 56.1
Statement, Ex. D at 53-54. After returning from this
trip, plaintiff took sick leave from approximately
February 25, 2002 to April 20, 2002. See id. at
55-56; Def. 56.1 Statement, Ex. H. Plaintiff was ex-
amined by Dr. Lourdes P. Esteban on February 27,
2002, who diagnosed plaintiff as having "lumbar
sacral sprain/ radiculopathy" and advised her to rest
for a month. See Pl. 56.1 Statement, Ex. P at 13. Dr.
Esteban saw plaintiff again on April 3, 2002 and
apparently advised her to rest for another month
and return to work on April 22, 2002. See Pl. 56.1
Statement, Ex. P at 16. When plaintiff returned to
Walton, she filed an "Application for Excuse of
Absence for Personal Illness (Sick Leave)" which
was ultimately approved as an "ordinary illness"
but denied as a "line of duty injury." See Def. 56. 1
Statement, Exs. H, I. As a result, plaintiff's sick
leave was authorized, but she did not receive pay
for these days. See Def. 56.1 Statement, Ex. D at
56-7.

**\*2** Plaintiff continued to teach at Walton until
either May or June of 2002. See Pl. 56.1 Statement
at ¶ 3; Def. 56.1 Statement at ¶ 9. Plaintiff's em-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2482622 (S.D.N.Y.)

**(Cite as: Slip Copy)**

ployment was terminated after she appeared before a committee responsible for hiring decisions and informed them that she wanted to leave Walton. *See* Pl. Aff. in Opp'n to Def. Mot. dated April 26, 2006 ("Pl.Aff.") at ¶ 8; Def. 56.1 Statement, Ex. D at 94-5. At this point, plaintiff was placed "in excess." When teachers are designated to be "in excess", they are apparently placed on a preference list for employment in other schools. *See* Pl. Aff. at ¶¶ 8,9. FN2

> **FN2.** Defendant has explained that "[e]xcessing occurs when a school does not need the same number of teachers or staffing as it did in the previous year. When this occurs, generally the least senior person in the particular license area is placed in excess and can move to a vacancy in another school in this district." Def. 56.1 Statement at n. 4.

In September 2002, plaintiff began working at P.S. 287 in Brooklyn. *See* Pl. Aff. at ¶ 9. She was hired as a regular substitute art cluster teacher by Principal John Khani ("Principal Khani"). *See* Pl. 56.1 Statement at ¶ 5; Def. 56.1 Statement, Ex. D at 108. A cluster teacher is an elementary school teacher with a specialty in a specific subject area. *See* Declaration of John R. Khani dated February 28, 2006 ("Khani Decl.") at ¶ 8.

Sometime before plaintiff started working at P.S. 287, the school applied for funding for a computer lab intended to improve student literacy. *See* Khani Decl. at ¶ 9. According to Principal Khani, the proposal requested $100,000 which did not include funding for the salary of an additional computer and literacy teacher. *See id.* FN3 In late November 2002, Principal Khani learned that the requested funding had been awarded to P.S. 287. *See* Khani Decl. at ¶ 11. The new computer lab was to be installed in Room 323, which was plaintiff's classroom and across the hall from the school's existing computer lab. *See id.* Principal Khani alleges that at this time he concluded he had to terminate one of the existing cluster teachers in order to hire someone who was proficient in teaching both liter-

acy and computer skills. *See* Khani Decl. at ¶ 12. Principal Khani also alleges that his decision to terminate plaintiff was determined by the fact that she was the least senior cluster teacher and the least senior teacher in the school. *See* Khani Decl. at ¶ 12; Pl. Aff. at ¶ 15. FN4

> **FN3.** Plaintiff's termination letter dated December 2, 2002 explains that the termination was because the school "had just been advised that [it] ha[d] received a grant for a wireless computer lab teacher who will be infusing literacy and technology within Room 323." *See* Pl. 56. 1 Statement, Ex. K. Plaintiff has not asserted that she was certified to teach either computer or literacy skills.

> **FN4.** Plaintiff has argued that Khani erroneously calculated her seniority because she had been working for the BOE for four years at the time of her termination. *See* Compl. at ¶ 19. However, seniority at P.S. 287 is calculated based on the length of the teacher's employment at the school. *See* Khani Decl. at ¶ 12. Plaintiff has conceded that if seniority is calculated in this manner, she did not have seniority. *See* Def. 56.1 Statement, Ex. D at 147-48.

During a student altercation on November 25, 2002, plaintiff injured her arm and finger and filed an injury report the same day. *See* Def. 56.1 Statement, Ex. L. Plaintiff sought treatment from a doctor, who diagnosed a muscle sprain and advised her to rest. *See* Def. 56.1 Statement, Ex. M. When plaintiff returned to work on December 2, 2002, she filed an "Application for Excuse of Absence for Personal Illness". *See* Def. 56.1 Statement, Ex. N. Plaintiff requested that her injury be classified as a line-of-duty injury and that her two-day absence be excused with pay and without any deduction from her sick leave account. *See id.* Principal Khani approved this application. *See id.* During the week after plaintiff returned to work, she apparently took an additional two days of leave for a colonoscopy. *See* Pl. Aff. at ¶ 10. FN5

Slip Copy, 2006 WL 2482622 (S.D.N.Y.)

**(Cite as: Slip Copy)**

FN5. At this time, plaintiff apparently had an intestinal infection. *See* Pl. Aff. at ¶ 11, Pl. 56.1 Statement, Ex. Q.

**\*3** Principal Khani sent plaintiff a termination letter dated December 2, 2002, which plaintiff received on December 9, 2002. *See* Pl. 56.1 Statement, Ex. C at ¶ 10, Ex. L; Def. 56.1 Statement, Ex. S at ¶ 7, Ex. U. The letter informed plaintiff that December 20, 2002 would be her final day at P.S. 287. *See* Pl. 56 .1 Statement, Ex. K. Thereafter, plaintiff's union representative later spoke to Principal Khani and persuaded him to employ plaintiff as a day-to-day substitute from December 20, 2002 to January 21, 2003.FN6 *See* Def. 56.1 Statement, Ex. Q; Khani Decl. at ¶ 14; Pl. 56.1 Statement, Ex. M. On December 19, 2002, Principal Khani sent a memorandum to plaintiff discussing her employment status. *See* Pl. 56.1 Statement, Ex. N. The memo reiterated that December 20, 2002 would be her last day as an art cluster teacher, but confirmed that the school would continue to employ her until January 31, 2003 as a day-to-day substitute for absent teachers as needed. *See id.* The memo clearly stated that "[a]s of January 31, 2003, [plaintiff's] services at '287 will terminate." *Id.*

FN6. Principal Khani has stated that he agreed to let plaintiff work as a daily substitute until January 31, 2003 so that she would be eligible to receive summer pay. *See* Khani Decl. at ¶ 14.

At bottom, plaintiff contends that the computer lab served as a pretext for Principal Khani to terminate her and that the decision was actually motivated by her race, national origin, and perceived disability. *See* Compl. at ¶¶ 18, 26.FN7 Plaintiff claims that the usual practice of the BOE in such situations is to place teachers "in excess" so that they can be reassigned. *See* Pl. Aff. at ¶ 9; Compl. at ¶ 17. She also claims that Principal Khani or other school employees improperly "classified" her licensing qualifications and seniority and that these errors contributed to her termination. *See* Compl. at ¶ ¶ 19-23. Finally, plaintiff alleges that Principal Khani repeatedly told her to keep her voice down at school

because he did not like her accent and that these comments serve as additional evidence of Principal Khani's bias against her national origin. *See* Pl. Aff. at ¶ 13.

FN7. We note that the complaints plaintiff filed with the EEOC and SDHR contained factual allegations beyond those asserted in her federal complaint. For example, she previously alleged that Principal Khani "harassed" a secretary who wore her hair in dreadlocks and cited various defects in plaintiff's classroom facilities as evidence of discrimination at P.S. 287. *See* Def. 56.1 Statement, Exs. S, V. In reciting the relevant facts, we have focused on the allegations set forth in the federal complaint and plaintiff's affidavit.

On October 8, 2003, plaintiff filed a notice of claim against defendant and the United Federation of Teachers Union with New York City's Office of the Comptroller alleging "discrimination on the basis of disability, national origin, sex, wrongful termination, and union contract matters." Def. 56.1 Statement at ¶ 24, Ex. R. On October 14, 2003, plaintiff filed a charge of discrimination against the defendant with the Equal Employment Opportunity Commission ("EEOC"). *See* Def. 56.1 Statement, Ex. S. On October 31, 2003, the EEOC notified plaintiff that it would not investigate her claim because it was untimely, but notified her of her right to sue. Def. 56.1 Statement, Ex. T. On November 18, 2003, plaintiff filed a complaint against the defendant with the New York State Division of Human Rights ("DHR"). *See* Def. 56.1 Statement, Ex. V. On March 9, 2004, DHR sent plaintiff a determination explaining that their investigation had yielded no evidence to support plaintiff's allegations of discrimination. *See* Def. 56.1 Statement, Ex. W. On April 30, 2004, the EEOC informed plaintiff that it was adopting DHR's findings and again notified her of her right to sue. Def. 56.1 Statement, Ex. X. Plaintiff filed the complaint in this action on July 28, 2004.

DISCUSSION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 2482622 (S.D.N.Y.)
**(Cite as: Slip Copy)**

### I. Standard of Review

**\*4** Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of showing that no disputes of material fact exist. *See, e.g., Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998). To successfully oppose such a motion, a nonmoving party must affirmatively set forth facts showing that there is a genuine issue for trial. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U .S. 242, 256 (1986). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Entry of summary judgment is required when a nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In resolving such motions, we "resolve all ambiguities and draw all factual inferences in favor of the nonmoving party." *Nora Beverages,* 164 F.3d at 742 (quoting *Adams v. Dep't Juvenile Justice of the City of New York,* 143 F.3d 61, 65 (2d Cir.1998)).

Finally, we are mindful of case law establishing that "trial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 87 (2d Cir.1996)(citing cases); *see also Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 448 (2d Cir.1999)("[E]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law."). However, this does not absolve the plaintiff from the responsibility of producing sufficient evidence from which a reasonable jury could return a verdict in her favor. *See Anderson,* 477 U.S. at 249.

### II. Title VII and ADA Claims

Prior to commencing a federal lawsuit alleging employment discrimination in New York, plaintiffs must file their claims with the EEOC no later than 300 days after the allegedly discriminatory action. *See* 42 U.S.C. § 2000e-5(e)(1); *Pikulin v. City Univ. of New York,* 176 F.3d 598, 599 (2d Cir.1999); *Ford v. Bernard Fineson Dev. Ctr.,* 81 F.3d 304, 307 (2d Cir.1996). This requirement applies to both ADA and Title VII claims. *See* 42 U.S .C. § 12117(a); *Harris v. City of New York,* 186 F.3d 243, 247-48 (2d Cir.1999). Where a plaintiff fails to file a claim with the EEOC within the allotted period, the federal action is time-barred. *See, e.g., Zerilli-Edelglass v. New York City Transit Auth.,* 333 F.3d 74, 81 (2d Cir.2003).

**\*5** "It has long been settled that a claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct." *Flaherty v. Metromail Corp.,* 235 F.3d 133, 137 (2d Cir.2000) (citing *Delaware State Coll. v. Ricks,* 449 U.S. 250, 258 (1980)). In this case, defendant contends that plaintiff's Title VII and ADA claims accrued on December 9, 2002 when she received the first termination letter from Principal Khani. *See* Def. Mem. at 2-3. Plaintiff contends that the second memoranda from Principal Khani, which informed her that P.S. 287 would continue to employ her as a day-to-day substitute through January 31, 2003, "superceded" the first termination letter and that December 19, 2002 is therefore the relevant accrual date. *See* Pl. Mem. at 10.

In discriminatory discharge cases, "the time for filing a claim with the EEOC starts running on the date when the employee receives a definite notice of the termination, not upon his discharge." *Flaherty,* 235 F.3d at 137 (quoting *Miller v. Int'l Telephone & Telegraph Corp.,* 755 F.2d 20, 23 (2d Cir.1985)) (internal quotation marks omitted); *see also Trenchfield v. Dupont Photomasks, Inc.,* 96 Civ. 1135(AGS), 1997 WL 53238, at \*5 (S.D.N.Y. Feb. 7, 1997) (finding that Title VII claim accrued on date of receipt of termination letter); *Sharpe v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*American Express Co., 689 F.Supp. 294, 298-99 (S.D.N.Y.1988)* (holding that 300-day filing period for Title VII claim began to run when plaintiff received notice that his position was being eliminated, not three months later when his employment actually terminated).

Applying Second Circuit case law to the undisputed facts of this case, we find that plaintiff received definite notice of her termination on December 9, 2002, the date she concedes that she received the termination letter. *See* Pl. 56.1 Statement, Ex. C at ¶ 10; Def. 56.1 Statement, Ex. S at ¶ 7, Ex. U. In the letter, Principal Khani unambiguously informed plaintiff that her employment at P.S. 287 was going to be terminated. Principal Khani wrote that he "regret[ted] to inform [plaintiff] that this art cluster position will terminate as of 3:00 P.M. on Friday, December 20th" and suggested that she "begin inquiring about a position elsewhere, as soon as possible." Pl. 56.1 Statement, Ex. K. The fact that plaintiff's final day of employment at P.S. 287 was later changed to January 31, 2003 does not change the fact that she received notice of a final termination decision on December 9, 2002. Accordingly, plaintiff had until October 5, 2003, which is 300 days from December 9, 2002, to file a charge with the EEOC. However, plaintiff waiting until October 14, 2003 to file her claims with the EEOC, and the EEOC specifically found that her claims were untimely. *See* Pl. 56.1 Statement at ¶ 6, Def. 56.1 Statement, Exs. S, T. Because plaintiff did not file her claims with the EEOC in a timely manner, her Title VII and ADA claims in this action are also time-barred.

### III. Section 1981 Claim

**\*6** To establish a Section 1981 claim, the plaintiff must show: "(1) that she is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendants; and (3) that the discrimination concerned one or more of the activities enumerated in § 1981." *Lautere v. Int'l Business Machines Corp., 216 F.3d 258, 261 (2d Cir.2000)*. When the defendant sued under Section 1981 is a municipality or municipal agency, a plaintiff must

also show that the claimed violations of his or her constitutional rights occurred as a result of a municipal policy or custom. *See Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir.2004)*. Under the standard articulated in *Monell v. New York City Dep't of Soc. Services, 436 U.S. 658, 694 (1978)*, a municipal policy exists where "(1) the [c]ity has promulgated a formal rule advocating or supporting the contested conduct, or (2) a single act is taken by a municipal employee who, as a matter of state law, has final policymaking authority in the area in which the action was taken." *Edwards v. City of New York, 03 Civ. 9407(PAC), 2005 WL 3466009, at \*10 (S.D.N.Y. Dec. 19, 2005)* (quoting *Davis v. City of New York, 228 F.Supp.2d 327, 336-37 (S.D.N.Y.2002)*) (internal quotation marks omitted). A custom exists where the applicable practice is "so widespread as to have the force of law." *Board of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997)* (citing *Monell, 436 U.S. at 690-91)*. Such a custom need not have formal approval, but plaintiff must demonstrate that it is a continuing practice. *See Davis, 228 F.Supp.2d at 337* (citing *City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)*).

Reading the complaint generously, plaintiff appears to allege that her termination in December 2002 amounted to discrimination violating Section 1981 because teachers in similar situations were commonly placed "in excess" rather than being terminated. *See* Compl. at ¶ 17-18. Defendant contends that plaintiff has brought forward no evidence whatsoever to permit a reasonable jury to conclude that her termination was pursuant to a policy, practice or custom, or otherwise meets the *Monell* standard. *See* Def. Mem. at 11. After carefully searching the record, we agree and therefore dismiss plaintiff's Section 1981 claim. *See Miller v. New York City Health & Hosp. Corp., 00 Civ. 140(PKC), 2005 WL 2022016, at \*4 (S.D.N.Y. Aug. 22, 2005)* (granting summary judgment on Section 1981 claim because plaintiff provided no evidence of municipal policy or custom); *Hawkins v. City of New York, 99 Civ. 11704(RWS), 2005 WL 1861855, at \*17 (S.D.N.Y. Aug. 4, 2005)* (same); *Richards v. Calvet, 99 Civ. 12172(RJH),*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 743251, at *13 (S.D.N.Y. Mar. 31, 2005) (same).

### IV. Non-Federal Claims

Having concluded that plaintiff's Title VII, ADA, and Section 1981 claims must be dismissed, we decline to exercise supplemental jurisdiction over plaintiff's remaining claims under the New York State Human Rights Law and the New York City Human Rights Law. *See* 28 U.S.C. § 1367(c)(3); *Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 55-57 (2d Cir.2004).FN8

> FN8. We do not reach defendant's remaining arguments.

### CONCLUSION

**\*7** For the reasons set forth above, defendant's motion for summary judgment is granted. The Clerk of the Court is respectfully requested to close this case.

IT IS SO ORDERED.

S.D.N.Y.,2006.
John v. New York City Dept. of Educ.
Slip Copy, 2006 WL 2482622 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 3**

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2003 WL 22004841 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 233
**(Cite as: Not Reported in F.Supp.2d)**

Porter v. New York University School of Law
S.D.N.Y.,2003.

United States District Court,S.D. New York.
Carlton PORTER, Plaintiff,
v.
NEW YORK UNIVERSITY SCHOOL OF LAW,
Frank Conti, and Leonard Pisano, Defendants.
**No. 99 Civ. 4693(TPG).**

Aug. 25, 2003.

Employee brought action against his former employer for disability discrimination and violation of Family and Medical Leave Act (FMLA). Upon employer's motion for summary judgment, the District Court, Griesa, J., held that: (1) employer did not willfully violate employee's right to seek leave under FMLA; (2) employee was not entitled to FMLA leave; (3) disability discrimination claims were time-barred; and (4) employee was not subjected to illegal discrimination under either the New York Human Rights Law or the N.Y.C. Administrative Code.

Motion granted.

West Headnotes

**[1] Labor and Employment 231H ⟜359**

231H Labor and Employment
  231HVI Time Off; Leave
    231Hk353 Terms and Conditions of Leave
      231Hk359 k. Medical Certifications. Most Cited Cases
    (Formerly 78k1501)

**Labor and Employment 231H ⟜386**

231H Labor and Employment
  231HVI Time Off; Leave
    231Hk381 Actions
      231Hk386 k. Defenses; Time to Sue. Most Cited Cases
    (Formerly 78k1501)
Employer did not willfully violate employee's right

to seek leave under the FMLA by seeking a second medical opinion, but not a third one; thus, employee was not entitled to the Act's three-year statute of limitations. Family and Medical Leave Act of 1993, §§ 103, 107(c), 29 U.S.C.A. §§ 2613, 2617(c).

**[2] Labor and Employment 231H ⟜367(4)**

231H Labor and Employment
  231HVI Time Off; Leave
    231Hk361 Rights of Employee; Violations
      231Hk367 Reinstatement; Restoration
        231Hk367(4) k. Exemptions and Exceptions in General. Most Cited Cases
    (Formerly 78k1231)
Since employee did not take FMLA leave, he was not entitled under Act to be restored to his position upon return from sick leave. Family and Medical Leave Act of 1993, § 104(a)(1), 29 U.S.C.A. § 2614(a)(1).

**[3] Labor and Employment 231H ⟜359**

231H Labor and Employment
  231HVI Time Off; Leave
    231Hk353 Terms and Conditions of Leave
      231Hk359 k. Medical Certifications. Most Cited Cases
    (Formerly 78k1231)
Employee was not entitled to FMLA leave where he offered no evidence challenging the results of medical exam that found him able to return to work. Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq.

**[4] Limitation of Actions 241 ⟜58(1)**

241 Limitation of Actions
  241II Computation of Period of Limitation
    241II(A) Accrual of Right of Action or Defense
      241k58 Liabilities Created by Statute
        241k58(1) k. In General. Most Cited Cases
Employer's letter to employee could not be considered an instance of disability discrimination

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2003 WL 22004841 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 233
**(Cite as: Not Reported in F.Supp.2d)**

which was part of a "continuing violation" so as to extend three-year limitations period for bringing disability discrimination claim under the New York Human Rights Law and city administrative code; letter merely notified employee that repeated absences from work had to be substantiated by a medical doctor's report attesting to his inability to perform his duties, and warned employee of consequences of failure to produce documentation but did not result in disciplinary action. N.Y. Executive Law § 296(1)(a); N.Y. CPLR § 214(2); New York City Administrative Code, § 8-107(1)(a).

**[5] Civil Rights 78 ⟲1218(4)**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1218 Who Is Disabled; What Is Disability
                78k1218(4) k. Employment Qualifications, Requirements, or Tests. Most Cited Cases

**Civil Rights 78 ⟲1225(4)**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1225 Accommodations
                78k1225(4) k. Requesting and Choosing Accommodations; Interactive Process; Cooperation. Most Cited Cases
Employee was not part of the class of persons covered by provisions of New York Human Rights Law and city administrative code prohibiting disability discrimination where he contended that he was unable to perform any work whatsoever when employer dismissed him and sought no reasonable accommodation of his disability that would allow him to return to work. N.Y. Executive Law § 296(1)(a); New York City Administrative Code, § 8-107(1)(a).

**[6] Civil Rights 78 ⟲1218(3)**

78 Civil Rights
    78II Employment Practices

78k1215 Discrimination by Reason of Handicap, Disability, or Illness
    78k1218 Who Is Disabled; What Is Disability
        78k1218(3) k. Particular Conditions, Limitations, and Impairments. Most Cited Cases

**Civil Rights 78 ⟲1221**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1221 k. Motive or Intent; Pretext. Most Cited Cases
Employee did not have a cause of action under New York Human Rights Law and city administrative code for disability discrimination, absent evidence that he suffered a disability at the time of his termination and that it was more likely than not that employer's decision was at least in part motivated by discrimination. N.Y. Executive Law § 296(1)(a); New York City Administrative Code, § 8-107(1)(a).

**[7] Civil Rights 78 ⟲1218(4)**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1218 Who Is Disabled; What Is Disability
                78k1218(4) k. Employment Qualifications, Requirements, or Tests. Most Cited Cases
Even if employee had provided evidence that he suffered from a disability at the time of his termination, he did not have a cause of action under New York Human Rights Law and city administrative code for disability discrimination where he claimed that he was unable to work at all. N.Y. Executive Law § 296(1)(a); New York City Administrative Code, § 8-107(1)(a).

*OPINION*

GRIESA, J.

**\*1** Plaintiff Carlton Porter, Jr. claims that defendant New York University School of Law ("NYU") wrongfully terminated his employment following a

Not Reported in F.Supp.2d                                                                                           Page 3
Not Reported in F.Supp.2d, 2003 WL 22004841 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 233
**(Cite as: Not Reported in F.Supp.2d)**

work-related back injury. Porter brought this law-suit against NYU, Frank Conti, and Leonard Pisano. Conti and Pisano were plaintiff's supervisors at NYU.

Plaintiff asserts causes of action for failure to restore him to his position as a security guard following medical leave, in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2612 et seq., and for disability discrimination in violation of the New York Human Rights Law, N.Y. Executive Law § 296(1)(a), and the New York City Administrative Code, § 8-107(1)(a).

Defendants NYU and Conti move for summary judgment claiming that plaintiff's claims are barred by their respective statutes of limitations. They also argue that, even if the claims are not time-barred, they present no triable issues of fact. The court has examined both the statute of limitations issues and the merits. Defendants are entitled to summary judgment on all issues.

It should be noted that NYU states that Pisano does not join in the present motion. Apparently, Pisano left NYU's employ in 1996. NYU claims that there is no evidence that Pisano has been served with a complaint. Porter's brief is silent on this issue. Court records indicate that a complaint was served on Pisano on July 8, 1999 by delivering a copy of the summons and complaint to a person authorized to accept service for NYU. A copy was also mailed to Pisano at NYU. NYU previously submitted both an Answer and a Local Rule 1.9 Statement on behalf of all defendants on July 23, 1999. Counsel for NYU has repeatedly stated in previous correspondence to the court that it represents the defendants. Summary judgment should be granted for all defendants and the case dismissed.

*Facts*

Porter began work as a security guard at NYU in August 1993. It is apparent from work records submitted by defendant that Porter was warned on several occasions before his injury about incidents of tardiness and absenteeism. Porter disputed those incidents, and no disciplinary action appears to have

been taken with regard to them. The present case concerns incidents that occurred after Porter injured his back in January 1995. NYU dismissed Porter on July 2, 1996 citing Porter's alleged abuse of sick leave and, secondarily, his allegedly poor attendance. Porter argues that he was entitled to medical leave under the FMLA. He contends that the real reason for his dismissal was discrimination against him on account of his alleged disability, caused by his injury. It is therefore necessary to discuss in some detail both his work record following this injury and his application for FMLA leave.

(1) Plaintiff's Work Record

On January 13, 1995 Porter suffered a back injury after falling at work. He was sent from NYU's health center to St. Luke's Hospital, where an emergency room doctor examined him. As a result of his injuries, he did not immediately return to work.

*2 Exactly when Porter returned to work is unclear. Records indicate that he received worker's compensation benefits from the date of the injury until April 12, 1995. Porter states in his affidavit that he returned to work on that date. Internal memoranda between Conti and Rinko Hemnes, NYU's human resources manager, conflict with the worker's compensation records and Porter's affidavit. One memorandum dated April 19, 1995 indicates that Porter returned from sick leave on March 9, 1995 but had accumulated numerous absences since his return.

On April 23, 1995 Porter again stopped reporting to work, apparently on the advice of his doctor. NYU's records indicate that he received worker's compensation until he returned to work on May 24, 1995. No medical records have been submitted by the parties regarding this period of time. Porter's doctor sent NYU a note dated May 22, 1995 that stated: "Mr. Carlton Porter has been under my care for the past month. He has improved greatly and can return back to work May 23, 1995 with no limitations. He will still be receiving treatment 3 x week." This note was followed by a second note dated May 24, 1995 that stated: "Mr. Carlton Porter

Not Reported in F.Supp.2d                                                                              Page 4
Not Reported in F.Supp.2d, 2003 WL 22004841 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 233
**(Cite as: Not Reported in F.Supp.2d)**

is able to return back to work today May 24th 1995. His diagnosis is low back pain and para spinal muscle spasm. His prognosis has improved greatly."

On June 16, 1995 Pisano, the Associate Director for NYU's facilities, wrote to Porter. This letter is at the root of Porter's claim of disability discrimination. Porter contends that it is evidence of ongoing discrimination against him that culminated in his termination. In relevant part, the letter said:

It has been brought to my attention that your attendance has not improved. Your record indicates you have used all your allotted sick time and vacation time.... All absences since your return from disability must be substantiated by a medical doctor's report attesting to your inability to come to work and perform your duties. I must receive this report no later than Friday, June 23, 1995. Failure to produce this documentation will result in disciplinary action due to abuse of sick leave.

Porter replied in a long letter dated June 23, 1995. Plaintiff stated that he had been "placed on disability" from April 23, 1995 "after sustaining a back injury while on duty." This appears to be a reference to Porter's injury in January. Porter stated that his disability leave ended on May 24, 1995 and that it was therefore inappropriate to count his accrued vacation time against that period of absence. Plaintiff also contested other absences after May 24 that Pisano alleged in his letter. No disciplinary action appears to have resulted from this exchange and it appears that plaintiff continued to work in his regular capacity and without incident through the remainder of 1995.

(2) Plaintiff's FMLA Application

Sometime in 1996 Porter began to visit a chiropractor, Dr. Matthew Pantofel. Porter states that he re-injured his back while at work on March 18, 1996. It is unclear whether Porter's chiropractic visits preceded this new injury or were prompted by it. On March 27, 1996 plaintiff ceased reporting to work and again collected worker's compensation. Records indicate that plaintiff received worker's

compensation until June 4, 1996.

**\*3** Porter's worker's compensation benefits were cut off on that date because a medical examination showed him fit to return to work. This same medical examination was also used to evaluate an application Porter made for medical leave under the FMLA. The details of the application are as follows.

On April 10, 1996 Porter submitted a note from Dr. Pantofel to NYU. The note reads in full:

Carlton Porter was in my office today for treatment of injuries sustained on 1-13-95. He continues to come in for treatment every day. At this time he is unable to work until further notice.

There is some dispute about how Porter submitted this note to NYU, but no dispute that NYU received it. Porter states that he gave the note to his immediate supervisor, Sergeant Joseph Quinlivan. NYU has submitted a declaration by Quinlivan in which he states that he does not recall receiving anything from Porter. A declaration has also been submitted for Margaret Beattie, a benefits coordinator for NYU. She states that Porter sent the letter by fax. Beattie also states that she spoke to Porter by phone that same day. Such a conversation is corroborated by handwritten notes dated April 10 that Beattie apparently made following the call. In any event, plaintiff submitted the letter to NYU.

According to her notes, Beattie also spoke by phone with Porter on the following day, April 11. Her notes state:

I *did* tell him it appears that letter was not adequate for purposes of establishing his current medical/disability status. Told him Risk Mgt. must receive full detailed report from physician *and* to call P. Lazarus at Risk asap for further instructions, etc.

(Emphasis in original.) "Risk Mgt." refers to Risk Management Planning Group, NYU's worker's compensation insurance carrier. Peggy Lazarus is an employee of Risk Management Planning Group. Porter does not refer to this conversation in his statement of issues of material facts in dispute.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 22004841 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 233
**(Cite as: Not Reported in F.Supp.2d)**

Beattie instructed NYU's human resources manager, Rinko Hemnes, to send Porter an "FMLA Kit" and such a kit was sent. The kit contained a Request for Leave of Absence form, Certification of Physician or Practitioner form, a summary of FMLA rights, a set of instructions and the FMLA statutory definition of a "serious health condition." The court has been provided copies of these forms but not of the general instructions.

On April 12, 1996 Conti wrote to Porter to confirm that he had "notified the University's Benefits Office of your need to take medical leave due to a serious medical condition that makes you unable to perform the essential functions of your job." The letter directly referred to the FMLA and directed plaintiff as follows:
Please complete Section 1 and sign the enclosed Request for Leave of Absence, attach the Certification of Physician or Practitioner completed and signed by your attending Physician/Practitioner, and return to me by Monday, May 6, 1996. (The note from your practitioner faxed to the Benefits Office does not contain the probable duration of condition and detailed regimen of treatment to be prescribed, and is deemed insufficient by the Benefits Office as verification of your disability.)

**\*4** The letter further stated that Porter would have to notify NYU prior to each injury-related absence unless he provided notice of the specific period his physician advised him to remain away from work.

On May 8, 1996 Conti sent Porter a second letter that reiterated these instructions. The letter further warned that "Without these forms, we will not be able to process your request for leave, and this will leave us with no choice but to treat your absence as unauthorized, and to terminate your employment."

On May 15, 1996 plaintiff submitted the Request for Leave of Absence and the Certification of Physician or Practitioner. However, Porter left the Request for Leave of Absence form incomplete. He did not indicate the reason for his requested FMLA leave from among the options listed on the form. The Certificate of Physician or Practitioner is

signed by both plaintiff and his chiropractor and dated May 15, 1996. A box was marked indicating that plaintiff was unable to perform work of any kind. The date plaintiff's condition commenced was given as January 13, 1995. The probable duration of the condition was stated to be three to six months. A regimen of chiropractic treatment was prescribed over the course of 20-28 weeks. Porter does not appear to have sent the "full, detailed report" that Beattie requested from his physician on April 11.

On May 16, 1996 Conti informed plaintiff by letter that "the University does not consider the information provided by your chiropractor on the Certification of Physician or Practitioner to be satisfactorily substantiating your inability to perform the essential functions of your job." The letter informed plaintiff that a physical examination by a different chiropractor had been scheduled for him. The letter further stated that approval of Porter's FMLA application would depend on that examination:
If we deem the report from the Risk Management to be satisfactorily substantiating your inability to perform the essential functions of your job, your leave that started on March 19, 1996 will be approved for the period of up to 12 weeks as your FMLA (Family Medical Leave Act) entitlement.

Porter underwent a physical examination on June 4, 1996 by Dr. Charles Sallahian. Sallahian was a chiropractor retained by Risk Management Planning Group. Dr. Sallahian's report stated that Porter was fit to return to his duties as a security guard.

At his deposition, Porter admitted to having received a copy of this report. He also received a telephone call from Lazarus at Risk Management. Porter states in his affidavit:
On June 6, 1996, I received a call from Ms. Peggy Lazarus from Risk Management Planning Group. She told me that Dr. Sallahian determined that I could return to work. In addition, she informed me that my Worker's Compensation benefits would cease due to the report. In this conversation I explained to Ms. Lazarus that my doctor, Dr. Pantofel, had advised me differently. Ms. Lazarus told

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22004841 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 233
**(Cite as: Not Reported in F.Supp.2d)**

me that I could submit more documentation if I wished, to substantiate my claim. She never mentioned to me the status of my FMLA claim or the final determination by NYU not to approve my leave. Ms. Lazarus never spoke to me about FMLA or my claim. On June 20, 1996, I faxed Dr. Pantofel's report to Lazarus.

**\*5** On June 20, Porter faxed Lazarus the original Certification form completed by Dr. Pantofel, which NYU had already received with Porter's application. Porter states that despite frequent telephone messages left for Lazarus, his calls were not returned. NYU has submitted declarations by Conti and Hemnes saying that Porter did not return their calls to them.

Following the June 4 medical examination, Porter did not return to work or submit any new documents to support his FMLA claim. On July 2, 1996 plaintiff received a termination letter from Conti. It reads in full:
This is to inform you of our decision to terminate your employment effective today due to your inability to return to work from your sick leave. Your prior record of attendance was also taken into consideration.

Plaintiff filed a grievance with his union. On the basis of a collective bargaining agreement, the matter was sent to arbitration. On May 28, 1998 the arbitrator held that he lacked jurisdiction to decide the matter upon its merits because the collective bargaining agreement had expired on June 30, 1996, two days prior to plaintiff's letter of termination.[FN1]

> [FN1.] Although the arbitrator briefly summarized the facts of the matter in his opinion, it would be inappropriate to utilize his record. It is unclear if the arbitrator relied on the same or similar submissions to compile his record as were submitted in this litigation. The arbitrator stated that "there is little dispute about the facts of the case." However, in briefing this motion plaintiff has submitted a detailed statement of ma-

terial facts in dispute, suggesting that such an observation may no longer be accurate. The court should make its own findings of fact.

*Discussion*

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the moving party's burden to show that no genuine factual dispute exists. *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When ruling on a summary judgment motion, a court must construe the facts in the light most favorable to the nonmovant and must resolve all ambiguities and draw all reasonable inferences against the movant." *Byam v. Barnhart,* 324 F.3d 110, 117 (2d Cir.2003).

(1) The FMLA Claim

(a) Statute of Limitations

The statute of limitations for violation of rights protected by the FMLA is two years after the date of the last event constituting the alleged violation, or three years after the date of the last event constituting a "willful" violation of section 2615 of the FMLA. 29 U.S.C. § 2617(c). Section 2615 makes it unlawful for any employer to interfere with an employee's exercise of leave or to discriminate against an employee for opposing such interference. 29 U.S.C. § 2615. The word "willful" is not defined in the statute. However, both parties refer to *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), in which the Supreme Court defined the term as used in the statute of limitations for the Fair Labor Standards Act to mean an employer who "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."

Porter alleges that NYU willfully interfered with his application for medical leave under the FMLA. Porter argues that his lawsuit, filed June 29, 1999,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22004841 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 233
**(Cite as: Not Reported in F.Supp.2d)**

is timely because it was filed within three years of the last event constituting the alleged violation, his termination on July 2, 1996. Porter alleges that NYU willfully violated his attempts to secure FMLA leave in three ways: (1) NYU failed to explain why his application was insufficient and did not permit him to submit more materials to support it; (2) NYU failed to schedule a third medical examination for him; (3) NYU failed to notify him of the status of his FMLA application before terminating him.

**\*6** These allegations all relate to certain procedures that an employer must follow under the FMLA to determine an employee's application for leave. The employer may require an employee to support his request for leave with certification issued by his health care provider. 29 U.S.C. § 2613(a). If the employer adopts such a requirement, the certification must state the date on which the serious health condition commenced, its probable duration, medical facts regarding the condition, and that the employee is unable to perform his job. 29 U.S.C. § 2613(b). A Department of Labor regulation describes an employer's responsibility to its employee regarding such certification:

At the time the employer requests certification, the employer must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification. The employer shall advise an employee whenever the employer finds a certification incomplete, and provide the employee a reasonable opportunity to cure any such deficiency.

29 C.F.R. § 825.305(d). The certification may be corroborated by the opinions of other health care providers approved by the employer:In any case in which the employer has reason to doubt the validity of the certification provided [by the employee], the employer may require, at the expense of the employer, that the eligible employee obtain the opinion of a second health care provider designated or approved by the employer ...

29 U.S.C. § 2613(c)(1). The FMLA also provides for a third medical opinion to resolve disputes:In

any case in which the second opinion ... differs from the opinion in the original certification provided [by the employee], the employer may require, at the expense of the employer, that the employee obtain the opinion of a third health care provider ...

29 U.S.C. § 2613(d)(1). If a third opinion is obtained, it "shall be considered to be final and shall be binding" on the employer and employee. 29 U.S.C. § 2613(d)(2).

There is no basis for Porter's first allegation, that NYU failed to explain why his application was insufficient and did not permit him to submit more materials to support it. NYU met all of its obligations to assist Porter in his application for FMLA leave. Porter sought to begin the process on April 10 by faxing a note from his chiropractor to NYU. On April 11, NYU told Porter by phone why the doctor's note was insufficient to justify FMLA leave. A "full, detailed report" was requested by NYU. NYU promptly sent Porter an FMLA application that included a certification form for his doctor to complete and general instructions. NYU sent a letter dated April 12, which again explained in writing that the chiropractor's note had been deemed insufficient to verify his alleged disability, and that it lacked information on the probable duration and treatment of his condition. On May 8, NYU advised Porter in writing of the potential consequences, including termination, of his failure to provide adequate certification.

**\*7** On May 16, the day after Porter submitted his FMLA application, NYU sent him a letter stating that his Physician's Certification did not provide information showing that Porter could not perform his job. As noted above, although Porter's doctor certified him unable to work, this certification stated that Porter's condition commenced in January 1995 and had a probable duration of three to six months. However, the certification was submitted seventeen months after the condition commenced, in May 1996. NYU, exercising its right under 29 U.S.C. § 2613(c)(1) to obtain a second medical examination, scheduled such an exam for June 4.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22004841 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 233
**(Cite as: Not Reported in F.Supp.2d)**

NYU told Porter that approval of his application was contingent on the results of this examination.

As Porter stated in his affidavit, he was told by telephone that the medical examination determined that he could return to work. In addition, he was told that his worker's compensation benefits would cease. When Porter stated that his own doctor had given him different advice, he was informed that he could submit more documentation to substantiate his claim if he so desired. Although Porter states that no mention was made of his FMLA claim during this telephone call, he had already been informed that his application would be granted only if the medical examination showed him unfit to work. Each party accuses the other of failing to return subsequent telephone calls. However, there is no evidence that Porter attempted to submit additional documentation to NYU beyond faxing his previously submitted certification a second time. Viewed in the light most favorable to plaintiff's claims, NYU cannot be said to have willfully violated plaintiff's right to be advised "whenever the employer finds a certification incomplete, and provide the employee a reasonable opportunity to cure any such deficiency." 29 C.F.R. § 825.305(d).

[1] Plaintiff's second contention, that NYU was obliged to obtain a third medical examination to resolve conflicts between the certification that Porter submitted and the June 4 medical examination, is without basis in law. As noted above, section 2613 of the FMLA states that an employer "may require" a second or third medical opinion. The Fourth, Seventh, and Eighth Circuits have all held that this language is permissive, not mandatory, and that therefore an employer is not required to seek a second, let alone a third opinion, before challenging the validity of an employee's certification. *Rhoads v. Federal Deposit Ins. Corp.*, 257 F.3d 373, 386 (4th Cir.2001)("Because the term 'may' is permissive, the plain language of the statute indicates that an employer who questions the validity of a certification has the option of seeking a second and third opinion, without being required to do so."); *Stekloff v. St. John's Merce Health Sys.*, 218 F.3d 858, 860 (8th Cir.2000)("We do not read § 2613(c)(1) as re-

quiring an employer to obtain a second opinion or else waive any future opportunity to contest the validity of the certification."); *Levine v. Children's Museum of Indianapolis, Inc.*, No. 02 Civ. 3013, 2003 WL 1545156, at *2 (7th Cir.2003)(unpublished order holding "may require" to be permissive, not mandatory language).

**\*8** Porter cites *Sims v. Alameda-Contra Costa Transit District*, 2 F.Supp.2d 1253, 1263 (N.D.Cal. Apr.9, 1998). That district court determined the phrase "may require" to be ambiguous. The court therefore looked to the legislative history, policy objectives, and structure of the FMLA to interpret the language as mandatory. No circuit court that has examined this section of the statute, however, has found any such ambiguity. Thus, there is no reason to reach beyond the plain language of the statute for an alternative interpretation. *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461-62, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002).

NYU did not willfully violate Porter's right to seek leave by seeking a second medical opinion, but not a third one.

Plaintiff's third contention, that NYU failed to notify Porter about his FMLA status before he was terminated, is also meritless. On May 16, NYU told Porter that his application for FMLA leave would depend on the results of his examination by Dr. Sallahian. On June 6, NYU told Porter by phone that the examination showed him fit to return to work. Porter stated at his deposition that he received a copy of Sallahian's report and understood it to conclude that he was able to return to work. As noted above, although Porter alleges that no mention was made of his FMLA application during the June 6 call, he had previously been informed that his application depended on the results of this examination. NYU cannot be said to have willfully failed to notify Porter of the status of his application.

Porter fails to demonstrate any "willful violation" by NYU of his rights under the FMLA that would entitle him to the Act's three-year statute of limitations. Porter's cause of action under the FMLA is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22004841 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 233
**(Cite as: Not Reported in F.Supp.2d)**

barred by the statute of limitations.

### (b) Violation of the FMLA

Although the FMLA claim is barred by the statute of limitations, the court will examine the claim on its merits, and here again defendants are entitled to dismissal.

In relevant part, the FMLA provides that "... an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period ... because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The parties do not dispute that Porter is an eligible employee under the statute. A serious health condition is an illness, injury, impairment, or physical or mental condition that involves inpatient care in specified institutions or continuing treatment by a health care provider. 29 U.S.C. § 2611(11); 29 C.F.R. § 825.114. On return from such leave, an employee is entitled to return to his original position of employment or an equivalent position. 29 U.S.C. § 2614(a)(1).

[2] Porter alleges that NYU "wilfully refused to restore plaintiff to his original position" of employment in violation of 29 U.S.C. § 2614(a)(1). Section 2614, as noted above, provides that any eligible employee is entitled to be restored to his original or equivalent position of employment after taking leave. Porter did not take FMLA leave. He is therefore not entitled to be restored to his position.

*9 [3] Porter's complaint might be interpreted to allege that he was improperly denied FMLA leave to which he was entitled. However, Porter offers no evidence challenging the results of the June 4 medical exam that found him able to return to work. Porter's brief and his Rule 56.1 statement state only that he informed Ms. Lazarus during their June 6 telephone conversation that his own doctor had "advised me differently." By his own admission, Porter was told he could submit further documentation to substantiate this claim. He never did so. In opposition to this motion for summary judgment, Porter still does not provide any evidence to contest

the conclusion of the most recent doctor to examine him that he was fit to work and thus ineligible for FMLA medical leave. Viewed in the light most favorable to Porter, his vague assertion is inadequate to meet Porter's burden to "set forth specific facts showing that there is a genuine issue for trial." F.R. Civ. P. 56(e); Celotex, 477 U .S. at 324.

Porter instead alleges only that NYU violated the FMLA by failing to notify him of deficiencies in his application and by failing to provide a third medical examination. These arguments have already been considered above and are without merit.

### (2) The State Law Discrimination Claims

#### (a) Statute of Limitations

Porter alleges that he was threatened with disciplinary action and then terminated on account of a disability that resulted from his injury. Porter's lawsuit for disability discrimination is brought under the New York Human Rights Law, N.Y. Executive Law § 296(1)(a), and the New York City Administrative Code, § 8-107(1)(a). Both statutes are governed by a three-year statute of limitations that begins to run from the time the plaintiff first becomes aware of the discriminatory act of which he complains. N.Y. CPLR § 214(2) (McKinney Supp.2002).

Porter alleges that his termination was "a continuation of defendants [sic] policy of harassment and discrimination" towards him. Porter alleges that the first act of discrimination on account of his disability was the June 16, 1995 letter from his supervisor, Leonard Pisano, which threatened disciplinary action for abuse of sick leave. This act took place more than three years prior to the filing of this lawsuit. However, Porter argues that the statute of limitations should be extended under the "continuing violation" doctrine because his termination on July 2, 1996 was the culmination of ongoing discrimination.

Under the continuing violation doctrine, "if a plaintiff has experienced a continuous practice and

Case 1:07-cv-05871-DC          Document 6-2          Filed 08/06/2007          Page 26 of 84

policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir.2001)(internal quotation marks omitted). A continuing violation may be found where "specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Id.* Porter argues that because his July 2 letter of termination referred both to his inability to return to work from sick leave and to his prior record of attendance, it was an act of discrimination related to the June 1995 letter concerning Porter's alleged abuse of sick policy. These two letters are the only instances alleged by Porter to constitute a policy by NYU of harassment and discrimination against him.

**\*10** [4] The June 1995 letter cannot be considered an instance of disability discrimination. The letter merely notified Porter that repeated absences from work "must be substantiated by a medical doctor's report attesting to your inability to come to work and perform your duties." The letter warned Porter that "[f]ailure to produce this documentation will result in disciplinary action due to abuse of sick leave." As noted above, Porter responded with a lengthy letter in response that asserted that his absences were proper. No disciplinary action resulted from the exchange and Porter worked without incident the remainder of that year. Thus, even were the letter to be viewed as an instance of disability discrimination, it could hardly be considered to have continued "unremedied." *Fitzgerald,* 251 F.3d at 359. Furthermore, these events are too isolated in time to constitute a "continuous practice and policy of discrimination." *See e.g. Quinn v. Green Tree Credit Corp. .,* 159 F.3d 759, 766 (2d Cir.1998)(refusing to apply continuing violation doctrine to incidents of sexual harassment that occurred twice in 1988, once in 1989 and once in 1990).

The continuing violation doctrine is inapplicable to plaintiff's allegations of disability discrimination. Plaintiff's causes of action for disability discrimination are barred by the statute of limitations.

(b) Disability Discrimination

Again the court will examine the merits, even though the state law claim is time-barred.

The New York Human Rights Law on disability discrimination states, in relevant part:
It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of the ... disability ... of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law § 296(1). Similarly, the New York City Administrative Code states:1. Employment. It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived ... disability ... of any person to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y.C.Code § 8-107.

The meaning of "disability" under both statutes is limited. "In order to be within the class of persons covered by either the state or the city provision, an employee must have a certain degree of disability, but he still must be able to perform the duties of his particular job." *Keller v. McGraw-Hill,* No. 99 Civ. 3110, 2002 WL 31016647, at \*8 (S.D.N.Y. Sept.10, 2002)(Griesa, J.). The New York Human Rights Law in the form it existed at the time of these events limited the meaning of the term "disability":
[I]n all provisions of this article dealing with employment, the term shall be limited to disabilities which do not prevent the complainant from performing in the job or occupation sought or held.

**\*11** N.Y. Executive Law § 292(21). In 1998, a clause was added that requires the employer to take into account a reasonable accommodation for an employee's disability when determining whether the employee can perform his job. The New York City Code at the time of these events mirrored the limit-

Not Reported in F.Supp.2d, 2003 WL 22004841 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 233
**(Cite as: Not Reported in F.Supp.2d)**

ation found in the state law, but included the reasonable accommodation requirement:Affirmative defense in disability cases. In any case where the need for reasonable accommodation is placed in issue, it shall be an affirmative defense that the person aggrieved by the alleged discriminatory practice could not, with reasonable accommodation, satisfy the essential requisites of the job or enjoy the right or rights in question.

N.Y.Code § 8-107(15)(b).

[5] Porter contends that he was unable to perform any work whatsoever at the time NYU dismissed him. Porter sought no reasonable accommodation of his disability that would allow him to return to work. Following the medical examination, Porter did not return to work, rendering any attempt at reasonable accommodation of his alleged disability futile. Indefinite leave is not a reasonable accommodation. *Guzman v. ARC XVI Inwood, Inc., No. 97 Civ. 0031, 1999 WL 178786,* at *9 (S.D.N.Y. Mar. 30, 1999). Porter makes no allegations regarding accommodation in his complaint or subsequent submissions to the court. He is not part of the class of persons covered by the statutes.

[6] Viewed in the light most favorable to Porter, there is no triable issue of fact as to whether Porter even suffered a disability at the time of his termination. Porter argues that his worker's compensation records established that Porter suffered from a physical impairment as defined in the statute. However, Porter was terminated after a medical examination showed him fit to return to work. This was the reason NYU stopped paying worker's compensation benefits to Porter. The sole purpose of that examination was to determine whether Porter continued to suffer from his earlier injury. Porter provides no contrary evidence that he suffered a disability at the time of the examination or at the time of his termination.

[7] However, as noted above, even if Porter had provided evidence that he suffered from a disability at the time of his termination, he does not have a cause of action under either statute. Porter contends

that he was unable to work at all.

Finally, there is also no triable issue of fact to support Porter's assertion of a discriminatory reason for his termination. In the intervening month between the June 4 examination and the July 2 letter of termination, Porter did not appear at work, explain his absence, or provide any new documentation to substantiate his claim for medical leave. Prolonged unexcused absence from work is obviously a legitimate, nondiscriminatory reason for termination. Porter does not meet his burden of showing that, more likely than not, NYU's decision was at least in part motivated by discrimination.

**\*12** Porter's memorandum of law in opposition to defendant's motion for summary judgment appears to allege a new cause of action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.* No cause of action under the ADA was pled in plaintiff's complaint. Because the elements of disability discrimination under the state and city statutes broadly track the ADA, it may be the case that Porter has used the ADA as a vehicle to support his already pleaded causes of action. However, Porter nowhere expresses this intention in his brief. To the extent that Porter may be pleading a new cause of action, it should be disregarded as improperly set forth in his opposition papers. Fed.R.Civ.P. 8; *Beckman v. U.S. Postal Service,* 79 F.Supp.2d 394, 407 (S.D.N.Y. Jan.12, 2000)("Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.")(internal quotation marks omitted).

Porter was not subjected to illegal discrimination under either the New York Human Rights Law or the N.Y.C. Administrative Code.

*Conclusion*

For the reasons stated above, plaintiff's cause of action under the Family and Medical Leave Act is barred by the statute of limitations. Plaintiff's causes of action under the New York State Human

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12
Not Reported in F.Supp.2d, 2003 WL 22004841 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 233
**(Cite as: Not Reported in F.Supp.2d)**

Rights Law and the New York City Administrative
Code are also barred by the statute of limitations.
But even on the merits, plaintiff's claims present no
triable issues of fact. Defendant's motion for sum-
mary judgment should be granted in its entirety.
The action is dismissed.

SO ORDERED.

S.D.N.Y.,2003.
Porter v. New York University School of Law
Not Reported in F.Supp.2d, 2003 WL 22004841
(S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 233

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 4**

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2007 WL 1098737 (S.D.N.Y.), 34 NDLR P 189
**(Cite as: Slip Copy)**

Ridgway v. Metropolitan Museum of Art
S.D.N.Y.,2007.

United States District Court,S.D. New York.
Peter H. RIDGWAY, Plaintiff,
v.
THE METROPOLITAN MUSEUM OF ART, Defendant.
**No. 06 Civ. 5055 SAS.**

April 10, 2007.

*OPINION AND ORDER*
SCHEINDLIN, J.

### I. INTRODUCTION

**\*1** Peter H. Ridgway, proceeding pro se, brings this action against the Metropolitan Museum of Art (the "Museum"), alleging discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"). FN1 Plaintiff also claims that he was denied leave in violation of the Family Medical Leave Act ("FMLA"),FN2 and was retaliated against for seeking workers' compensation in violation of the New York State Workers' Compensation Law ("N.Y. Workers' Comp.").FN3 The Museum moves to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(6).FN4 For the following reasons, defendant's motion to dismiss is granted in part and denied in part.

> FN1. *See* 42 U.S.C. § 12101 *et seq.*

> FN2. *See* 29 U.S.C. § 2601 *et seq.*

> FN3. *See* N.Y. Workers' Comp. Law § 120 ("It shall be unlawful for any employer ... to discharge or in any other manner discriminate against an employee as to his or her employment because such employee has claimed or attempted to claim compensation from such employer...."). 

> FN4. *See* Memorandum of Law in Support of the Metropolitan Museum of Art's Mo-

tion to Dismiss ("Def.Mem.") at 1.

### II. BACKGROUND FN5

> FN5. Because plaintiff is proceeding pro se, I will construe his Complaint liberally in deciding this motion to dismiss. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972). Because the Complaint is somewhat difficult to understand and lacking in factual detail, it is necessary to rely on plaintiff's "Summary Statement" submitted to the New York State Workers' Compensation Board ("Compensation Board"), which provides clearer factual detail. *See generally* Summary Statement-Peter Ridgway ("Summary Statement"), Ex. D to Def. Mem. This document is deemed "incorporated in[to the Complaint] by reference." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002); *see also* Complaint ("Compl.") at 1 (citing "Worker's Compensation records").

#### A. Procedural Background

On June 4, 2003, Ridgway filed a charge with the New York State Division of Human Rights ("NYSDHR") alleging discrimination based on his disability in violation of the New York State Human Rights Law and the ADA.FN6 The NYSDHR dismissed Ridgway's claims on January 10, 2006.FN7 The Equal Employment Opportunity Commission ("EEOC") adopted the NYSDHR's findings, and issued a right-to-sue letter on March 6, 2006.FN8 Ridgway received this letter on March 14, 2006.FN9

> FN6. *See* Pro Se Complaint Form ("Compl.Form") at 4; State Division of Human Rights Complaint ("NYSDHR Complaint"), Ex. C to Def. Mem.

> FN7. *See* Compl. at 16; Determination and Order After Investigation, Ex. E to Def. Mem. at 1-3.

© 2007 Thomson/West. No Claim to Orig. U.S. Works.

Slip Copy, 2007 WL 1098737 (S.D.N.Y.), 34 NDLR P 189
**(Cite as: Slip Copy)**

FN8. *See* Compl. at 17; 3/6/06 Dismissal and Notice of Rights, Ex. F to Def. Mem.

FN9. *See* Compl. Form at 5.

While Ridgway's case was pending in the NYSDHR, he filed a claim with the Compensation Board on November 8, 2004, alleging that the Museum mishandled his workers' compensation claim, and retaliated against him and unlawfully terminated his employment because he sought workers' compensation.FN10

FN10. *See generally* Compl.; Summary Statement.

On June 12, 2006, Ridgway filed this action against the Museum for discriminatory conduct in violation of the ADA on four grounds: *first,* for "[t]ermination of [his] employment," *second,* for "[f]ailure to accommodate [his] disability," *third,* for "[u]nequal terms and conditions of [his] employment," and *fourth,* for "[r]etaliation." FN11 Ridgway also alleges that he was denied leave in violation of the FMLA,FN12 and that the Museum retaliated against him for seeking and obtaining workers' compensation benefits.FN13 On January 3, 2007, the Compensation Board approved a settlement agreement between Ridgway and the Museum .FN14

FN11. Compl. Form at 1, 3.

FN12. *See* Compl. at 6.

FN13. *See id.* at 1-2. Ridgway's Complaint also seems to allege that the Museum retaliated against him for seeking workers' compensation. *See id.* at 8, 14. However, in Ridgway's Affirmation in Opposition to Defendant's Motion to Dismiss ("Opp. Aff." or "Affirmation in Opposition"), he states that he has "never alleged" and does not currently allege "retaliation in connection with [his] receipt of workers' compensation benefits." Opp. Aff. at 2.

FN14. *See* Opp. Aff. at 3; New York State

Workers' Compensation Board Notice of Decision ("Board Decision"), Ex. G to Def. Mem.

B. Factual Background

Ridgway worked at the Museum from 1998 until January 31, 2003, when the Museum terminated his employment.FN15 He first worked as an intern and ultimately as an Administrative Assistant in the Department of Greek and Roman Art.FN16 On September 20, 2002, Ridgway was "injured in a work accident." FN17 After a steam pipe burst in a storeroom containing the Museum's collection of Greek and Roman Art, Ridgway was told to "help transport a very large and very heavy table" to another floor of the Museum.FN18 Over the next few months, Ridgway experienced intense lower back pain and "muscle spasms and stiffness" that required him to rest at home, "substantially reduce [his] working hours," and "take regular breaks to lay on the floor" at work.FN19

FN15. *See* Compl. at 1; 1/31/03 Letter from Richard M. Lefante, Deputy Chief Human Resources Officer, to Peter Ridgway ("1/31/03 Letter"), Ex. C to Compl.

FN16. *See* Compl. at 1, 3.

FN17. *Id.* at 1.

FN18. *Id.*

FN19. Summary Statement at 1.

Following the accident, Ridgway attempted to meet with one of his supervisors, Dr. Carlos Picon, to discuss how the Museum could accommodate his disability. FN20 On three separate occasions in October 2002, Ridgway approached Dr. Picon and each time Dr. Picon either "waved [Ridgway] away from his office" or "shouted" at him in an "unexpectedly hostile tone" that he was "too busy" to discuss any accommodations.FN21

FN20. *See* Compl. at 7.

FN21. *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** On November 14, 2002, Dr. Philip Robbins, an orthopedist, diagnosed Ridgway as having "lumbar derangement" and requested authorization for an MRI and physical therapy. FN22 In addition, Dr. Robbins ordered Ridgway to "work a maximum of 1/2 day." FN23 Ridgway gave this to the "Employee Benefits Department ... that afternoon." FN24 In response, Ridgway's supervisor, Ms. Deborah Kuo, sent Ridgway a memorandum dated November 20, 2002 (the "11/20/02 Memorandum"), which stated that Ridgway "may not return to work at the Museum until [he] provides a note from [his] doctor that states that [he] may return to work without restrictions." FN25 In addition, the 11/20/02 Memorandum stated that the Museum does not offer "part-time work to full-time staff because of a stated medical condition." FN26 According to the Complaint-and contrary to the 11/20/02 Memorandum-the Museum later claimed that it did offer Ridgway a part-time work schedule. However, Ridgway refutes this and claims that he was "never offered any part-time work schedule after [his] work injury." FN27 Ridgway further charges that the Museum's policy which "prohibits employees from working in any capacity if they have a health restriction of any kind" is facially discriminatory. FN28

FN22. 11/14/02 Letter from Dr. Philip Robbins to the Metropolitan Museum of Art ("11/14/02 Letter"), Ex. B4 to Compl. at 3.

FN23. 11/14/02 Prescription from Dr. Philip Robbins for Peter Ridgway, Ex. B3 to Compl.

FN24. Compl. at 12.

FN25. 11/20/02 Memorandum from Deborah Kuo to Peter Ridgway, Ex. D to Compl.

FN26. *Id.*

FN27. Compl. at 5.

FN28. *Id.* at 13.

After receipt of the 11/20/02 Memorandum, Ridgway went on "leave without pay." FN29 In December 2002, Ridgway went into the office to "check [his] email and review [his] messages." FN30 He was, however, unable to "log into the system" because his password was not recognized and his "user profile ... had been deleted." FN31 Although the Museum communicated to Ridgway that his leave status would be maintained throughout most of January 2003, FN32 Ridgway alleges that his "termination was actively being carried out long before the museum" officially terminated his employment on January 31, 2003. FN33

FN29. *Id.* at 15.

FN30. *Id.*

FN31. *Id.*

FN32. *See id.; see also* 1/7/03 Letter from Lefante to Ridgway, Ex. I to Compl.

FN33. Compl. at 15.

Ridgway also alleges that he was denied permission to apply for medical leave under the FMLA, that the Museum mishandled his application for workers' compensation benefits, and that the Museum retaliated against him for seeking and obtaining these benefits. FN34

FN34. *See id.* at 1-2, 6. Because this Court does not have jurisdiction over Ridgway's FMLA or workers' compensation claims, as discussed *infra,* the factual allegations regarding these claims are omitted.

### III. APPLICABLE LAW

#### A. Rule 12(b)(6) Motion to Dismiss

A court may not dismiss an action pursuant to Rule 12(b)(6) unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' FN35 The task of the court is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support

Slip Copy, 2007 WL 1098737 (S.D.N.Y.), 34 NDLR P 189
**(Cite as: Slip Copy)**

thereof." FN36 Although "[g]enerally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself," FN37 "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." FN38 In addition, because plaintiff is proceeding pro se, the factual allegations in Ridgway's Affirmation in Opposition and attached exhibits will be treated as part of his Complaint. FN39 When deciding a motion to dismiss, courts "accept all factual allegations as true and draw all reasonable inferences in plaintiff's favor." FN40 "While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." FN41

FN35. *Faulkner v. Beer*, 463 F.3d 130, 133 (2d Cir.2006) (quoting *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 106 (2d Cir.2005)). *Accord Jones v. Bock*, 127 S.Ct. 910, 920 (2007) ("A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief.").

FN36. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir.2004) (quotation marks and citation omitted).

FN37. *Faulkner*, 463 F.3d at 134.

FN38. *Chambers*, 282 F.3d at 152. *Accord Faulkner*, 463 F.3d at 134 (holding that "[c]onsideration of materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion") (citing *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir.1996) for the proposition that it is permissible to consider the full text of documents partially quoted in the complaint, and *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991) for the proposition that it is permissible to consider documents relied upon by plaintiff in drafting the complaint and

which are integral to the complaint).

FN39. *See Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir.1987) (considering pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim).

FN40. *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir.2006).

FN41. *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 344 (2d Cir.2006).

### B. ADA Disability Claims

#### 1. Discrimination

**\*3** The ADA prohibits covered employers from discriminating:
against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. FN42

FN42. 42 U.S.C. § 12112(a).

Under the ADA, a plaintiff raising an employment discrimination claim must establish that:
(1) his employer is subject to the ADA; (2) he is disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability. FN43

FN43. *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir.2001). *Accord Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir.1998).

A plaintiff is considered disabled under the ADA if he has, or is regarded as having, a physical or men-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1098737 (S.D.N.Y.), 34 NDLR P 189

**(Cite as: Slip Copy)**

tal impairment that substantially limits a major life activity, such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." FN44 To survive a motion to dismiss, a plaintiff need not plead "specific facts establishing a prima facie case of discrimination." FN45 The complaint, however, must contain "at least, a short plain statement showing that the pleader is entitled to relief." FN46

> FN44. 29 C.F.R. § 1630.2(i); *see also* 42 U.S.C. § 12102(2).

> FN45. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 (2002).

> FN46. *Harewood v. Beth Israel Med. Ctr.,* No. 02 Civ. 5511, 2003 WL 21373279, at *5 (S.D.N.Y. June 13, 2003).

A plaintiff has ninety days to file a complaint in the district court upon receipt of a right-to-sue letter from the EEOC. FN47 Two presumptions follow from this rule: *first,* that a mailed document is received three days after the date on which it is sent, FN48 and *second,* that a notice sent by a government agency is mailed on the date indicated on the notice. FN49 Nevertheless, this presumption may be rebutted by admissible evidence, such as an affidavit or sworn testimony by the plaintiff, stating the actual date of receipt (or lack thereof). FN50

> FN47. *See* 42 U.S.C. § 2000e-5(f)(1); *Sherlock v. Montefiore Med. Ctr.,* 84 F.3d 522, 525 (2d Cir.1996); *Sousa v. NLRB,* 817 F.2d 10, 11 (2d Cir.1988).

> FN48. *See* Fed.R.Civ.P. 6(e); *Sherlock,* 84 F.3d at 525-26.

> FN49. *See Sherlock,* 84 F.3d at 526.

> FN50. *See id.*

 2. Failure to Accommodate FN51

> FN51. *See* 42 U.S.C. § 12112(b)(5)(A). Ridgway also brings claims under the ADA based upon defendant's denial of

equal terms, conditions, and privileges of employment. Although Ridgway checked off this box on the Pro Se Complaint Form, the allegations in his Complaint constitute part of Ridgway's failure to accommodate claim because both claims ultimately turn on Ridway's requests for accommodations. Therefore, only the failure to accommodate claim need be addressed.

A failure to accommodate claim requires plaintiff to allege facts showing: (1) he is an individual with a disability; (2) that an employer covered by the ADA had notice of his disability; (3) that, with reasonable accommodation, he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations. FN52

> FN52. *See Lyons v. Legal Aid Soc'y,* 68 F.3d 1512, 1515 (2d Cir.1995).

### 3. Retaliation

To establish a retaliation claim under the ADA, a plaintiff must show: "(1) he was engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action." FN53 Failure to satisfy any of these prongs is fatal to a retaliation claim.

> FN53. *Lovejoy-Wilson v. Noco Motor Fuel, Inc.,* 263 F.3d 208, 223 (2d Cir.2001).

### C. Exhaustion of Remedies

As a precondition to filing an ADA claim in federal court, a plaintiff must first exhaust his administrative remedies and file a timely complaint with the EEOC. FN54 The Second Circuit has held, however, that " 'claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are *reasonably related* to those that were filed with the agency." ' FN55 " 'A claim is considered 'reasonably related' if the conduct

complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." ' FN56 The Second Circuit has characterized this exception as "essentially an allowance of loose pleading [ ] based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering." FN57

> FN54. *Cf. Butts v. City of New York Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993), *superseded by statute,* 42 U.S.C. § 1981, *on other grounds as stated in Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684 (discussing the filing requirements for Title VII claim); *see Santos v. City of New York,* No. 01 Civ. 0120, 2001 WL 1568813, at *2 (S.D.N.Y. Dec. 7, 2001) (finding that ADA has substantially the same subject matter jurisdiction requirements as Title VII).

> FN55. *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (quoting *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F .3d 683, 686 (2d Cir.2001)) (emphasis added).

> FN56. *Id.* at 200-01 (quoting *Fitzgerald v. Henderson,* 251 F.3d 345, 359-60 (2d Cir.2001)).

> FN57. *Id.* (quotation marks and citation omitted).

### D. FMLA Claims

**\*4** Generally, there is a two-year statute of limitations for alleging a violation of the FMLA.FN58 Where the conduct underlying the FMLA claim is "willful," the time period is extended to three years.FN59 In both instances, the limitations period begins after the date of the last event constituting the alleged violation.FN60

> FN58. *See* 29 U.S.C. § 2617(c)(1).

> FN59. *Id.* § 2617(c)(2).

> FN60. *See id.* §§ 2617(c)(1)-(2).

### E. Workers' Compensation Claims

"Where an employee has a remedy against his employer in proceedings under the Workers' Compensation Law, that remedy is exclusive." FN61 The exclusivity of Workers' Compensation Law is limited to claims for work-related injuries caused by an employer's negligence FN62 and to claims that an employer discriminated and/or retaliated against an employee because he or she "claimed or attempted to claim" workers' compensation benefits.FN63 "There is no cause of action for such [ ] claim[s] in the federal district court." FN64

> FN61. *Williams v. Brooklyn Union Gas Co.,* 819 F.Supp. 214, 231 (E.D.N.Y.1993) (citing *Burlew v. American Mut. Ins. Co.,* 63 N.Y .2d 412, 416 (1984) ("[A]ll employer conduct that is regulated by the Workers' Compensation Law is subject to the protection of that law's exclusivity; if the employer violates any provision of the code, an employee's remedies cannot exceed those granted in the statutes.")).

> FN62. *See Patterson v. Salvation Army,* 610 N.Y.S.2d 42, 43 (1st Dep't 1994) (holding that Workers' Compensation Law is an employee's exclusive remedy where the employer carried workers' compensation insurance and did not cause the injury intentionally).

> FN63. N.Y. Workers' Comp. Law § 120. *See also Martinelli v. Swissre Holding (N. Am.) Inc.,* No. 95 Civ. 10996, 1996 WL 125657, at *3 (S.D.N.Y. Mar. 20, 1996).

> FN64. *Martinelli,* 1996 WL 125657, at *3. An employee can, however, seek a remedy under the ADA based on the same disability as long as he does not allege common law negligence for work-related injuries or discrimination and/or retaliation because

he sought workers' compensation benefits. *See Schapiro v. New York City Dep't of Health,* 179 F.Supp.2d 170, 177 (S.D.N.Y.2001), *aff'd,* 2002 WL 4575, at *2 (2d Cir. Dec. 28, 2001) (Summary Order).

### IV. DISCUSSION

### A. ADA Claims

### 1. Discrimination

Ridgway has sufficiently alleged that his back injury constitutes a disability within the meaning of the ADA. As documented in the doctor's reports attached to his Complaint, Ridgway's back injury is a physiological condition that causes him severe pain.FN65 It can further be inferred from the pleadings that his back injury substantially limits the major life activities of working and of general mobility. Ridgway had difficulty commuting during rush hour, had to occasionally rest his back by laying on the floor at work, and his pain was aggravated by walking and using the subway steps.FN66 In addition, Ridgway has sufficiently alleged that he could "perform the essential functions of his job" if he were granted accommodations such as changes in his work schedule, the ability to attend physical therapy appointments during the day, and the ability to rest on the job.FN67

> FN65. *See generally* Exs. B1-10, to Compl.
>
> FN66. *See* Summary Statement at 1-2.
>
> FN67. *See id.*

Moreover, he has alleged an adverse employment action resulting from his disability. In mid-November, Ridgway was prohibited from returning to work until he provided "adequate medical documentation" that he could "return to work without restrictions." FN68 Ridgway's doctor provided notice that he was only able to work a half day, but the Museum refused to accommodate plaintiff's request for a limited work schedule.FN69 He was re-

peatedly rebuffed by his supervisor in attempting to discuss his disability and reasonable accommodations that could be made.FN70 As a result, the Museum terminated Ridgway's employment while he was on leave without pay status because his injury prevented him from returning to work without restrictions.FN71

> FN68. *See* 11/20/02 Memorandum.
>
> FN69. *See id.; see also* 11/14/02 Letter.
>
> FN70. *See* Compl. at 7.
>
> FN71. *See* 1/31/03 Letter. The letter also states that Ridgway was terminated because he failed to provide the Museum with the "medical certification" that was required for Ridgway to receive family medical leave. Ridgway disputes this charge and raises this issue in his Complaint. However, because this Court does not have jurisdiction over Ridgway's FMLA claims, the relevant factual allegations are omitted.

### 2. Failure to Accommodate

Ridgway has also pled sufficient facts to indicate that the Museum failed to accommodate his disability. The Museum clearly had notice of Ridgway's disability,FN72 and at this early stage of the proceedings the Court must accept as true plaintiff's allegation that with reasonable accommodation-such as work schedule changes-he could perform his job. Ridgway has also alleged that the Museum refused to discuss or implement these accommodations.FN73

> FN72. *See* Compl. at 7; 11/20/02 Memorandum.
>
> FN73. *See* Compl. at 7.

### 3. Retaliation

**\*5** Ridgway alleges that he sought reasonable accommodation of his disability, which constitutes protected activity under the ADA.FN74 Moreover,

Ridgway has pled sufficient facts to indicate that the Museum was aware of his attempts to seek such accommodation,[FN75] and that he suffered an adverse employment action when the Museum fired him.[FN76] With regard to the fourth element, Ridgway has pled sufficient facts to indicate a causal connection between his requests to obtain disability accommodation and the termination of his employment.[FN77] As such, Ridgway has established a cognizable claim of retaliation under the ADA.

> [FN74.] *See Weixel v. Board of Educ. of N.Y., 287 F.3d 138, 149 (2d Cir.2002)* (citing *Muller v. Costelio, 187 F.3d 298, 311 (2d Cir.1999)*). Ridgway's Complaint also seems to allege retaliation based on the fact that he sought workers' compensation benefits; however, Ridgway emphatically denies this in his Affirmation in Opposition to the instant motion. *See* Opp. Aff. at 2. Moreover, as discussed below, even if Ridgway is alleging that he was retaliated against for seeking workers' compensation, that claim would be dismissed for lack of subject matter jurisdiction.

> [FN75.] *See* Compl. at 7, 12; 11/20/02 Memorandum.

> [FN76.] *See* Compl. at 1.

> [FN77.] *See id.* at 5, 15.

In addition, Ridgway's allegations are sufficient to meet the "reasonably related" test and are thus properly before this Court.[FN78] Although Ridgway did not mark the box labeled retaliation on the EEOC complaint form, the allegations include the fact that he engaged in protected conduct (*i.e.*, he requested "disability accommodations") and that these requests and subsequent denials were part of the basis for his termination.[FN79] These facts could have sufficiently apprised the EEOC of the presence of retaliation and can reasonably be expected to grow out of the charge of disability discrimination and subsequent termination. Thus, Ridgway's EEOC charges are reasonably related to his ADA retaliation claim.

> [FN78.] *See Deravin, 335 F.3d at 200-01*. Although the allegation of retaliation occurred before Ridgway filed his EEOC charge, the Second Circuit held in *Francis v. City of New York* that the " 'reasonably related' test is not limited to plaintiffs alleging post-charge conduct" as long as the plaintiff, as in this case, can still meet the reasonably related standard. 235 F.3d 763, 766 (2d Cir.2000).

> [FN79.] *See* NYSDHR Complaint at supplemental page. *See also Deravin, 335 F.3d at 201* ("In determining whether claims are reasonably related, the focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.' ") (quoting *Freeman v. Oakland Unified Sch. Dist., 291 F.3d 632, 637 (9th Cir.2002)*); *Alonzo v. Chase Manhattan Bank, N.A., 25 F.Supp.2d 455, 458 (S .D.N.Y.1998)* ("[I]t is the substance of the charge and not its label that controls.").

B. Ridgway's ADA Claim Was Timely Filed

If this Court applies the presumption that the EEOC mailed Ridgway's right-to-sue letter on the date typed on the letter (March 6, 2006), and further presumes that Ridgway received this letter three days later, on March 9, 2006, then his claim would be untimely filed by five days.[FN80] However, on Ridgway's Pro Se Complaint Form, he noted that he received the right-to-sue letter on March 14, 2006, in which case his Complaint would be timely.[FN81] Because Ridgway's ADA claims are sufficiently pled, and because Ridgway's sworn complaint is sufficient to rebut the presumption that he received the right-to-sue letter on March 9, 2006,[FN82] the Museum's motion to dismiss Ridgway's ADA claims as untimely is denied.

> [FN80.] Ridgway filed the instant Complaint on June 12, 2006. *See* Compl. Form at 1. If the limitations period began to run on March 9, 2006, he would have had until

June 7, 2006 to file a timely complaint. *See Toliver v. Sullivan,* 841 F.2d 41, 42 (2d Cir.1998) (finding that in the case of a pro se litigant, the timeliness of the complaint is measured from the date of receipt by the clerk's office).

FN81. *See* Compl. Form at 5.

FN82. *See Sherlock,* 84 F.3d at 526.

C. Ridgway's FMLA Claim Is Time-Barred

Ridgway's FMLA claim is time-barred because it was not filed until June 12, 2006-over three years and four months after the Museum terminated his employment on January 31, 2003.FN83

FN83. *See* 29 U.S.C. § 2617(c)(1). Even assuming that defendant's action amounted to a "willful violation," which would afford Ridgway the maximum three-year filing time under the statute, he is still four months outside of the limitations period. *Id.* § 2617(c)(2).

D. This Court Lacks Jurisdiction to Hear Ridgway's Workers' Compensation Claims

On January 3, 2007, the Compensation Board approved a settlement agreement between the parties based on Ridgway's allegations that the Museum mishandled his workers' compensation claim, retaliated against him, and unlawfully terminated his employment because he sought and obtained workers' compensation.FN84 The N.Y. Worker's Comp. Law provides an "exclusive remed[y]" to employees on these matters.FN85 To the extent that the instant Complaint contains allegations of retaliation because Ridgway sought workers' compensation, this Court lacks jurisdiction to hear these claims.

FN84. *See* Opp. Aff. at 3; Board Decision.

FN85. *Burlew,* 63 N.Y.2d at 415.

V. CONCLUSION

**\*6** For the reasons discussed above, defendant's

motion to dismiss is granted with respect to plaintiff's FMLA and workers' compensation claims; it is denied with respect to plaintiff's ADA claims. The Clerk of the Court is directed to close this motion [Document # 12]. A conference is scheduled for April 24, 2007, at 4:30 p.m. in Courtroom 15C.

SO ORDERED:

S.D.N.Y.,2007.
Ridgway v. Metropolitan Museum of Art
Slip Copy, 2007 WL 1098737 (S.D.N.Y.), 34 NDLR P 189

END OF DOCUMENT

**TAB 5**

Slip Copy                                                                Page 1

Slip Copy, 2006 WL 3057289 (S.D.N.Y.)
(Cite as: Slip Copy)

Riddle v. Liz Claiborne, Inc.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Beverly A. RIDDLE, Plaintiff,
v.
LIZ CLAIBORNE, INC., Kathy Robson, Shelly
O'Connell and Katherine Hudson, Defendants.
Beverly A. RIDDLE, Plaintiff,
v.
LIZ CLAIBORNE, INC., Kim Roy, Helen Welsh,
Melissa Wallace, and Jeanne Bradshaw, Defendants.
No. 00 Civ. 1374(SAS), 03 Civ. 8798(SAS).

Oct. 27, 2006.

Beverly A. Riddle, New York, NY, Plaintiff, pro se.
Jed L. Marcus, Michael DiChiara, Grotta, Glassman & Hoffman, P.C., Roseland, NJ, for Defendants.

*OPINION AND ORDER*
SCHEINDLIN, J.

### I. INTRODUCTION

**\*1** Beverly A. Riddle, proceeding pro se, brings two separate actions against Liz Claiborne, Inc. ("LCI") and individual LCI employees, alleging violations of several federal statutes. In the first of these related cases ("2000 Case"), Riddle claims racial discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").[FN1] In the second case ("2003 Case"), Riddle asserts that defendants violated the Americans with Disabilities Act ("ADA")[FN2] and the Family and Medical Leave Act ("FMLA")[FN3] by discriminating against her because of her disabilities (depression and allergies). Riddle, a former employee of LCI, claims that she was subjected to a hostile work environment, disparate treatment and wrongful termination. She further alleges retaliation for reporting this discrimination to LCI management and the City of New York Commission on Human Rights

("NYCHR"). Defendants now move for summary judgment as to all claims in both cases. Because the 2000 and 2003 actions are premised on the same facts, I address both motions in one opinion.[FN4]

FN1. See 42 U.S.C. § 2000e et seq.

FN2. See id. § 12102 et seq.

FN3. See 29 U.S.C. § 2617(c)(1).

FN4. Plaintiff's claims against the individual defendants in the 2000 Case must be summarily dismissed because there is no individual liability under Title VII. See *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995), *abrogated on other grounds by Burlington Indus. v. Ellerth,* 524 U.S. 742 (1998). Similarly, the Second Circuit has held that individual defendants may not be held personally liable for alleged violations of the ADA. *See Corr v. MTA Long Island Bus,* 199 F.3d 1321 (2d Cir.1999). Accordingly, plaintiff's Title VII and ADA claims against the individual defendants are hereby dismissed.

### II. BACKGROUND

Riddle, an African-American female, began working for LCI in January, 1998, as a Senior Administrative Assistant to Katherine Hudson, LCI's former Vice President of Sales for its Handbags and Small Leather Goods division.[FN5] Riddle's duties included managing Hudson's executive appointment calendar, answering Hudson's telephone, coordinating projects with account executives and sales assistants, and filing and distributing reports.[FN6] Hudson was Riddle's immediate supervisor; Hudson, in turn, reported to Kathy Robson, LCI's former Vice President and General Manager of the division.[FN7]

FN5. See Defendants' Statement in Compliance with Rule 56.1 ("Def.56.1") ¶¶ 2-3; Plaintiff's Statement in Compliance with

Rule 56.1 ("Pl.56.1") ¶¶ 2-3.

FN6. *See* Def. 56.1 ¶¶ 4-6; Pl. 56.1 ¶¶ 4-6.

FN7. *See id.*

On June 12, 1998, Riddle sent a memo to Shelley O'Connell, LCI's Director of Human Resources, asserting that Robson was fostering a "hostile working environment" and describing several incidents to illustrate her point.FN8 Specifically, Riddle wrote:

> FN8. 6/12/98 Memo from Riddle to O'Connell ("6/12/98 Memo to O'Connell"), Ex. J of Certification of Mark A. Saloman, Esq., Counsel to Defendants ("Saloman Cert.").

I feel Kathy Robson is creating a hostile working environment.
The week of January 26, 1998
My 1st week in the department, I was reprimanded by my boss, Katherine Hudson because Kathy Robson made an issue of me to her about me not recognizing her voice on the telephone.FN9 It made me feel badly as if I had done something wrong, which I had not.

> FN9. Riddle characterizes this incident as "criticism for [her] speech." Pl. 56.1 ¶ 22.

April 22, 1998
I was yelled at by Kathy Robson for not disturbing a meeting for a phone call, making me feel once again that I had done something wrong when I had not been informed to interrupt the meeting for any phone calls, so I took a message as usual.
April 22, 1998
Kathy Robson yelled to me to put a meeting on my boss' calendar and left without giving me an opportunity to see if it could be done; once again I was reprimanded by my boss because Kathy Robson made an issue about something that was clearly not my fault.
April 23, 1998
While working on an urgent report that was time

sensitive I was reprimanded for not doing receptionist relief and I was not scheduled to do so. I did not have time to do the receptionist relief plus complete the report as well. I was made to feel badly again. I felt that this is a priority problem that I am being burden [sic] with and it is not my fault. It is creating a stressful work environment.
**\*2** June 9, 1998
Kathy Robson yelled at me for saying "Good Morning" This made me feel very frighten [sic] and on edge as I do not know what is expected of me. I have tried to resolve these issues which stems [sic] from Ms. Robson's action by talking with my boss, Katherine Hudson, but the situation remains the same which is very stressful for me.FN10

> FN10. 6/12/98 Memo to O'Connell (bold in original).

On July 16, 1998, Riddle sent O'Connell an addendum:
Katherine Hudson threatened me, saying based on my complaint about Kathy Robson, that there will be repercussions for my actions. I asked her what she meant with regards to her statement, "that there will be repercussions for me" and again she made me feel that I should be silent and not have a voice in my mistreatment.FN11

> FN11. *Id.*

O'Connell states that after receiving these memos she immediately contacted Riddle saying that LCI did not tolerate retaliation and there would be no "repercussions" resulting from any complaint filed with Human Resources.FN12 According to O'Connell, throughout the summer of 1998, she had a series of discussions with Hudson and Robson about Riddle's allegations and that "[e]ach strenuously denied that they were hostile to Ms. Riddle and both confirmed that they merely coached Ms. Riddle to improve her job performance in the workplace."FN13

> FN12. Affidavit of Shelly O'Connell ("O'Connell Aff.") ¶ 5.

Slip Copy, 2006 WL 3057289 (S.D.N.Y.)

**(Cite as: Slip Copy)**

FN13. Def. 56.1 ¶ 30. Riddle contests that she received any "ongoing coaching," because she characterizes these statements as "retaliatory" criticism. Pl. 56.1 ¶¶ 23, 25-28, 30.

Riddle sent another complaint to O'Connell on or about October 2, 1998, stating:

There are times when I have been late, as have many of the other employees of Liz Claiborne. And on these occasions, it has been, because I was not feeling well and even thought I might not make it to work at all. Admittedly, I could have phoned Katherine Hudson and let her know of the circumstance. However, I did not want my health to be an issue for discrimination. In the past, I have phoned, but not for every instance when I was not feeling well. Since the time of the lateness was only for 10 minutes or less [sic].

I don't believe there are any issues between Katherine Hudson and myself as my work for her and Liz Claiborne has been exemplary for the past year and four months (June 5, 1997 thru October 5, 1998) which is the reason I am now a permanent employee as I started working at Liz Claiborne as a temporary employee.

I do not understand why, but this seems no more than a witch hunt of Kathy Robson carry [sic] out by Katherine Hudson to make good on her promise to me on her 07/06/98, that since I had spoken with Shelley O'Connell on 06/12/98, in reference to Kathy Robson creating a hostile environment for me, there will be ramifications for me.

Since that statement and in Katherine Hudson's continued contact with Kelly Robson, she has made subtle moves to retaliate against me. Before I went on my 2 week vacation, Katherine Hudson warned me that Kathy Robson would be upset that she allowed me to take those 2 weeks off. Since my return from my vacation on 8/30, an effort has been made to create problems for me, where there are none. FN14

FN14. 10/2/98 Memo from Riddle to O'Connell ("10/2/98 Memo to O'Connell"), Ex. L to Saloman Cert.

*3 The memo also describes several incidents occurring in September and October in which Riddle was allegedly reprimanded for being late to work, failing to promptly answer telephones and allowing Hudson's unchecked voicemails to accumulate. FN15 Nothing in the memo suggests that the reprimands had discriminatory undertones or stemmed from racial prejudice.

FN15. See id.; Def. 56.1 ¶ 33. In one memo, Riddle admits she was late on numerous occasions because she did not feel well and that she chose not to notify her boss on these occasions because she presumed her health would become "an issue for discrimination." 10/2/98 Memo to O'Connell. However, in her moving papers, Riddle asserts there is "no evidence on record that would identify that, I admitted in writing that I was, in fact late to work [sic].... I admitted in writing that Hudson considered me to be late." Pl. 56.1 ¶ 33 (bold in original).

On October 29, 1998, Riddle met with O'Connell and Hudson. FN16 They discussed Riddle's written complaints, and Riddle declared, in substance, that she felt she was receiving harsher reprimands than other employees and that she wanted fair treatment. Nothing Riddle said at the meeting indicated that she believed her treatment was the product of racial or disability discrimination. FN17

FN16. See Def. 56.1 ¶ 37; Pl. 56.1 ¶ 37.

FN17. See O'Connell Aff. ¶ 37; Def. 56.1 ¶ 36; Pl. 56.1 ¶ 36.

The next day, Riddle sent an email to O'Connell, asserting that she was "disturbed" by the previous meeting and still felt that her supervisors were conducting "a continued and deliberate attempt at what must now be considered harassment." FN18 In response to this memo, O'Connell met with Riddle on October 30 and November 3, and on one of those days O'Connell suggested to Riddle that she "think about exiting" the company. FN19 O'Connell then referred the matter to Francine Hopkins, Director of

LCI's Associate Relations Division, who opened a formal investigation into Riddle's complaints.[FN20]

> **FN18.** 10/29/98 Email from Riddle to O'Connell ("10/29/98 Email to O'Connell"), Ex. M to Saloman Cert.

> **FN19.** Def. 56.1 ¶¶ 42-44. Riddle asserts that the meeting had a much more wicked tone: "Shelley O'Connell wanted me to discuss what was in [previous complaints] and I told her at this point, any questions that she has, must be in writing and which would show good intentions [sic].... [O'Connell] stated that it is not how they work [sic]; and that I should think about exiting; I felt threatened by this remark and appalled. She continued to badger me; saying this is not going to work and she can not put me into that assignment and that I should really think of a way to exit the company .... [she] became hostile and jumped up and verbally threw me out of the ... office saying I better think about this over the week-end and she will call me on Monday; I was frightened as she was very angry I wasn't sure whether she was going to strike me.... I see this meeting was an attempt to further intimidate or silence me by threatening me with possible loss of my job." 10/30/98 Email from Riddle to O'Connell ("10/30/98 Email to O'Connell"), Ex. O to Salomon Cert.

> **FN20.** *See* Def. 56.1 ¶¶ 43-44; Pl. 56.1 ¶¶ 44-46.

Riddle's next step was to send a letter to Paul Charron, LCI's President and CEO.[FN21] She informed him that she was being subjected to harassment, hostility and threats by company employees, and that she was "alarmed" that they would engage in such "blatant discrimination without considering the illegal implications."[FN22] Charron re-directed the letter to Hopkins, who contacted Riddle by telephone and arranged a meeting.

> **FN21.** *See* 11/4/98 Letter from Riddle to

Charron ("11/4/98 Letter to Charron"), Ex. O to Salomon Cert.; Def. 56.1 ¶ 45; Pl. 56.1 ¶ 45.

> **FN22.** Def. 56.1 ¶ 45; Pl. 56.1 ¶ 45.

On November 5, Riddle filed a complaint with the NYCHR. Although she had never alleged racial discrimination in her internal complaints, Riddle told the Commission that she had been subjected to "racially inflammatory rhetoric and epithets" since January 26, 1998.[FN23]

> **FN23.** 11/20/98 Verified Complaint to the NYCHR ("Verified Compl.") ¶ 7, Ex. 4 to Plaintiff's Exhibits in Support of Plaintiff's Opposition to Summary Judgment ("Plaintiff's Exhibits").

Riddle and Hopkins met on November 19, 1998. It was an abrupt meeting; when Hopkins asked Riddle if she had anything to add to her complaints, Riddle declared that she had already submitted everything in writing and was not prepared to "give a deposition."[FN24]

> **FN24.** Def. 56.1 ¶ 48; Pl. 56.1 ¶ 48. Riddle contends, without any citation to the record, that "Hopkins [sic] investigation was retaliatory." Pl. 56.1 ¶ 48.

Hopkins concluded her investigation in late November with a written report finding Riddle's complaints "completely without merit," and noting that Riddle had "mis-characterized [her] supervisor's discipline," which in reality had simply been "steps ... taken by management to correct legitimate performance issues."[FN25] Riddle received a copy of Hopkins' report and responded by sending another letter to Charron.[FN26] As in her previous complaints to LCI management, Riddle claimed her workplace was hostile and discriminatory but made no indication that she believed she was a target of disability or racial animus.[FN27]

> **FN25.** 11/6/98 Memo from Hopkins to Riddle ("Hopkins Memo"), Ex. H to Certification of Michael DiChiara (Defendants'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3057289 (S.D.N.Y.)

**(Cite as: Slip Copy)**

Counsel) in Support of Defendants' Motion for Summary Judgment ("DiChiara Cert."); Def. 56.1 ¶ 50. While I appreciate that Riddle is appearing pro se, her rebuttal of Hopkins' report-along with most of her submissions-contains incomplete sentences and is difficult to understand. For example, she writes: "Francine Hopkins of Liz Claiborne Human Resources has identified that I was 'disciplined' and the Plaintiff has identified that she received unwarranted disciplines that came after the Plaintiff objection of the harassment that she received from the Defendants." [sic] (bold in original). Pl. 56.1 ¶ 50.

FN26. *See* 11/20/98 Letter from Riddle to Charron ("11/20/98 Letter to Charron"), annexed as an undesignated exhibit to the Amended Complaint.

FN27. *See id.*

*4 In March 1999, Hudson resigned from LCI and Riddle was reassigned to assist Regional Sales Manager Jeanne Bradshaw; her job functions remained the same.FN28 A pattern of skirmishes developed between Riddle and Bradshaw, usually over Riddle's office attendance and work-product.FN29 LCI also alleges that by this time Riddle's behavior was "increasingly bizarre." FN30 On June 30, 1999, Riddle sent an email to Liz Claiborne's CEO, this time accusing Bradshaw of being hostile to her on the telephone.FN31 She emailed him again on August 18, claiming that she was being blamed for things out of her control.FN32 Riddle's next few weeks at work did not go smoothly. She allegedly suffered from depression accompanied by acute stress reaction.FN33 She left work on multiple occasions because of health problems and was reprimanded at least once for leaving without notifying her supervisor.FN34 She was also criticized for making errors at work and inaccurately following directions.FN35 Riddle was ultimately dismissed by LCI on September 10, 1999, allegedly based on her poor work performance.FN36

FN28. *See* Def. 56.1 ¶ 72.

FN29. *See* Declaration of Zuzel Prieto, Director of Human Resources at LCI, in Support of Defendants' Motion for Summary Judgment ("Prieto Decl.") ¶¶ 9-13.

FN30. Def. 56.1 ¶ 70; Prieto Decl. ¶ 9. Riddle disputes that her behavior was "bizarre," but concedes that she was being treated for depression at the time, which "many times" led to "bouts of crying." Pl. 56.1 ¶ 72.

FN31. *See* 6/20/99 Email from Riddle to Charron ("6/20/99 Email to Charron"), Ex. L to DiChiara Cert.; Def. 56.1 ¶ 73. Riddle justifies emailing Charron on the theory that Bradshaw's remark "you are just a typist," was an invective worthy of reporting to the highest level of LCI management. Pl. 56.1 ¶ 73.

FN32. *See* 8/18/99 Email from Riddle to Charron ("6/20/99 Email to Charron"), Ex. M to DiChiara Cert.

FN33. *See* Pl. 56.1 ¶¶ 75, 80; *see also* Plaintiff's Reply to Defendants' Reply and Request for Clarification of the Plaintiff's Memorandum of Law, Statement of Disputed Facts and Affidavit, in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Reply") at 7.

FN34. *See* Def. 56.1 ¶¶ 75 -78. Riddle's discussion of this issue is a string of unrelated, incomplete sentences, but she writes that she was "given a hard time about seeing her doctor." Pl. 56.1 ¶¶ 75-78.

FN35. *See* Def. 56.1 ¶¶ 75-78; Pl. 56.1 ¶¶ 75-78.

FN36. *See* Def. 56.1 ¶¶ 70-81. LCI offers several reasons for Riddle's dismissal, including her failure to obey supervisors' in-

structions and her "established practice of accusing her supervisors of harassment when they simply were trying to communicate with her or requesting that she perform her job duties." Def. 56.1 ¶ 70; Prieto Decl. ¶ 7.

Soon after her dismissal, Riddle filed a charge with the Equal Employment Opportunity Commission ("EEOC") and was granted a Notice of Right to Sue. She filed her initial complaint in the instant case on February 23, 2000. On October 31, 2002, defendants filed a motion for summary judgment on all of plaintiff's claims. On November 1, 2002, plaintiff filed a motion for summary judgment. On August 20, 2003, Magistrate Judge Henry Pitman issued a Report and Recommendation ("R & R"), denying plaintiff's motion on the merits and denying defendants' motion, without prejudice to renewal, because of a procedural defect.

On November 6, 2003, Riddle filed a separate complaint-based on the same facts-alleging that she was discriminated against under the ADA and the FMLA. Defendants moved for summary judgment in both cases on November 28, 2005.

### III. LEGAL STANDARDS

#### A. Summary Judgment

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [FN37] An issue of fact is genuine if "the evidence is such that a jury could return a verdict for the nonmoving party." [FN38] A fact is material when it " 'might affect the outcome of the suit under the governing law." ' [FN39] The movant has the burden of demonstrating that no genuine issue of material fact exists. [FN40]

FN37. Fed.R.Civ.P. 56(c).

FN38. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). *Accord Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006).

FN39. *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (quoting *Anderson,* 477 U.S. at 248).

FN40. *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact that does " 'not rely on conclusory allegations or unsubstantiated speculation." ' [FN41] To do so, it must do more than show that there is " 'metaphysical doubt as to the material facts." ' [FN42] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. [FN43]

FN41. *Jeffreys,* 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2002)).

FN42. *Woodman v. WWOR-TV, Inc.,* 411 F.3d 69, 75 (2d Cir.2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).

FN43. *See Golden Pac. Bancorp v. FDIC,* 375 F.3d 196, 201 (2d Cir.2004).

#### B. Title VII Wrongful Termination

**\*5** Under Title VII, it is "unlawful for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." [FN44]

FN44. 42 U.S.C. § 2000e-2(a).

"To withstand a motion for summary judgment, a discrimination plaintiff must withstand the three-part burden-shifting laid out in *McDonnell Douglas Corp. v. Green.*" [FN45] "[T]he initial burden rests with the plaintiff to establish a prima facie case of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3057289 (S.D.N.Y.)

**(Cite as: Slip Copy)**

discrimination." [FN46] A plaintiff meets this burden by showing that "(1) [she] is a member of a protected class; (2) [she] is competent to perform the job or is performing [her] duties satisfactorily; (3)[she] suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on [her] membership in the protected class." [FN47] The Second Circuit recently reaffirmed that the evidence necessary to establish a prima facie case is " 'minimal,' " noting that " 'it requires no evidence of discrimination." ' [FN48]

> FN45. *McPherson v. New York City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). *Accord Joseph v. Leavitt,* No. 05 Civ. 3348, 2006 WL 2615313, at *2-3 (2d Cir. Sept. 13, 2006) (applying *McDonnell Douglas* framework to race discrimination claim).

> FN46. *Cross v. New York City Transit Auth.,* 417 F.3d 241, 248 (2d Cir.2005).

> FN47. *Dawson v. Bumble & Bumble,* 398 F.3d 211, 216-17 (2d Cir.2005) (quoting *Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 767 (2d Cir.2002)).

> FN48. *Joseph,* 2006 WL 2615313, at *2 (quoting *James v. New York Racing Ass'n,* 233 F.3d 149, 153-54 (2d Cir.2000)).

Plaintiff's prima facie case "gives rise to a presumption of unlawful discrimination that shifts the burden of production to the defendant, who must proffer a 'legitimate, nondiscriminatory reason' for the challenged employment action." [FN49] "If the defendant articulates such a reason, 'the presumption of discrimination drops out,' and the plaintiff must 'prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." ' [FN50] At this final stage of analysis, courts must "examin[e] the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

against the plaintiff." ' [FN51] In other words, plaintiff has the burden of proving that race was the actual reason for any adverse employment actions.[FN52]

> FN49. *Woodman,* 411 F.3d at 76 (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 91 (2d Cir.2001)) (citations omitted).

> FN50. *Id.* (quoting *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir.2001)).

> FN51. *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir.2000) (quoting *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 143 (2000)).

> FN52. *See Joseph,* 2006 WL 2615313, at *2 (citing *James,* 233 F.3d at 153-54).

### C. ADA Disability Claims

#### 1. Discrimination

The ADA prohibits covered employers from discriminating:

against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.[FN53]

> FN53. 42 U.S.C. § 12112(a).

Under the ADA, a plaintiff raising an employment discrimination claim bears the initial burden of establishing a prima facie case and must show:

(1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without a reasonable accommodation; and (4) she was [discriminated against] because of her disability.[FN54]

> FN54. *Ryan v. Grae & Rybicki, P.C.,* 135

*F.3d 867, 869-70 (2d Cir.1998). Accord Usala v. Consolidated Edison Co. of New York, 141 F.Supp.2d 373, 380 (S.D.N.Y.2001).*

The ADA describes an individual as suffering from a "disability" if she makes a showing of any one of the following: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." FN55 Riddle does not allege, nor can it be inferred from the pleadings, that she has a record of disability or that she was regarded as disabled by defendants. Accordingly, under the statute, Riddle must plead that she has "a physical or mental impairment that substantially limits one or more major life activities." FN56

FN55. 42 U.S.C. § 12102(2).

FN56. *Id.* § 12102(2)(A).

**\*6** In evaluating whether an individual qualifies as disabled under the ADA, the Second Circuit uses the three-step approach taken by the Supreme Court in *Bragdon v. Abbott.* FN57 First, plaintiff must show that she suffers from a physical or mental impairment. FN58 Second, plaintiff must identify the activity claimed to be impaired and establish that it constitutes a "major life activity." FN59 Third, the plaintiff must show that her impairment "substantially limits" the major life activity previously identified. FN60 If a plaintiff fails to satisfy any of these three prongs, her discrimination claim must be dismissed. FN61

FN57. *524 U.S. 624 (1998). Accord Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 641 (2d Cir.1998).*

FN58. *See Colwell, 158 F.3d at 641* (citing *Bragdon, 524 U.S. at 631).*

FN59. *Id.*

FN60. *Id.*

FN61. *See Felix v. New York City Transit*

*Auth., 154 F.Supp.2d 640, 653 (S.D.N.Y.2001).*

Because LCI does not dispute that Riddle has an impairment under the ADA, the inquiry is whether her impairments substantially limit a major life activity. FN62 The ADA does not define "substantially limits" or "major life activities," but the EEOC regulations provide significant guidance.FN63 In general, "major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." FN64

FN62. *See* Defendants' Memorandum of Law in Support of Summary Judgment ("Def.Mem.") at 6 (recognizing that depression is an ADA-qualifying impairment).

FN63. *See Ryan, 135 F.3d at 870.*

FN64. 29 C.F.R. § 1630.2(i).

Whether a plaintiff's impairment substantially limits a major life activity is a "fact-specific" inquiry.FN65 To prove that an impairment substantially limits the major life activity of working, a plaintiff must show that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." FN66 "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." FN67 When determining whether an individual is disabled under the ADA, the court must consider her condition as she functions with the use of corrective and mitigating measures, including prescribed medications. FN68

FN65. *Godfrey v. New York City Transit Auth., No. 02 Civ. 2101, 2006 WL 2505223, at \*4 (E.D.N.Y. Aug. 28, 2006)* (citing *Colwell, 158 F.3d at 643).*

FN66. 29 C.F.R. § 1630.2(j)(3)(i).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN67. *Id. Accord Sutton,* 527 U.S. at 491.

FN68. *See Godfrey,* 2006 WL 2505223, at *4 (citing *Sutton,* 527 U.S. at 475 (holding that the court must consider plaintiff's condition in reference to eyeglasses and contact lenses)).

2. Failure to Accommodate [FN69]

FN69. *See* 42 U.S.C. § 12112(b)(5)(A). Riddle also brings claims under the ADA based upon defendants' denial of equal terms, conditions, and privileges of employment-in particular, that defendants deliberately made it difficult for her to leave work for doctors' appointments. Although couched in different language, these allegations constitute part of Riddle's failure to accommodate claim because both claims ultimately turn on Riddle's requests to leave work. Therefore, only the failure to accommodate claim need be addressed.

A failure to accommodate claim requires plaintiff to allege facts showing: (1) she is an individual with a disability; (2) that an employer covered by the ADA had notice of her disability; (3) that, with reasonable accommodation, she could perform the essential functions of the position; and that (4) that the employer refused to make such accommodations.[FN70]

FN70. *See Lyons v. Legal Aid Soc'y,* 68 F.3d 1512, 1515 (2d Cir.1995).

3. Retaliation

To establish a prima facie case of retaliation under the ADA a plaintiff must show: "(1) she was engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action." [FN71] Failure to satisfy any of these prongs is fatal to a retaliation claim.

FN71. *Lovejoy-Wilson v. Noco Motor Fuel, Inc.,* 263 F.3d 208, 223 (2d Cir.2001).

D. FMLA Claims

Generally, there is a two-year statute of limitations for alleging a violation of the FMLA.[FN72] Where the conduct underlying the FMLA claim is "willful," the time period is extended to three years.[FN73] In both instances, the limitations period begins after the date of the last event constituting the alleged violation.[FN74]

FN72. *See* 29 U.S.C. § 2617(c)(1).

FN73. *Id.* § 2617(c)(2).

FN74. *See id.* § 2617(c)(1)-(2).

IV. DISCUSSION

A. Title VII

1. Hostile Work Environment and Retaliation

**\*7** Because Riddle's opposition to LCI's motion for summary judgement offers no new facts or arguments, and because I have reviewed Judge Pitman's thorough and thoughtful report, it is hereby adopted in full on both her hostile work environment and retaliation claims.[FN75] As Judge Pitman found no evidence in the record to support these claims, they are hereby dismissed. The only Title VII claim that Judge Pitman never considered on its merits concerns Riddle's wrongful termination, addressed below.[FN76]

FN75. *See* R & R at 14-16 (denying defendants' motion for summary judgement on the 2000 Case because it did not include proper notice to pro se litigant, as required by Local Civil Rule 56.2 and *Vital v. Interfaith Medical Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999)).

FN76. *See id.* at 15 (finding that "[s]ince the Amended Complaint expressly alleges

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3057289 (S.D.N.Y.)
**(Cite as: Slip Copy)**

wrongful termination at page 3, defendants' current motion, even if granted, would not dispose of all claims in the case.")

2. Wrongful Termination [FN77]

[FN77.] Defendants argue that since they have cured the procedural defect of their previous motion for summary judgment in the 2000 Case, law of the case "mandates" that I dismiss all of Riddle's Title VII claims. *See* Def. Mem. at 5. This argument overlooks the purpose of pro se summary judgment notice. Judge Pitman observed that Riddle's reply papers "failed to address many of defendants' arguments," relied on parts of the record that had no relevance, and presented facts in a manner "so muddled" it could not "support an inference that plaintiff understands the nature of a summary judgement motion." R & R at 14-15. Judge Pitman gave Riddle a second chance to oppose summary judgment, perhaps with greater awareness of its nature and consequence. Therefore, this opinion fully considers Riddle's opposition.

The record demonstrates that Riddle has failed to establish a prima facie case of wrongful termination due to race-based animus because she has not provided the "de minimis" evidence needed to establish the second and fourth elements of a prima facie case. As an African-American whose employment was terminated, Riddle satisfies the first and third elements of a prima facie case. [FN78] However, the record also clearly demonstrates that Riddle was terminated for unsatisfactory job performance and behavioral issues-not because of racial discrimination.

FN78. *See Joseph,* 2006 WL 2615313, at *3 (listing termination of employment as an example of an 'adverse employment action') (citing *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003)).

From the start of her employment at LCI, Riddle had difficulty communicating with her co-workers, particularly her supervisors. [FN79] The reports of her supervisors are particularly relevant here, because "in determining whether an employee's job performance is satisfactory, courts may-as they often must-rely on [supervisors] evaluations." [FN80] A pattern emerged whereby after Riddle received constructive criticism or direction, she would lodge an accusation of harassment. [FN81] Despite repeated attempts by Human Resources to clear up misunderstandings between parties, Riddle continued to misconstrue comments by her supervisors as harassment.

FN79. *See* 06/12/99 Memo to O'Connell.

FN80. *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985).

FN81. *See* Prieto Decl. ¶ 7; *see also* 06/12/99 Memo to O'Connell; 10/2/98 Memo to O'Connell; 10/29/98 Email; 11/4/98 Letter to Charron; 6/20/99 Email to Charron.

In early 1999, Riddle was satisfactorily performing her duties as an administrative assistant, but her behavior remained unprofessional and taxing on co-workers. This is reflected in Riddle's annual performance review dated March 23, 1999, in which Hudson describes Riddle as "accurate" and "extremely organized," but goes on at length about Riddle's need to curb her aggressiveness and hostility, cultivate better working relationships and be respectful of others' opinions. [FN82]

FN82. 1998 Performance Review of Beverly Riddle ("Performance Review"), Ex. G to DiChiara Cert.

The record demonstrates Riddle's declining job performance throughout 1999 and her increasingly volatile behavior. [FN83] O'Connell, Hudson, and Bradshaw cite numerous instances of Riddle failing to perform tasks correctly, overreacting to criticism and complaining to the company CEO. [FN84] These problems came to a head in September 1999, when

Slip Copy, 2006 WL 3057289 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Riddle, an "at-will" employee, was dismissed.[FN85] In light of these events and the absence of any countervailing evidence refuting the supervisors' testimony, Riddle fails to establish the second element of a prima facie case, that her job performance had been satisfactory when she was terminated.

> [FN83.] *See id; see also* Prieto Decl. ¶¶ 9-16; 10/2/98 Memo to O'Connell; 10/29/98 Email to O'Connell; 11/4/98 Letter to Charron.

> [FN84.] *See* 11/4/98 Letter to Charron; 11/6/98 Letter to Charron; 6/30/99 Email to Charron; 8/18/99 Email to Charron.

> [FN85.] *See* LCI Associate Handbook ("Handbook"), Ex. E to Saloman Decl. at i. (defining associate employment as " 'at-will,' which means that it is for no definite period, and can be terminated at any time by either you or the Company, for any or no reason, with or without cause or notice.").

Riddle also fails to establish the fourth element of a prima facie case because-even construing the facts in a light most favorable to her-she was not terminated under circumstances giving rise to an inference of discrimination. Every example of alleged discrimination she cites is an ambiguous, isolated incident that offers no basis for inferring discrimination. For example, Riddle contends that she suffered discrimination upon overhearing a female account executive comment that "Blacks, Jews and Gays, they have it all bad."[FN86] Riddle finds this offensive because she is African-American, her last name is Jewish and she has gay friends.[FN87] Another example is Riddle's statement that she witnessed LCI employees mocking and criticizing African-American celebrities, including Stevie Wonder and Whoopi Goldberg.[FN88] As Judge Pitman observed, "even if the conduct alleged did occur," it is "not derogatory on its face and is susceptible to [racially neutral] interpretation."[FN89] The same holds true for all the job-related directives

that Riddle contends were race-based, such as Hudson's comments about phone etiquette that Riddle took as criticisms of her "African American dialect."[FN90] The record is simply devoid of evidence that would suggest anything other than termination due to unsatisfactory job performance and volatile temperament.

> [FN86.] Pl. 56.1 ¶ 53.

> [FN87.] *See id.*

> [FN88.] *See id.* at ¶¶ 52-58.

> [FN89.] R & R at 26.

> [FN90.] Pl. 56.1 ¶ 53.

**\*8** Riddle has failed to raise any triable issue of fact that would preclude summary judgment. LCI supported its motion for summary judgment with depositions and affidavits setting forth numerous examples of substandard job performance and disruptive, contentious behavior exhibited by Riddle throughout her employment. The lack of countervailing evidence on these points renders Riddle's wrongful termination claim a "mere incantation of intent or state of mind," which cannot "defeat an otherwise valid motion."[FN91] After construing all of the evidence in the light most favorable to Riddle and drawing all justifiable inferences in her favor, I find that she has failed to establish a prima facie case necessary to survive summary judgment. Riddle's Title VII claims must be dismissed as a matter of law.

> [FN91.] *Meiri,* 759 F.2d at 998 (citations omitted).

B. ADA Disability Claims

1. Discrimination

Riddle satisfies the first and third elements of a prima facie case of disability discrimination.[FN92] LCI does not dispute that it is subject to the ADA, nor that Riddle was otherwise qualified to perform the essential functions of her job.[FN93]

FN92. *See* Def. Mem. at 6, 10 (only discussing the second and fourth elements of the prima facie case).

FN93. *See id.* at 7.

The second element of a prima facie case requires that plaintiff have an ADA-qualifying disability.FN94 In order for Riddle's impairments to qualify, they must substantially limit a major life activity.FN95 Although Riddle does not expressly articulate which major life activities are affected by her disorders she alleges that as a result of her depression, acute stress and allergies she was forced to miss work on several occasions and suffered "sleepless nights" that affected her job performance.FN96 Even granting that Riddle has pled a limitation on her ability to work, however, her claim suffers from a more fatal defect.FN97

FN94. *See Colwell,* 158 F.3d at 641.

FN95. *See id.* LCI stipulates that depression can constitute an "impairment" under the ADA. *See Horwitz v. L & J.G. Stickley, Inc.,* 122 F.Supp.2d 350, 354 (N.D.N.Y.2000).

FN96. *See* 2003 Complaint ("2003 Compl.") ¶¶ 79, 89.

FN97. In *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 491-93 (1999), the Supreme Court expressed some concern over whether "working" should be considered a "major life activity" under the ADA and noted that limitations on working should only be considered if a plaintiff is limited in no other "major life activities."

While the nature of Riddle's impairment is not insignificant, given the record in the present case, no reasonable jury could conclude that its effect on her ability to work was substantial. Aside from isolated incidents of crying and difficulty sleeping, there is no medical documentation or other evidence substantiating a degree of impairment that would interfere with her ability to work.FN98 She also testi-

fied that medication and therapy helped her keep her depression under control.FN99 Uncontroverted evidence in the record reveals that Riddle was perfectly capable of working in a wide range of jobs in various fields despite her disability. By her own admission, her annual performance review attests that she met expectations and that "there was no problem where [she] was unable to do the work." FN100 Even in the weeks leading up to her termination, she fully participated in projects and completed numerous administrative tasks.FN101 There is simply no basis for concluding that Riddle's impairments substantially limited the major life activity of working.FN102

FN98. *See* 2003 Compl. ¶¶ 79, 84, 86-89.

FN99. *See* Deposition of Beverly A. Riddle ("Riddle Dep."), Ex. F to DiChiara Cert. at 76-77.

FN100. *Id.* at 91.

FN101. *See* Pl. 56.1 ¶¶ 73, 75-78.

FN102. As I noted earlier in conjunction with plaintiff's Title VII wrongful termination claim, there is no evidence in the record suggesting that race or disability played any role in LCI's decision to terminate Riddle. The record clearly demonstrates that she was dismissed for poor work performance and behavioral issues.

### 2. Failure to Accommodate

Riddle does not make out a prima facie case for failure to accommodate because there is no indication that LCI employees had any notice of her alleged disability. As the Second Circuit recently held, a plaintiff must provide some evidence that her employer knew of her alleged disability to satisfy a prima facie case of disability discrimination under the ADA.FN103 Riddle only proffers a few isolated incidents where she complained of not feeling well and had difficulty getting last-minute permission to go to the doctor.FN104 Accordingly, her failure to accommodate claim is dismissed.

Slip Copy, 2006 WL 3057289 (S.D.N.Y.)
**(Cite as: Slip Copy)**

FN103. *See* *Woodman, 411 F.3d at 81-82* (citations omitted).

FN104. *See* Riddle Dep. at 318, 321, 324; 2003 Compl. ¶¶ 15-17; 19.

### 3. Retaliation

**\*9** Riddle's purported protected activity was filing a complaint with the NYCHR on November 5, 1998. She alleges that in retaliation for filing this complaint she was subjected to hostility from her supervisors, unequal treatment and ultimately terminated from her job. Yet as I discussed at length above, and as Judge Pitman concluded in his Report and Recommendation, the record is devoid of any examples of disparate or hostile treatment.[FN105] Moreover, plaintiff's termination in September 1999 is too far removed from her protected activity to suggest the requisite causal connection.[FN106] Her retaliation claim is dismissed.

FN105. *See* R & R at 22.

FN106. *See* *Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001)* (noting that where mere temporal proximity establishes the causal connection the temporal proximity must be "very close," and finding that a time period of twenty months suggested, "by itself, no causality at all") (citations omitted)).

### C. FMLA Claim

Riddle's FMLA claim is time-barred because it was not filed until November 6, 2003, more than four years after LCI terminated her employment.[FN107]

FN107. *See* 29 U.S.C. § 2617(c)(1)-(2).

### V. CONCLUSION

For the foregoing reasons, LCI's motion for summary judgment is granted. The Clerk of the Court is directed to close this motion [No. 169 on the Docket Sheet]. The Clerk is also directed to close the 2000 Case and all of its pending motions [Nos. 154, 161, 166, 167, and 180 on the Docket Sheet], as well as the 2003 Case and all of its pending motions [Nos. 27 and 31 on the Docket Sheet].
SO ORDERED:

S.D.N.Y.,2006.
Riddle v. Liz Claiborne, Inc.
Slip Copy, 2006 WL 3057289 (S.D.N.Y.)

END OF DOCUMENT

**TAB 6**

LEXSEE

## CAROL SHANNON v. CITY OF PHILADELPHIA

## CIVIL ACTION NO. 98-5277

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### *1999 U.S. Dist. LEXIS 2428; 137 Lab. Cas. (CCH) P33,824; 75 Empl. Prac. Dec. (CCH) P45,790; 5 Wage & Hour Cas. 2d (BNA) 380*

### March 5, 1999, Decided

**DISPOSITION:**     [*1] Defendant's motion to dismiss GRANTED IN PART and DENIED IN PART. Motion DENIED as to Count I; Count II DISMISSED; and Count III DISMISSED, WITHOUT PREJUDICE.

**COUNSEL:** For CAROL SHANNON, PLAINTIFF: JAMES R. INGRAM, PHILA, PA USA.

For CITY OF PHILADELPHIA, DEFENDANT: BETH C. GROSSMAN, DISTRICT ATTORNEY OF PHILADELPHIA, PHILADELPHIA, PA USA.

**JUDGES:** LOUIS C. BECHTLE, J.

**OPINION BY:** LOUIS C. BECHTLE

**OPINION**

### *MEMORANDUM AND ORDER*

BECHTLE, J.

MARCH 5, 1999

Presently before the court is defendant City of Philadelphia's ("the City") motion to dismiss and plaintiff Carol Shannon's ("Shannon") response thereto. For the reasons set forth below, said motion will be granted in part and denied in part.

### I. *BACKGROUND*

Shannon filed the instant action seeking relief under the Americans with Disabilities Act ("ADA"), *42 U.S.C.* *§§ 12101-12117*, the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601-2654 and the Pennsylvania Human Relations Act ("PHRA"), Pa. Stat. Ann. tit. 43, §§ 951-63. [1] The facts as alleged in Shannon's Complaint are as follows.

> 1     The court has jurisdiction over Shannon's ADA and FMLA claims pursuant to *28 U.S.C. § 1331*. The court has jurisdiction over Shannon's PHRA claim pursuant to *28 U.S.C. § 1367*.

[*2] In June of 1989, Shannon began working for the City as a data support clerk in the Homicide Unit of the District Attorney's Office. On June 10, 1994, Shannon was admitted to the Crises Center at Fitzgerald Mercy Hospital where she was diagnosed with major depression. On June 29, 1994, Shannon applied to the City for leave from work under the FMLA and included a report from her physician stating that her condition would last six months. [2] In August of 1994, Shannon requested an additional three month unpaid leave of absence from September 2, 1994 to December 6, 1994. The City instructed Shannon to return to work on September 2, 1994. In September of 1994, Shannon made a second request for extended medical leave. On September 16, 1994, the City denied Shannon's second request and informed Shannon that her employment with the District Attorney's Office was terminated.

> 2     Although not specifically stated in her complaint, Shannon states in her response to the City's motion to dismiss that the City granted her leave under the FMLA from July 6, 1994 to September 1, 1994. (Pl.'s Resp. at 2.)

1999 U.S. Dist. LEXIS 2428, *2; 137 Lab. Cas. (CCH) P33,824;
75 Empl. Prac. Dec. (CCH) P45,790; 5 Wage & Hour Cas. 2d (BNA) 380

[*3] On July 12, 1995, Shannon filed a claim with the Equal Employment Opportunity Commission ("EEOC") alleging that the City violated her rights under the FMLA. On July 26, 1998, the EEOC issued Shannon a Right to Sue letter. On October 4, 1998, Shannon filed the instant action. On December 9, 1998, the City filed its motion to dismiss and alternatively sought summary judgment. For the reasons set forth below, the court will not convert the motion to dismiss to one for summary judgment and the motion to dismiss will be granted in part and denied in part.

## II. *LEGAL STANDARD*

For the purposes of a motion to dismiss, the court must accept as true all well-pleaded allegations of fact in a plaintiff's complaint, construe the complaint in the light most favorable to the plaintiff, and determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Colburn v. Upper Darby Township, 838 F.2d 663, 665-66 (3d Cir. 1988).* The court, however, need not accept as true legal conclusions or unwarranted factual inferences. *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)* (citations omitted). A complaint is properly dismissed [*4] only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).*

Under *Federal Rule of Civil Procedure 12(b)*, the court may consider matters outside the complaint by converting a motion filed pursuant to *Rule 12(b)(6)* to one for summary judgment under *Rule 56* provided that the court grants the parties a reasonable opportunity to present all material information to allow the court to decide the motion. *Fed. R. Civ. P. 12(b)*. The court will not convert the City's motion to dismiss to one for summary judgment. Discovery will go forward on the claims not dismissed by the accompanying Order and the parties may move for summary judgment under *Rule 56* at an appropriate time.

## III. *DISCUSSION*

In its motion to dismiss, the City sets forth four primary grounds for dismissal. First, the City asserts that Shannon failed to properly plead that she exhausted her administrative remedies before filing a claim under the ADA in this court. Second, the City argues that Shannon did not establish that she is a qualified individual as defined [*5] by the ADA. Third, the City argues that Shannon's FMLA claim should be dismissed because the action is barred by the statute of limitations. Finally, the City asserts that Shannon failed to properly plead that she exhausted her administrative remedies before filing a claim under the PHRA with this court. The court will address each argument separately.

### A. *ADA Claim*

#### 1. Exhaustion of Administrative Remedies

Prior to filing suit in federal court under the ADA, a plaintiff must exhaust her administrative remedies by filing a claim with the EEOC. *Reddinger v. Hospital Cent. Serv., Inc., 4 F. Supp. 2d 405, 409 (E.D. Pa. 1998).* The plaintiff must also receive a right to sue letter from the EEOC before filing suit. *Id.* The City asserts that Shannon failed to properly plead that she exhausted her administrative remedies before filing a claim under the ADA in this court.

Shannon's Complaint states that "on or about July 12, 1995 Plaintiff filed a claim with the Equal Employment Opportunity Commission alleging that defendant violated her rights pursuant to the terms and conditions of the Family Medical Leave Act." (Compl. P 9.) The Complaint also states that "on or [*6] about July 6, 1998 The Equal Employment Opportunity Commission issued to Plaintiff a Notice of her Right To Sue." (Compl. P 10.) The Complaint further alleges that "all jurisdictional prerequisites to filing suit have been met." (Compl. P 11.) The City argues that because Shannon's Complaint does not mention that she filed a claim with the EEOC alleging any violations of the ADA, Shannon failed to properly plead that she exhausted her administrative remedies with respect to her claim under the ADA.

The City is correct in that the Complaint states that Shannon filed a claim with the EEOC for violations of the FMLA and does not mention that she filed a claim for violations of the ADA. Shannon attached copies of the claim she filed with the EEOC and the Right to Sue letter issued by the EEOC to her response to the City's motion to dismiss. [3] (Pl.'s Opp. Exs. A & C.) Those documents clearly reflect that Shannon made a claim to the EEOC for violations of the ADA, as well as for violations of the FMLA. On the "charge of discrimination" form, Shannon marked the boxes next to "disability" and "retaliation" to indicate the basis for her claim of discrimination. (Pl.'s Opp. Ex. A.) In the [*7] body of that document Shannon

1999 U.S. Dist. LEXIS 2428, *7; 137 Lab. Cas. (CCH) P33,824;
75 Empl. Prac. Dec. (CCH) P45,790; 5 Wage & Hour Cas. 2d (BNA) 380

stated, "I believe I have been discriminated against because of my disability in violation of the Americans with Disabilities Act of 1964." *Id.* The EEOC Right to Sue letter sent to Shannon, dated July 6, 1998, states that "you are notified that you have the right to institute a civil action under Title I of the Americans with Disabilities Act of 1990." (Pl.'s Opp. Ex. C.) These documents referenced in Shannon's Complaint demonstrate that Shannon exhausted her administrative remedies prior to filing a claim with this court under the ADA. (Compl. PP 9-11.)

    3    Generally, courts may not look beyond the complaint in deciding a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*. However,

        a court may properly look beyond the complaint to matters of public record including court files, records and letters of official actions or decisions of government agencies and administrative bodies, documents referenced and incorporated in the complaint and documents referenced in the complaint or essential to a plaintiff's claim which are attached to a defendant's motion.

    *Arizmendi v Lawson, 914 F. Supp. 1157, 1160-61 (E.D. Pa. 1996)* (citations omitted) (considering EEOC right to sue letter attached to defendant's motion to dismiss). *See also Gallo v. Board of Regents of Univ. of California, 916 F. Supp. 1005, 1007 (S.D. Cal. 1995)* (considering EEOC right to sue letter referenced in complaint). Because Shannon must show that she exhausted her administrative remedies before this court can consider her ADA claim, these documents are essential to that claim. Thus, the court may properly consider Shannon's charge of discrimination filed with the EEOC and the Right to Sue letter attached to her response because the documents are referenced in her Complaint and are essential to her claim.

### [*8] 2. "Qualified Individual" Under the ADA

The ADA prohibits employers from discriminating against "qualified individuals with a disability." *42 U.S.C. § 12112(a)*. To establish a prima facie case under the ADA, the plaintiff must prove that (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the job she held or sought; and (3) she was terminated or discriminated against because of her disability. *Harris v. SmithKline Beecham, 27 F. Supp. 2d 569, 581 (E.D. Pa. 1998)* (citations omitted).

The City argues that Shannon is not a qualified individual as defined by the ADA because she could not attend work for an extended period of time. The City states that Shannon received twelve weeks of FMLA leave from June 10, 1994 through September 1, 1994. (Def.'s Mem. Supp. Mot. Dis. at 5.) Shannon alleges that in August of 1994 she requested an additional three month unpaid leave of absence from September 2, 1994 to December 6, 1994. (Compl. P 15.) The City denied that request. (Compl. P 17.) Shannon submitted a second request for additional leave and included a letter from her physician that indicated she would be [*9] able to return to work in three to six months. (Compl. PP 18-19.) On September 16, 1994, the City denied that request and informed Shannon that her employment was terminated. (Compl. PP 20-21.)

The City argues that because Shannon's physician indicated that Shannon would not be able to return to work for three to six months beyond the leave period granted under the FMLA that Shannon was not qualified to perform the essential function of attending work. (Compl. PP 27-28.) Shannon argues that her request for an additional period of unpaid leave, beyond that received pursuant to the FMLA, was a reasonable accommodation that the City could have granted without undue hardship.

Under the ADA, "a qualified individual with a disability" is a person who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. § 12111(8)*. The term "reasonable accommodation" may include--

        (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

        (B) job restructuring, part-time or modified work schedules, reassignment to

1999 U.S. Dist. LEXIS 2428, *9; 137 Lab. Cas. (CCH) P33,824;
75 Empl. Prac. Dec. (CCH) P45,790; 5 Wage & Hour Cas. 2d (BNA) 380

a vacant position, acquisition [*10] or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*42 U.S.C. § 12111(9)*. Whether granting the additional leave requested was a reasonable accommodation and whether the City could provide it to Shannon without undue hardship are factual inquiries that are not properly decided in the context of a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*. *Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1391-92 (3d Cir. 1994)* (reversing trial court for resolving factual issues in context of *Rule 12(b)(6)*). Accordingly, the court will deny the City's motion to dismiss Shannon's ADA claim.

## B. *FMLA Claim*

The City seeks dismissal of Shannon's FMLA claim for failure to comply with the statute of limitations. Generally, a statute of limitations defense cannot be used in the context of a *Rule 12(b)(6)* motion to dismiss. However, "an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense [*11] clearly appears on the face of the pleading." *Oshiver, 38 F.3d at 1384 n.1 (3d Cir. 1994)*. The statute of limitations under the FMLA is ordinarily two years. *29 U.S.C. § 2617(c)(1)*. For willful conduct, however, the statute of limitations is three years. *29 U.S.C. § 2617(c)(2)*. Shannon does not allege a willful violation of the FMLA. Accordingly, the two year statute of limitations applies.

Shannon alleges that the City denied her request for additional leave under the FMLA and terminated her employment on September 16, 1994. (Compl. PP 20-21.) The statute of limitations for a claim under the FMLA begins to run "the date of the last event constituting the alleged violation for which the action is brought." *29 U.S.C. § 2617(c)(1)*. Shannon alleges, among other things, that the denial of additional leave violates the FMLA. The last denial occurred on September 16, 1994. Thus, the latest date on which the statute of limitations for Shannon's FMLA claim began to run was September 16, 1994. Shannon did not file her Complaint instituting

this action until October 4, 1998. Shannon does not address the issue in her response to the City's motion to dismiss beyond stating that the claim [*12] is timely. She does not cite any authority or basis for that argument. In this instance, it is clear from the face of Shannon's Complaint that she did not file this action alleging a violation under the FMLA until over four years after her employment was terminated. [4] This period is plainly beyond the two year statute of limitations that applies to Shannon's claim under the FMLA. Accordingly, the court will dismiss Shannon's FMLA claim.

> 4.    The court agrees with the City's argument, which is not disputed by Shannon, that filing a discrimination charge with the EEOC does not toll the statute of limitations for her FMLA claim. *See Johnson v. Railway Express Agency, 421 U.S. 454, 465-67, 44 L. Ed. 2d 295, 95 S. Ct. 1716 (1975)* (holding that an EEOC filing did not toll the limitation period for a suit brought under *42 U.S.C. § 1981*); *Sanders v. Hale Fire Pump Co., 1987 U.S. Dist. LEXIS 8826*, No. 87-2468, 1987 WL 17748, *3 (E.D. Pa. Sept. 30, 1987)* (finding that plaintiff's EEOC claim did not toll statute of limitations for a hybrid claim under § 301 of the Labor Management Relations Act). This position is bolstered by the fact that the FMLA does not require a plaintiff to pursue any administrative remedies before filing suit in federal court. *See 29 U.S.C. §§ 2601 et seq.*; *29 C.F.R. § 825.400(a)*; *Krohn v. Forsting, 11 F. Supp. 2d 1082, 1085 (E.D. Mo. 1998)*; *Churchill v. Star Enter., 1998 U.S. Dist. LEXIS 6068*, No. 97-3527, 1998 WL 254080, *6 (E.D. Pa. 1998)*.

[*13]  **C. *PHRA Claim***

The City argues that Shannon's PHRA claim should be dismissed because she failed to plead that she exhausted her administrative remedies under the PHRA before instituting an action in this court. A plaintiff may not seek judicial remedies under the PHRA, unless an administrative complaint is filed with the Pennsylvania Human Relations Commission within 180 days of the alleged act of discrimination. *Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997)* (citation omitted). Shannon's Complaint does not allege that she exhausted her administrative remedies under the PHRA prior to filing suit in this court. Additionally, Shannon does not address this issue in her response to the City's motion to

1999 U.S. Dist. LEXIS 2428, *13; 137 Lab. Cas. (CCH) P33,824;
75 Empl. Prac. Dec. (CCH) P45,790; 5 Wage & Hour Cas. 2d (BNA) 380

dismiss. The court will dismiss Count III of Shannon's Complaint alleging a claim under the PHRA for failure to allege that she exhausted her administrative remedies.

### IV. *CONCLUSION*

For the reasons set forth above, the City's motion to dismiss will be granted in part and denied in part.

An appropriate Order follows.

### *ORDER*

AND NOW, TO WIT, this 5th day of March, 1999, upon consideration of defendant the City of Philadelphia's motion to [*14] dismiss and plaintiff Carol Shannon's response thereto, IT IS ORDERED that said motion is GRANTED IN PART and DENIED IN PART as follows:

(1) Said motion is DENIED as to Count I;

(2) Count II is DISMISSED; and

(3) Count III is DISMISSED, WITHOUT PREJUDICE. Plaintiff may amend her Complaint within twenty (20) days to properly allege a claim under the Pennsylvania Human Relations Act.

LOUIS C. BECHTLE, J.

**TAB 7**

Not Reported in F.Supp.    Page 1
Not Reported in F.Supp., 1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C
**(Cite as: Not Reported in F.Supp.)**

Duffy v. Drake Beam Morin
S.D.N.Y.,1998.

United States District Court, S.D. New York.
Joseph DUFFY, Sylvan Von Burg and Raphael
Graham, Plaintiffs,
v.
DRAKE BEAM MORIN, HARCOURT GENER-
AL, INC. and Harcourt Brace And Company, De-
fendants.
**No. 96 Civ. 5606(MBM).**

May 19, 1998.

Joseph J. Ranni, Ranni & Smith New York, NY, for
Plaintiffs.
Thomas R. Kelly, Epstein Becker & Green, New
York, NY, for Defendants.

OPINION AND ORDER
MUKASEY, J.

**\*1** Joseph Duffy, Sylvan Von Burg, and Ralphael
Graham FN1 sue their former employer Drake
Beam Morin ("DBM"), and its parent company,
Harcourt General, Inc. ("Harcourt General"), for vi-
olating the Age Discrimination in Employment Act
of 1967 ("ADEA"), 29 U.S.C. §§ 621, et seq.
(1994), the Employee Retirement Income Security
Act of 1974 ("ERISA"), 29 U.S.C. §§ 1140 et seq.
(1994), and state and local anti-discrimination laws.
Harcourt General moves pursuant to Fed.R.Civ.P.
56(c) for a summary judgment of dismissal on all
claims. DBM moves for partial summary judgment
on certain claims. For the reasons stated below,
Harcourt General's motion is granted, and DBM's
motion is granted in part and denied in part.

> FN1. Graham sues in both plaintiffs' ori-
> ginal and First Amended Complaint under
> the name "Raphael Graham."

I.

The following facts, viewed in the light most favor-
able to plaintiffs, FN2 are relevant to defendants'
motions for summary judgment: DBM provides ca-
reer counseling and management services to com-
panies and their employees. (Def. Rule 56.1 State-
ment ¶ 21) DBM has its main office in Manhattan,
and branch offices in Melville, New York, and Par-
sippany, New Jersey, among other places. (Id. ¶ 30;
Compl. ¶¶ 4, 44, 69) FN3 Duffy, Von Burg, and
Graham were formerly employed by DBM as con-
sultants. (Compl.¶¶ 10, 42, 67)

> FN2. Plaintiffs failed to file a statement of
> facts as to which there exists a genuine is-
> sue of material fact as required by Local
> Civil Rule 56.1. As a result, any facts in
> Defendant's Rule 56.1 Statement that are
> not controverted by plaintiffs' papers and
> supporting documents are deemed admit-
> ted pursuant to the terms of that Rule. See
> Glazer v. Formica Corp., 964 F.2d 149,
> 154 (2d Cir.1992) (citing Dusanenko v.
> Maloney, 726 F.2d 82, 84 (2d Cir.1984)).

> FN3. "Compl." refers to plaintiffs' First
> Amended Complaint filed in May 1997.

DBM is a wholly-owned subsidiary of Harcourt
General. (Def. Rule 56.1 Statement ¶ 1) Although
Harcourt General reviews DBM's financial reports
regularly and requires DBM to obtain its approval
before making significant changes in operations
(Walz Depos. at 22-23), Harcourt General exercises
no day-to-day control over DBM. (Def. Rule 56.1
Statement ¶ 2) Moreover, Harcourt General and
DBM have separate human resources departments
(id. ¶ 10), and DBM develops its own policies and
makes its own decisions as to the hiring, discipline,
and termination of its employees. (Id. ¶ 3)
However, DBM employees are eligible to particip-
ate in pension and benefit plans administered by
Harcourt General. (Walz Depos. at 40-41)

Beginning in 1994, DBM implemented new per-
formance standards for its consultants called "core
competencies." (Def. Rule 56.1 Statement ¶ 23)
Each consultant at DBM reviewed the core compet-

Not Reported in F.Supp., 1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C
**(Cite as: Not Reported in F.Supp.)**

encies with his or her manager before they took ef-
fect. (*Id.* ¶ 25) At that time, DBM gave its consult-
ants the option of either remaining at DBM and per-
forming in accordance with the core competencies,
or resigning and taking advantage of an enhanced
severance package. (*Id.* ¶ 26) Consultants who
chose the former course, but who failed to meet the
new performance standards, were fired and re-
ceived only a standard severance package. (*Id.* ¶ 27;
Kelly Aff. Exs. M, N) DBM rehired some of these
former employees to perform consulting work for
DBM clients as independent contractors, although
these consultants-who are no longer DBM employ-
ees-are ineligible to participate in DBM's pension
or benefit plans. (Ranni Aff. Ex. 1 at 9)

### A. *Joseph Duffy*

**\*2** Duffy was hired by DBM on December 2, 1985.
(Def. Rule 56.1 Statement ¶ 29) At all times relev-
ant to this case, Duffy worked out of DBM's office
in Melville, New York. (*Id.* ¶ 30) When DBM in-
troduced the core competencies in early 1995,
Duffy elected to remain at DBM and attempt to
meet the new standards. (*Id.* ¶ 28) On October 6,
1995, DBM fired Duffy on the ground that he had
failed to meet these standards. (*Id.* ¶ 31) At that
time, Duffy's pension rights were fully vested for
both normal and early retirement benefits in the
DBM pension plan. (*Id.* ¶ 34) On October 13, 1995,
Duffy filed a charge of employment discrimination
against DBM with the Equal Employment Oppor-
tunity Commission ("EEOC"). (Ranni Aff. Ex. 13)

In November 1995, DBM hired Duffy as an inde-
pendent contractor to conduct a two-day workshop
for one of DBM's clients. (Def. Rule 56.1 Statement
¶ 37) After Duffy conducted the workshop, but be-
fore he was paid for that work, DBM asked Duffy
to sign an independent contractor agreement. (*Id.* ¶
38) The agreement contained, *inter alia,* a non-
competition provision barring Duffy from perform-
ing consulting services for any of DBM's clients for
at least one year. (Ranni Aff. Ex. 20 ¶ 7) The
parties dispute whether the agreement DBM asked
Duffy to sign was its "standard" independent con-
tractor agreement (Def. Reply Mem. at 20; Kelly

Aff. Exs. AG, AH), or a more restrictive version of
the one DBM typically offers to other independent
contractors. (Pl. Mem. at 17; Ranni Aff. Ex. 21)
When Duffy refused to sign the independent con-
tractor agreement, DBM refused to pay him for the
workshop. (Def. Rule 56.1 Statement ¶ 42) DBM
subsequently dropped its demand that Duffy sign
the agreement and paid him in full. (*Id.*)

### B. *Sylvan Von Burg*

Von Burg was hired by DBM on May 23, 1988 (*id.*
¶ 44), and he worked at all relevant times at DBM's
main office in New York City. (Compl.¶ 44) When
the core competencies were introduced, Von Burg,
like Duffy, declined DBM's offer of an enhanced
severance package and elected instead to continue
working at DBM. (Def. Rule 56.1 Statement ¶ 28)
On June 30, 1995, DBM fired Von Burg on the
ground that he, too, had failed to satisfy the new
performance standards. (*Id.* ¶¶ 12, 46) On October
13, 1995, Von Burg filed a charge of discrimination
against DBM with the EEOC. (Compl. ¶ 50; Kelly
Aff. Ex. Q) At the time he was fired, Von Burg's
pension rights were fully vested for normal retire-
ment benefits under DBM's pension plan (Def. Rule
56.1 Statement ¶ 46), but he was more than three
years away from having his rights vest for early re-
tirement benefits. (*Id.* ¶ 47)

### C. *Ralphael Graham*

Graham was hired by DBM on May 1, 1985. (*Id.* ¶
49) At all relevant times, Graham worked at DBM's
office in Parsippany, New Jersey. (Compl.¶ 69)
Graham also continued to work at DBM after the
core competencies were introduced in 1995. (Def.
Rule 56.1 Statement ¶ 50) On October 27, 1995,
Mark Landsberg, Graham's supervisor at DBM, met
with Graham to discuss his performance. (*Id* .) At
that meeting, Landsberg offered Graham an en-
hanced severance package if he would accept early
retirement and sign a severance agreement. (*Id.* ¶
51) Graham neither signed the agreement nor re-
turned to work after October 27, 1995. (*Id.* ¶ 52)
However, DBM continued to pay him salary
through December 20, 1995. (*Id.*) When Graham

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C
**(Cite as: Not Reported in F.Supp.)**

left DBM, his pension rights were fully vested for both normal and early retirement benefits. (*Id.* ¶ 55) On December 1, 1995, Graham filed a discrimination complaint with the EEOC. (Ranni Aff. Ex. 14)

**\*3** The parties dispute whether Graham was still employed by DBM between October 27, 1995, and December 20, 1995, and how much severance pay, if any, Graham was entitled to receive from DBM when he left. However, viewed in the light most favorable to Graham, the facts reveal that Graham was fired by DBM on October 27, 1995, when he refused to accept early retirement and sign the severance agreement. (Graham Depos. at 129; Ranni Aff. Ex. 13) The payments Graham received from DBM after October 27, 1995, were amounts to which he was entitled under DBM's standard severance package (Ranni Aff. Ex. 12), and based on his ten years of service with DBM, Graham was entitled to continue receiving those payments until January 26, 1996. (*Id.*)

### D. *Procedural History*

After they received right-to-sue letters from the EEOC, plaintiffs filed this action against DBM and Harcourt General alleging unlawful age discrimination and retaliation in violation of the ADEA and state and local anti-discrimination laws. Plaintiffs claim also that defendants fired them in an effort to deny them their pension rights in violation of ERISA. Harcourt General moves pursuant to Rule 56(c) for a summary judgment dismissing all claims. DBM moves for partial summary judgment on the following claims: 1) Duffy's and Graham's retaliation claims;[FN4] 2) Duffy's, Von Burg's, and Graham's ERISA claims; 3) Duffy's and Graham's claims under the New York City Human Rights Law ("City Human Rights Law"), N.Y. City Admin. Code § 8-107 *et seq.* (1986); and 4) Graham's claims under the New York State Human Rights Law ("State Human Rights Law"), N.Y. Exec. Law § 296 (McKinney 1990).

> **FN4.** Von Burg does not assert a claim for retaliation.

### II.

On a motion for summary judgment, the moving party bears the burden of proving that there are no material facts in dispute and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Although the burden of persuasion is always on the moving party, the non-movant may not resist a motion for summary judgment merely by offering conclusory assertions suggesting that "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the non-movant must set forth specific facts that demonstrate a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In employment discrimination cases, where liability often turns on the issue of intent, courts should approach a motion for summary judgment with special caution. *See* *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994). Because employers rarely leave direct evidence of discriminatory intent, the court must scrutinize all of the available evidence in search of circumstantial proof to rebut the employer's explanation for its actions. *See* *Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85 (2d Cir.1990).

**\*4** However, that discrimination cases are subject to a heightened duty of care does not mean that summary judgment is unavailable in such cases. *See* *McLee v. Chrysler Corp.,* 38 F.3d 67, 68 (2d Cir.1994). When an employer provides convincing evidence explaining its conduct, and the plaintiff's case rests on conclusory allegations of discrimination, the court may properly conclude that there is no genuine issue of material fact and grant summary judgment to the employer. *See* *Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995).

### III.

Harcourt General moves for a summary judgment of dismissal on each of plaintiffs' claims. It argues that it is not liable to plaintiffs because they worked for DBM, and not Harcourt General, and because

Not Reported in F.Supp., 1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C
**(Cite as: Not Reported in F.Supp.)**

Harcourt General was not involved in any of the employment decisions that are at issue in this case. FN5 (Def. Mem. at 21) I agree.

> FN5. Harcourt General argues also that plaintiffs' discrimination claims should be dismissed because plaintiffs failed to exhaust their administrative remedies before filing suit against Harcourt General. (Def. Mem. at 12-13) Because I agree with Harcourt General's first argument, I do not reach this alternative ground for dismissal.

As the Second Circuit recently observed, "the law only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances." *Murray v. Miner, 74 F.3d 402, 404 (2d Cir.1996).* Whether a case presents such circumstances turns on the outcome of a "flexible four-part test aimed at determining the degree of interrelationship between the two entities." *Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240 (2d Cir.1995).* The "single employer" doctrine, as this test has come to be known, provides as follows: A parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.

*Id.* at 1240 (quotation omitted). FN6 Although each of these factors is important, the second one-centralized control of labor relations-should be the focus of the inquiry. *See Id.* at 1241; *see, e.g., Sharkey v. Lasmo (Aul Ltd.), 992 F.Supp. 321 (S.D.N.Y.1998).* That criterion has been distilled further into the following question: "What entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Arrowsmith, 69 F.3d at 1240* (quotation omitted).

> FN6. It is unclear whether this standard is also the proper one for assessing whether Harcourt General may be held liable for the ERISA violations allegedly committed

by DBM. *See, e.g., Carner v. MGS-576 5th Ave., Inc., No. 93 Civ. 8259, 1998 WL 33978, at *10 (S.D.N.Y. Jan. 21, 1998)* (holding that single employer doctrine does not apply to ERISA claims). I need not resolve this issue here because plaintiffs' ERISA claims must be dismissed on the ground that plaintiffs fail to present a prima facie case of intentional interference with their pension rights as required by that statute, *see* discussion *infra* at pp. 20-24.

Applying the single employer doctrine to the facts of this case demonstrates that Harcourt General may not be held liable for the allegedly discriminatory conduct of DBM. It is uncontroverted that DBM and Harcourt General have separate human resources departments (Def. Rule 56.1 Statement ¶ 9), and that DBM establishes its own policies and makes its own decisions as to the hiring, discipline, and termination of its employees. (*Id.* ¶ 3) It is likewise undisputed that plaintiffs worked for DBM and that each was supervised by another DBM employee. (Duffy Depos. at 60-61; Von Burg Depos. at 114-115; Graham Depos. at 45-48) It follows from these undisputed facts that DBM, and not Harcourt General, made the "final decisions" regarding plaintiffs' employment that are at issue here. *See Arrowsmith, 69 F.3d at 1240.*

**\*5** The other *Arrowsmith* factors support this conclusion. Nothing in the record suggests that Harcourt General and DBM have interrelated operations such as shared employees or office space, *cf. Regan v. In the Heat of the Nite, Inc., No. 93 Civ. 862, 1995 WL 413249, at *4 (S.D.N.Y. July 12, 1995)* (restaurants jointly liable based on shared employees and office space), or that they have any of the same officers or managers. *Cf. Dortz v. City of New York, 904 F.Supp. 127, 145-47 (S.D.N.Y.1995)* (medical school jointly liable where it controlled hospital's operations and supervised its employees, including plaintiff). The only factor that favors requiring Harcourt General to answer for the acts of its subsidiary-common ownership and financial control-is insufficient, without

Not Reported in F.Supp.                                                                                  Page 5
Not Reported in F.Supp., 1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C
**(Cite as: Not Reported in F.Supp.)**

more, to create such liability. *See Balut v. Loral Elec. Sys., 988 F.Supp. 339, 347 (S.D.N.Y.1997)* ("the mere fact of a parent-subsidiary relationship does not trigger liability").

Plaintiffs resist this conclusion, arguing that Harcourt General was involved in the employment decisions at issue in this case. They surmise that DBM must have obtained Harcourt General's approval before implementing the core competencies because the new standards represented a significant change in DBM's operations. (Pl. Mem. at 9) In support of this claim, plaintiffs assert that DBM's implementation of the core competencies resulted in the firing of at least ten employees over the age of 40. (*Id.*) Plaintiffs also suggest that Harcourt General had a strong interest in the core competencies because, as the administrator of DBM's pension and benefit plans, Harcourt General benefitted directly from any reduction in the number of DBM employees who were eligible to participate in these plans. (*Id.*) These allegations are not supported by the record.

Although Harcourt General generally requires DBM to obtain its approval before making significant changes in operations (Walz Depos. at 22-23), there is no evidence that such approval was either sought or obtained with respect to any of DBM's actions at issue here. Rather, plaintiffs offer only speculation that implementation of the new performance standards was a significant change in DBM's operations that would have required Harcourt General's approval. Plaintiffs' failure to support these allegations with evidence is particularly striking given the extensive pre-trial discovery in this matter.

Furthermore, that Harcourt General administers the pension and benefit plans for its subsidiaries, including DBM, is hardly uncommon, *see, e.g., Pagan v. NYNEX Pension Plan, 52 F.3d 438, 439 (2d Cir.1995)*; *Reichelt v. Emhart Corp., 921 F.2d 425, 427-28 (2d Cir.1990)*, nor is it proof that Harcourt General made the employment decisions at issue here. *See Richard v. Bell Atlantic Corp., 946 F.Supp. 54, 62-63 (D.D.C.1996)* (that parent admin-

isters pension and benefit plans for its subsidiary is of "low or no probative value" in determining single employer status) (citing *Frank v. U.S. West, Inc., 3 F.3d 1357, 1363 (10th Cir.1993)*). Accordingly, plaintiffs' discrimination claims against Harcourt General must be dismissed.

IV.

**\*6** DBM also moves for partial summary judgment on the following claims: 1) Duffy's and Graham's retaliation claims; 2) Duffy's, Von Burg's, and Graham's ERISA claims; 3) Duffy's and Graham's City Human Rights Law claims; and 4) Graham's State Human Rights Law claims. These claims are subject to the familiar three-step framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)*, and later refined in *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)*, among other cases. *See Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir.1997)* (retaliation); *Dister v. Continental Group, Inc., 859 F.2d 1108, 1112 (2d Cir.1988)* (ERISA). A court applying this standard proceeds as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine, 450 U.S. at 252* (quoting *McDonnell Douglas, 411 U.S. at 802*)).

A. *Duffy's and Graham's Retaliation Claims*

Although DBM concedes that disputed issues of fact preclude summary judgment on plaintiffs' age discrimination claims (Def. Reply Mem. at 5), it has moved for summary judgment on Duffy's and Graham's retaliation claims. *See Davis v. State*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 6
Not Reported in F.Supp., 1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C
**(Cite as: Not Reported in F.Supp.)**

*Univ. of New York,* 802 F.2d 638, 642 (2d Cir.1986) ("A finding of unlawful retaliation is not dependent on the merits of the underlying discrimination complaint."). A prima facie case of retaliation stemming from a charge of age discrimination requires proof of the following four elements: "1) the plaintiff was engaged in an activity protected under the ADEA; 2) the employer was aware of the plaintiff's participation in the protected activity; 3) the plaintiff was subject to an adverse employment action; and 4) there is a nexus between the protected activity and the adverse action taken." *Wanamaker,* 108 F.3d at 465; *accord Hollander,* 895 F.2d at 85.[FN7]

> **FN7.** Duffy and Graham assert identical claims of retaliation under the ADEA and the City and State Human Rights Laws. These state and local law claims are governed by the same standards as those brought under the ADEA. *See Spence v. Maryland Cas., Co.,* 995 F.2d 1147, 1158 (2d Cir.1993).

"Adverse employment action" includes dismissal, demotion, diminution of an employee's wages or benefits, and other actions by an employer which cause an employee to suffer a "materially adverse change in the terms and conditions of employment." *Torres v. Pisano,* 116 F.3d 625, 640 (2d Cir.), *cert. denied,* 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997). The Court of Appeals also has found adverse employment action even after an employee has been terminated where the employer takes some additional step which adversely affects the employee's ability either to secure future employment, *see Silver v. Mohasco Corp.,* 602 F.2d 1083, 1090 (2d Cir.1979) ("blacklisting" former employee), *rev'd on other grounds,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980), or to "expeditiously ascertain and enforce [his] rights [against the employer]." *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (refusing to participate in grievance procedure). The requisite causal connection may be proved "indirectly by showing that the protected activity was followed closely by discriminatory treatment...." *Id.* (citing *DeCintio v.*

*Westchester County Medical Ctr.,* 821 F.2d 111, 115 (2d Cir.1987)).

### 1. Duffy

**\*7** Duffy claims that DBM retaliated against him for filing a complaint with the EEOC by refusing to pay him for the workshop he conducted in November 1995 unless he signed an independent contractor agreement with DBM. (Pl. Mem. at 17) As noted, that agreement contained a non-competition provision which would have restricted Duffy's right to work as a consultant for any of DBM's clients for at least one year. (Ranni Aff. Ex. 20 ¶ 7) DBM concedes that these allegations satisfy the first two elements of a prima facie case of retaliation. (Def. Mem. at 31) However, it argues that Duffy fails to establish the third and fourth elements. (*Id.* at 31-32) I disagree.

As noted, Duffy filed a complaint with the EEOC on October 13, 1995. (Ranni Aff. Ex. 13) Approximately one month later, in mid-November 1995, DBM hired Duffy to conduct a two-day workshop for one of DBM's clients as an independent contractor. (Def. Rule 56.1 Statement ¶ 37) DBM subsequently refused to pay Duffy unless he signed the agreement described above. (Ranni Aff. Ex. 12 ¶ 7)

Of course, that DBM rehired Duffy as an independent contractor was not adverse employment action. *Cf. Boyle v. McCann-Erickson, Inc.,* 949 F.Supp. 1095, 1104-05 (S.D.N.Y.1997) ("Here, plaintiff had already been terminated; accordingly this alleged decision [not to rehire him to do freelance work] did not effect his employment nor hinder him in any way from enforcing his rights."). However, that DBM refused to pay him for work he had already performed unless he signed an agreement restricting his right to work in the future arguably qualifies as adverse employment action. *Cf. Silver,* 602 F.2d at 1090 (employer's "blacklisting" of former employee prevented him from securing future employment). Further, that DBM forced the agreement on Duffy approximately one month after he filed his EEOC complaint is sufficient to establish a prima facie case of retaliation. *See Johnson,* 931 F.2d at

Not Reported in F.Supp.                                                                              Page 7
Not Reported in F.Supp., 1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C
**(Cite as: Not Reported in F.Supp.)**

207.

The burden now shifts to DBM to provide a legit-imate, non-discriminatory reason for its conduct. *See Hollander, 895 F.2d at 83.* DBM claims that the agreement it required Duffy to sign was its "standard" independent contractor agreement, and that in doing so, DBM was treating Duffy the same as its other independent contractors. In support of this claim, DBM has submitted a blank independent contractor agreement (Kelly Aff. Ex. AG), as well as testimony from one of its employees to the effect that the agreement proffered to Duffy was prepared using that form as a template. (Collins Depos. at 514-15) Together, this evidence is sufficient to meet DBM's burden of production on this issue. *See Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir.1993).*

Because DBM has carried this burden, Duffy must show that DBM's proffered reason was not the true reason for its actions but was instead a pretext for discrimination. *See Burdine, 450 U.S. at 255-56.* However, Duffy need not present additional evid-ence to satisfy this burden and may rely instead on the evidence that established his prima facie case. *See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).* Here, it is clear that DBM's refusal to pay Duffy after he completed the work was wrongful. DBM did not ask Duffy to sign the independent contractor agree-ment before he performed the work, nor is there any competent evidence that Duffy knew at the time he agreed to conduct the workshop that he would have to limit his future employment signific-antly if he accepted work from DBM. As noted, DBM forced the agreement on Duffy approximately one month after Duffy filed his complaint with the EEOC.

**\*8** Moreover, there is evidence in the record-al-though admittedly not-much-which casts doubt on DBM's claim that all its independent contractors worked according to the same terms that were offered to Duffy. (Ranni Aff. Ex. 21) Duffy's evid-ence, taken together and viewed in the light most favorable to him, suggests that DBM may have

treated Duffy differently from its other independent contractors. As a result, Duffy has shown that there is a genuine issue of material fact as to whether DBM's proffered reason for its actions was a pre-text for discrimination. Accordingly, DBM's motion for summary judgment on Duffy's retaliation claims is denied.

### 2. *Graham*

Graham alleges that DBM retaliated against him for filing his EEOC complaint by refusing to pay him the severance to which he claims to have been en-titled. (Pl. Mem. at 16) Graham argues that DBM stopped paying him severance on December 20, 1995, and that based on his ten years of service at DBM, he was entitled to continue receiving pay-ments until January 26, 1996. (*Id.*) Again, DBM concedes that Graham has established the first two elements of a prima facie case (Def. Mem. at 31), but argues that he fails to establish the third and fourth elements. (Def. Reply Mem. at 18-19) Once again, I disagree.

Viewing the facts in the light most favorable to Graham, DBM fired Graham on October 27, 1995, when he refused to accept early retirement and sign a severance agreement. (Pl. Mem. at 16) As noted, Graham filed a discrimination complaint with the EEOC on December 1, 1995. (Ranni Aff. Ex. 14) Approximately three weeks later, on December 20, 1995, DBM stopped making severance payments to Graham (*id.* Ex. 17), even though he was entitled to receive such payments until January 26, 1996. (*Id.* Ex. 12) Because failing to pay an employee sever-ance to which he is entitled is an adverse employ-ment action, *see Wanamaker, 108 F.3d at 466,* and because DBM stopped making these payments less than three weeks after Graham filed a complaint with the EEOC, *see Johnson, 931 F.2d at 207,* Gra-ham has stated a prima facie case of retaliation.

DBM claims that it had a legitimate, non-discriminatory reason for discontinuing these pay-ments to Graham. It argues that contrary to Gra-ham's assertions, Graham was still an employee of DBM from October 27, 1995, through December

20, 1995, although DBM had told him to stop re-
porting to work while he considered whether to ac-
cept the enhanced severance package and sign the
severance agreement. (Def. Rule 56.1 Statement ¶
51) Thus, DBM alleges, Graham was receiving
salary-and not severance payments-during this peri-
od. (*Id.* ¶ 52)

Furthermore, DBM claims that it contacted Graham
on December 20, 1995, and requested that he accept
the package or return to work. (*Id.* ¶ 53) When Gra-
ham refused to do either, DBM deemed him to have
retired and ceased paying him salary. (*Id.* ¶ 54)
DBM claims also that Graham was not entitled to
severance because he had retired, even though Gra-
ham never signed the severance agreement or re-
ceived the enhanced severance package. (Def.
Reply Mem. at 19) Based on the above allegations
and supporting evidence, DBM has met its burden
of setting forth a legitimate, non-discriminatory ex-
planation for its conduct. *See Jackson v. Lyons
Falls Pulp & Paper, Inc., 865 F.Supp. 87, 95
(N.D.N.Y.1994)* (conditioning payment of sever-
ance on employee's willingness to sign severance
agreement not unlawful where employee was not
otherwise entitled to severance); *Cronin v. ITT
Corp., 737 F.Supp. 224, 230 (S.D.N.Y.)* (same),
*aff'd,* 916 F.2d 709 (1990) (table).

**\*9** Graham must now show that this explanation
was not the true reason for DBM's actions but was
instead a pretext for discrimination. *See Burdine,
450 U.S. at 255-56.* Again, a plaintiff does not have
to present additional evidence to carry this burden
and may rely instead on the evidence that estab-
lished his prima facie case. *See Hicks, 509 U.S. at
510.* On this record, I cannot determine whether
DBM's proffered reason for discontinuing the pay-
ments to Graham was pretextual because there is a
genuine issue of fact as to whether Graham was en-
titled to receive severance pay from DBM and, if
so, how much. DBM's severance policy, as reflec-
ted in its employee handbook, arguably supports
both Graham's and DBM's positions. (Ranni Aff.
Ex. 12) The handbook states that employees
"released" by DBM are entitled to receive sever-
ance payments, but those electing "retirement,

whether 'early,' 'normal,' or 'deferred," ' are not.
(*Id.*) Whether DBM "released" Graham, or whether
he "retir[ed]" is an issue of fact for trial.

Apart from whether Graham was entitled to sever-
ance under DBM's severance policy, other evidence
in the record suggests that DBM's reason for dis-
continuing salary payments to Graham may have
been pretextual. DBM paid severance to both Duffy
and Von Burg, even though each of them-like Gra-
ham-declined the enhanced severance package and
refused to sign the severance agreement. (Kelly
Aff. Exs. M, N) Further, the agreement that DBM
asked Graham to sign appears to acknowledge that
Graham was entitled to receive DBM's standard
severage package even if he declined the enhanced
one. (Ranni Aff. Ex. 5 ¶ 6) Under these circum-
stances, Graham's evidence, viewed in the light
most favorable to him, is sufficent to raise an infer-
ence of discrimination and therefore also to defeat
DBM's motion for summary judgment. *See Fisher
v. Vassar College, 114 F.3d 1332, 1338 (2d
Cir.1997)* (en banc) ("The sufficiency of the finding
of pretext to support a finding of discrimination de-
pends on the circumstances of the case."), *cert.
denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d
752 (1998). Accordingly, DBM's motion for sum-
mary judgment on Graham's retaliation claims is
denied.

### B. *Duffy's, Von Burg's, and Graham's ERISA claims*

Section 510 of ERISA makes it unlawful for "any
person to discharge, fine, suspend, expel, disci-
pline, or discriminate against a participant or benefi-
ciary ... for the purpose of interfering with the at-
tainment of any right to which such participant may
become entitled under the plan." 29 U.S.C. § 1140
(1994). Although this section is concerned primar-
ily with "protect[ing] plan participants from termin-
ation motivated by an employer's desire to prevent
a pension from vesting," *Inter-Modal Rail Employ-
ees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.,
520 U.S. 510, 117 S.Ct. 1513, 1515, 137 L.Ed.2d
763 (1997)* (quotations and citations omitted),
ERISA also protects employees whose pension

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C
**(Cite as: Not Reported in F.Supp.)**

rights are fully vested against actions by their employers that are specifically intended to prevent them from accruing additional vested benefits. *See Gitlitz v. Compagnie Nationale Air France, 129 F.3d 554, 558 (11th Cir.1997); Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 238 (4th Cir.1991); Clark v. Resistoflex Co., Div. of Unidynamics Corp., 854 F.2d 762, 770 (5th Cir.1988).*

**\*10** However, "[n]o ERISA cause of action lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." *Titsch v. Reliance Group, Inc., 548 F.Supp. 983, 985 (S.D.N.Y.1982), aff'd, 742 F.2d 1441 (2d Cir.1983)* (table). Thus, a plaintiff must do more than show "that if he had not been terminated, he would have been able to accrue additional benefits." *Dister, 859 F.2d at 1111* (quotation omitted). Rather, "the ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights...." *Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1222 (11th Cir.1993).*

To state a prima facie case under § 510, a plaintiff must prove: 1) that he is an employee who may be entitled to receive benefits under a plan covered by ERISA; 2) that he was otherwise qualified for the job he held; and 3) that the timing of his discharge and the resulting cost saving to the employer raises an inference of discrimination. *See Dister, 859 F.2d at 1114-15; Burger v. Litton Indus., Inc., No. 91 Civ. 0918, 1996 WL 421449, at \*17 (S.D.N.Y. Apr. 25, 1996)* (Peck, M.J.). In this case, DBM concedes that the first element has been established (Def. Mem. at 37), and disputed issues of fact preclude summary judgment as to whether plaintiffs were otherwise qualified for the jobs they held at DBM. However, Duffy's, Von Burg's, and Graham's ERISA claims must be dismissed because they have failed to establish the third element of a prima facie case-that the timing of their discharge and the resulting cost saving to DBM raises an inference of discrimination. *See Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir.1997).*

As noted, Duffy's and Graham's pension rights were

fully vested for both early and normal retirement benefits when DBM fired them. (Def. Rule 56.1 Statement ¶ ¶ 34, 55) At the time he was fired, Von Burg was fully vested for normal retirement benefits, but was more than three years away from vesting for early retirement. (*Id.* ¶ 47) As a consequence, that DBM fired plaintiffs when it did fails to raise an inference of discrimination. *See Burger, 1996 WL 421449, at \*17* (no inference where employee fired four months before enhanced pension rights would have vested); *see also Turner v. Schering-Plough Corp., 901 F.2d 335, 348 (3d Cir.1990)* (no inference where employee fired more than two years before vesting).

Nor is there evidence that DBM-or Harcourt General, for that matter-stood to reap substantial cost savings by firing plaintiffs. *See Sweet v. Electronic Data Systems, Inc., No. 95 Civ. 3987, 1996 WL 204471, at \*11 (S.D.N.Y. Apr. 26, 1996)* ("Plaintiff has offered nothing about ... the amount of benefits he might have received, [or] the amount EDS may have saved by letting him go ... to suggest that the decision to fire him was motivated by a desire to avoid pension or health care responsibilities."). On this record, the mere fact that plaintiffs were terminated fails to raise an inference that DBM fired them with the specific intent to deny plaintiffs their pension rights. *Cf. Dister, 859 F.2d at 1155* (inference proper where employee fired four months before vesting and plaintiff presented evidence of substantial cost saving to employer); *Corcoran v. GAB Business Servs., Inc., 723 F.Supp. 966, 969 (S.D.N.Y.1989)* (inference proper where employee fired seven months before vesting coupled with evidence of cost saving).

**\*11** Nor is this case similar to *Seaman v. Arvida Realty Sales, 985 F.2d 543 (11th Cir.1993),* upon which plaintiffs rely. In *Seaman,* the Court permitted Seaman to proceed with her ERISA claims against her former employer, Arvida, even though her pension rights were fully vested at the time of her discharge. *Id.* at 546. Seaman alleged that Arvida's decision to terminate her prevented her from receiving additional vested benefits under Arvida's pension plan. *Id.* at 546. In holding that this allega-

tion was-sufficient to state a claim under ERISA, the Eleventh Circuit relied heavily on Arvida's admission that it had fired Seaman because she refused to accept a change in status from employee to independent contractor and the concomitant loss of pension and health benefits. *Id.* at 544. On these facts, the Court reversed the district court's dismissal of Seaman's ERISA claims. *Id.* at 547.

*Seaman* is readily distinguishable. Unlike the employer in *Seaman,* DBM did not fire plaintiffs because they refused to give up their right to participate in DBM's pension and benefit plans. Rather, it fired them because they failed to perform under the new performance standards. Whether those standards discriminated against plaintiffs on the basis of age, or whether DBM applied them in a discriminatory manner, are issues to be decided at trial. However, plaintiffs have come forward with no evidence that DBM's decision to fire them was motivated by a desire to reduce its contributions to the pension and benefits plans. Accordingly, plaintiffs' ERISA claims must be dismissed.

### C. *Duffy's and Graham's City Human Rights Law claims*

Duffy's and Graham's City Human Rights Law claims must be dismissed because neither Duffy nor Graham was subjected to discriminatory conduct within New York City. [FN8] The City Human Rights Law prohibits employers from discriminating against its employees, *inter alia,* on the basis of age. *See* N.Y.C. Admin. Code § 8-107. However, both New York State law and the New York City Administrative Code limit the applicability of the City Human Rights Law to acts occurring within the boundaries of New York City. *See* N.Y. Gen. Mun. Law § 239-s (McKinney 1990); N.Y.C. Admin. Code § 2-201 (1986); *see also* Levy v. City Comm'n on Human Rights, 85 N.Y.2d 740, 743, 628 N.Y.S.2d 245, 246-47, 651 N.E.2d 1264 (1995) ("The Administrative Code ... vests in the New York City Commission on Human Rights the authority and jurisdiction to eliminate and prevent discrimination within the City of New York.") (citation and footnote omitted). Thus, in order to

state a claim under the City Human Rights Law, a plaintiff must allege that he was discriminated against by the defendant within New York City. *See* Casper v. Lew Lieberbaum & Co., No. 97 Civ. 3016, 1998 WL 150993, at *4 (S.D.N.Y. Mar. 31, 1998); Wishner v. Continental Airlines, No. 94 Civ. 8239, 1997 WL 420286, at *8 (S.D.N.Y. July 25, 1997).

> FN8. DBM argues also that plaintiffs' City Human Rights Law claims-including Von Burg's-must be dismissed because they failed to serve a copy of their complaint on the New York City Commission on Human Rights and the Corporation Counsel as required by N.Y.C. Admin.Code § 8-502 (1986). (Def. Mem. at 23-24) Whatever doubt may have existed before, *see, e.g.,* Paladines v. Poulos, No. 93 Civ. 9031, 1994 WL 389022, at *3 (S.D.N.Y. July 22, 1994) (service of complaint on administrative agencies is a prerequisite to suit under City Human Rights Law); *see also* Gray v. Shearson Lehman Bros., Inc., 947 F.Supp. 132, 137 (S.D.N.Y.1996) (dismissing City Human Rights Law claim where plaintiff failed to serve complaint on administrative agencies and did not oppose dismissal on that ground), it is now settled that filing a complaint with the above agencies is not a prerequisite to bringing suit under the City Human Rights Law. *See* Quirk v. Sherry, 238 A.D.2d 274, 656 N.Y.S.2d 874 (1st Dep't 1997); Westphal v. Catch Ball Products Corp., 953 F.Supp. 475, 481 (S.D.N.Y.1997); Kim v. Dial Serv. Int'l, Inc., No. 96 Civ. 3327, 1997 WL 5902, at *7-8 (S.D.N.Y. Jan. 8, 1997).

**\*12** Here; it is undisputed that, at all relevant times, Duffy and Graham worked at DBM's offices in Melville, New York, and Parsippany, New Jersey, respectively. (Def. Rule 56.1 Statement ¶ 30; Compl. ¶ 69) Duffy's and Graham's immediate supervisors, Joelyn Cecere and Mark Landsberg, respectively, also worked in these field offices. (Duffy Depos. at 132-33; Kelly Aff. Ex. AA; Trum Depos. at

Not Reported in F.Supp., 1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C
**(Cite as: Not Reported in F.Supp.)**

487; Ranni Aff. Ex. 13) By contrast, nothing in the record suggests that either Duffy or Graham was subjected to discriminatory conduct by DBM in New York City.

Moreover, even if, as Duffy and Graham claim, the decision to fire them was made by DBM at its headquarters in New York City, that fact, standing alone, is insufficient to establish a violation of the City Human Rights Law when the employees affected by that decision did not work in New York City. See *Lightfoot v. Union Carbide Corp.*, No. 92 Civ. 6411, 1994 WL 184670, at *5 (S.D.N.Y. May 12, 1994) (dismissing City Human Rights Law claim where plaintiff worked in Connecticut even though decision to adopt early retirement program that led to plaintiff's dismissal was made at defendant's New York City office), *aff'd*, 110 F.3d 898 (2d Cir.1997). To hold otherwise would be to expand the City Human Rights Law to cover any employee who is fired pursuant to a decision handed down by an employer from its New York City headquarters, no matter where the employee in question actually works. Accordingly, because neither Duffy nor Graham was subject to any discriminatory conduct in New York City, Duffy's and Graham's City Human Rights Law claims are dismissed.

#### D. *Graham's State Human Rights Law claims*

For essentially the same reasons, Graham's State Human Rights Law claims also must be dismissed. The State Human Rights Law-like its local law counterpart-prohibits employers from discriminating against their employees, *inter alia*, on the basis of age. See N.Y. Exec. Law § 296(a). Although the State Human Rights Law, unlike the City Human Rights Law, applies to certain discriminatory acts committed outside New York State, *see* N.Y. Exec. Law § 298-a (McKinney 1990) ("The provisions of this article shall apply as hereinafter provided to an act committed outside this state against a resident of this state ... if such act would constitute an unlawful discriminatory practice if committed within this state"), the State Human Rights Law affords no remedy to a non-New York resident who suffers discrimination outside New York State. See

*Iwankow v. Mobil Corp.*, 150 A.D.2d 272, 273, 541 N.Y.S.2d 428 (1st Dep't 1989) ("absent an allegation that a discriminatory act was committed in New York or that a New York State resident was discriminated against, New York's courts have no subject matter jurisdiction over the alleged wrong [under the State Human Rights Law]."); *Beckett v. Prudential Ins., Co.*, 893 F.Supp. 234, 238 (S.D.N.Y.1995) ("The [State Human Rights Law] does not provide a non-resident with a private cause of action for discriminatory conduct committed outside New York by a New York corporation").

**\*13** Graham is a resident of Morristown, New Jersey. (Compl.¶ 3) As noted, Graham worked, at all times relevant to this case, at DBM's branch office in Parsippany, New Jersey. (*Id.* ¶ 69) Graham's immediate supervisor also worked in that office. (Trum Depos. at 487; Ranni Aff. Ex. 13) Nothing in the record suggests that Graham was subjected to discriminatory conduct by DBM in New York State.

Similarly, even if the decision to fire Graham was made by DBM at its headquarters in New York City, that fact is insufficient to establish a violation of the State Human Rights Law. *See* *Miller v. Citicorp*, No. 95 Civ. 9728, 1997 WL 96569, at *8-9 (S.D.N.Y. Mar. 4, 1997); *Sherwood v. Olin Corp.*, 772 F.Supp. 1418, 1426 (S.D.N.Y.1991). As Judge Preska noted recently in *Miller,* this same argument was considered and rejected by the Appellate Division in *Iwankow:*

Plaintiff attempts to salvage his [State Human Rights Law] claim by asserting that CSI could not have acted as it did in Florida without the approval of Citicorp and Citibank, N.A. in New York. A similar contention was raised and rejected in *Iwankow.* There, the court noted that 'the only jurisdictional nexus asserted in the complaint, apart from the fact that defendants are domestic corporations, is that plaintiff's termination was part of a worldwide reduction in force which was decided upon at corporate headquarters in New York. The court rejected the application of the [State Human Right Law] [on those facts]....

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 12
Not Reported in F.Supp., 1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C
**(Cite as: Not Reported in F.Supp.)**

1997 WL 96569, at *9 (citations omitted). This result does not leave Graham without a remedy under state law; he has asserted claims-which DBM does not challenge-under the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 *et seq.* (West 1993). Accordingly, Graham's State Human Rights Law claims must be dismissed.FN9

> FN9. Alternatively, I would reach the same result were I to apply New York's choice-of-law rules to determine whether New York or New Jersey law governs Graham's claims. *See Littman v. Firestone Tire & Rubber Co., 709 F.Supp. 461, 469 (S.D.N.Y.1989)* (New Jersey law applies to wrongful discharge claim where plaintiff worked and was fired in New Jersey).

For the above reasons, Harcourt General's motion for a summary judgment of dismissal is granted. DBM's motion for partial summary judgment is denied with respect to Duffy's and Graham's retaliation claims, and is granted in all other respects.

S.D.N.Y.,1998.
Duffy v. Drake Beam Morin
Not Reported in F.Supp., 1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 8**

Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1998 WL 150993 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Casper v. Lew Lieberbaum & Co., Inc.
S.D.N.Y.,1998.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Kimberly A. CASPER, Deanna Caliendo and
Linette Cinelli, Plaintiffs,
v.
LEW LIEBERBAUM & CO., INC., Mark I. Lew,
Leonard A. Neuhaus, Brian T. Clendenin, Joseph
A. Alagna, Jr., Barry S. Rabkin, Bernard L.
Golembe, Marc H. Rabkin, Fred Dorushkin and
Ronald Dorushkin, Defendants.
**No. 97 Civ. 3016(JGK).**

March 31, 1998.

Lai Lee Chan, New York City, Richard S. Missan,
New York City, Thomas P. Puccio, New York City,
for plaintiffs.
Michael P. Zweig, Loeb & Loeb LLP, New York
City, for defendant Lew Lieberbaum & Co, Inc.
Steven G. Eckhaus, Eckhaus & Olson, New York
City, for defendant Mark I. Lew.
David L. Katsky, Thomas M. Lopez, Esanu Katsky
Korins & Siger, New York City, for defendant Le-
onard A. Neuhaus.
Frances Mary Maloney, Epstein Becker & Green,
New York City, for defendant Brian T. Clendenin.
Bettina B. Plevan, Proskauer Rose LLP, New York
City, for defendant Joseph A. Alagna, Jr.
Lois Carter Schlissel, Meyer, Suozzi, English &
English, P.C., Mineola, NY, for defendants Barry
S. Rabkin, Marc H. Rabkin, and Fred Dorushkin.
Marc A. Agnifilo, New York City, for defendant
Bernard L. Golembe.
Martin I. Saperstein, Goodman, Saperstein &
Cuneo, Garden City, NY, for defendant Ronald
Dorushkin.

OPINION AND ORDER
KOELTL, J.
**\*1** The plaintiffs, Kimberly Casper ("Casper"),
Deanna Caliendo ("Caliendo"), and Linette Cinelli
("Cinelli") filed this action against Lew

Lieberbaum & Co., Inc. ("LLCI") and various
LLCI employees alleging claims for sexual discrim-
ination, retaliation, and constructive discharge un-
der Title VII of the Civil Rights Act of 1964 ("Title
VII"), 42 U.S.C. § 2000e, et. seq., the New York
Human Rights Law, N.Y. Executive Law § 296, et.
seq. ("NYHRL"), and the New York City Human
Rights Law, New York City Administrative Code §
8-101, et. seq. (N.Y.CHRL"), as well as claims for
assault, battery, slander per se, and intentional in-
fliction of emotional distress. All defendants have
filed motions to dismiss certain claims in the
Amended Complaint pursuant to Federal Rule of
Civil Procedure 12(b)(6), and defendant Brian T.
Clendenin ("Clendenin") has also moved in the al-
ternative for summary judgment under Federal Rule
of Civil Procedure 56 dismissing those aspects of
the plaintiffs' fourth through sixth causes of action
directed at him. Clendenin also moves to dismiss all
claims against him pursuant to Federal Rule of
Civil Procedure 12(b)(1) because he alleges that the
plaintiffs failed to name him in their Equal Employ-
ment Opportunity Commission charges. In addition,
the defendants ask the Court to decline to exercise
supplemental jurisdiction over the remaining pen-
dent state law claims under 28 U.S.C. § 1367(c).

**I.**

On a motion to dismiss, the allegations in the com-
plaint are accepted as true. See Cohen v. Koenig, 25
F.3d 1168, 1172-73 (2d Cir.1994); see also Baxter
v. A.R. Baron & Co., Inc., No. 94 Civ. 3913, 1996
WL 586338, at \*2 (S.D.N.Y. Oct.11, 1996); Lora v.
Greifinger, No. 96 Civ. 0628, 1997 WL 102473, at
\*3 (S.D.N.Y. Feb. 27, 1997). In addition, all reas-
onable inferences must be made in the plaintiff's fa-
vor. See Gant v. Wallingford Bd. Of Educ., 69 F.3d
669, 673 (2d Cir.1995); Cosmas v. Hasset, 886 F.2d
8, 11 (2d Cir.1989); See also Lora, 1997 WL
102473, at \*3. The court's function on a motion to
dismiss is "not to weigh the evidence that might be
presented at trial but merely to determine whether
the complaint itself is legally sufficient." Goldman
v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985); see

*also Lora, 1997 WL 102473, at \*3*. Therefore, the defendants' motion should only be granted if it appears that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *See Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir.1994); see also Goldman, 754 F.2d at 1065; Lora, 1997 WL 102473, at \*3*.

Therefore, for the purposes of this motion, the Court accepts as true the following facts as alleged in the Amended Complaint. The three plaintiffs are all former employees of LLCI, a nationwide investment banking and brokerage firm with offices in Garden City, Hauppage, and Manhattan in the state of New York, and in the states of Connecticut, Massachusetts, Pennsylvania, Texas, Arizona, and Florida. (Amended Complaint ("Compl.") ¶¶ 3, 19.) The plaintiffs worked at LLCI's executive office in Garden City, New York on Long Island. (Compl.¶¶ 3, 15-17.) Casper worked at LLCI from August 1989 to August 1990 and then from May 1992 to February 1995, when she was fired. (Compl.¶ 15.) Caliendo worked at LLCI from November 1995 to November 1996, at which time she alleges she was constructively discharged. (Compl.¶ 16.) Cinelli worked at LLCI from November 1995 to December 1996, at which time she claims that she was also constructively discharged. (Compl. ¶ 17.) All three are currently residents of the state of New York. (Compl.¶¶ 15-17.)

**\*2** The individual defendants were all officers and employees of defendant LLCI who worked at LLCI's Garden City, New York, office while the plaintiffs were also employed there. Defendant Lew was the principal shareholder and Chairman of the Board of Directors and Chief Executive Office of LLCI. (Compl.¶ 20.) Defendant Neuhaus was the Chief Financial Officer and Chief Operating Officer of LLCI. (Compl.¶ 21.) Defendant Clendenin was President and Head Trader of LLCI. (Compl.¶ 22.) Defendant Alanga was the Executive Vice President and National Sales Manager of LLCI. (Compl.¶ 23.) Defendant Barry S. Rabkin was the First Vice President and Sales Coordinator for LLCI. (Compl.¶ 24.) Defendant Bernard L.

Golembe was the Operations Manager of defendant LLCI. (Compl.¶ 25.) Defendants Marc H. Rabkin, Fred Dorushkin, and Ronald Dorushkin were all Junior Partner Brokers at LLCI. (Compl.¶¶ 26-28.)

The Amended Complaint alleges a pervasive campaign of sexual harassment and discrimination by the individual defendants and by LLCI against the plaintiffs. (Compl.¶ 3.) The plaintiffs claim that they were the victims of numerous acts of both physical and verbal harassment, including allegedly serving as the targets for sexually explicit comments and inappropriate contact over the entire period of their employment at LLCI. Moreover, when they complained about their supervisors' behavior and ultimately filed a complaint with the EEOC, the plaintiffs allege that they were retaliated against, and in the case of Casper, terminated, for making their complaints.

Casper filed a charge of discrimination against the defendants with the EEOC on June 9, 1995. (Compl.¶ 9.) Caliendo filed a charge of discrimination with the EEOC on November 19, 1996. (Compl.¶ 10.) Cinelli first filed a charge of discrimination on December 23, 1996, and on January 16, 1997 filed a second charge alleging retaliation. (Compl.¶ 11.) The EEOC issued separate right to sue letters for all plaintiffs on April 10, 1997, and the plaintiffs then filed this action on April 28, 1997. (Ex. 1 to Compl.; Compl. ¶ 12.)

## II.

Defendant Clendenin moves to dismiss all of the plaintiffs' claims against him pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction because he contends that the plaintiffs did not name him as a respondent in the administrative charge of discrimination that they filed with the EEOC. This argument has no merit. As the defendants themselves correctly argue with respect to the issue of whether a pending EEOC charge tolls the statute of limitations with respect to state law claims, claims arising under state common law are claims independent of a plaintiff's Title VII claims and may be brought in a parallel proceeding.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Cf. Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) ("the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently [her] rights under both Title VII and other applicable state and federal statutes.") (internal quotation marks omitted). Thus, there is no requirement that a plaintiff file an EEOC administrative charge against a prospective defendant who will be sued on state common law tort claims. In any event, jurisdiction over the plaintiffs' claims against Clendenin is based on this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, and Clendenin is not, and in fact cannot be, sued under Title VII as an individual.[FN7] *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995) (holding that Title VII does not provide remedies against individual employees allegedly responsible for prohibited conduct).

> FN7. All of the cases cited by Clendenin in support of his argument were decided prior to the Court of Appeals for the Second Circuit's decision in *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995), which foreclosed individual liability under Title VII.

**\*3** Accordingly, Clendenin's motion to dismiss for lack of subject matter jurisdiction is denied.

### III.

The plaintiffs' fourth, fifth, and sixth claims allege violations of the New York State Human Rights Law, N.Y.Exec.Law § 296, et. seq. The fourth claim alleges that all defendants discriminated against the plaintiffs on the basis of gender, including quid pro quo harassment and sexual harassment creating an abusive and hostile work environment. (Compl.¶¶ 210-222.) Plaintiff Cinelli alone asserts the fifth cause of action, for retaliation, against defendants LLCI, Lew, Clendenin, and Rabkin. (Compl.¶¶ 223-227.) In the sixth cause of action, plaintiffs Caliendo and Cinelli assert a claim of constructive discharge against all defendants. (Compl.¶¶ 228-231.) Defendants Clendenin, Dorushkin, Golembe and Alagna now move to dismiss

these claims. Clendenin moves to dismiss the plaintiffs' fourth, fifth, and sixth causes of action as asserted against him on two bases. First, he argues that he is not an "employer" or "supervisor" as defined in the NYHRL, and therefore, he cannot be held individually liable under the statute. Second, he contends that, with respect to his conduct, the plaintiffs have failed to state a claim for sexual harassment, Cinelli has failed to state a claim for retaliation, and Cinelli and Caliendo have failed to state a claim for constructive discharge. Defendant Golembe also argues that the plaintiffs' fourth and sixth claims should be dismissed because he is not an "employer" or "supervisor" and thus cannot be held individually liable. Defendant Alagna contends that Cinelli's claims against him should be dismissed for failure to plead sufficient allegations in the Amended Complaint that his conduct violated the NYHRL. Defendant Ronald Dorushkin also argues that both Caliendo's and Cinelli's claims against him should be dismissed for insufficiently pleading that he violated their rights under the NYHRL.

In *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 660, 473 N.E.2d 11 (1984), the New York Court of Appeals held that an employee may not be sued individually under the NYHRL "if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Id.; see also Tomka,* 66 F.3d at 1317. Section 296(6) of the NYHRL, however, states that it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." In interpreting this section of the statute, the Court of Appeals for the Second Circuit in *Tomka* distinguished *Patrowich* and found that "a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the [NYHRL]." *Tomka,* 66 F.3d at 1317. This interpretation of § 296(6) has been accepted by the New York State Supreme Court Appellate Division, First Department. *See Steadman v., Sinclair,* 636 N.Y.S.2d 325, 326, 223 A.D.2d 392, 393 (1st Dep't 1996); *Peck v. Sony Music Corp.,* 632 N.Y.S.2d

963, 963, 221 A.D.2d 157, 158 (1st Dep't 1995); *but see Foley v. Mobil Chemical Co., 647 N.Y.S.2d 374, 170 Misc.2d 1 (N.Y.Sup.Ct. Monroe Co.1996).* Thus, the actions of individual defendants in creating a hostile working environment may subject them to liability under the NYHRL. *See Tomka, 66 F.3d at 1317; Wise v. New York City Police Dep't, 928 F.Supp. 355, 374 (S.D.N.Y.1996).*

**\*4** Having carefully reviewed the Amended Complaint, the Court finds that the allegations with respect to defendants Clendenin, Golembe, Alagna, and Ronald Dorushkin are sufficient to state claims under the NYHRL and to survive a motion to dismiss. The detailed allegations of the complaint sufficiently allege that these defendants actively participated in creating the hostile work environment and in the acts leading to the alleged constructive discharge of plaintiffs Cinelli and Caliendo and alleged retaliation against Caliendo. Thus, since the allegations of the complaint are sufficient, there are plainly issues of fact with respect to these issues that cannot be decided on a Rule 12(b)(6) motion to dismiss.[FN8]

> **FN8.** Clendenin's motion for summary judgment is denied for the same reason. As evidenced in the papers, there are issues of fact with respect to Clendenin's position in the company, his involvement in fostering the hostile work environment, whether he retaliated against Cinelli, and whether he participated in the acts leading to the constructive discharge of Cinelli and Caliendo.

## IV.

The plaintiffs' seventh, eighth, and ninth causes of action assert violations of the New York City Human Rights Law, Administrative Code of the City of New York, §§ 8-101 et seq. The plaintiffs' seventh, eighth, and ninth claims under the NYCHRL parallel the plaintiffs' fourth, fifth, and sixth claims under the NYHRL. In the seventh claim, all three plaintiffs allege that the defendants discriminated against the plaintiffs on the basis of gender, including quid pro quo harassment and sexual harassment creating an abusive and hostile work environment. (Compl.¶¶ 232-246.) Plaintiff Cinelli alone asserts the eighth cause of action, for retaliation, against defendants LLCI, Lew, Clendenin, and Rabkin. (Compl.¶¶ 247-252.) In the ninth cause of action, plaintiffs Caliendo and Cinelli assert a claim of constructive discharge against all defendants. All defendants move to dismiss these causes of action because all of the discriminatory conduct alleged in the Amended Complaint occurred in Garden City, New York. Therefore, the defendants argue that the plaintiffs have not satisfied the jurisdictional prerequisite to the application of the Administrative Code, since the Administrative Code applies only to conduct that takes place within the five boroughs of New York City.

Title 8 of the New York City Administrative Code, the New York City Human Rights Law, "vests in the New York City Commission on Human Rights the authority and jurisdiction to eliminate discrimination only within the City of New York." *Launer v. Buena Vista Winery, Inc., 916 F.Supp. 204, 214 (E.D.N.Y.1996.)* Both New York State law and the Administrative Code limit the applicability of the Administrative Code to acts that occur within the boundaries of New York City. *See* N.Y.Gen.Mun.Law § 239-s; N.Y.C.Admin.Code § 2-201. Thus, the plaintiffs must allege that the defendants intentionally discriminated against them within New York City for their claims to fall within the jurisdiction of the Administrative Code. *See Lightfoot v. Union Carbide Corp., No. 92 Civ. 6411, 1994 WL 184670, at \*5 (S.D.N.Y. May 12, 1994); see also Pierre v. Chemical Bank, 960 F.Supp. 21, 23 (E.D.N.Y.1997)* (noting that the City Commission on Human Rights had no subject matter jurisdiction over an alleged discrimination "since its territorial jurisdiction does not extend to employment outside of New York City."); *Funderburke v. Uniondale Union Free School Dist., 660 N.Y.S.2d 659, 661, 172 Misc.2d 963, 966 (N.Y.Sup.Ct. Nassau Co.1997).* Moreover, the plaintiff must show more than the happenstance that a defendant has an office in New York City. *See Lightfoot, 1994 WL 184670, at \*5* (granting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

summary judgment dismissing plaintiff's claims under the New York City Human Rights Law because the discriminatory conduct impacted the plaintiff at the defendant's Connecticut office where he was employed, even though the decision to adopt the Early Separation Program that led to plaintiff's dismissal was made at the New York City office).

**\*5** The plaintiffs argue that since some of the allegedly discriminatory conduct took place in New York City, application of the New York City Human Rights Law is appropriate. In support of this argument, they point to comments of a sexually explicit nature that were allegedly broadcast through LLCI's interoffice microphone system from the Garden City office to the New York City office. (Compl.¶¶ 4, 18, 19, 152-155.) In addition, the plaintiffs aver that certain defendants would answer the plaintiffs' telephones with vulgar innuendo or sexual obscenities.FN9 (Compl.¶¶ 59, 148-150.) However, these allegations are insufficient to demonstrate that any discriminatory conduct against these plaintiffs occurred in New York City. All of the plaintiffs and the defendants worked at LLCI's Garden City office, and all of the alleged acts of harassment were performed there. To the extent that telephone calls or sexually explicit comments were made to New York, those comments impacted on the plaintiffs solely at the Garden City office. The alleged violations of the Administrative Code were the quid pro quo and hostile environment sexual harassment claims, and the constructive discharge and retaliatory discharge claims, all of which impacted the plaintiffs in Garden City. *See Lightfoot,* 1994 WL 184670, at *5 (noting that the "impact" of any discriminatory acts occurred while the plaintiff was employed in Connecticut). This is not a case like *Launer,* 916 F.Supp. at 214, in which discriminatory comments were made via telephone and facsimile to the plaintiff in New York City from California and the plaintiff was fired in New York City, since there is no allegation in the Amended Complaint that any statements were made to the plaintiffs in New York City at all.FN10 The discriminatory conduct in this case, the alleged hostile work environment or the quid pro quo sexual harassment, occurred in Garden City

and not in New York City.

> FN9. At argument, counsel for plaintiff informed the Court that these telephone calls were often from individuals living in New York City. However, that fact is not alleged in the Amended Complaint. In any event, the Court has assumed for the purposes of this motion that the telephone calls were from New York City.

> FN10. The plaintiffs also argue that under *Batchelor v. Nynex Telesector Resources Group,* 623 N.Y.S.2d 235, 236, 213 A.D.2d 189, 190 (1st Dep't 1995), they must only allege that the offices of the defendant relevant to the complaint are located in New York City to show that some of the conduct took place in New York City, and they contend that they have met this standard. However, the seventh claim, the only one that references New York City, merely states that LLCI has an office in Manhattan. (Compl.¶ 235.) This statement alone does not demonstrate that any relevant conduct affecting the plaintiffs took place in the New York City office, and the complaint as a whole fails to make any such allegations.

Accordingly, the defendants' motions to dismiss the plaintiffs' seventh, eighth, and ninth claims is granted.

## V.

All defendants move to dismiss plaintiff Casper's tenth through thirteenth causes of action, which allege claims for assault, battery, slander, and intentional infliction of emotional distress, as barred by New York's one-year statute of limitations for intentional torts. Under New York law, the statute of limitations for intentional torts, including all four of these claims, is one year. N.Y.C.P.L.R. § 215. All of the defendants' alleged actions giving rise to these claims occurred prior to February 1995, the effective date of her termination, more than one year before plaintiff Casper filed her complaint on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

April 28, 1997.

The plaintiff argues that the statute of limitations on these claims was tolled pending the filing and investigation of her EEOC charges. However, the weight of well-reasoned authority in this Circuit has rejected the very same argument. *See, e.g., Walker v. Weight Watchers Int'l,* 961 F.Supp. 32, 36-37 (E.D.N.Y.1997); *Gray v. Shearson Lehman Bros.,* 947 F.Supp. 132, 137 (S.D.N.Y.1996); *Hall v. USAir, Inc.,* No. CV95-3944, 1996 WL 228458, *3 (E.D.N.Y. Apr.29, 1996); *Lamb v. Citibank, N.A.,* No. 93 Civ. 2358, 1994 U.S. Dist. LEXIS 12903, *23-3 (S.D.N.Y. Sept. 12, 1994), *aff'd without op.,* 1995 U.S.App. LEXIS 28868 (2d Cir.Sept.11, 1995), *cert. denied,* 116 S.Ct. 1675 (1996); *accord Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322-23 (7th Cir.1992) (statute of limitations on Illinois state law claims not tolled); *Arnold v. United States,* 816 F.2d 1306, 1313 (9th Cir.1987) (statute of limitations on California state law claims not tolled). In *Johnson v. Railway Express Agency, Inc.,* the Supreme Court found that the timely filing of an employment discrimination charge with the EEOC did not toll the running of the statute of limitations under 42 U.S.C. § 1981. *Id.,* 421 U.S. at 459. There is similarly no provision in New York state law that allows the tolling of the state statute of limitations for intentional torts during the pendency of EEOC charges. Therefore, the statute of limitations on Casper's state law intentional tort claims was not tolled by the pendency of her EEOC proceeding.

**\*6** Accordingly, the defendants' motions to dismiss plaintiff Casper's tenth through thirteenth causes of action, for assault, battery, slander, and intentional infliction of emotional distress, are granted.

## VI.

Defendants Alagna and Golembe move to dismiss the plaintiffs' tenth cause of action, which alleges a claim of assault against each defendant. With respect to defendant Alagna, the Amended Complaint alleges that:
In or about May 1996 ... while speaking to Plaintiff

DEANNA CALIENDO in his office, when her back was turned to him, Defendant JOSEPH A. ALAGNA, JR.... closed the door to his office. With her back still turned to him, he went to his couch and sat down. When she turned around to face him, he stared at her, and started to unbutton and unzip his pants. As he did so, he asked her to perform oral sex on him. Horrified, she quickly ran out of his office.

(Compl.¶¶ 263d, 86.) With respect to defendant Golembe, the Amended Complaint alleges that:In or about August 1996, Defendant BERNARD L. GOLEMBE ... looked down the blouse of Plaintiff LINETTE CINELLI and said to her, "Hey, Cinelli!, Lean over a little more so I can get a better look."

(Compl.¶¶ 263g, 147.)

"An 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact." *United Nat. Ins. Co. v. Waterfront New York Realty Corp.,* 994 F.2d 105, 108 (2d Cir .1993). *See Hayes v. Schultz,* 541 N.Y.S.2d 115, 116, 150 A.D.2d 522, 522 (2d Dep't 1989) (affirming trial court's dismissal of an assault claim following a nonjury trial, because "the plaintiff did not establish that any of the actions of the defendant ... although arguably discourteous, put her in 'imminent apprehension' of 'harmful or offensive contact.' ") Alagna and Golembe argue that these alleged acts are insufficient to state a claim for assault because Caliendo and Cinelli have not alleged that the defendants' respective acts placed the plaintiffs in fear of imminent harmful or offensive contact. However, paragraph 264 of the Amended Complaint specifically alleged that "[e]ach of said acts ... placed each of the Plaintiffs in fear of imminent harmful or offensive contact." (Compl.¶ 264.) Paragraph 267 similarly alleges that "[i]n each of saidacts, [the plaintiffs] each believed that she was about to receive bodily injury, or was placed in fear of imminent or offensive contact." (Compl.¶ 267.) Thus, the plaintiffs have appropriately alleged that Alagna's and Golembe's acts placed them in imminent fear of harmful of offensive contact. Moreover, to the extent that Alagna and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 150993 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Golembe argue that their acts are insufficient as a matter of law to constitute assault, there are plainly issues of fact that cannot be resolved on a motion to dismiss. *See* Cohen v. Davis, 926 F.Supp. 399, 402 (S.D.N.Y.1996).

## VII.

Defendants LLCI, Lew, Neuhaus, Alagna, Barry Rabkin, Golembe, Fred Dorushkin, and Ronald Dorushkin also move to dismiss Caliendo's and Cinelli's claims for slander per se.[FN11] Caliendo and Casper assert that twenty-six statements (some published more than once) by various defendants constitute slander per se. Generally, there are "four elements necessary to establish a prima facie case of slander: (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff." Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 61 (2d Cir.1993). The plaintiff pleading a slander claim must allege publication of the defamatory statements to a third party. *See* Geddes v. Princess Properties Int'l, Ltd., 451 N.Y.S.2d 150, 151, 88 A.D.2d 835, 835 (1st Dep't 1982); *see also* Williams v. Varig Brazilian Airlines, 564 N.Y.S.2d 328, 330, 169 A.D.2d 434, 437 (1st Dep't), *appeal denied,* 78 N.Y.2d 854, 573 N.Y.S.2d 467, 577 N.E.2d 1059 (1991); Memory Gardens, Inc. v. D'Amico, 458 N.Y.S.2d 956, 957, 91 A.D.2d 1159, 1159 (3rd Dep't 1983). In addition, the plaintiff must allege that the statements took place within one year prior to the filing of the Complaint so that a defendant may properly interpose a statute of limitations defense. *See* Tasso v. Platinum Guild Int'l, No. 94 Civ. 8288, 1997 WL 16066, at *4 (S.D.N.Y. Jan.16, 1997); Reeves v. Continental Equities Corp. of America, 767 F.Supp. 469, 473 (S.D.N.Y.1991) (dismissing defamation claim for, among other reasons, failure to allege the dates of the defamatory statements); Geddes, 451 N.Y.S.2d at 151, 88 A.D.2d at 835.

> FN11. Because the Court finds the Casper's slander per se claim is barred by the one year statute of limitations applicable to intentional torts, the Court need not

address the defendants' arguments with respect to her claim.

**\*7** The plaintiffs in this case have not pleaded special damages, but instead argue that this case falls within two of the four categories of slander per se. Although "slander as a rule is not actionable unless the plaintiff suffers special damage," Liberman v. Gelstein, 80 N.Y.2d 429, 434, 590 N.Y.S.2d 857, 860, 605 N.E.2d 344 (1992), damages are "presumed when the defamatory statement takes the form of slander per se." Weldy, 985 F.2d at 61-62. For a claim to fall within the slander per se exception, it must "consist of statements (i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." Liberman, 80 N.Y.2d at 435, 590 N.Y.S.2d at 860, 605 N.E.2d at 347. The plaintiffs only argue that the alleged slanderous statements either charge the plaintiffs with a serious crime or tend to injure the plaintiffs in their trade.

### A.

### 1.

With respect to whether a statement charges a plaintiff with a serious crime, "the law distinguishes between serious and relatively minor offenses, and only statements regarding the former are actionable without proof of damage." Liberman, 80 N.Y.2d at 435, 590 N.Y.S.2d at 861, 605 N.E.2d 344. In considering whether a statement charges an allegedly defamed plaintiff with a crime, the New York Court of Appeals has adopted the Restatement (Second) of Torts ("Restatement") approach. The Restatement considers an imputation of criminal conduct slander per se if the crime charged "would be (a) punishable by imprisonment in a state or federal institution, or (b) regarded by public opinion as involving moral turpitude." Restatement § 571. *See, e.g.,* Weldy, 985 F.2d at 62; Liberman, 80 N.Y.2d at 435-36, 590 N.Y.S.2d at 861, 605 N.E.2d 344 (finding that although an accusation charging a plaintiff with bribery was a "serious" crime meeting

Not Reported in F.Supp.                                                                                          Page 8
Not Reported in F.Supp., 1998 WL 150993 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

the requirements for a claim of slander per se, harassment, which is not even a misdemeanor, was not a serious crime).

In this case, the plaintiffs argue that certain statements by the defendants imputed to the plaintiffs the serious crimes of prostitution or sodomy. *See, e.g.,* Compl. ¶¶ 93; 96; 129; 131; 132; 133; 134; 135; 136; 139; 141; 142; 143; 144; 146; 148; and 149. The defendants respond that these crimes are not sufficiently "serious" to state a claim to satisfy the requirements for slander per se. Under New York law, prostitution is a class B misdemeanor, with a penalty of up to three months in prison, N.Y.Penal Law § 230.00, as is consensual sodomy. N.Y. Penal Law §§ 130.38; 130.00. These are sufficiently serious crimes for the purposes of slander per se. *See Weldy,* 985 F.2d at 62.

### 2.

The defendants also argue that their alleged statements are merely vulgar outbursts or statements of opinion that are not actionable. "Under either Federal or State law, the dispositive question is whether a reasonable listener ... could have concluded that [the defendant] was conveying facts about the plaintiff." *600 West 115th St, Corp. v. Von Gutfeld,* 80 N.Y.2d 130, 139, 589 N.Y.S.2d 825, 829, 603 N.E.2d 930 (1992) (citing *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20-21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)), *cert. denied,* 508 U.S. 910 (1993). Statements which are mere "rhetorical hyperbole, [or] vigorous epithet[s]" are not actionable. *Greenbelt Cooperative Publishing Ass'n, Inc. v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) ("blackmail" was rhetorical hyperbole and not actionable); *see also National Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 285-86, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) ("scab" was "merely rhetorical hyperbole, a lusty and imaginative expression ..."). New York law provides a broad protection for statements of opinion. *See Levin v. McPhee,* 119 F.3d 189, 197 (2d Cir.1997). Thus, under New York law

**8 the inquiry, which must be made by the court ... entails an examination of the challenged statements

with a view toward (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Gross v. New York Times Co.,* 82 N.Y.2d 146, 153-54, 603 N.Y.S.2d 813, 817-18, 623 N.E.2d 1163 (1993) (citations and internal quotation marks omitted) (reversing dismissal of complaint asserting claim for libel where the articles cited "contain many assertions of objective fact that, if proven false, could form the predicate for a maintainable libel action."); *see also Levin,* 119 F.3d at 196-197. "When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact." *Levin,* 119 F.3d at 197.

It may well be that the alleged statements made by the defendants in this case were mere vulgar epithets or statements of opinion, and that when understood in context, they were not reasonably understood as statements of fact accusing the plaintiffs of committing a crime. Moreover, it may be that the statements were mere rhetorical hyperbole. But those issues cannot be decided on the papers before the Court, particularly given the fact that the statements were spoken and their full context is not set forth. The Court at this point cannot analyze their full context as required under New York law and cannot determine whether they were or were not conveying facts about the plaintiffs such that the motion could be granted in the defendants' favor. *See 600 West 115th Street Corp.,* 80 N.Y.2d at 139, 589 N.Y.S.2d at 829, 603 N.E.2d 930; *Levy v. Educational Records Bureau, Inc.,* 566 N.Y.S.2d 613, 613, 170 A.D.2d 391, 392 (1st Dep't 1991). Instead, the Amended Complaint sufficiently alleges that some remarks were uttered by the defendants in this case as statements of fact that the plaintiffs were in fact selling sex for money, an allegation of a serious crime, in the context of an environment that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 150993 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 9

was allegedly rife with sexual harassment. Thus, at least for the purposes of this Rule 12(b)(6) motion to dismiss, the Court cannot find that these statements are protected hyperbole or opinion.

### 3.

Because at this stage of the proceedings the Court cannot find that these statements were protected opinion or hyperbole, and because the crimes alleged are sufficiently "serious" as to constitute slander per se, the Court must consider whether each purportedly slanderous statement on its face charged the allegedly defamed plaintiff with a serious crime. *See Feche v. Viacom Int'l, Inc.,* 649 N.Y.S.2d 782, 782, 233 A.D.2d 125, 125 (1st Dep't 1996) (statement must be "of and concerning" the plaintiffs). In assessing each claim, the Court must "construe the allegedly defamatory statement according to its plain meanings.... Innuendo is not available to enlarge the meaning of the statement beyond the significance of the words themselves." *Nunez v. A-T Fin. Info., Inc.,* 957 F.Supp. 438, 441 (S.D.N.Y.1997). In light of these principles, the Court finds that only those statements referred to in paragraphs 93 (with respect to Golembe's alleged charge in May, August, and October 1996), 129, 131, 132, 139, 141, 144, 146, and 148 state claims for slander per se under the "serious crime" exception.[FN12] Of these, paragraphs 132, 141, and 148 fail to allege to whom the statement was published, and paragraphs 132, 141 and 146 fail to allege the specific dates upon which the statements were made. The slander per se claims with respect to the statements alleged in these four paragraphs will be dismissed without prejudice to filing a second amended complaint within 30 days of the date of this Opinion and Order.

FN12. The statement in paragraph 95 was alleged to have been made in January 1996 and is dismissed as barred by the one year statute of limitations.

### B.

*9 The plaintiffs also assert that certain alleged defamatory statements tend to injure the plaintiffs in

their trade or business. *See, e.g.,* Compl. ¶ ¶ 94; 102; and 137. The "trade, business or profession" exception is " 'limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities." *Liberman,* 80 N.Y.2d at 436, 590 N.Y.S.2d at 861, 605 N.E.2d 344 (quoting Prosser and Keeton, *Torts* § 112 at 791). The statements alleged in this case to have injured Caliendo and Cinelli in their "trade, business or profession" do not meet this standard. Instead, it is clear that these statements are merely comments, however reprehensible, on the general characteristics of their intended targets and do not "impugn the plaintiff's ability to perform his or her specific occupation." *Van-Go Transport Co. v. New York City Brd. of Educ.,* 971 F.Supp. 90, 98 (E.D.N.Y.1997) (citing *Liberman* ).

To summarize, the defendants, motions to dismiss the slander per se claims are denied with respect to those statements alleged in paragraphs 93 (with respect to Golembe's charges in May, August, and October 1996), 129, 131, 139, and 144. The slander per se claims with respect to those statements alleged in paragraphs 132, 141, 146 and 148 are dismissed without prejudice to filing a second amended complaint within 30 days of this Opinion and Order. The defendants' motions to dismiss the slander per se claims are granted in all other respects.[FN13]

FN13. The slander per se claims can only be maintained by the specific plaintiffs against the specific individual defendants and LLCI named in the paragraphs cited. To the extent the complaint seeks to make these charges against other defendants not named in those paragraphs, those claims are dismissed. Accordingly, all slander pe se claims against defendants Lew, Neuhaus, Clendenin, Alagna, Mark Rabkin, and Ronald Dorushkin are dismissed. Caliendo's claims against Barry Rabkin

Not Reported in F.Supp.                                                                                                          Page 10
Not Reported in F.Supp., 1998 WL 150993 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

and Fred Dorushkin are also dismissed. Finally, as explained above, Cinelli's claims in paragraphs 132 against Barry Rabkin, 141 against Fred Dorushkin, 146 against Bernard Golembe, and 148 against Barry Rabkin are also dismissed without prejudice.

### VIII.

All defendants except for LLCI move to dismiss the plaintiffs' claim for intentional infliction of emotional distress.[FN14] Under New York law, the elements of a claim for intentional infliction of emotion distress are: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York, 78 F.3d 787, 790 (2d Cir .1996).* In *Fischer v. Maloney, 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978),* the New York Court of Appeals adopted the Restatement's explanation of this cause of action, which notes that "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id., 43 N.Y.2d at 557, 402 N.Y.S.2d at 992-93, 373 N.E.2d 1215* (quoting Restatement § 46(1) cmt. d); *Cohn-Frankel v. United Synagogue of Conservative Judaism, 667 N.Y.S.2d 360, 361 (1st Dep't 1998).* This standard is extremely high and exacting, *Stylianou v. St. Luke's/Roosevelt Hosp. Ctr., 902 F.Supp. 54, 58 (S.D.N.Y.1995),* and the New York Court of Appeals has not yet sustained a claim under this cause of action. *See Silberstein v. Advance Magazine Publishers, Inc.,* No. 97 Civ. 7832, 1997 U.S. Dist. LEXIS 20425, *2-3 (S.D.N.Y. Dec. 23, 1997) (quoting *Howell v. New York Post Co., Inc. 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993)*).

> FN14. The Court has dismissed plaintiff Casper's intentional infliction of emotional distress claim as barred by New York's one-year statute of limitations for inten-

tional torts. Thus, only the intentional infliction of emotional distress claims of Caliendo and Cinelli remain.

*10 The defendants argue that Caliendo and Cinelli have failed to allege conduct that rises to the level of extreme and outrageous conduct required to state a claim for intentional infliction of emotional distress. However, "there is no question in New York 'that sexual harassment can give rise to a claim for intentional infliction of emotional distress.' " *Bonner v. Guccione, 916 F.Supp. 271, 276 (S.D.N.Y.1996)* (quoting *Collins v. Willcox, Inc., 600 N.Y.S.2d 884, 885, 158 Misc.2d 54 (N .Y.Sup.Ct.N.Y.Co.1992)*); *see, e.g., Dana v. Oak Park Marina, Inc., 660 N.Y.S.2d 906, 910, 230 A.D.2d 204 (4th Dep't 1997)* (sustaining a claim for infliction of emotional distress based on reckless conduct where the defendants installed a videotape camera in a ladies' restroom); *O'Reilly v. Executone of Albany, Inc., 503 N.Y.S.2d 185, 186, 121 A.D.2d 772, 774 (3rd Dep't 1986)* (affirming lower court's denial of motion to dismiss where plaintiff was subjected to physical sexual contact, sexual jokes, pornography and erotica); *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.,* No. 128889/94, 1997 WL 838144, at *8 (N.Y.Sup.Ct.N.Y.Co. Aug. 25, 1997)* (upholding jury verdict for intentional infliction of emotional distress damages based on a pattern of sexual harassment); *Koster v. Chase Manhattan Bank, N.A., 609 F.Supp. 1191, 1198 (S.D.N.Y.1985).* Such a claim may result from a pattern or course of conduct. *Bonner, 916 F.Supp. at 276* (quoting *Carter v. Andriani, 443 N.Y.S.2d 157, 158, 84 A.D.2d 513 (1st Dep't 1981)*). For example, in *Bonner,* the Court found that the plaintiff had stated a claim for intentional infliction of emotional distress in the sexual harassment context where "the plaintiff has plead a course of harassing, intimidating, and demeaning conduct (in the form of verbal abuse)...." *Id.* at 278. The conduct alleged to have taken place in this case, including a pervasive pattern of lewd and salacious behavior and unwanted physical contact, fits comfortably within the range of those cases that have sustained a claim for intentional infliction of emotional distress in this context.

The defendants also argue that Cinelli and Caliendo have failed to plead that the defendants intended to cause them extreme emotional distress. However, the Amended Complaint alleges that "[s]uch conduct was intentional or reckless and so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency." (Compl.¶ 295.) This statement, coupled with the detailed allegations in the Amended Complaint, are sufficient to defeat a motion to dismiss.

Accordingly, the defendants' motion to dismiss the plaintiffs' claim for intentional infliction of emotional distress is denied.[FN15]

> [FN15.] Alagna and Ronald Dorushkin argue that because Cinelli has not made any factual allegations against them, her claim for intentional infliction of emotional distress against them should be dismissed. Having reviewed the complaint, it is clear that Cinelli makes no factual allegations against either defendant to support her claims of intentional infliction of emotional distress by them against her. Cinelli's claims against Alagna and Ronald Dorushkin for intentional infliction of emotional distress are therefore dismissed.

## IX.

The individual defendants argue that the court should not exercise its supplemental jurisdiction over the state law claims asserted against them pursuant to 28 U.S.C. § 1367(c). "Depending on a host of factors, ... including the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims-district courts may decline to exercise jurisdiction over supplemental state law claims." *City of Chicago v. International College of Surgeons,* 522 U.S. 156, ----, 118 S.Ct. 523, 534, 139 L.Ed.2d 525 (1997); *see also* 28 U.S.C. § 1367(c). Moreover, a district court should "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City*

*of Chicago,* 522 U.S. at ----, 118 S.Ct. at 534 (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). In this case, although no federal claims are asserted against the individual defendants, the Title VII claim against LLCI and the state law claims asserted against the individual defendants and LLCI arise from the same facts and are part of the same case or controversy. *See* 28 U.S.C. § 1367(a); *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Requiring the plaintiffs to litigate their state law claims in New York state court would result in duplicitous and wasteful litigation and would not serve the interests of judicial economy and fairness for all litigants. Moreover, to the extent the defendants' argument rests on the purported uncertainty as to whether the NYHRL permits individual liability, *Tomka v. Seiler Corp.,* 66 F.3d 1295 (2d Cir.1995), is the law of this Circuit, and this Court is bound by its interpretation of New York law. Therefore, the Court finds that the exercise of supplemental jurisdiction in this case is proper. *See, e.g., Rodrigue v. Hartford Fire Ins. Co.,* No. 3:97CV01226, 1997 WL 736525, at *4 (D.Conn. Nov.24, 1997); *Kudatzky v. Galbreath Co.,* No. 96 Civ. 2693, 1997 WL 598586, at *8 (S.D.N.Y. Sept.23, 1997); *Velasquez v. Mirv Coffee, Inc.,* No. 96 Civ. 5464, 1996 WL 706910, at * 2 (S.D.N.Y. Dec.6, 1996); *Moore v. Natwest Mkts.,* No. 96 Civ. 1166, 1996 WL 507333, at *3 (S.D.N.Y. Sept.6, 1996); *Sigmon v. Parker Chapin Flattau & Klimpl,* 901 F.Supp. 667, 680 (S.D.N.Y.1995).

## CONCLUSION

*11 The defendants' motions to dismiss the plaintiffs' claims under the New York City Human Rights Law are **granted.** The defendants' motions to dismiss plaintiff Kimberly Casper's intentional tort claims as barred by the statute of limitations (tenth through thirteenth claims) are **granted.** The defendants' motions to dismiss the slander per se claims are denied with respect to those statements alleged in paragraphs 93 (to the limited extent noted above), 129, 131, 139, and 144. The slander per se claims with respect to those statements al-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 12
Not Reported in F.Supp., 1998 WL 150993 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

leged in paragraphs 132, 141, 146, and 148 are dismissed without prejudice to filing a second amended complaint within 30 days of this Opinion and Order. The defendants' motions to dismiss the slander per se claims are **granted** in all other respects. Plaintiff Cinelli's claims against Alagna and Ronald Dorushkin for intentional infliction of emotional distress are dismissed. The defendants' remaining motions to dismiss are all **denied.** Defendant Clendenin's motion for summary judgment is also **denied.**

**SO ORDERED.**

S.D.N.Y.,1998.
Casper v. Lew Lieberbaum & Co., Inc.
Not Reported in F.Supp., 1998 WL 150993 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.