**TAB 9**

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1994 WL 184670 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Lightfoot v. Union Carbide Corp.
S.D.N.Y.,1994.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Richard Hall LIGHTFOOT, Plaintiff,
v.
UNION CARBIDE CORPORATION, A.W. Lutz,
President, Industrial Chemicals Division and W.E.
Shackleford, Vice President, Industrial Chemical
Division, Defendants.
**No. 92 Civ. 6411 (RPP).**

May 12, 1994.

Wisehart & Koch, New York City, for plaintiff.
Mudge Rose Guthrie Alexander & Ferdon, by Joel
Cohen, New York City, for defendants.

ORDER AND OPINION
ROBERT P. PATTERSON, Jr., District Judge.
**\*1** Defendants, Union Carbide, A.W. Lutz and
W.E. Shackleford move for an order pursuant to
Fed.R.Civ.P. 56(b) granting summary judgment to
defendants, dismissing plaintiff's amended com-
plaint which contains seven counts and awarding
defendants attorneys' fees and costs. Plaintiff,
Richard Lightfoot, moves for an order granting par-
tial summary judgment for plaintiff on Counts I, II,
III and V of his amended complaint. Plaintiff also
moves to strike the affidavit of Joel E. Cohen, Esq.
sworn to July 9, 1993 and a letter dated December
3, 1992 from the record, for further discovery pur-
suant to Fed.R.Civ.P. 56(f), for sanctions against
defendants pursuant to Fed.R.Civ.P. 11, and for an
award of attorneys' fees and costs in plaintiff's fa-
vor. Each of these requests will be discussed in
turn.

*I. BACKGROUND FACTS*

In 1959, Plaintiff Richard Lightfoot accepted a pos-
ition at Union Carbide Corporation ("Carbide") as a
Chemical Engineer. Shortly after beginning his em-
ployment with Carbide plaintiff signed a Memor-
andum of Employee's Agreement. In the Agreement

plaintiff assigned to Carbide all rights to any inven-
tion in which he was involved during the course of
his employment. In 1968, plaintiff was transferred
to Carbide's New York City headquarters. In 1980,
plaintiff was relocated from Carbide's New York
City office to Carbide's new headquarters in Dan-
bury, Connecticut. He continued to reside in New
York City. In 1986, Plaintiff signed a second
Memorandum of Employee's Agreement assigning
Carbide his rights to his inventions. Wisehart Aff.
submitted pursuant to local rule 3(g), at ¶¶ 1, 2, 4,
6.

In the 1980's, plaintiff held a variety of positions
including Special Projects Manager and Marketing
Manager for Surfactants. *Id.* at ¶ 5. On April 27,
1992, plaintiff was terminated from Carbide as part
of a reduction in force program. He rejected the en-
hanced severance benefits offered by the program
and instead received full pay as severance until
February 1993. On December 3, 1992, Carbide
made an offer to reinstate plaintiff to his former po-
sition; plaintiff rejected this offer. Cohen Aff.,
Exhs. G & H. In February 1993, plaintiff accepted a
position with CRI, Inc. a consulting firm in the
Chemical industry. *Id.* at ¶¶ 12, 14-16.

*II. APPLICABLE LEGAL STANDARD*

Summary judgment is appropriate if the evidence
offered demonstrates that there is no genuine issue
as to any material fact and the moving party is en-
titled to judgment as a matter of law. *Anderson v.
Liberty Lobby, Inc., 477 U.S. 242 (1986).* The bur-
den rests on the moving party to demonstrate the
absence of a genuine issue of material fact, *Adickes
v. S.H. Kress & Co., 398 U.S. 144, 157 (1970),* and
the Court must view the facts in the light most fa-
vorable to the non-moving party. *United States v.
Diebold, Inc., 369 U.S. 654, 655 (1962).*

*III. PLAINTIFF'S NEW YORK STATE AND FED-
ERAL AGE DISCRIMINATION CLAIMS*

Defendants contend that they should be granted
summary judgment as to Counts I and III of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

amended complaint, plaintiff's federal and New York State age discrimination claims, because plaintiff cannot meet his burden of showing that age was a determinative factor in his dismissal.[FN1] In order to prove discrimination based on age "[t]he plaintiff has the burden of proving that 'age was the 'determining factor' in his discharge in the sense that, 'but for' his employer's motive to discriminate against him because of age, he would not have been discharged.' " *Pena v. Battleboro Retreat,* 702 F.2d 322, 323 (2d Cir.1983) (citation omitted). Defendants rely on plaintiff's deposition testimony in which he ascribed his termination to the jealousy, self-interest and competitive attitude of his immediate supervisor to support their motion for summary judgment.

**\*2** Plaintiff urges utilization of the *McDonnell Douglas,*[FN2] analysis of the evidence:
In order to establish a prima facie case of termination of employment in violation of the ADEA, a plaintiff must show (1) that he was within the protected age group, (2) that he was qualified for the job, (3) that he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination.

*Stetson v. NYNEX Service Co.,* 995 F.2d 355, 359 (2d Cir.1993). "If a prima facie case is established, the employer must offer a legitimate, nondiscriminatory reason for its actions." *Spence v. Maryland Casualty Co.,* 995 F.2d 1147, 1155 (2d Cir.1993). If the employer presents such a reason the burden is on the plaintiff to show that the proffered reason was pretext for discrimination. *Id.*

Under the *McDonnell Douglas* test Lightfoot has established the first three elements of a prima facie case because he: 1) was in the protected age group, 2) was qualified for the job he held and 3) was discharged.

Defendants and plaintiff dispute whether the evidence shows that plaintiff's discharge occurred under circumstances that give rise to an inference of discrimination. Plaintiff was discharged as a result of a reduction in force at Carbide under a program

called the "Enhanced Separation Program."[FN3] To effectuate this reduction of force supervisors at Carbide "forced-ranked" employees within a group to determine which employee should be terminated. The "Forced-ranking" system involved weighing the following factors: ability, effectiveness, versatility, value to continuing business operation, uniqueness, company service and reassignment potential. In plaintiff's case it was applied to a group of 13 employees of which Lightfoot was the oldest. Lightfoot Aff. in Opposition to Summary Judgment, Exhs. E and I. Plaintiff's main contention is that a report on the forced-ranking session in which Carbide made the decision to terminate him shows that age played a factor in his termination because the document contains the dates of birth of the employees forced-ranked and because plaintiff, the oldest person ranked, was terminated rather than a person under 40 who received an equal ranking. Lightfoot Aff. in Opposition to Summary Judgment, Exh. E. Plaintiff also bases his argument on a written comment and a non-verbal response (a look) by Mr. Shackelford, his superior, when plaintiff informed him that plaintiff intended to work until age 70. Lightfoot Aff. in Opposition to Summary Judgment, Exh. C.[FN4] The comment was made two years before plaintiff was terminated and on its face does not give rise to an inference of discrimination based on age. *See Moore v. Eli Lilly & Co.,* 990 F.2d 812, 818 (5th Cir.1993), *cert. denied,* 114 S.Ct. 467 (1993) (supervisor's inquiry into employee's retirement plans after learning employee's age did not represent a discriminatory intent, but was a reasonable inquiry regarding employee's longevity). The look by Shackelford could be open to various interpretations.

**\*3** Since plaintiff was the oldest employee, plaintiff's termination due to the forced-ranking procedure instead of an equally ranked younger employee gives rise to an inference of discrimination based on age. Here, however, plaintiff testified expansively during his deposition as to his conclusion that Mr. Shackelford's self-interest and competitiveness with plaintiff were the cause of plaintiff's termination from Carbide. Cohen Aff., Exh. C, Lightfoot Dep. at 122-25, 166-170. Plaintiff at-

Case 1:07-cv-05871-DC     Document 6-3     Filed 08/06/2007     Page 4 of 77
Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 184670 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**
Page 3

tempts to rebut defendants' use of his deposition testimony by directing the Court to other portions of his deposition testimony in which he stated that the treatment he received at Carbide was due to age discrimination, and that he thought Mr. Shackelford was discriminating against him on the basis of age.FN5 Lightfoot Aff. in Opposition to Summary Judgment, Exh. L, pp. 22-26, 163. Both excerpts are conclusions of plaintiff reached after his discharge, as is the plaintiff's testimony about Shackelford's self-interest and competitiveness.

Under these circumstances, where plaintiff's deposition testimony states more than one possible motivation for his employer's decision to terminate him, plaintiff's complaint must be examined as arising out of mixed motivation and *Price Waterhouse v. Hopkins,* 109 S.Ct. 1775 (1989) applies. In *Price Waterhouse,* the Supreme Court held that:
An employer may not ... prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision.... The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision.

*Id.* at 1791-92.

In this case Carbide's papers fail to set forth a legitimate and sufficient reason for its decision to terminate plaintiff, instead defendants rely on plaintiff's conclusory statements as to Shackelford's self-interest and competitiveness. Thus Carbide has failed to show that its legitimate reasons for terminating plaintiff standing alone would have induced it to make the decision to terminate plaintiff. Accordingly, summary judgment is inappropriate because an inference of age discrimination has been raised by the termination of plaintiff, the oldest member of the group of employees evaluated, rather than the equally-ranked younger employee in the group. Accordingly, genuine issues of material fact remain regarding Carbide's motives for terminating plaintiff. Defendants' motion for summary judgment on plaintiff's ADEA and New York State Human Rights claims is denied.FN6

## IV. THE LETTER OF REINSTATEMENT

In a December 3, 1992 letter to plaintiff Mr. Shackelford of Carbide made an unconditional offer to reinstate plaintiff to his prior position as market manager. Cohen Aff., Exh. G. Plaintiff responded to the letter through his counsel. Cohen Aff., Exh. H. In the response letter and in his motion papers plaintiff contends that the letter was an improper violation of Disciplinary Rule 7-104(a)(1) and that it should be stricken from the record pursuant to Fed.R.Evid. 408 because it was an offer of compromise.

**\*4** In *Ford Motor Co. v. E.E.O.C.,* 458 U.S. 219, 241 (1982), the Supreme Court held that "absent special circumstance, the rejection of an employer's unconditional job offer ends the accrual of potential backpay liability." The letter in this case was sent by Mr. Shackelford on Carbide letterhead explaining that because another marketing manager had resigned Carbide was offering Mr. Lightfoot his old job back. The letter also stated that "*[t]his offer is unconditional.*" Because plaintiff had received full pay as severance and continued to receive such pay after he received the offer Carbide contends that plaintiff is entitled to no backpay.

Plaintiff argues that the letter is "bogus" and is inadmissible evidence. Plaintiff's first objection is that the letter was sent directly to Mr. Lightfoot at a time when he was represented by counsel in violation of DR 7-104(a)(1).FN7 Although the letter was not sent by defendant's counsel to Mr. Lightfoot, plaintiff contends that "[t]he contents of the Shackelford letter are such as to indicate that it must have been sent with the prior knowledge or consent of counsel for the defendants...." Pl. Mem. in Support of Summary Judgment, p. 10. Despite plaintiff's presumption the evidence does not show that any disciplinary rule has been broken. At his deposition Mr. Shackelford testified that it was his idea to offer Mr. Lightfoot his job back after another employee decided to leave Carbide. Shackelford then conferred with Mr. Lawlor, Carbide's inside counsel, about whether he could offer Mr. Lightfoot the job and showed Lawlor a draft of the letter. Shackelford also testified that the language of the letter,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4
Not Reported in F.Supp., 1994 WL 184670 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

particularly the term "unconditional," came from him. Shackelford Dep., pp. 26-46. Thus the November 1992 letter was not a violation of DR 7-104(a) because no evidence has been elicited that an attorney sent the letter or caused the letter to be sent. FN8

Plaintiff argues that the letter was an offer of compromise and is inadmissible under Fed.R.Evid. 408. However, plaintiff does not show any circumstances which would make the letter an offer of compromise and the letter on its face is unconditional and does not require Lightfoot to compromise his claims against the defendants. Although plaintiff's counsel's response to the offer by Carbide refers to settlement negotiations, there is no evidence that the offer letter was sent as part of those settlement negotiations; rather Mr. Shackelford testified that the idea to send the letter stemmed from a vacancy in his department and his thought that plaintiff could fill the position. Moreover, by the terms of the letter plaintiff was not required to drop his claims against defendants. Thus Fed.R.Evid. 408 is not a bar to the admission of the letter as an offer of compromise.

Plaintiff also contends that the letter does not end Carbide's backpay liability because the offer was not unconditional since it was predicated on Mr. Lightfoot having to accept or reject the letter by a certain date, it did not offer plaintiff increased benefits to which he claims he was entitled and because the job he was offered could not be the same because most of the people he worked with were no longer in the group. Although these may be deemed conditions, an offer for reinstatement is considered "unconditional" if the job offered is substantially equivalent to the position that the employee claims to have been wrongfully terminated from and if the employee does not have to drop his legal claims against the employer. *See* Ford, 458 U.S. at 232. The letter sent by Carbide to Lightfoot is an unconditional offer of reinstatement and serves to cut off Carbide's backpay liability. *See Ford.* Although plaintiff may pursue his federal and New York State age discrimination claims he cannot recover damages for lost wages because he continued to re-

ceive full pay as a severance benefit after he was offered his job back. Summary judgment is granted in the defendants' favor in all causes of actions as to Carbide's liability for backpay.

### V. NEW YORK CITY HUMAN RIGHTS LAW CLAIM

**\*5** Defendants contend that plaintiff's claim under the New York City Human Rights law must be dismissed because plaintiff has failed to allege that his complaint was filed with the New York City Commission on Human Rights or with the New York City Corporation Counsel prior to the commencement of this action and because there are no allegations that the defendants intentionally discriminated against him within the boundaries of New York City. Plaintiff argues that the New York City Human Rights Law should extend to his claim because he was living in New York City and performed work at home occasionally and because Carbide still has some offices in New York City. Plaintiff also alleges that the Early Separation Program adopted by Carbide was approved at a meeting in New York City. Its impact on him, however, occurred while he was employed in Connecticut. Lightfoot Aff. in Opposition, ¶¶ 265-266, 269-274.

Although plaintiff argues that summary judgment should not be granted in defendant's favor because he has "duly" filed his complaint with the New York City Commission on Human Rights or the New York City Corporation Counsel, he has not testified that he filed his complaint prior to commencing this civil action or provided the Court with an exhibit to support his claim that his complaint was filed prior to commencing this civil action as required under the City Law. Lightfoot Aff. in Opposition to Summary Judgment at ¶ 267; *see* New York City Administrative Code § 8-502. Moreover, plaintiff does not allege that defendants intentionally discriminated against him within the boundaries of New York City and the jurisdiction of the New York City Human Rights Commission does not extend to Connecticut. *See* N.Y.Gen.Mun.Law § 239-s; N.Y.C.Admin.Code § 2-201. Accordingly, summary judgment is granted in the defendants' fa-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 184670 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

vor on plaintiff's New York City Human Rights claim and Count II of plaintiff's amended complaint is dismissed.

### VI. PLAINTIFF'S ERISA CLAIM

Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140, provides that "[i]t shall be unlawful for any person to discharge ... a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan...."

Plaintiff maintains that he has an ERISA claim against Carbide because there is a causal link between his discharge and the diminution of his pension benefits. Plaintiff has presented no evidence to show that his discharge was motivated by Carbide's desire to lessen his pension benefits. Plaintiff cites _Turner v. Schering-Plough Corp.,_ 901 F.2d 335 (3d Cir.1990), for the proposition that the reduction of benefits resulting from plaintiff's termination could reasonably be viewed as a motivating factor in his discriminatory treatment. However, in _Turner,_ the Third Circuit did not find that a plaintiff's mere allegations that his benefits were reduced to be sufficient evidence to support a claim for discrimination under ERISA. In fact, the Third Circuit stated:

**\*6** As we have noted, Turner's discharge did not deprive him of his pension. All Turner has shown is that his termination deprived him of the opportunity to accrue additional benefits through more years of employment. This kind of deprivation occurs whenever an ERISA employer discharges an employee and is not alone probative of an intent to interfere with pension rights.

_Id._ at 348. The court in _Turner_ held that under the circumstances surrounding Turner's discharge Turner had not established a _prima facie_ case of discrimination based on ERISA and that summary judgment was properly granted to the employer. Similarly, here plaintiff has only shown that his potential pension benefits were diminished by his termination, and although the court in _Turner_ acknow-

ledged that a plaintiff might be able to establish a prima facie case of ERISA discrimination if the reduction of pension benefits were substantial this is not such a case. _See Dister v. Continental Group, Inc.,_ 859 F.2d 1108, 1117 n. 1 (2d Cir.1988) ("[the Second Circuit's opinions] cannot be read to mean that mere cost savings and proximity to benefits are sufficient _per se_ to create a genuine issue of fact requiring a trial."). Lightfoot's pension benefits have already vested and although his discharge resulted in his being unable to accrue further benefits, plaintiff has not presented any evidence that this was a motivating factor in his discharge. Indeed he was offered the opportunity to accrue additional benefits and chose not to do so when he rejected Shackelford's offer of reinstatement. Accordingly, summary judgment on plaintiff's ERISA claim is granted in defendants' favor and Count VI of the amended complaint is dismissed.[FN9]

### VII. BREACH OF CONTRACT CLAIM

Plaintiff contends that Connecticut law should be applied to his breach of contract claim because under New York law the law of the state where the contract is to be performed applies, and in this case Carbide's office was located in Connecticut. _See Bergstein v. Jordache Enterprises, Inc.,_ 767 F.Supp. 535, 541 (S.D.N.Y.1991); _Babcock v. Jackson,_ 240 N.Y.S.2d 743 (1963). Defendants argue that plaintiff's claim fails under either Connecticut or New York law.

Plaintiff maintains that the contract he entered into with Carbide provided that he could be terminated only if he failed to perform adequately. However, the two Memorandums of Employee's Agreement that he signed with Carbide expressly provide that: "[t]his agreement does not, of course, bind either party to any specific period of employment." Cohen Aff., Exh. D and E. Plaintiff maintains that he had a lifetime employment agreement with Carbide but does not give specifics, rather stating that Carbide represented to him that he had a life-time position with the company. Lightfoot Aff. at ¶¶ 239-247. Under Connecticut law these allegations are insufficient to defeat a summary judgment motion when

employment was at will.

**\*7** "In Connecticut, an implied employment contract may arise under the doctrine of promissory estoppel, where injustice to a promisee who has acted in reliance can be avoided only by enforcement of 'a clear and definite promise which a promisor could reasonably have expected to induce reliance.' " *Manning v. Cigna Corp.,* 807 F.Supp. 889, 895 (D.Conn.1991) (citation omitted). In *Manning,* the court granted summary judgment to the employer on the plaintiff's implied contract claim because the plaintiff could not provide any evidence "to support his unilateral understanding of an implied employment contract on the issue of discharge." *Id.* at 896. *See Anderson v. Coca Cola Bottling Co. of New York, Inc.,* 772 F.Supp. 77 (D.Conn.1991); *Johnson v. Carpenter Technology Corp.,* 723 F.Supp. 180 (D.Conn.1989). In this case plaintiff does not point to any clear and definite promise which was made to him by Carbide. The lack of a clear and definite promise of lifetime employment combined with the two Memorandums of Employee's Agreement which plaintiff signed support the conclusion that plaintiff's employment was terminable at will. New York law does not differ. *See Cucchi v. New York City Off-Track Betting Corp.,* 818 F.Supp. 647, 653 (S.D.N.Y.1993); *Sabatey v. Sterling Drug, Inc.,* 514 N.Y.S.2d 209 (1987). Accordingly, Count IV of the amended complaint is dismissed and summary judgment as to plaintiff's implied contract claim is granted in the defendants' favor.

### *VIII. QUANTUM MERIT*

In his complaint plaintiff alleges that he has a claim in quantum meruit against Carbide because of his participation in the making of inventions at Carbide. Defendants contend that plaintiff's claim for quantum meruit fails as a matter of law.

In order to make out a claim in *quantum meruit,* the plaintiff must establish performance of his services in good faith, acceptance of the services by the persons to whom such services are rendered, expectation of compensation, and the reasonable value of such services.

*Paper Corp. of U.S. v. Schoeller Technical Papers, Inc.,* 773 F.Supp. 632, 640 (S.D.N.Y.1991) (citing *Martin H. Bauman Assocs., Inc. v. H & M Int'l Transport.,* 567 N.Y.S.2d 404, 404 (1st Dept 1991)).

Defendants contend that plaintiff has not established that he had a reasonable expectation of compensation for his role in developing the inventions. Plaintiff argues that he has shown as required by New York precedent that the services he provided by participating in the inventions were "so distinct from the duties of his employment and of such a nature that it would be unreasonable for the employer to assume that they were rendered without expectation of further pay." *Robinson v. Munn,* 238 N.Y. 40, 43 (1924).[FN10] However, during his deposition plaintiff testified that:

It was everything that the marketing manager's job was to do. I mean our whole role.... Our reason for existence, reason for this huge-not just me but there was 100 odd marketing people, maybe 10 marketing managers, probably 300 R & D involved in this effort, the whole reason was to develop new products, new product lines.

**\*8** Lightfoot Dep. at 97.

Mr. Lightfoot also testified that although his job included the development of new products he would not develop all new products, just those related to surfactants, the group for which he was a marketing manager.

My job was new products and surfactants and I was just bending my talents to it the best way I knew to make the best for the company but not outside surfactants. Now, I don't recall any particular product coming out that was outside surfactants. I will say this, if we came up with an idea that was outside surfactants, again, I have no recollection of that, I would have made it my duty, my business to get the right people somewhere within Carbide both R & D and commercial people to alert them of the idea. I wouldn't do more than alert them of the idea.

Lightfoot Dep. at 75.

In an August 26, 1992 sworn declaration to the

Case 1:07-cv-05871-DC    Document 6-3    Filed 08/06/2007    Page 8 of 77
Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1994 WL 184670 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

United States Patent and Trademark Office regarding one of the inventions at issue, plaintiff asserted:
That I was not employed or assigned to perform research, development, or exploration work, but the invention is nevertheless related to the work or duties I was employed or assigned to perform;
That the invention was made during working hours and with the use of the facilities, equipment, materials, funds, information and services of Union Carbide Chemicals and Plastics Company, Inc.;

Cohen Aff., Exh. F, p. 2. This declaration by plaintiff, the provisions of the two Memorandums of Employee's Agreement in which plaintiff agreed to assign all his inventions to Carbide and his deposition testimony all establish that plaintiff's participation in the development of the inventions was not so far outside of the scope of his employment so that Carbide would have to provide extra compensation for those services.

Although plaintiff claims that Carbide should have known that the work plaintiff performed in terms of the inventions entitled him to additional compensation, plaintiff has submitted no evidence that he was promised or asked for anything more than consideration for a promotion.FN11 Summary judgment in defendants' favor is granted with regards to plaintiff's *quantum meruit* claim based on his contributions to inventions and new products at Carbide.

### IX. UNJUST ENRICHMENT

Unjust enrichment is a quasi-contractual claim which allows a party to recover to prevent another party from being unjustly enriched at his expense. *Bradkin v. Leverton,* 309 N.Y.S.2d 192, 196 (1970); *Connecticut Nat'l Bank v. Chapman,* 216 A.2d 814, 817-18. Count VI of plaintiff's verified amended complaint asserts a claim for unjust enrichment due to plaintiff's participation in the inventions. Defendants argue that plaintiff's claim for unjust enrichment fails as a matter of law because Carbide was entitled to any benefits that Carbide received from plaintiff's participation in the inventions by virtue of the two Memorandums of Em-

ployee's Agreement which plaintiff signed.

**\*9** In 1959, plaintiff signed a Memorandum of Employee's Agreement, in which he agreed that:
In consideration of my employment by Union Carbide Corporation ... I agree.... [t]o assign to Union Carbide Corporation all inventions made by me, alone or jointly with others, in the course of such employment, relating to the business of the Corporation or resulting from tasks specifically assigned to me by the Corporation.

Cohen Aff., Exh. D. In 1986, plaintiff signed another Memorandum of Employee's Agreement with the same provision. Cohen Aff., Exh. E. Nevertheless plaintiff claims that "Carbide has been unjustly enriched by receiving the benefit of new product lines and inventions developed by plaintiff pursuant to its requests." Complt. at ¶ 141. Plaintiff contends that because his employment was terminated that the non-occurrence of the condition precedent that he be employed discharged his duty to assign under the terms of the employment agreement. However, plaintiff was employed by Carbide for 33 years, thus the condition precedent that he be employed by Carbide occurred and plaintiff is obliged to assign the rights to the inventions he made during the course of his employment to Carbide.

Plaintiff cites to *Eenkhoorn v. New York Tel. Co.,* 514 N.Y.S.2d 160 (1st Dept.1987), claiming that Carbide is not entitled to summary judgment because issues of fact exist as to whether the company has been unjustly enriched. *Eenkhoorn* is distinguishable from this case because in *Eenkhoorn* there was no agreement between the employee and the employer pertaining to the development of ideas. Thus questions of fact existed as to whether the company had a policy of remunerating employees for suggestions and as to whether the company had been unjustly enriched by using the employee's ideas. *Id.* at 161. In this case there is an agreement between the employee and the employer as to the assignment of inventions, and plaintiff has presented no proof whatsoever that Carbide had a policy of paying employees for new inventions. Accordingly, Count V of plaintiff's amended complaint is

dismissed and defendants are granted summary judgment on plaintiff's unjust enrichment claim.

### X. TORTIOUS INTERFERENCE WITH CONTRACT CLAIM

Defendant Shackelford seeks to dismiss plaintiff's claim against him for tortious interference with contract because the venue is improper and because it fails as a matter of law. Plaintiff contends that the venue is proper under Section 7(c)(1) of the ADEA (29 U.S.C. § 626(c)), and that the defendants have waived their venue objections under Fed.R.Civ.P. 12(h)(1).

28 U.S.C. 1391(b) provides in relevant part:
A civil action ... may be brought in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ... or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

Venue in this district is inappropriate under Section 1391(b)(1) because at the time the suit was commenced defendant Shackelford was a resident of Connecticut, defendant Lutz was a resident of the State of New York and Carbide (for the purposes of this motion) was both a resident of New York and Connecticut. Since a substantial portion of the acts or omissions giving rise to plaintiff's cause of action for tortious interference with contract occurred in Connecticut, plaintiff's place of employment, venue in Connecticut would be appropriate.

**\*10** Plaintiff contends that venue is proper under Section 7(c)(1) of the ADEA, 29 U.S.C. § 626(c)(1) and under the New York Law Arm statute, New York Civil Practice Law and Rules § 302. Section 7(c)(1) of the ADEA provides that: "[a]ny person aggrieved may bring a civil action in any court of competent jurisdiction." However, this does not relieve the parties of establishing proper venue. See Quinn v. Bomar Publishing Co., 445 F.Supp. 780 (D. Md.1978) (venue for ADEA claim lay in district in which plaintiff was discharged). Plaintiff

states in a conclusory fashion that Shackelford is subject to personal jurisdiction under the New York long arm statute without attempting to show why the necessary elements for such jurisdiction have been met. Because no evidence has been presented that Shackelford transacts any business within the state of New York or that he derives substantial revenue from in interstate or international commerce, the New York long arm statute does not provide this Court with personal jurisdiction over Shackelford. N.Y.Civ.Prac.L. & R. § 302. Moreover, contrary to plaintiff's assertions, defendants have not waived their venue objections under Fed.R.Civ.P. 12(b) since in their Answer and in their motion papers the venue objection was properly asserted. Answer ¶ 166.

Plaintiff's tortious interference claim also fails as a matter of law. Under Connecticut law plaintiff's claim is barred by the Workers Compensation Act because plaintiff failed to allege that his employer, Carbide, directed Shackelford to commit the tort. Vorvis v. Southern New England Tel. Co., 821 F.Supp. 851, 856 (D.Conn.1993) ("intentional tort claim is barred unless the actor is acting with the knowing authorization of the employer") (citing Jett v. Dunlap, 425 A.2d 1263 (Conn.1979)). Plaintiff's tortious interference with contract claims also fails under New York law because plaintiff may not circumvent the lack of a cause of action for abusive or wrongful discharge of an at-will-employee under New York law by casting his cause of action as another intentional tort. Ingle v. Glamore Motor Sales, Inc., 538 N.Y.S.2d 771, 774 (1989) ("the plaintiff here cannot be allowed to evade the employment-at-will rule and relationship by recasting his cause of action in the garb of a tortious interference with his employment"); Murphy v. American Home Products Corp., 461 N.Y.S.2d 232 (1983) (plaintiff not allowed to subvert the traditional at-will-contract rule by casting his cause of action as one for intentional infliction of emotional distress or as a prima facie tort). Accordingly, Count VII of plaintiff's amended complaint against defendant Shackelford for tortious interference with contract is dismissed.

*XI. PLAINTIFF'S DISCOVERY REQUESTS*

Plaintiff's request for further discovery was denied in this Court's Order of November 22, 1993 and the Order of December 6, 1993 pending the outcome of the motions decided herein. The request for further discovery is now denied because plaintiff failed to make a motion pursuant to Fed.R.Civ.P. 37 to compel production of the documents requested but not provided and because plaintiff has not provided the Court with evidence of any efforts by his counsel to obtain these documents from April 23, 1993 to the bringing of this motion for further discovery on September 8, 1993. Furthermore, defendants state that some of the requested documents are not relevant, have already been produced pursuant to earlier requests or cannot be produced because they do not exist. *Cf.* Order and Opinion of December 6, 1993. Plaintiff has failed to show how each of the document requests are relevant to his case and how the requested documents will produce any genuine issue of material fact as required by 56(f). *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp 769 F.2d 919, 926 (2d Cir.1985).* Accordingly, plaintiff's motion for discovery of documents listed as (a) through (b1) in his affidavit is denied without prejudice to plaintiff renewing the motion, within twenty days of the date of this opinion, after following the proper procedure to obtain such discovery.

*XII. CONCLUSION*

**\*11** Summary judgment is granted in defendants' favor on all claims except for plaintiff's federal and New York State age discrimination claims. Count II, IV, V, VI, and VII of plaintiff's amended complaint are dismissed. Although plaintiff is entitled to a trial to determine whether Carbide discriminated against him on the basis of age, if he prevails his damages will be limited as he cannot recover damages for lost wages.FN12

Plaintiff's motion for partial summary judgment for plaintiff on Counts I, II, III and V of his amended complaint is denied. Plaintiff's motion to strike the affidavit of Joel E. Cohen, Esq. sworn to July 9,

1993 and a letter dated December 3, 1992 from the record, for further discovery pursuant to Fed.R.Civ.P. 56(f)) and sanctions against defendants pursuant to Fed.R.Civ.P. 11 is also denied. The parties shall bear their own costs. The parties will appear before the Court for a pre-trial conference on May 27, 1994 at 9 a.m. in Room 302.

IT IS SO ORDERED.

> FN1. Plaintiff's age discrimination claim under New York Executive Law § 239 *et seq.* is governed by the same standard as his ADEA claim, 29 U.S.C. § 623 *et seq. See Spence v. Maryland Casualty Co., 995 F.2d 1147, 1158 (2d Cir.1993).*

> FN2. *McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).*

> FN3. Plaintiff also argues in his cross-motion that partial summary judgment should be granted in his favor on the age discrimination claim because defendants failed to deny that the Enhanced Separation Program adopted by Carbide "has a coercive purpose and effect. Older employees who did not accept the separation package were force to leave the company in any event." Amended Complaint, ¶ 49. This point is without merit since all reduction in force programs force employees to leave a company.

> FN4. In a written evaluation of plaintiff's work in 1989, Shackelford wrote that:
> Dick [plaintiff] wants to work until he is 70 and wants to know how he can maximize his contributions during the next 15 years! I suggested his two areas of greatest demonstrated strength were in management of product safety and an incredible feel for tactical dynamics-ie, a super tactical product/market manager. At this point this is the direction I would recommend for him.
> Lightfoot Aff. in Opposition, Exh. C.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 184670 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

FN5. Plaintiff also seeks to substantiate his claim of age discrimination by citing to his moving affidavit which merely states conclusory allegations of age discrimination. Defendants object to statements in Lightfoot's affidavit such as "[b]ias against older employees was (and is) a part of the permanent corporate psyche of Union Carbide Corporation ..." Aff. at ¶ 60. Defendant correctly states that to the extent such statements are inconsistent with plaintiff's deposition testimony they must be disregarded because they do not create genuine issues of material fact. *See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 572 (2d Cir.1991); Douglas v. Weil, Gotshal & Manges, 1993 WL 364572 (S.D.N.Y.1993).*

FN6. Plaintiff moves for summary judgment on his age discrimination claim based on the fact that defendants did not verify their answer in response to plaintiff's verified complaint in violation of New York Civil Practice Law and Rule § 3016(f). However, since this action was brought in federal court "the Federal Rules of Civil Procedure 'govern the mode of proceedings in federal court....' " *Harbor Seafood, Inc. v. June Foods, Inc., 1987 WL 15275 (E.D.N.Y.1987)* (denying plaintiff's motion for summary judgment predicated upon defendant's failure to comply with CPLR § 3016(f) in federal diversity action) (citing *Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 438 (1974).*

FN7. DR 7-104(a)(1) states:
During the course of the representation of a client a lawyer shall not:
(1) Communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is

authorized by law to do so.

FN8. Plaintiff also asks the Court to strike the affidavit of Mr. Cohen, the defendants' attorney, because it is not based on personal knowledge. There is no basis upon which to strike Mr. Cohen's affidavit because it merely serves as a roadmap for the documentary evidence and deposition testimony produced during this litigation. *See Spence v. Maryland Casualty Co., 803 F.Supp. 649, 664 (W.D.N.Y.1992), aff'd, 995 F.2d 1147 (2d Cir.1993); Maier-Schule GMC, Inc. v. General Motors Corp., 780 F.Supp. 984, 988 (W.D.N.Y.1991).*

FN9. Plaintiff argues that summary judgment in his favor on his ERISA claim should be granted because defendants failed to answer ¶ 49 of the Amended Verified Complaint and have "conceded that the separation program had a coercive purpose and effect...." Pl. Brief in Opposition, p. 13. After reviewing the Answer it is clear that the failure to deny paragraph 49 was a clerical oversight created by a page break. Cohen Reply Aff., ¶ 5. Because plaintiff has suffered no prejudice due to this oversight, defendants' Answer is considered to have denied ¶ 49 of plaintiff's Amended Verified Complaint. *See Jewish Nat'l Fund, Inc. v. Garland, 1985 WL 163 (S.D.N.Y.1985); Pelch v. Peninsula Gen. Hosp., 340 N.Y.S.2d 388 (2d Dept.1973).*

FN10. Plaintiff does not argue that any law other than New York law applies to his quantum meruit claim.

FN11. His March 1990 performance evaluation stated that consideration for a promotion required more than for plaintiff to develop new products, it also required plaintiff to improve his interpersonal skills. Lightfoot Aff. in Opposition, Exh. C.

FN12. Compensatory and punitive dam-

Not Reported in F.Supp., 1994 WL 184670 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

ages are unavailable under ADEA. *John-son v. Al Tech Specialties Steel Corp., 731 F.2d 143 (2d Cir.1984)*.

S.D.N.Y.,1994.

Lightfoot v. Union Carbide Corp.

Not Reported in F.Supp., 1994 WL 184670 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 10**

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2002 WL 986641 (S.D.N.Y.), 89 Fair Empl.Prac.Cas. (BNA) 29
**(Cite as: Not Reported in F.Supp.2d)**

Lucas v. Pathfinder's Personnel, Inc.
S.D.N.Y.,2002.

United States District Court, S.D. New York.
Pamela LUCAS, Plaintiff,
v.
PATHFINDER'S PERSONNEL, INC., JS Partner
Group, Shane Howell, and Jonathan Schwartz, De-
fendants.
Pamela LUCAS, Plaintiff,
v.
PATHFINDER'S PERSONNEL, INC., JS Partner
Group, Defendants.
**No. 01 CIV.2252(BSJ).**

May 13, 2002.

MEMORANDUM ORDER
JONES, District J.
**\*1** Plaintiff filed the above captioned actions al-
leging that Defendants unlawfully discriminated
against Plaintiff based on her pregnancy. In 01 CV
2252, filed on March 16, 2002, Plaintiff asserts that
Defendants Pathfinder's Personnel, Inc., JS Partner
Group, Shane Howell and Jonathan Schwartz inten-
tionally discriminated against Plaintiff on the basis
of her pregnancy in violation of the New York State
Human Rights Law (N.Y.SHRL) and the New York
City Human Rights Law (N.Y.CHRL). In 02 CV
1743, Plaintiff alleges that Defendants Pathfinder's
Personnel, Inc. and JS Partner Group's discriminat-
ory conduct violates Title VII. Defendants
Pathfinder's Personnel, Inc., JS Partner Group,
Shane Howell and Jonathan Schwartz (collectively,
"Defendants") have moved, pursuant to Federal
Rule of Civil Procedure 12(b)(6), to dismiss
Plaintiff's claims under the NYSHRL and NY-
CHRL. For the following reasons, Defendants' mo-
tion is granted.

Plaintiff alleges that Defendants violated the NY-
CHRL and NYSHRL by (1) terminating Plaintiff's
employment based on her pregnancy, and (2) rehir-
ing Plaintiff but then materially altering the terms
and conditions of her employment such that once

again she effectively was terminated. Turning first
to Plaintiff's NYCHRL claim, the NYCHRL pro-
hibits employers from engaging in certain types of
discrimination against its employees. The NY-
CHRL, however, applies only to acts occurring
within the boundaries of New York City. *See, e.g.,*
*Duffy v. Drake Beam Morin, Harcourt General,*
*Inc.,* 1998 WL 252063, \*11 (S.D.N.Y.1998). While
Plaintiff concedes that at the time of the alleged
discrimination she was a Massachusetts resident
working as Managing Recruiter in Pathfinder's Bo-
ston office, Plaintiff argues that the NYCHRL none-
theless applies because the decision to terminate
Plaintiff's employment was made in New York
City, where Defendants Pathfinder's and JS Partner
Group maintain their principal places of business.
The court disagrees. The allegation that the de-
cision to terminate Plaintiff was made in New York
City, even when taken as true (as this court must on
a motion to dismiss), is insufficient to establish a
violation of the NYCHRL where, as here, the im-
pact of that decision occurred outside of New York
City. *Id.* at \*12 (fact that decision to fire plaintiffs
was made in New York City office was insufficient
to establish a violation of the NYCHRL when the
affected employees did not work in New York
City); *see also* *Wahlstrom v. Metro-North Com-*
*muter Railroad Co.,* 89 F.Supp.2d 506, 527-28
(S.D.N.Y.2000) ("[The] NYCHRL only applies
where the actual impact of the discriminatory con-
duct or decision is felt within the five boroughs,
even if a discriminatory decision is made by an em-
ployer's New York City office."); *Salvatore v. KLM*
*Royal Dutch Airlines,* 1999 WL 796172, \*16
(S.D.N.Y.1999) ("To determine the location of the
discrimination [under the NYCHRL], courts have
looked to the location of the impact of the offensive
conduct."); *Lightfoot v. Union Carbide Corp.,* 1994
WL 184670, \*5 (S.D.N.Y.1994).

**\*2** For essentially the same reason, Plaintiff's claim
under the NYSHRL must also be dismissed. Like
the NYCHRL, the NYSHRL "does not provide a
non-resident with a private cause of action for dis-
criminatory conduct committed outside of New

Not Reported in F.Supp.2d, 2002 WL 986641 (S.D.N.Y.), 89 Fair Empl.Prac.Cas. (BNA) 29
**(Cite as: Not Reported in F.Supp.2d)**

York by a New York corporation." *See Thomas v. Texaco, Inc.*, 998 F.Supp. 368, 371 (S.D.N.Y.1998) (quotations and citations omitted). Thus, in order for Plaintiff to establish a NYSHRL violation, she must allege that Defendants' discriminatory conduct occurred in New York. As discussed above, however, the fact that the decision to terminate Plaintiff was made in New York State is not sufficient to establish a violation of the NYSHRL. *See Duffy*, 1998 WL 252063 at *12-13.

Accordingly, Plaintiff's claims under both the NYCHRL and NYSHRL must be dismissed.

*Conclusion*

For the reasons stated above, Plaintiff's claims under the NYCHRL and NYSHRL are dismissed. Because these are the only claims asserted in 01 CV 2252, Plaintiff's Complaint in that action is dismissed in its entirety and the Clerk of Court is directed to close that case. The parties are directed to submit a joint pre-trial order regarding 02 CV 1743 no later than June 10, 2002.

SO ORDERED:

S.D.N.Y.,2002.
Lucas v. Pathfinder's Personnel, Inc.
Not Reported in F.Supp.2d, 2002 WL 986641 (S.D.N.Y.), 89 Fair Empl.Prac.Cas. (BNA) 29

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 11**

Westlaw.

Not Reported in F.Supp.2d                                                              Page 1
Not Reported in F.Supp.2d, 2005 WL 2030355 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Germano v. Cornell University
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Thomas J. GERMANO, Plaintiff,
v.
CORNELL UNIVERSITY, New York State School
of Industrial and Labor Relations, Edwar J. Lawler,
Ronald Seeber, and Ann W. Martin, Defendants.
No. 03 Civ. 9766(DAB).

Aug. 17, 2005.

*MEMORANDUM & ORDER*
BATTS, J.
**\*1** Plaintiff Thomas J. Germano commenced this
action against the above-named Defendants, claim-
ing that they discriminated against him on the basis
of age in the course of his employment and termin-
ation thereof, and that the Defendants' termination
of his employment was a breach of contract.
Plaintiff asserts claims under the Age Discrimina-
tion in Employment Act ("ADEA"), the New York
State Human Rights Law (N.Y.SHRL), and the
New York City Human Rights Law ("NYCHRL");
as well as for common law breach of contract and
breach of implied-in-fact contract. Defendants Cor-
nell University, New York State School of Industri-
al and Labor Relations ("ILR School"), Edward J.
Lawler, Ronald Seeber, and Ann W. Martin move
pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure to dismiss Plaintiff's NYCHRL,
contract, and implied contract claims for failure to
state a claim upon which relief can be granted. De-
fendants also move to dismiss Plaintiff's New York
City Human Rights Law claim for lack of subject
matter jurisdiction pursuant to F.R.C.P. 12(b)(1).
For the reasons stated below, Defendants' motion to
dismiss is GRANTED IN PART AND DENIED IN
PART.

I. BACKGROUND

II.

A. Plaintiff's Employment at the ILR School

Plaintiff began working at the ILR School on Octo-
ber 7, 1976. (Compl.¶ 1). FN1 The ILR School, a
division of Defendant Cornell University, offers the
nation's only four-year undergraduate program in
industrial and labor relations. The school has sever-
al extension offices in the State of New York, in-
cluding Buffalo, Rochester, Albany, Ithaca, New
York City, and Long Island, which is where
Plaintiff worked as the Director for the entire dura-
tion of his employment from October 7, 1976 until
his termination on January 13, 2003. (Id. ¶¶ 3, 12)

> FN1. Because Defendants' motion is
> brought under F.R.C.P. 12(b)(6), the Court
> accepts as true all factual allegations in the
> Complaint. *Bolt Elec., Inc. v. City of New
> York*, 53 F.3d 465, 469 (2d Cir.1995).

Plaintiff began his employment at the ILR School
as an Extension Associate I, which is how the ILR
School refers to instructors who work at its Exten-
sion offices. (Compl.¶ 13). Extension associates
have professional qualifications comparable to
those of professors and associate professors at Cor-
nell. (Id.). In 1988, Plaintiff "was promoted to Seni-
or Extension Associate II, which was the ILR
School Extension's version of "tenure." (Id. ¶ 14).
At that time, ILR School Associate Deans Lois
Gray and Ronald Seeber told him that "once Cor-
nell and the ILR School appointed him a Senior
Extension Associate II, he had the equivalent of ten-
ure, and, accordingly, could not be fired other than
for cause or budgetary exigencies whereby the
school was unable to continue paying his salary."
(Id. ¶ 16).

B. Harassment and Termination of Plaintiff Begin-
ning in 2000, Cornell, the ILR School, and Defend-
ant Ann Martin, associate Dean of the ILR School
until Cornell terminated her position in December
2002, FN2 allegedly tried for two and half years to
force him to retire by constant pressure, threats, and
harassment regarding his age. (Compl.¶ 20). For

example, Martin first suggested that Plaintiff retire during a meeting on November 2, 2000, and allegedly repeated several times at this meeting that he should consider retiring and that "it's time" for him to retire. (*Id.* ¶ 21). Plaintiff next saw Martin at a meeting in New York City on February 6, 2001, where she allegedly asked him if he was considering her suggestion to retire. (*Id.* ¶ 22). Subsequently, Plaintiff ate dinner in Manhattan with Martin on April 18, 2001 where she again allegedly asked Plaintiff if he planned on retiring. Moreover, at that same dinner, she supposedly "threatened to find someone else to do his work and that he should begin some serious retirement planning." (*Id.* ¶ 23).

> FN2. Martin is now a Senior Extension Associate at the ILR School in Ithaca, NY. (Complaint ¶ 6).

**\*2** Thereafter, at a District Directors meeting in New York City on December 5, 2001, Martin announced that a committee would meet the next day to discuss the future of the Long Island office and allegedly told Plaintiff specifically that his attendance was not necessary, although he had been the Director of that Office for nearly 25 years. (Compl.¶ 26). On December 18th, Martin and Plaintiff met at JFK Airport where she allegedly told Plaintiff his office would have to produce savings or increased income in the amount of $20,000 to $25,000 by June 2002 and function with one less employee. Additionally, Plaintiff claims Martin "threatened to break the lease and close the Long Island Office either partially or completely." (*Id.* ¶ 27).

From January to June 2002, Plaintiff reduced the Long Island office's operating costs by approximately $25,000 while working with one less employee. (*Id.* ¶ 28). Meanwhile, on January 23, 2002, Martin allegedly told Plaintiff that if he would relinquish the position of Director she would stop harassing him to retire. (*Id.* ¶ 30).

On October 4, 2002, Martin met with Plaintiff at the Long Island office and informed him that Defendant Edward Lawler, Dean of the ILR School,

had decided to close the Long Island Office to save money. (*Id.* ¶ 31). She allegedly stressed that the decision to close the Office was not made as a result of poor performance, and that in fact the office "was overachieving despite being understaffed." (*Id.*). Thereafter, during a conference call between ILR School Deans and Directors on October 9, Lawler allegedly told Plaintiff that ILR needed to save $500,000 and that some people might need to retire. (*Id.* ¶ 32). During this conversation, Martin supposedly said, "I know Tom Germano is sitting quietly in a great deal of pain, and I thank you for that, Tom. I'm sure others are feeling for you as I am." (*Id.*).

On October 24, 2002, Plaintiff allegedly received a letter from Lawler stating that Plaintiff's employment had been terminated for financial reasons effective July 1, 2002. (*Id.* ¶ 33). The letter did not mention performance or managerial problems. (*Id.*). The only other employee at the Long Island Extension office whose employment was terminated was a woman over 70 years old with only 2 1/2 years service to Cornell while the other employees, all junior and younger than Plaintiff, were allegedly offered employment with the ILR School's New York City district office. (*Id.* ¶ 34). However, after the Long Island Federation of Labor and the Long Island Labor Advisory Board threatened to lobby for an alternative provider of labor education in Long Island, the Long Island Office remained open and Plaintiff kept his job as Director. (*Id.* ¶ 39-40).

On December 23, 2002, Plaintiff sent an email to Lawler seeking confirmation that the Long Island office's current level of staffing would be retained and that a vacant labor studies support position could be filled. (Compl.¶ 47). According to Jack Caffey, the President of the Long Island Federation of Labor, Plaintiff allegedly had the authority to hire up to the current level of staff working at the Long Island Office at that time, plus fill the labor studies support position that had been vacant. (*Id.* ¶ 48). On December 24, 2002, Plaintiff sent a letter to Margaret Sipser Leibowitz, an ILR School employee who was teaching ILR classes in Ithaca in the fall of 2002, and called Tina Hament "to see if

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2030355 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

either or both would fill the one vacant position and one soon-to-be vacant position in the Long Island Office, respectively." (*Id.* ¶ 49). Plaintiff claims both prospective employees were aware that any offer of employment Plaintiff made was contingent upon approval from Cornell. (*Id.*). A copy of the letter Plaintiff sent to Ms. Leibowitz was sent simultaneously to Lawler. (*Id.*).

**\*3** Then, on January 3, 2003, Lawler responded to Plaintiff's December 23, 2002 email, and confirmed that Plaintiff had authority to keep current labor staffing, including sufficient staff support. (Compl.¶ 50). Three days later, Plaintiff contacted Lawler's office on to confirm that he had authority to fill the labor staff support position that had been vacant since April 2002. (*Id.* ¶ 51). Later that same day, an employee in Lawler's office emailed Plaintiff and informed him that Lawler would not permit him to fill this position and Lawler would make no specific decisions about staffing in the Long Island Office until the needs assessment for statewide labor was completed. (*Id.* ¶ 52).

On January 13, 2003, Plaintiff met Defendants Seeber and Lawler. (Compl.¶ 53). At this meeting, these Defendants gave Plaintiff a letter, which stated that his employment with the ILR School was terminated because he had offered Ms. Leibowitz a position. (*Id.*).

### C. Procedural History of the Present Action

On February 13, 2003, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging that Defendants terminated his employment because of his age in violation of the ADEA. (Compl. ¶ 8; Affidavit of Nelson E. Roth ["Roth Aff."], Ex. 2 (Charge of Discrimination)). On September 8, 2003, the EEOC dismissed Plaintiff's administrative charge, and informed him that he could file a private ADEA lawsuit in United States District Court within 90 days without a "right-to-sue" letter. (Compl. ¶ 9; Roth Affidavit, Ex. 3 (Letter from EEOC to Plaintiff, dated September 8 2003)).

Thereafter, on December 9, 2003, Plaintiff commenced the present action by filing his Complaint, alleging five causes of action: (1) an ADEA claim for employment discrimination-specifically, on-the-job harassment and eventual terminationon the basis of Plaintiff's age (Compl.¶ 62); (2) a New York State Human Rights Law Claim for age discrimination in employment based on the same conduct (*id.* ¶ 67); (3) a New York City Human Rights Law claim for age discrimination in employment (*id.* ¶ 72); (4) a breach of contract claim for allegedly terminating Plaintiff without cause in violation of an alleged contract under which he had life tenure, (*id.* ¶¶ 16, 77-79); and (5) a breach of implied-in-fact contract for terminating Plaintiff despite Cornell and the ILR School's alleged prior treatment of Senior Extension Associate II's as tenured. (*Id.* ¶ 86). Defendants now move to dismiss the latter three claims pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

### II. DISCUSSION

#### A. Rule 12(b)(1) Dismissal

Defendants move to dismiss Plaintiff's NYCHRL claim pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction. However, because this court has original federal question jurisdiction over plaintiff's federal ADEA claim under 28 U.S.C. § 1331, and because the NYCHRL claim arises out of the "same nucleus of operative facts" as the ADEA claim, the Court clearly has supplemental subject matter jurisdiction over this latter claim under 28 U.S.C. § 1367(a). *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Promisel v. First American Artificial Flowers, 943 F.2d 251, 254 (2d Cir.1991)* (noting that § 1367(a) codified the availability of pendant jurisdiction as set forth in *Gibbs* ), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992). Accordingly, Defendants' Rule 12(b)(1) motion is wholly without merit.

#### B. Rule 12(b)(6) Dismissal

**\*4** In deciding a Rule 12(b)(6) motion, the Court

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2030355 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

must read the complaint generously, accepting as true all factual allegations therein and drawing all reasonable inferences in favor of the plaintiff. *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995); *Mills v. Polar Molecule Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). Dismissal is only proper when "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02 (1957)). Because a Rule 12(b)(6) motion is used to assess the legal feasibility of a complaint, a court should not "assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). Rather, consideration of a Rule 12(b)(6) motion is limited to the factual allegations in the complaint, documents attached to the complaint as exhibits or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which plaintiff's had knowledge and relied on in bringing suit. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561 (1992)).

### 1. NYCHRL Claim

Under the New York City Human Rights Law, it is unlawful for an employer to discriminate against or discharge an employee on the basis of his or her age. N.Y.C. Admin.Code § 8-107(a). Both New York State law and the New York City Administrative Code limit the applicability of the NYCHRL to acts occurring within the boundaries of New York City. *See* N.Y. Gen. Mun. Law § 239-s (1999); N.Y.C. Admin.Code § 2-201 (2003). Consequently, in order to state a claim under the NYCHRL, all "plaintiffs must allege that the defendants intentionally discriminated against them within New York City." *Casper v. Lieberbaum & Co., Inc.,* No. 97 Civ. 3016, 1998 WL 150993 at *4 (S.D.N.Y. Mar. 31, 1998).

"To determine the location of the discrimination, courts have looked to the location of the *impact* of the offensive conduct." *Salvatore v. KLM Royal Dutch Airlines,* No. 98 Civ. 2450, 1999 WL 796172 at *16 (S.D.N.Y. Sept. 30, 1999) (citing *Casper,* 1998 WL 150993 at *5) (*emphasis added* ). In *Casper,* plaintiffs worked in Garden City, and the alleged gender discrimination occurred over an interoffice microphone system from New York City to Garden City while plaintiffs were in Garden City. *Casper,* 1998 WL 150993 at *5. Judge Koeltl dismissed the case because the comments impacted plaintiffs solely at the Garden City office. *Id.* "Plaintiff must show more than the happenstance that a defendant has an office in New York City." *Id.* at *4 (citing *Lightfoot v. Union Carbide Corp.,* No. 92 Civ. 6411, 1994 WL 184670 at *5 (S.D.N.Y. May 12, 1994), *aff'd,* 110 F.3d 898 (2d Cir.1997)).

**\*5** Defendants argue that Plaintiff cannot as a matter of law maintain his NYCHRL claim because the alleged discrimination did not take place in New York City. (Def. Mem. Law at 7-8; Def. Reply at 1-2). Plaintiff alleges in his Complaint that Defendants discriminated against him at four meetings and dinners that took place in New York City at which Martin harassed and pressured him to retire. Assuming such conduct constitutes discrimination, Plaintiff still only felt the impact of that discrimination in his place of occupation, Long Island, not New York City. *See Salvatore,* 1999 WL 796172 at *17 (finding that alleged "isolated incidents" of sexual and racial harassment occurring in New York City did not establish that the "whole or substantial part" of the alleged employment discrimination took place in New York City because the allegedly hostile work environment created by such incidents was in Westchester County-plaintiffs' place of employmentnot New York City).

The facts of the present case mirror those in *Salvatore.* Like the Plaintiff here, the *Salvatore* plaintiffs were employed outside of New York City. Furthermore, the *Salvatore* plaintiffs were not subject to any adverse employment action, such as termination or denial of overtime pay, benefits or promotions, in New York City.1999 WL 796172 at

Not Reported in F.Supp.2d, 2005 WL 2030355 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*17. Instead, the plaintiffs only alleged that defendant created a hostile working environment by making sexually suggestive and racial harassing remarks and unwanted sexual advances during a company outing in New York City and one of plaintiffs' visits to defendant's home in New York City. *Id.* at *15. Ultimately, the court agreed with the defendant that these isolated incidents impacted plaintiffs' employment only in Westchester County—their place of employment-not New York City, and dismissed their NYCHRL claim under Rule 12(b)(6). *Id.* at *15-17. Thus, to the extent that the present Plaintiff's NYCHRL claim rests on the aforementioned four incidents of harassment by Martin in New York City, it cannot survive Rule 12(b)(6) dismissal.

Plaintiff in turn argues that because the January 13, 2003 meeting at which he was finally terminated took place in New York City, this case is analogous to *Launer v. Buena Vista Winery,* 916 F.Supp. 204 (E.D.N.Y.1996), in which the district court found that the plaintiff who had been terminated at a meeting in New York City and had discriminatory remarks faxed to him at his New York City phone number had suffered discrimination in New York City. 916 F.Supp. at 214; (Pl. Mem. at 6-7). However, Plaintiff's Complaint makes no mention of the fact that such termination meeting occurred in New York City. Moreover, even if the Court takes notice of such fact, the present case is still distinguishable from *Launer* because while the plaintiff in *Launer* was terminated in New York City, he also maintained an office for the defendant employer in New York City and attended periodic regional company sales meetings there. *Launer,* 916 F.Supp. at 206. In contrast, Plaintiff did not maintain an office or any other workspace in New York City, nor did he perform any of his job-related duties there.

**\*6** Instead, Plaintiff's situation is more analogous to the plaintiff in *Lightfoot v. Union Carbide Corp..* In *Lightfoot,* the plaintiff worked in Connecticut, and he occasionally brought work home with him to his residence in New York City. In addition, the defendants in that case approved the plaintiff's termination at a meeting in New York City. Nevertheless, Judge Patterson granted summary judgment in favor of the defendant on the plaintiff's NYCHRL claim, finding that the impact of defendant's alleged adverse employment action on the plaintiff occurred while the latter was employed in Connecticut. *Lightfoot,* 1994 WL 184670 at *5. Accordingly, in the present case, Plaintiff has failed to allege that Defendants' adverse employment actions impacted him in New York and therefore cannot state a viable cause of action under the NYCHRL.

### 2. *Breach of Contract*

Plaintiff's fourth cause of action alleges that in terminating him from his position as a Senior Extension Associate II "without cause", Defendants breached their contract with him under which he allegedly was guaranteed life tenure and could only be fired "for cause and/or budgetary exigencies." (Com pl.¶¶ 78-79). Such contract, which was allegedly oral rather than written, was in turn supposedly based on Defendants Gray and Seeber's alleged representation to Plaintiff that he had the "equivalent of tenure" upon his appointment as a Senior Extension Associate II, and the policies of Cornell and the ILR School, under which a Senior Extension Associate II is allegedly treated as "a tenured faculty member." (*Id.* ¶¶ 16-17, 77).

However, the Cornell Faculty Handbook, which was submitted in conjunction with Defendants' Motion to Dismiss (*see* Affidavit of Nelson E. Roth ["Roth Aff."], Ex. 17) and which the Court may consider because it contains some of the "policies of Cornell" referred to in the Complaint (*see* Compl. ¶ 77), directly contradicts Plaintiff's version of the contract terms as set forth in the Complaint.FN3 The Handbook in fact explicitly provides that rather than enjoying life tenure, "Senior Extension Associates are appointed for terms of up to five years and may be reappointed on the basis recommendations by the department and the appropriate extension director and deans(s)." (Roth Aff., Ex 17 at 33). Thus, the Complaint's allegations do not establish the existence of an oral contract for tenure between Defendants and Plaintiff. *See Matusovsky*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*v. Merrill Lynch,* 186 F.Supp.2d 397, 400 (S.D.N.Y.2002) ("If a plaintiff's allegations are contradicted by [ ] a document [attached to or incorporated by reference into the complaint], those allegations are insufficient to defeat a motion to dismiss."); *In re Bristol-Myers Squibb Sec. Litig.,* 312 F.Supp.2d 549, 555 (S.D.N.Y.2004) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.") (citation omitted).[FN4]

> **FN3.** Defendants have also submitted several term appointment letters they sent to Plaintiff during the course of his employment which also appear to contradict the Complaint's allegation that he had tenure (see Roth Aff., Exs. 4-9); however, because none of these letters are attached to or even mentioned in the Complaint, the Court may not consider them in ruling on Defendants' present motion.

> **FN4.** Indeed, in a recent decision, Judge Daniels granted Rule 12(b)(6) dismissal of an almost identical breach of contract claim brought against these very same defendants by Plaintiff's former colleague at the ILR School, Margaret Leibowitz, concluding that because the Faculty Handbook "clearly indicate[s] that appointments could be for no more than a five year period," "the allegations in [Leibowitz's] complaint fail to show that a contract existed between [her] and either Cornell University or the ILR School ensuring her employment indefinitely." *Leibowitz v. Cornell Univ.,* No. 03 Civ. 9976(GD), 2005 WL 267560, at *6 (S.D.N.Y. Feb. 3, 2005).

**\*7** Accordingly, Plaintiff's breach of contract claim must be dismissed.

### 3. *Breach of an Implied-in-Fact Contract*

Plaintiff also alleges that even if there was no express employment contract granting him tenure, the parties had entered into an implied-in-fact contract under which he had tenure. (Compl.¶ 83). This im-

plied-in-fact contract, Plaintiff claims, arises from Defendants' conduct, the treatment of other Senior Extension Associate II's as having tenure, and the policies of Cornell and the ILR School. (*Id.* ¶¶ 84-86).

"A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words ... and is derived from the presumed intention of the parties as indicated by their conduct." *Jemzura v. Jemzura,* 36 N.Y.2d 496, 503-04, 369 N.Y.S.2d 400 (1975) (internal quotations and citations omitted). While an implied in fact contract is equally binding as an expressed contract, *id.,* and, like an express contract, requires mutual assent evincing the intention of the parties to be bound by specific contractual terms, *see Maas v. Cornell Univ.,* 94 N.Y.2d 87, 93-94, 699 N.Y.S.2d 716 (1999) (citations omitted), it "rests upon the conduct of the parties and not their verbal or written words." *Parsa v. New York,* 64 N.Y.2d 143, 148, 485 N.Y.S.2d 27 (1984).

As an initial matter, Defendants argue that "[a] plaintiff may not rely on an implied-in-fact contract where an express contract governs the subject matter." (Def. Mem. at 10). While Defendants have correctly stated the law, *see Stissi v. Interstate & Ocean Transp. Co. of Philadelphia,* 814 F.2d 848, 851 (2d Cir.1987) ("It is an elementary principle of contract law that, where there exists an express contract for compensation, an action outside that contract will not lie."); *Muhich v. St. Gregory the Great Roman Catholic Church and School,* 239 A.D.2d 901, 659 N.Y.S.2d 679, 680 (4th Dep't 1997) ("Where, as here, an express contract exists between the parties concerning the same subject matter, there may be no recovery upon a theory of implied contract."), such rule has no application in the present case where, as stated above, there was no express employment contract giving Plaintiff tenure.

Nevertheless, Plaintiff has failed to allege adequately the existence of an implied-in-fact contract between him and Defendants giving him lifetime tenure in employment. The Complaint's general ref-

Not Reported in F.Supp.2d, 2005 WL 2030355 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

erence to Cornell and the ILR School's "conduct indicat[ing] to [Plaintiff] that he was a tenured faculty member" (Compl.¶ 84) is too vague to overcome a Rule 12(b)(6) motion. *See Electronics Communications Corp v. Toshiba,* 129 F.3d 240, 243 (2d Cir.1997) (holding that conclusory statements in a complaint will not substitute for sufficient factual allegations when trying to overcome a motion to dismiss). Moreover, as discussed above, his allegations that granting him tenure was consistent with Defendants' treatment of other Senior Extension Associate II's and with Cornell and ILR School Policy are directly contradicted by the Cornell Faculty Handbook itself and thus carry no weight with the Court.

**\*8** Accordingly, the Court also finds that Plaintiff has failed to a state viable claim for breach of implied-in-fact contract.

### C. Leave To Amend

Having found that Plaintiff's NYCHRL, contract, and implied-in-fact contract claims must be dismissed pursuant to Rule 12(b)(6), the Court must next determine whether Plaintiff should be granted leave to amend its Complaint to cure the defects in these three causes of action. Under F.R.C.P. 15(a), leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, although "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead," *Cortec Industries, Inc.,* 949 F.2d at 48 (citing *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990), a court may dismiss without leave to amend when amendment would be futile. *Oneida Indian Nation of New York v. City of Sherrill,* 337 F.3d 139, 168 (2d Cir.2003) (citing *Foman v. Davis,* 371 U.S. 178, 182,83 S.Ct. 227, 230, 7 L.Ed.2d 385 (1962)). Ultimately, the decision to grant leave to amend a complaint rests within the discretion of the district court. *Foman,* 371 U.S. at 182, 83 S.Ct. at 230.

With respect to Plaintiff's NYCHRL claim, no additional amount of pleading will establish that Plaintiff felt the impact of the alleged discrimination in New York City. After all, Plaintiff's office

was in Long Island. Even if Plaintiff alleges more acts of discrimination during meetings in New York City, the impact of such discrimination was still on Plaintiff's employment in Long Island. Similarly, as discussed above, even if Plaintiff alleges the termination meeting was in New York City, the impact of that meeting on plaintiff's employment was also in Long Island. Thus amendment of this claim would be futile. The same can also be said for Plaintiff's contract and implied-in-fact contract claims because no amount of additional allegations in the Complaint would change the fact that Cornell and the ILR's School's employment policy with respect to Senior Extension Associates, as expressly reflected by the Faculty Handbook, was to offer them 5-year employment terms rather than lifetime tenure.

Accordingly, leave to amend is denied with respect to all three of Plaintiff's dismissed claims.

### III. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss under Rule 12(b)(1) is DENIED, but their Motion to Dismiss the three causes of action under Rule 12(b)(6) is GRANTED. Accordingly, Plaintiff's New York City Human Rights Law, breach of express contract, and breach of implied-in-fact contract claims are DISMISSED WITH PREJUDICE. Defendants are directed to answer Plaintiff's two remaining causes of action within twenty (20) days of the date of this Order. Upon joinder of the remaining issues, a Rule 16 conference shall be scheduled by the Court.

SO ORDERED

S.D.N.Y.,2005.
Germano v. Cornell University
Not Reported in F.Supp.2d, 2005 WL 2030355 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 12**

Slip Copy                                                                                                    Page 1

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

Peters v. Sikorsky Aircraft Corp.
D.Conn.,2006.

United States District Court,D. Connecticut.
Edward PETERS, Plaintiff,
v.
SIKORSKY AIRCRAFT CORP., Defendant.
**No. 3:04cv1066 (PCD).**

Aug. 10, 2006.

Alexander H. Schwartz, SouthporT, CT, Peter Harvey, Orange, CT, for Plaintiff.
Sara R. Simeonidis, Day, Berry & Howard, Hartford, CT, for Defendant.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PETER C. DORSEY, District Judge.

**\*1** Plaintiff Edward Peters ("Peters") brings this action alleging discrimination based upon a physical disability (Count I) and breach of contract (Count II). Defendant Sikorsky Aircraft Corp. ("Sikorsky") moves for summary judgment on both counts of Plaintiff's Amended Complaint [Doc. No. 35]. For the reasons set forth herein, Defendant's Motion for Summary Judgment [Doc. No. 37-1] is **granted.**

### I. BACKGROUND

Defendant Sikorsky designs, manufactures and overhauls helicopters. Its main manufacturing plant is located in Stratford, Connecticut and it also maintains smaller Connecticut facilities in Bridgeport and Shelton. Sikorsky employed Plaintiff from 1988 until his layoff on January 12, 2001. Plaintiff primarily worked in the larger Stratford plant, but he also worked for short periods of time at its smaller Bridgeport and Shelton locations. Plaintiff was a member of the Teamsters Union, Local 1150 (the "Union") while he was employed at Sikorsky. A collective bargaining agreement ("CBA") between Sikorsky and the Union set forth, among other things, the rules that Sikorsky must follow when laying off and recalling employees. Employees are

laid off and recalled by their non-interchangeable occupational groups in accordance with seniority. This process, and the definitions and parameters of these terms, are contained in the CBA, Article VIII, Sections 8.1-8.24 and Appendix A.

Plaintiff began his employment at Sikorsky in 1988 as a Riveter/Assembler. After Plaintiff underwent surgery to his right wrist in 1991, his doctor gave him permanent medical restrictions that prohibited him from riveting and lock bolting. Sikorsky attempted to find Plaintiff another position that would accommodate his restrictions and eventually, Sikorsky found Plaintiff a Labor Grade 9 Fork Lift Operator position on the first shift in its Bridgeport facility. Later, he received a promotion to a Labor Grade 8 Fork Lift Operator position in the main Stratford plant. As a Labor Grade 8 Fork Lift Operator, Plaintiff was responsible for moving material using two machines: a jitney vehicle (also called a "power ox") and a fork truck (also called a "fork lift").<sup>FN1</sup> A Grade 8 Fork Lift Operator would also have to load and unload the wagon pulled by the jitney vehicle and could be assigned other duties. In the Grade 8 position, Plaintiff estimated that he used the jitney vehicle 30% of the time, and the fork truck 70% of the time, until a second injury in 1996.

> FN1. During the time that Plaintiff worked as a Labor Grade 9 Fork Lift Operator in the Bridgeport facility, he used only the jitney vehicle. The jitney vehicle pulls a wagon and delivers small parts and packages. It is operated by manipulating handgrips that must be pressed to start, steer and stop the vehicle. The fork truck is primarily used to move material on wooden pallets. In contrast to a jitney vehicle, the fork truck has a wheel for steering and levers to raise and lower the boom.

In 1996, Plaintiff's second injury to his right wrist meant that he could no longer physically drive the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

jitney vehicle. Plaintiff's physician, Dr. Zaretsky, assessed a permanent disability rating for his right wrist of 27% and ordered that Plaintiff stop driving the jitney vehicle. Sikorsky's Medical Department concurred with Dr. Zaretsky's order and Plaintiff never drove the jitney vehicle after 1996. In 1997, Sikorsky issued Plaintiff a revised Medical Placement Report ("1997 MPL") at Dr. Zaretsky's request detailing his restrictions.FN2 Plaintiff testified that these medical restrictions have not changed since 1997.

> FN2. The restrictions in the 1997 MPL are as follows: (i) minimal use of right hand with minimum grasping, (ii) no lifting over 10 pounds, (iii) no riveting or lock bolting, (iv) no repetitive gripping or grasping, and (v) no duties driving jitney vehicles (power oxs).

**\*2** After 1996, Plaintiff sought and was given a significant amount of family leave. Plaintiff also took time off from work because of wrist pain. Plaintiff used only a fork truck, and not a jitney vehicle, from 1996 until 1998 to perform his duties as a Fork Lift Operator. The large Stratford facility had six other Fork Lift Operators on the first shift at this time.

In 1998, Plaintiff asked for a shift change to the smaller second shift to reduce his absences for family reasons. Sikorsky tried to grant Plaintiff's requests by offering a number of temporary light duty jobs on the second shift that satisfied his medical restrictions. Plaintiff performed various duties in all three of Defendant's Connecticut facilities during 1998, 1999 and 2000, including: placing nuts and bolts in UR bins, performing some crib attendant duties and kitting assembler jobs in both Stratford and Shelton, panel board maintenance duties, and fork lift work. Some of these duties are light duty. During these temporary assignments, Sikorsky maintained Plaintiff's title, hourly pay and labor grade of Fork Lift Operator.

On January 12, 2001, Sikorsky conducted a reduction in force that affected the Plaintiff's occupational group. As a result, Plaintiff and four other employees in transportation were laid off. The CBA provided employees laid off for lack of work with certain recall rights based upon their seniority. When a position becomes available for recall, the Sikorsky human resources department contacts the most senior employee laid off in that occupational group. If the laid off employee is interested in the position, he or she must complete pre-employment processing (including a medical exam, drug test and background check).

Sikorsky had an opening in one of the two Fork Lift Operator positions in its smaller Bridgeport facility in early 2002. The other Fork Lift Operator position was held by a work leader that had more seniority and was two labor grades more advanced than Plaintiff. On February 14, 2002, the Human Resources Department notified Plaintiff of this open position.

On February 26, 2002, Plaintiff attended his pre-employment processing at Sikorsky. He continued to have the same restrictions set out in the 1997 MPR (including an inability to drive jitney vehicles). Plaintiff assumed that the duties of the Bridgeport position were the same as the duties of the Fork Lift position Sikorsky had been able to modify to accommodate his restrictions four years earlier in Stratford. However, after learning about Plaintiff's continued inability to use a jitney vehicle, Sikorsky notified him that he would not be called back because the position required someone to operate both the jitney vehicle and the fork truck.FN3 Sikorsky then filled the position with the next most senior person on layoff status.

> FN3. Plaintiff's "denial" in his 56(a)(2) at ¶ 53 is not credited, because it does not deny Defendant's assertion that these were the reasons given for refusing to assign Peters to the 2002 open position. (*See* Am. Compl. at ¶ 7.) To the extent that Plaintiff denies Defendant's assertion that jitney vehicle duties were essential for the open position, see discussion *infra* Part III.A.2.ii.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

As a result of the failed recall in 2002, Plaintiff filed a claim with the Connecticut Commission on Human Rights and Opportunities ("CHRO") on September 3, 2002, claiming discrimination on the basis of disability.

**\*3** In May 2003, another open Fork Lift Operator position became available in Sikorsky's Shelton facility on the second shift. The position included operating a fork truck some of the time, going out into the yard to get parts, operating a scrubber, using hand tools, and other odd jobs. The scrubber had hand controls like a jitney that required an operator to use his or her wrists to operate it. Supervision for this open Shelton position was concerned that the restrictions in Plaintiff's 1997 MPR would prevent him from performing the job duties of the position.FN4

> **FN4.** Plaintiff's response to Defendant's factual assertions in its 56(a)(1) Statement at ¶ 60 is not responsive to the facts asserted therein. *See* discussion *infra* Part III.A.2.ii.

Nevertheless, Sikorsky contacted Plaintiff about this open position and he came in for a pre-employment medical screening on May 23, 2003. Dr. Mongillo, one of Defendant's part-time physicians, examined him. At the examination, Plaintiff wore a splint on his right hand and complained of pain, including parethesias (numbness), tingling, and pain in the arm. Dr. Mongillo was concerned that a doctor had not seen Plaintiff since 2001. Thus, he recommended that Plaintiff see Dr. Watson, a hand specialist, to get an objective diagnosis of Plaintiff's condition, comment on therapy, and give an opinion as to what Plaintiff's medical restrictions should be. Dr. Mongillo told Plaintiff that Sikorsky would pay for the examination and that he must see a hand specialist for an evaluation. While he recommended Dr. Watson, he later told the Plaintiff that he could see another doctor for the evaluation, provided the doctor was a hand specialist.

In addition to Plaintiff's conversation with Dr.

Mongillo, the Sikorsky Medical Department and the Sikorsky Human Resources Department sent, and Plaintiff received, five letters trying to schedule an appointment for a hand specialist.FN5 Plaintiff did not answer the letters and he did not see a hand specialist.FN6 As a result, Sikorsky did not make a further determination as to Plaintiff's restrictions or his ability to perform the job at the Shelton plant. Pursuant to the last letter (dated November 20, 2003), Plaintiff's lack of response by December 4, 2003 led Sikorsky to presume that he had chosen not to pursue any further employment with Sikorsky. On December 4, 2003, Plaintiff amended his complaint at the CHRO to include allegations that Sikorsky discriminated against him on the basis of disability by not placing him in the Shelton position in 2003.

> **FN5.** The letters were dated May 30, 2003, July 23, 2003, August 13, 2003, August 28, 2003 and November 20, 2003.

> **FN6.** Plaintiff's denial of Defendant's factual assertion in its 56(a)(1) Statement at ¶ 75 is not responsive to the facts asserted therein, because ¶ 75 simply quotes Peters' deposition testimony. However, the Court credits additional facts that Plaintiff alleges in his 56(a)(2) Statement at ¶ 75, adequately supported by citations to the record.

Plaintiff filed his Amended Complaint ("Am.Compl.") with this Court on June 16, 2005. Peters alleges that the layoff and two failed recalls constitute discriminatory employment practices based upon a physical disability in violation of Conn. Gen. Statute § 46a-60 (Count I). He also alleges that these events constitute a breach of the CBA between Sikorsky and his Union (Count II).

## II. STANDARD OF REVIEW

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The mere existence of an alleged factual dispute is not, by itself, sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The adverse party must provide sufficient evidence to demonstrate that there is a genuine issue of material fact. *See id.* at 248-49. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The court must view the facts in the light most favorable to the adverse party and draw all inferences in its favor. See *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992). However, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986).

### III. DISCUSSION

**\*4** Defendant argues in its briefs that both Counts I and II are preempted by the Labor Management Relations Act ("LMRA") because they require analysis of, and are dependent on, a collective bargaining agreement. As explained below, Count I for discriminatory employment practices is not preempted by the LMRA, but summary judgment is granted to Defendants on other grounds. Count II for breach of the CBA is preempted by the LMRA, subject to a six-month statute of limitations, and since the action was not filed within six months, summary judgment is granted to Defendants as to Count II.

**A. *Count I: Discriminatory Employment Practices***
In Plaintiff's Am. Compl., he identifies three separate incidents of alleged discrimination based on his physical disability: the January 2001 layoff, the February 2002 failed recall ("2002 Recall"), and the May 2003 failed recall ("2003 Recall"). Each of these events will be treated separately.

**1. *The January 2001 Layoff***

In Count I, Plaintiff alleges that his layoff in January 2001 "was prompted by the physical disability of the plaintiff" and this layoff constitutes a discriminatory employment practice in violation of Conn. Gen. Statute § 46a-60. It is unnecessary for the court to consider Defendant's LMRA preemption argument with respect to Count I and the 2001 layoff, because the Plaintiff failed to exhaust his state administrative remedies under the Connecticut Fair Employment Practices Act ("CFEPA").

A plaintiff bringing a civil action for employment discrimination under the CFEPA must first file a "timely complaint" with the CHRO and then obtain a release from the commission. Conn. Gen.Stat. § 46a-100, 46a-101. The CFEPA states that an administrative complaint must be filed within 180 days with the CHRO in order to be timely. Conn. Gen.Stat. §§ 46a-82.

However, Plaintiff was laid off on January 12, 2001 and did not file a claim with the CHRO until September 3, 2002, almost twenty months later. The administrative complaint is certainly not "timely" under the requirements of the CFEPA, and therefore, the Plaintiff did not exhaust his state administrative remedies, as set by the legislature, with respect to the January 2001 layoff.[FN7] *See Sullivan v. Board of Police Comm'rs,* 196 Conn. 208, 215-16 (1985) (holding that plaintiff's failure to follow administrative route set in the Connecticut statute gives plaintiff no authority to pursue his claim in civil court). Consequently, Plaintiff's claim under Conn. Gen.Stat. § 46a-60 regarding his January 2001 layoff is dismissed and summary judgment is granted to the Defendants as to this claim.

> FN7. Plaintiff appears to misconstrue Defendant's arguments regarding the exhaustion of state administrative remedies. Plaintiff writes that "[s]ince the plaintiff admits that his second count is governed exclusively by the LMRA, defendant's contention that plaintiff has failed to exhaust his state administrative remedies be-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

comes irrelevant, as such state administrative procedures are only a prerequisite to a suit under the CFEPA." (Pl.'s Opp., Section II .B.) However, Defendant actually argues that Plaintiff's failure to exhaust his administrative remedies is applicable to Count I, the state law discrimination claim. (Def.'s Memo, Section II.C.) The exhaustion of state administrative remedies is clearly relevant for the purposes of the state law claim of employment discrimination (Count I). Therefore, Plaintiff implicitly concedes that the 180 day administrative requirement is a prerequisite to filing a CFEPA suit in civil court here.

### 2. *The 2002 and 2003 Recalls*

#### i. *LMRA Pre-emption*

Defendant argues that Plaintiff's state law disability discrimination claim based upon the two recalls is preempted by § 301 of the LMRA. Defendant maintains that the claims are founded upon recall rights created by the CBA, and the Court will have to interpret the terms of the CBA to resolve these claims. The Court disagrees.

**\*5** Although § 301 of the LMRA is facially a grant of jurisdiction to the federal district courts, it has been construed to be a source of substantive law as well, giving federal courts the authority to fashion a uniform federal common law to resolve disputes over collective bargaining agreements. *See Textile Workers v. Lincoln Mills,* 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 103-104, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). In *Lucas Flour,* the Supreme Court analyzed the preemptive effect of § 301 and stressed that uniform interpretation of collective bargaining agreements according to a federal body of common law would allow parties to negotiate and administer these agreements with certainty and efficiency. *Id.*

Accordingly, the Supreme Court has held that this federal interest in uniform interpretation of collective bargaining agreements may preempt certain state-law tort actions. *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 210-11, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) ("Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract."). If resolution of a state law claim depends upon analysis of the terms of a collective bargaining agreement, then § 301 pre-empts the claim. *Id. at 220.* FN8 However, when a state law claim can be resolved without interpreting the collective bargaining agreement, the claim is independent of it and not preempted by § 301. *See Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 409-410, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988).

FN8. As this Court has noted, the Supreme Court has articulated multiple standards to decide if a state law claim is preempted by § 301. Preemption is necessary for "claims that are 'founded directly on the rights created by collective bargaining agreements,' claims that 'require [ ] the interpretation of a collective bargaining agreement,' claims that are 'substantially dependent on analysis of a collective bargaining agreement,' claims that are 'inextricably intertwined with consideration of the terms of the labor contract,' and claims that assert rights 'derived from the contract.' " *Williams v. Comcast Cablevision of New Haven, Inc.,* 322 F.Supp.2d 177, 182 (D.Conn.2004) (internal citations omitted).

Defendant maintains that the right to recall is created by, and completely dependent upon the CBA. Defendant argues that any claim based upon the recall is therefore preempted. In support of this assertion, Defendant cites a number of cases where claims were preempted because the right or duty a plaintiff sought to be enforced was derived from a collective bargaining agreement. For example, in *Allis-Chalmers Corp.,* a state tort suit for bad faith failure to pay benefits was preempted because the implied covenant of good faith and fair dealing, contained in all contracts, established the duties and rights at issue. 471 U.S. at 216-17. Likewise, in

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

*United Steelworkers of America v. Rawson,* a state tort claim that a union negligently failed to inspect a mine pursuant to a collective bargaining agreement provision was also held to be preempted, because the union's duty to inspect did not exist independently of the agreement. 495 U.S. 362, 371, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990). This Court held that a claim for negligent infliction of emotional distress is preempted where the collective bargaining agreement set the duty owed to plaintiff. *Almonte v. Coca-Cola Bottling Co.,* 959 F.Supp. 569, 576-77 (D.Conn.1997).

In the context of recall rights contained in collective bargaining agreements, Defendant cites *Zimmer v. AT & T,* 947 F.Supp. 302 (E.D.Mich.1994), *aff'd mem.,* 78 F.3d 585 (6th Cir.1996) (holding that tort claims alleging breach of a duty of care concerning the processing of an employee's recall interest form were preempted). Defendant also cites a decision where this Court held that an employee's claims for violations of his recall and seniority rights under a collective bargaining agreement were preempted, because the prohibition of the defendant's actions was governed by the agreement. *Petrucelli v. Cytec Indus.,* No. 3:95-cv-1055 (AHN), 1996 U.S. Dist. LEXIS 22498 at *15 (D.Conn.1996).

**\*6** As the caselaw cited above demonstrates, a claim alleging a failure to recall pursuant to a CBA may be preempted where the underlying duty to recall arises from the CBA. However, the Court believes that Plaintiff's discrimination claim concerns rights and duties that exist independently of the CBA. In this regard, Plaintiff's argument is more persuasive. Sikorsky has indeed "attempted to conflate the issue of whether the Plaintiff was entitled to be recalled[,] which may implicate the [CBA]," with the question of whether the Plaintiff has a right not to be denied a position based upon a physical disability, which may constitute discrimination as it and does not implicate, but arises apart from, the CBA. (Pl.'s Opp., Section II.B.)

The caselaw Defendant cites concerns mostly state law tort claims that are essentially a claim for contract breach, and where the defendants would have

no duty to refrain from their allegedly wrongful conduct absent the CBA. Although *Zimmer* seems to suggest that all claims based upon recall rights in a CBA are preempted, the Sixth Circuit's holding is inapposite here. The claims in *Zimmer* alleged a breach of a duty of care concerning the processing of the employee's recall interest form, and certainly, no such independent duty of care exists aside from the CBA. 947 F.Supp. at 306-307. However, duties and obligations regarding alleged discrimination do exist independently from the CBA, and these are based on state law. In *Petrucelli,* this Court held preemption was appropriate for a claim of intentional infliction of emotional distress, noting that "plaintiff has not alleged any specific actions whose prohibition [have] an independent basis in state law." 1996 U.S. Dist. LEXIS 22498 at *15. Peters, on the other hand, alleges actions that are prohibited by the state law of Connecticut and this claim, although related to the right to recall found in the CBA, is sufficiently independent of the CBA to avoid preemption.

Additionally, Defendant argues that resolution of Plaintiff's discrimination claims will not simply require reference to the CBA, but its analysis and interpretation does and therefore, this claim should be preempted. Defendant cites a First Circuit case, *Fant v. New Eng. Power Serv. Co.,* 239 F.3d 8, 15-16 (1st Cir.2001), where a state law claim for discrimination was preempted because the conduct at issue constituted a breach of duty under the CBA and resolution of the dispute hinged upon interpretation of the CBA. Similarly, this Court held that claims of fraud and intentional infliction of emotional distress were preempted because resolution of the claims required interpretation of a collective bargaining agreement's terms regarding negotiations and modifications to that agreement. *Dittman v. GMC-Delco Chassis Div.,* 941 F.Supp. 284, 289 (D.Conn.1996), *aff'd mem.,* 116 F.3d 465 (2d Cir.1997).

However, as demonstrated *infra* in Section III.A.2.ii, resolution of Plaintiff's physical disability discrimination claim does not require analysis and interpretation of the CBA. While Defendant is cor-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

rect in pointing out that the CBA contains various provisions regarding layoffs, recalls and seniority, the Court is unaware of any specific terms or provisions that govern the actual recall procedure after the initial notification of an open position.FN9 Instead, our inquiry is a fact-bound analysis and will not require interpretation of the CBA.

> FN9. It would be a different situation if the CBA set forth the process whereby an employee notified of an open recall position could be denied, or if it outlined the decision-making process to be followed when making job reassignments. Cf. Zimmer. 947 F.Supp. 302 at 306-307 (noting that the CBA contained terms that required the employer to present the employee with a "complete termination packet" including a recall interest form, and tort claims based upon a failure to follow this process were preempted).

*7 In Count I, the Plaintiff is not arguing that Defendant interfered with rights stemming from the CBA. Instead, Plaintiff claims Defendant violated an independent right under the CFEPA to be free from employment discrimination. The Court is not aware of instructive caselaw in this jurisdiction where, as here, a Plaintiff alleges employment discrimination in the context of a recall. The difficulty is that, without the right to recall in the CBA, Plaintiff's state law rights against employment discrimination could not be exercised at all. Additionally, "[t]he boundary between claims requiring 'interpretation' of a CBA and ones that merely require such an agreement to be 'consulted' is elusive." Wynn v. AC Rochester, 273 F.3d 153, 158 (2d Cir.2001). This line is even more elusive where the rights to recall are found in the CBA, but a plaintiff's claims are based upon state anti-discrimination statutes.

The Court concludes that Plaintiff's state law discrimination claim is sufficiently independent of the CBA to avoid preemption. The cases cited in Plaintiff's Opposition, mostly from the Sixth Circuit, are instructive. Plaintiff relies upon Lingle,

which held that since plaintiff's retaliatory discharge claim did not require interpretation of the CBA, preemption was inappropriate. 486 U.S. at 314. In Smolarek v. Chrysler Corp., 879 F.2d 1326, 1335 (6th Cir.1989), the court held that because resolution of claims for retaliatory discharge and handicap discrimination would not necessitate interpretation of a collective bargaining agreement, these claims were not preempted. Although these cases do not involve rights to recall specifically, they do apply to claims that an employer discriminated on the basis of a disability. Thus, they are persuasive where a claim is founded upon independent state rights which do not require interpretation of a CBA.FN10 A similar conclusion can be found in the Second Circuit's Wynn decision. In that case, a plaintiff's misrepresentation claim was not preempted by § 301, even when it was based upon rights to employee benefits and recall found in the collective bargaining agreement. Wynn, 273 F.3d at 159. The court noted that "[r]eference to the CBA may be needed, but ... [s]tate law-not the CBA-is the source of the rights asserted by plaintiffs: the right to be free of economic harm caused by misrepresentation." Id.

> FN10. Additionally, the Sixth Circuit applied a Lingle analysis to state handicap discrimination claims and followed Smolarek in O'Shea v. The Detroit News, 887 F.2d 683, 687 (6th Cir.1989) (holding that despite an employer's possible defenses (based on a CBA) about its right to make a certain employment decision, "[t]he point is that Michigan employees have the right not to be discriminated against on the basis of age or handicap without regard to the collective bargaining agreement's language about an employee's rights"); see also Welch v. General Motors Corp., 922 F.2d 287, 290 (6th Cir.1990) (affirming that the district court's ruling that even where a CBA provides a remedy for discrimination, independent state statutory rights could be asserted because "the right to be free from handicapped discrimination was created by the [Michigan Handicapper's Civil Rights

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

Act] and not solely by the collective bargaining agreement").

Furthermore, application of state law to Count I will not implicate the policy interests of the Supreme Court in promulgating a uniform federal labor law. In *Allis-Chalmers Corp.,* although the Court held that the tort claims were preempted by § 301, it also noted that "in extending the preemptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." 471 U.S. at 212. Where a plaintiff's age discrimination claims arose under New York state laws, one court held that "[i]t cannot be said that such a claim is, in reality, one under § 301 of the LMRA." *Intern'l Assoc. of Machinists & Aerospace Workers v. Gen. Elec. Co., 713 F.Supp. 547, 554 (N.D.N.Y.1989).* The court's ruling was consistent with the federal interest in a uniform labor law policy, because it did not involve the breach of a duty stemming from a CBA, and "the heart of the plaintiff's claims against [GE] arise under the laws of the State of New York and are not generally of the sort which may be negotiated away at a bargaining table." *Id. at 554-55.* Plaintiff's claim of physical disability discrimination is similarly an assertion of state law rights, which arise independent of the CBA and will not implicate federal labor law policy.

**\*8** With regard to the two failed recalls, Plaintiff's Count I claim that Sikorsky's employment practices constituted discrimination is not preempted by § 301 of the LMRA.

### ii. *Discriminatory Employment Practices Claim*

Under the CFEPA, it is a discriminatory employment practice "to refuse to hire or employ or to bar or to discharge from employment any individual ... because of the individual's ... physical disability." Conn. Gen.Stat. § 46a-60(a)(1). Courts construe disability discrimination claims brought under the CFEPA similarly to those brought under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12101 *et seq.,* and the Connecticut courts review federal precedent concerning employment discrimination for guidance in enforcing the CFEPA. *Worster v. Carlson Wagon Lit Travel, Inc. 353 F.Supp.2d 257, 267 (D.Conn.2005); Levy v. Commission on Human Rights & Opportunities, 671 A.2d 349, 355 (Conn.1996).* Courts employ the burden shifting framework of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Hill v. Pfizer, Inc., 266 F.Supp.2d 352, 359 (D.Conn.2003)* (explaining that a plaintiff must first demonstrate a *prima facie* case of discrimination, the defendant must then offer a legitimate reason for its decision, and if it does so, the burden shifts back to plaintiff who must demonstrate pretext); *see also Levy, 671 A.2d at 357-58* (same). "The burden of proof that must be met to permit an employment discrimination plaintiff to survive a summary judgment motion at the *prima facie* stage is *de minimus.*" *Hill, 266 F.Supp.2d at 359.*

Under Connecticut law, as under the ADA, to establish a *prima facie* case of discrimination, Plaintiff must show that (1) he was a member of a protected group; (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) the adverse employment decision occurred under circumstances giving rise to a reasonable inference of discrimination. *Shaw v. Greenwich Anesthesiology Assocs. P.C., 137 F.Supp.2d 48, 64-65 (D.Conn.2001);* Curry v. Goodman, CV020817767S, 2004 Conn.Super. LEXIS 3481 at *14-15 (Conn.Super.Ct.2004).

The Court finds that Defendant's evidence is sufficient to defeat Plaintiff's *prima facie* case with regard to both failed recalls. The Plaintiff has not met his burden of demonstrating evidence sufficient to create a genuine issue of material fact to survive summary judgment on Count I. Specifically, Plaintiff cannot prove the second element of his *prima facie* case, that he was qualified for the open recall positions, with or without reasonable accommodations.

#### 1. *2002 Recall*

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

In order to make out his *prima facie* discrimination case, Plaintiff must demonstrate that he is qualified for the positions at issue. *E.g.,* *Shaw,* 137 F.Supp.2d at 64-65. In determining if a plaintiff is "qualified," courts look to whether or not the employee can perform the essential functions of the job. *Shannon v. N.Y. City Transit Auth.,* 332 F.3d 95, 99-100 (2d Cir.2003); *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 6 (2d Cir.1999). Although the term "essential functions" is not defined in the ADA itself, the Equal Employment Opportunity Commission ("EEOC") defines the term in its ADA regulations to mean "the fundamental duties of the position in question, but not functions that are merely marginal." *Mitchell,* 190 F.3d at 8 (internal citation omitted); *see also Shannon,* 332 F.3d at 100. The regulations illustrate possible reasons a given function may be considered "essential." 29 C.F.R. § 1630.2(n). Specifically applicable to Defendant's proffered evidence, "[t]he function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed." *Id.* § 1630.2(n)(2)(ii). Also, a court must give "considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *Shannon,* 332 F.3d at 100 (internal quotations and citations omitted); *see also Cheatwood v. Roanoke Indus.,* 891 F.Supp. 1528, 1537 (N.D.Ala.1995).

**\*9** With respect to the 2002 Recall, Defendant offers evidence to show that operating the jitney vehicle was an essential function of the open position in the Bridgeport facility. Plaintiff admitted in his deposition that, as a Labor Grade 9 Forklift Operator, he and others used only the jitney vehicle. Once he was promoted to Labor Grade 8, he began using the fork truck also. He also admitted that until his 1996 injury, he used the jitney vehicle 30% of the time, and the fork truck 70% of the time. Furthermore, Scott Katchmar, a supervisor in the transportation department in 2002, states in his affidavit that an individual filling the open position in Bridgeport in 2002 had to operate both the jitney vehicle and the fork truck. This is because the Bridgeport facility had only one other Fork Lift Op-

erator besides the position to be filled. The existing Operator was a working leader with more seniority than Peters, and he was in a better labor grade. Plaintiff worked as a Fork Lift Operator and only used a fork truck in the Stratford plant between 1996 and 1998, but there were six other Operators on Plaintiff's shift in the larger facility. Defendant claims that this allowed the Plaintiff to temporarily operate only the fork truck (and not the jitney vehicle), because other Operators could use the jitney vehicles when necessary. Plaintiff, however, maintains that operating the jitney vehicle was not essential to the position, and his medical restrictions therefore did not prevent him from performing the duties of the open position. Though unable to use a jitney vehicle, Plaintiff nevertheless argues that he was qualified for the 2002 Bridgeport position since he was able to perform the work required of him using only a fork truck between 1996 and 1998, before his layoff.

To the extent this argument is made to rebut Defendant's assertion that using a jitney vehicle was an essential function for the Bridgeport position, it fails to create a genuine issue of material fact. Plaintiff states that he "was able to perform all work necessary to his position of forklift operator between 1996 and 1998 without accommodation of any kind, except such accommodation as he made for himself." (56(a)(2) Statement at ¶ 44.) However, this conclusory statement does not effectively deny the fact that the 2002 open position in Bridgeport required the use of both a jitney vehicle and fork truck. Plaintiff does not point to any evidence in the record that *this* open position would not require an operator to use a jitney vehicle.

Uncontested evidence shows that Plaintiff himself used a jitney vehicle 30% of the time prior to his injury in 1996, the open position was available in a different and smaller facility, and there was only one other Fork Lift Operator there. As the EEOC ADA regulations instruct, a function may be essential if a limited number of employees are available to perform that function, and if the employer actually requires employees in the position to perform the function it claims is essential. 29 C.F.R. §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

1630.2(n). The fact that Plaintiff was able to per-
form all of the required work by utilizing only a
fork truck in the larger Shelton facility four years
earlier is not sufficient to create an issue of fact as
to whether using a jitney vehicle was an essential
function for this position.[FN11]

> [FN11.] Additionally, Plaintiff admits that
> he did not know the details of the open
> Bridgeport position, did not ask, and as-
> sumed the duties would be the same as
> they were four years earlier in Stratford.
> (56(a)(2) Statement ¶¶ 51-52.)

**\*10** It is undisputed that Plaintiff could not perform
tasks that required using a jitney vehicle. After his
1996 injury, Plaintiff's doctor ordered him to stop
operating jitney vehicles, and he could not and did
not drive one after 1996. His 1997 MPR stated that
he had minimal use of his right hand with minimal
grasping, and could perform no duties driving jit-
ney vehicles. These restrictions remain unchanged.

Consequently, Plaintiff does not offer sufficient
evidence to show he was qualified for the 2002 pos-
ition because he does not refute the fact that using a
jitney vehicle was an essential function for the 2002
Bridgeport position, and it is undisputed that the
Plaintiff is unable to use a jitney vehicle.[FN12]
"Employers formulate jobs to fit the needs of their
enterprises ... [and] the essential character of a par-
ticular job qualification is therefore a matter of
judgment and opinion." *Shannon, 332 F.3d at
102-03*. It is clear that Plaintiff did not drive a jit-
ney vehicle due to his medical restrictions between
the 1996 injury and the 2001 layoff, and this modi-
fication was a departure from the normal duties per-
formed by other Fork Lift Operators. Plaintiff does
not point to any facts that suggest a Fork Lift Oper-
ator could perform his job exclusively with a fork
truck, *without* passing jitney vehicle duties on to
other Operators. And as the record indicates, Fork
Lift Operator duties could vary depending on the
facility, shift, and time period. Nothing in the re-
cord states that an open recall position should only
include duties identical to those performed by the
employee in that position prior to a layoff.[FN13]

The limited personnel in the Bridgeport facility,
along with the fact that the time and place in which
Plaintiff worked from 1996 to 1998 allowed certain
modifications to be made to the position, is suffi-
cient to show that driving a jitney vehicle was an
essential function.

> [FN12.] Plaintiff's assertion that he was
> cleared by the Sikorsky medical depart-
> ment in 2002 to return to work as a Forklift
> Operator is based upon a MPR Work
> Sheet, dated February 26, 2002 and at-
> tached to Plaintiff's Brief as Exhibit 8.
> However, the worksheet is not signed by a
> doctor and states on its face that "THIS IS
> NOT A PERMANENT RECORD."
> Plaintiff does not offer any reason why the
> Court should credit the worksheet as evid-
> ence that Plaintiff was qualified for the
> open position. The MPR Work Sheet is
> simply a worksheet. Though it appears
> Plaintiff was initially cleared for work *with
> restrictions* on this handwritten form, it
> was subsequently amended by hand to read
> "Placement NOT Accepted." The docu-
> ment is not a finalized MPR that returns an
> employee to work.

> [FN13.] The Court notes that engaging in an
> analysis of duties and essential functions
> that a recalled employee can be expected
> to perform requires interpretation of the
> terms of the CBA, and would therefore be
> preempted by § 301 of the LMRA.

Plaintiff also claims that Defendant's failure to re-
call him for the 2002 Bridgeport position is dis-
criminatory because Defendant did not make any
attempt to reasonably accommodate the Plaintiff's
restrictions. "The CFEPA has also been interpreted
to require an employer to reasonably accommodate
disabled employees." *Hill, 266 F.Supp.2d at 364*.
However, it is well established that "[a] reasonable
accommodation can never involve the elimination
of an essential function of a job." *Shannon, 332
F.3d at 100* (citation omitted).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

Plaintiff suggests that Sikorsky could make a reasonable accommodation by eliminating jitney vehicle responsibilities or requiring the more senior Fork Lift Operator in Bridgeport in 2002 to use the jitney vehicle when necessary. However, the law clearly does not require Defendant to accommodate Plaintiff's physical disability by eliminating essential functions from the job, and Plaintiff does not cite any authority that suggests otherwise. *See Borkowski v. Valley Cent. School Dist.,* 63 F.3d 131, 140 (2d Cir.1995) ("[I]ndividuals whose physical condition precludes them from engaging in heavy lifting, and who seek jobs for which such lifting is shown to be an essential function, need not be accommodated by shifting responsibility for the lifting to other individuals.") (citation omitted); *Gilbert v. Frank,* 949 F.2d 637, 643-44 (2d Cir.1991) (holding that employee's suggestion that other workers could lift mailbags that were too heavy for him was not a reasonable accommodation because it eliminated an essential function of the job); *Drew v. Sears, Roebuck & Co.,* No. 3:95cv1746 (PCD), 1997 U.S. Dist. LEXIS 23843 (D.Conn.1997) (holding that employee must be able to perform the required functions of a position with the accommodation suggested, and employer is not required to modify the actual duties of the job for employee). As the Second Circuit stressed in *Borkowski,* a plaintiff must show an accommodation is available that allows the plaintiff to perform the essential functions of the job by introducing evidence that such an accommodation exists and would permit the employee to perform the job *at the same level* as a non-disabled employee. 63 F.3d at 141.[FN14]

> FN14. To the extent that Plaintiff suggests that Sikorsky should have measured his qualifications against the modified position he held in the Stratford facility, the Seventh Circuit has held that an employee's qualifications must be measured against the duties of his original position and not a temporary or modified position assigned as a result of injury. *Malabarba v. Chicago Tribune Co.,* 149 F.3d 690, 696 (7th Cir.1998).

*11 Aside from the accommodations referenced above which eliminate an essential function of the job, Plaintiff has not identified other effective and reasonable accommodations that potentially render him otherwise qualified for the position. To withstand a motion for summary judgment, the Plaintiff must identify a reasonable accommodation which, if implemented, would permit him to perform the essential functions of the job. *See Kennedy v. Dresser Rand Co.,* 193 F.3d 120, 122 (2d Cir.1999), *cert. denied,* 528 U.S. 1190, 120 S.Ct. 1244, 146 L.Ed.2d 103 (2000). Because Plaintiff has failed to meet this burden and establish a genuine issue of material fact as to his qualifications for the 2002 Bridgeport recall position, summary judgment is granted to Defendants on Count I and the 2002 Recall.

### 2. 2003 Recall

With regard to the 2003 recall in Shelton, Plaintiff's Opposition is devoid of any arguments that contradict Defendant's assertions. From the Facts section of Plaintiff's Opposition, however, it appears as though Plaintiff claims Defendant's request that he see a hand specialist was unreasonable, because Sikorsky had not requested such an opinion before. The Plaintiff does not cite any authority to suggest that it was unreasonable for Dr. Mongillo and Sikorsky to make this request, however. Plaintiff admits that Dr. Mongillo would allow him to see another doctor for the evaluation, as long as it was a hand specialist. Additionally, the undisputed evidence indicates that it was Plaintiff's failure to answer five separate letters requesting medical records and his refusal to see a hand specialist which led to Sikorsky's assumption that Plaintiff no longer sought employment at Sikorsky in December 2003. Peters has not come forth with any explanation that would provide legal justification for his own failure to participate in the process.

Therefore, Plaintiff has not offered sufficient evidence regarding the 2003 Recall to meet the burden of a *prima facie* case of discrimination. Statements found in the Facts Section of his Opposition seem to attempt to create a genuine issue of material fact

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

that he was qualified for the 2003 Shelton position. Plaintiff claims that although Sikorsky expressed reservations about his ability to perform the job in 2003, these concerns were not genuine because they were not expressed at the time the Plaintiff returned to work after his injury in 1996. (56(a)(2) Statement ¶ 60.) Plaintiff does not, however, offer any support for his assertion that a request for a specialized medical examination *seven years later* is unreasonable. Comparing the situation in 1996 to that in 2003, with respect to a position with different though analogous duties, does not create an issue of fact sufficient to survive summary judgment.

Furthermore, Plaintiff does not contradict the legal authorities Defendant cites which state that the ADA envisions an "interactive process," whereby employers and employees work together to evaluate whether an employee's disability can be reasonably accommodated. *Jackan v. N.Y. State DOL,* 205 F.3d 562, 566 (2d Cir.2000).[FN15] Courts construing ADA claims recognize that medical inquiries may be necessary where an employer has genuine reason to doubt whether that employee can perform job-related functions. *Donofrio v. N.Y. Times,* 99 Civ. 1576(RCC)(JCF), 2001 U.S. Dist. LEXIS 13788 at *20-21 (S.D.N.Y.2001), *magistrate's decision adopted by,* 2002 U.S. Dist. LEXIS 2399 (S.D.N.Y.2002). Since Plaintiff failed to submit to the independent examination requested by Defendant to determine what positions Plaintiff could qualify for, he cannot prove his *prima facie* case of discrimination. *See id.* at *22; *Thompson v. City of N.Y.,* 98 Civ. 4725(GBD), 2002 U.S. Dist. LEXIS 23675 at *26 (S.D.N.Y.2002).

> FN15. The Facts Section claims that an August 28, 2003 letter from Sikorsky requesting a hand specialist examination (the fourth such letter) "made clear to the Plaintiff that regardless of the report of the specialist, he would not be granted the fork lift position in Shelton." (Pl.'s Opp., Facts Section, 2nd to last ¶ ); (56(a)(2) Statement, ¶ 75.) Presumably, Plaintiff offers this letter to show that Sikorsky would not put him in the open position even if he did

participate in the interactive process. However, the letter does not indicate what Plaintiff contends it does. It merely says that the requested evaluation was not tied to a specific position at Sikorsky, but any number of open positions. In fact, such language seems to indicate that Sikorsky actively tried, from May until December of 2003, to ascertain Plaintiff's exact restrictions since the Shelton position (and possible other open positions) required Plaintiff to perform duties similar to those using a jitney vehicle.

*12 Accordingly, this Court finds that the plaintiff has not met his burden of establishing a *prima facie* case of discrimination under the CFEPA with regard to either the 2002 Recall or the 2003 Recall. Summary judgment is appropriate in favor of Defendant on Count I entirely.

### B. *Count II: Breach of Contract*

Count II of the Amended Complaint for breach of the CBA is completely preempted by § 301 of the LMRA, and this is not disputed. The Court must construe and interpret the terms and provisions of the CBA to decide Plaintiff's breach of contract claim and therefore, it is well settled that federal labor law preempts the state law claim. *See, e.g., Allis-Chalmers Corp.,* 471 U.S. at 211 ("Questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law."); *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 394, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987); *Williams,* 322 F.Supp.2d at 183-84.

However, Defendant argues that Plaintiff's claims preempted by § 301 of the LMRA are also barred by a six-month statute of limitations. The Court agrees. Plaintiff correctly notes that a six-month statute of limitations applies to hybrid claims brought under § 301. A hybrid claim is one in which "an employee has a cause of action against both the employer and the union, where the two

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

claims are inextricably linked, and where the case to be proved is the same against both." *McKee v. Transco Products, Inc., 874 F.2d 83, 86 (2d Cir.1989).* The Supreme Court, in *Delcostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 171-72, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983),* determined that because there is no federal statute of limitations that expressly applies to such hybrid claims, the appropriate statute of limitations is the six-month time period provided under § 10(b) of the National Labor Relations Act (29 U.S.C. § 160(b)).

Nonetheless, Plaintiff argues that his action is not such a hybrid claim because he sues only his employer and therefore, the Connecticut six-year statute of limitations for breach of contracts should apply. The Second Circuit, however, has concluded that a hybrid claim is presented if the plaintiff, in addition to suing the employer, can also bring a cause of action against a union for breach of the duty of fair representation (regardless of whether or not the plaintiff actually does bring the union action). *McKee, 874 F.2d at 86-87.* Indeed, the Plaintiff "cannot circumvent the six-month limitations period for hybrid actions by choosing to sue only [his] employer." *Id.* at 86. Instead, "what makes a case a 'hybrid' action against both union and employer is the nature of the *claim,* not the identity of the *parties.*" *Id.* (emphasis in original) (internal citations and quotations omitted); *see also Carrion v. Enterprise Ass'n, 227 F.3d 29, 34 (2d Cir.2000)* (following *McKee* in holding that a six-month statute of limitations applies to an action for breach of contract brought against the employer only); *Notice v. Chanler Lewis, Inc., 333 F.Supp.2d 28, 30-31 (D.Conn.2004)* (same).[FN16]

> **FN16.** The single case Plaintiff cites to support his contention that Count II is not a hybrid claim is *Cabarga Cruz v. Fundacion Eductitiva Ana G. Mendez, 822 F.2d 188 (1st Cir.1987).* However, *Cruz* is unpersuasive. It was decided before the relevant decisions in this jurisdiction regarding hybrid claims and therefore it does not take into account the standards set forth in *McKee* and *Carrion.* Additionally,

*Cruz* is factually distinguishable. In that case, the court held that the claim was a pure breach of contract claim against the employer, because the facts demonstrated that plaintiff had no action against the union for breach of its duty of fair representation. *Cruz, 822 F.2d at 191.* Peters, however, stated in his deposition that the Union did not take his claim to arbitration or pursue the grievance procedures provided in the CBA. (Peters Dep. at 79-80.) Peters, unlike the plaintiff in *Cruz,* does have a possible claim against the Union for its failure to pursue his grievance, pursuant to the CBA. *See Allocco v. Dow Jones & Co.,* No. 02 Civ. 1029(LMM), 2002 U.S. Dist. LEXIS 11690 at *21-22 (S.D.N.Y. June 27, 2002) ("Even though Allocco chose not to bring suit against the Union, it is clear from his allegations regarding the Union's failure to pursue his grievance that he has a fair representation claim against the Union."), *citing McKee, 874 F.2d at 86-87.*

**\*13** Additionally, the Second Circuit has held that the mere presence of an arbitration clause in a CBA is enough to make an employee's claim a hybrid one and subject it to the six-month statute of limitations. *United Auto, Aerospace and Agric. Implement Workers v. R.E. Dietz Co., 996 F.2d 592, 596 (2d Cir.1993)* ("We hold that the mere presence of an arbitration clause implicates the federal interest in prompt, private dispute resolution in labor cases and requires application of the six-month statute of limitations."); *McKee, 874 F.2d at 87-88* (noting the destructive effect upon CBA arbitration provisions if employees were allowed to bring claims of breach of the agreement up to six years after the alleged violation); *Ycaza v. CT Transit-Stamford Div., 289 F.Supp.2d 180, 183 (D.Conn.2003).* Section 6.17 of the CBA between the Union and Sikorsky provides for mandatory arbitration in the event a contractual grievance is not settled through the required grievance procedures. This arbitration clause subjects Plaintiff's claim for breach of the CBA to a six-month statute of limitations.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2331077 (D.Conn.), 180 L.R.R.M. (BNA) 2414, 18 A.D. Cases 671
**(Cite as: Slip Copy)**

The record demonstrates that Count II for breach of contract is not timely under the applicable six-month statute of limitations. The six-month period begins to run when the plaintiff discovers, or should have discovered, those acts that constitute the alleged violation of the agreement. *E.g., Ycaza, 289 F.Supp.2d at 183; Wilhelm v. Sunrise Ne., 923 F.Supp. 330, 337 (D.Conn.1995)* (internal citations and quotations omitted). In this action, the Plaintiff filed his first complaint with the Court in June 2004. Therefore, the LMRA claim based upon his January 2001 layoff is untimely by about three years. Defendant notified Plaintiff that he would not receive the first recall position in March 2002, and therefore the LMRA claim based upon the 2002 Recall is untimely by more than a year and a half. Likewise, Defendant notified Plaintiff that he would not receive the second recall position on or about June 15, 2003,[FN17] and therefore the LMRA claim based on the 2003 Recall is untimely by about six months. As a result, Plaintiff's Count II claims under § 301 of the LMRA fail as a matter of law, and Defendant is entitled to summary judgment on Count II entirely.

FN17. Am. Compl. ¶ 11.

### IV. CONCLUSION

The Court has considered Plaintiff's claims and finds them to be insufficient to survive Defendant's motion for summary judgment. Count I fails because Plaintiff cannot make out a *prima facie* case of discriminatory employment practices. Count II for breach of the CBA is subject to a six-month statute of limitations and since the action was not filed within six months, Plaintiff's claim fails as a matter of law.

For the reasons stated herein, Defendant's Motion for Summary Judgment is **granted.** The clerk shall close the file.

SO ORDERED.

D.Conn.,2006.
Peters v. Sikorsky Aircraft Corp.
Slip Copy, 2006 WL 2331077 (D.Conn.), 180

L.R.R.M. (BNA) 2414, 18 A.D. Cases 671

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 13**

Westlaw.

Slip Copy                                                                                                      Page 1

Slip Copy, 2006 WL 2864716 (D.Conn.)
**(Cite as: Slip Copy)**

Evarts v. Southern New England Telephone Co.
D.Conn.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
Denise EVARTS, Plaintiff,

v.

SOUTHERN NEW ENGLAND TELEPHONE
COMPANY, Defendant,
**No. 3:00CV1124 WIG.**

Oct. 2, 2006.

Angelica N. Papastavros, Law Offices of Angelica
N. Papastavros, Karen Lee Torre, New Haven, CT,
for Plaintiff.
Deborah Dehart Cannavino, Tyler, Cooper & Al-
corn, Stamford, CT, Lori B. Alexander, Tyler,
Cooper & Alcorn, New Haven, CT, for Defendant.

*RULING ON DEFENDANT'S MOTION FOR SUM-
MARY JUDGMENT [DOC. # 113]*
GARFINKEL, Magistrate, J.
**\*1** Plaintiff, Denise Evarts, has brought this single-
count employment discrimination action under Title
VII of the Civil Rights Act of 1964, as amended, 42
U.S.C. § 2000e, *et seq.,* ("Title VII"), and Con-
necticut's Fair Employment Practices Act, Conn.
Gen.Stat. § 46a-60(a)(1), *et seq.,* ("FEPA"), against
her former employer, Southern New England Tele-
phone Company, commonly referred to as "SNET,"
alleging that she was discriminated against on the
basis of her gender. She alleges that she was sub-
jected to a "myriad of adverse employment actions
based upon her gender which created a hostile
working environment." (Pl.'s Compl. ¶ 12).

Defendant has moved for summary judgment [Doc.
# 113] under Rule 56(c), Fed.R.Civ.P., on the
grounds that there are no genuine issues of material
fact and that it is entitled to judgment as a matter of
law. After due consideration of the parties' extens-
ive briefs and exhibits and the relevant case law,
and after hearing oral argument of counsel, for the
reasons set forth below, Defendant's Motion for
Summary Judgment will be granted in part and

denied in part.

*Background*

SNET is a regional provider of a wide range of tele-
communications services to businesses and private
residences in Connecticut. It employs approxim-
ately 7,400 persons at various locations throughout
the state. Plaintiff was hired by SNET on January
12, 1987, as a repair service clerk as part of its New
Haven Payphone Services Installation and Repair
Group ("Payphone Services"), which installs and
repairs telephones. She worked out of the SNET
garage in New Haven. In 1989, she was promoted
to service technician in the Payphone Services De-
partment. As a service technician, Plaintiff in-
stalled, repaired, and maintained coinoperated tele-
phones and associated network facilities. She re-
mained in that position until May 30, 1997. Over
the course of her ten years with SNET, Plaintiff re-
ceived regular pay increases and was not subject to
any disciplinary procedures, other than as noted be-
low.

Plaintiff, like other technicians, was at all times a
member of the Connecticut Union of Telephone
Workers, such that the terms and conditions of her
employment were governed by a collective bargain-
ing agreement.

During Plaintiff's tenure as a service technician, she
was the only female service technician on her eight-
person crew, and one of only two female service
technicians out of a total of approximately fifty ser-
vice technicians in her entire department.

The incidents giving rise to this lawsuit commenced
with the appointment of Plaintiff's new supervisor,
Matt Cordner ("Cordner"), who took over as Super-
visor of Payphone Services in July 1996. Prior to
the arrival of Cordner, Plaintiff had worked under
two managers, Crystal White and Patrick Kinsella.
She had no problems with either of these super-
visors. Plaintiff claims that from July 1996 to May
1997, she was subjected to a hostile work environ-
ment on the basis of her gender and cites to the fol-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lowing incidents in support of her discrimination claim:

**\*2** (1) Cordner's refusal to create a satellite office for a service technician in North Madison, Connecticut, although her previous supervisors had promised Plaintiff that this satellite office would be created and that Plaintiff would probably be assigned to it, since she lived in close proximity to North Madison; FN1

> FN1. On November 8, 1996, Cordner offered Plaintiff the opportunity to move to the Guilford, Connecticut satellite office, which she declined. Cordner then entered the following note in his records after he offered her a move to the Guilford office: "Denise told me: I don't want you to feel you did me any favors-Because you didn't-I wanted North Madison not Guilford! (She also talked to Ed [Cordner's superior] about this and tried to get him to override me -) (Ed feels as I do that the work load does not warrant a person in Madison)." On November 11th and 12th, he noted that Denise [Plaintiff] had a bad attitude and was not speaking to him. (Pl.'s Ex. 4). Plaintiff maintains that from that point on, Cordner targeted her for discriminatory treatment, excessive and obsessive supervision, oversight, and criticism with the aim of forcing her out of her job or orchestrating her discharge. (Pl.'s Local Rule 56(a)2 St. ¶ 19, citing Pl.'s Ex. 11-19). On November 15, 1996, Cordner noted in Plaintiff's personnel file an incident when Plaintiff called in sick so as to avoid being assigned overtime work. He stated that he would discuss sick time with her on Monday and noted that her attitude since the Guilford "co-offer has been very negative." (Pl.'s Ex. 5).

(2) Following Plaintiff's leave of absence to care for her terminally ill sister, Cordner's calling her after the funeral to inquire why she had not shown up for work and threatening her with discharge if she did not return to work; FN2

> FN2. Plaintiff was on leave from late November 21, 1996, until January 24, 1997. Her sister died on January 12, 1997. According to Defendant's version of the facts, Plaintiff told Cordner she was going to resign in order to care for her sister. Instead, Cordner encouraged her to take a leave of absence, although she was not entitled to this leave under the Family and Medical Leave Act, which does not apply to absences to care for a sibling. He allowed her to work whenever she wanted to and specifically allowed her to work the day before a holiday so she would get paid for the holiday. Following her sister's funeral, Cordner gave her a week of bereavement leave rather than the usual three days. When she did not return on the scheduled day, Cordner states that he called her and allowed her to take an unscheduled paid vacation until she was ready to return to work. He denies that he ever threatened her with discharge. (Cordner Aff. ¶¶ 7-10).

(3) Cordner's giving a new work truck to a male service technician whose truck was newer and in better condition than Plaintiff's truck, after Plaintiff had been told by Ed Dillman, Cordner's superior, that she would be getting a new truck;

(4) On February 6, 1997, shortly after she returned from her leave of absence, Cordner's requiring her to perform a "ride along," an exercise customarily reserved for new employees, although experienced male service technicians were not subjected to this exercise, during which Cordner was excessively critical and "nit-picky" concerning her work; FN3

> FN3. Plaintiff states that during the entire time that Cordner was her supervisor, no other technician was subjected to a ride along exercise. Cordner, on the other hand, claims that the purpose of the "ride-along" was to reacquaint her with her job and to observe her work. Defendant emphasizes

*that she did not receive any kind of warn-
ing or discipline as a result of this exercise.
See* Def.'s Ex. 8.

(5) Cordner's revoking her cell phone privileges
due to her exceeding the 300-minute monthly allot-
ment, although male employees were not similarly
treated and there was no written policy to this ef-
fect; FN4

> FN4. Defendant points to the fact that
> Plaintiff violated this 300-minute limit in
> six out of ten months in 1996 and in Janu-
> ary and February of 1997. Cordner had
> counseled her twice about this excessive
> usage. Her phone usage and that of a male
> technician, David Ianiello, who had his
> phone removed twice, exceeded that of all
> other co-workers. Plaintiff was not discip-
> lined in any way, but her cell phone was
> taken from her for a month. When it was
> returned, she still exceeded the 300-minute
> limit.

(6) On March 17, 1997, Cordner's giving her a doc-
umented verbal warning FN5 for leaving her work
truck unlocked, whereas male employees, who left
their trucks unlocked did not receive similar warn-
ings, and on March 18, 1997, Cordner's placing a
note FN6 in Plaintiff's personnel file detailing her
presentation of evidence to him that the lock on her
truck was broken, and his violently screaming at
her; FN7

> FN5. The documented verbal warning was
> for failure to secure her vehicle which left
> access to tools, supplies, and a coin box
> with cash in it. This was a six-month warn-
> ing "to be kept on file." (Pl.'s Ex. 11). Un-
> der the Collective Bargaining Agreement,
> this was the first and lowest step of discip-
> line in the four-step disciplinary process.
> Union Steward Gerry Nuzzo was present at
> the disciplinary meeting. When he asked
> Cordner if anyone else had been written up
> for leaving his truck unlocked, Cordner re-
> sponded "no." (Pl.'s Local Rule 56(a)2 St.

¶ 44).

FN6. Cordner wrote, "She feels me telling
her about the seriousness of the situation
(could lead to dismissal) was a threat from
me-(it was a reminder of how serious this
is)." (Pl.'s Ex. 12). Defendant explains that
it had a policy requiring technicians to
keep their vehicles locked whenever they
were unattended, which was particularly
important when coins from the payphones
were in the vehicles. Under the policy, vi-
olations resulted in progressive discipline.
After frequent reminders to all of the ser-
vice technicians, in March 1997, during a
routine check, Cordner discovered three
employees' vehicles were unlocked and all
three, two males and plaintiff, were
counseled about the need to lock their
vehicles. Cordner found plaintiff's truck
unlocked two more times and counseled
her each time. Only the fourth time, when
she allowed open access to company tools,
supplies, and a coin box, was she given a
documented verbal warning. Plaintiff does
not deny that she left her truck unlocked
and admits that on prior occasions equip-
ment had been stolen from her truck and
she had not been disciplined. Her excuse
was that the knob for locking the truck was
broken, but she did not report this until
after she was disciplined, and that every-
one left his truck unlocked inside the gar-
age.

FN7. Plaintiff testified in her affidavit,
Mr. Cordner had a violent temper. For ex-
ample, with respect to the disciplinary ac-
tion he took against me for failing to lock
my vehicle, when I returned to Mr. Cord-
ner with documentary proof that the rear
door locking mechanism on my truck was
broken, Mr. Cordner rose quickly to anger
and went out of control. He screamed at
me at the top of his lungs, stating that he
did not care what kind of note I had from
the mechanics. He was having a near-vi-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 4
Slip Copy, 2006 WL 2864716 (D.Conn.)
**(Cite as: Slip Copy)**

olent temper tantrum which was not only
unsettling but physically intimidating. His
eyes were wide and his complexion turned
bright red. Mr. Cordner's tantrum took
place not in the confines of a closed office
but in an open area of the administrative
offices at SNET's New Haven garage. In
fact, Mr. Cordner was so loud and abusive
and caused such a disturbance that two
cable technicians, one male and one fe-
male, came over and asked if "everything
was OK."
(Pl.'s Ex. 27, Pl.'s Aff. ¶ 11).

(7) On April 9, 1997, Cordner's orally counseling
her about the increase in her "minutes per trouble"
FN8 for March, whereas male service technicians
with comparable "minutes per trouble" did not re-
ceive oral counseling, and she had previously re-
ceived an award from SNET for having the best re-
cord in the entire state; FN9 and

> FN8. "Minutes per trouble" measures a
> technician's efficiency. (Pl.'s Aff. ¶ 9).

> FN9. SNET maintains that Cordner's ac-
> tions were justified based on the decline in
> Plaintiff's productivity after the death of
> her sister. Cordner never disciplined
> Plaintiff because of her poor productivity
> but he did meet with her on April 9, 1997,
> to discuss this with her. *See* Def.'s Ex. 3.

(8) On May 2, 1997, Cordner's verbally reprimand-
ing her when her hand-written time sheets did not
match Defendant's computer print-outs, the "DCWS
data," whereas male service technicians were not
reprimanded for committing the same violation,
which was a common error, since time sheets were
customarily filled out at the end of the day rather
than on the job, and the computers were frequently
down. FN10

> FN10. On May 2, 1997, Plaintiff was
> summoned to a meeting with Cordner,
> Dillman, and union representative Debbie
> Guarnieri, to review the discrepancies in
> her time sheets and the DCWS reports. She

was asked to account minute-by-minute for
the jobs she performed on April 25, 1997.
Plaintiff and Guarnieri demanded to know
if Cordner had analyzed the male techni-
cians' time records as well, and, according
to Plaintiff, he responded "no." (Pl.'s Local
Rule 56(a)2 St. ¶ 13; Pl.'s Ex. 17). On May
5th and 6th, Cordner again reviewed the
discrepancies in Plaintiff's time sheets.
When Cordner requested a meeting with
her, she indicated she wanted a union rep-
resentative present. Cordner noted in her
personnel file, "Denise also told me I'd
better be checking everyone else's time
sheets-Told her that's not the issue here."
(Pl.'s Ex. 18). Defendant maintains that
Plaintiff was counseled more frequently
than others because her performance was
worse.

According to David Ianiello, Plaintiff's union stew-
ard and co-worker, during the time that Plaintiff
worked under Cordner, Cordner referred to her as
an example of a "woman who doesn't belong in the
job," and that Cordner repeatedly made comments
to the effect that women did not belong in the field,
that this was a man's job, and that women belonged
in an office behind a desk. (Ianiello Depo. at 5, 8).
He testified that Cordner was "constantly riding"
Plaintiff, scrutinizing her work more closely than
anyone else's work. (*Id.* at 20). In fact, he told
Plaintiff that he believed that Cordner was trying to
make her life as difficult as possible. (*Id.* at 22).
Plaintiff testified that the men on her crew told her,
in rather crude terms, that Cordner "has a problem
with anyone who can't stand up to pee." (Pl.'s Depo.
at 69). She also complained that he was constantly
reprimanding her for things that the male techni-
cians were also guilty of doing. (*Id.*). She also testi-
fied that Cordner was trying to make her life on the
job as difficult as possible. (*Id.*).

**\*3** In April 1997, Plaintiff told Dillman that she did
not want to work for SNET any longer and asked
him for a "pink slip" indicating that she had been
laid off so that she could collect unemployment
compensation benefits. Dillman declined to issue

her a pink slip. On May 16, 1997, she submitted to Cordner her two-week written notice of resignation, which stated, "I feel that it is no longer in my best interest to remain employed at SNET in this current position. I have tried to transfer to other positions, but I have not been successful. Please accept my resignation and my last day of employment being two weeks from the date of this letter." (Def.'s Ex. 9). Before resigning, Plaintiff spoke with union representative Guarnieri and told her that she could not withstand Cordner's harassment any longer. (Pl.'s Depo. at 171, 191). She had also complained to Cordner that he treated her differently than he treated her male counterparts. (Cordner's Depo. at 236). Plaintiff's last day of work was May 30, 1997.

Cordner did subject Ianiello to a ride-along evaluation and disciplined a male employee for failing to lock his truck, but only after Plaintiff gave notice of her intent to resign and complained of discrimination by Cordner. Cordner completed a Work Reference Report, indicating that he would not recommend Plaintiff for reemployment because of her frequent "absents [sic], Referred to medical." (Pl.'s Ex. 28).

During the times relevant to this complaint, SNET had an anti-discrimination and anti-harassment policy in place that contained complaint procedures. (Def.'s Ex. 10). The reporting procedure required the employee to report any incident of sexual or other unlawful harassment to his or her supervisor and/or to the EEO Manager. (*Id.*) Supervisors who became aware of possible sexual or other unlawful harassment were also required to promptly advise the EEO Manager. (*Id.*)

It was not until after Plaintiff submitted her two-week notice of resignation that she complained to SNET's human resources office (EEO office) that she believed she had been subjected to a hostile work environment by her supervisor, Cordner. Plaintiff told Constance Rogers, SNET's EEO manager, that she "couldn't take it any more" and felt compelled to quit. (Pl.'s Local Rule 56(a)2 St. ¶ 81). Rogers never interviewed Plaintiff in person, although she did interview in person Cordner, who

told her that he had subjected Ianiello to the same treatment. (Rogers' Depo. at 29). Rogers did nothing further by means of investigation. She never interviewed Ianiello; she never interviewed any of Plaintiff's co-workers; and she never reviewed Plaintiff's personnel file. She closed her investigation because Plaintiff's allegations of discrimination could not be corroborated. (*Id.* at 63).

Plaintiff dual-filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and Connecticut's Commission on Human Rights and Opportunities ("CHRO") on November 17, 1997. On June 16, 2000, after receiving a right-to-sue letter,[FN11] she timely filed the instant lawsuit.

> FN11. Plaintiff, citing *Philbrook v. Ansonia Bd. of Edud., 757 F.2d 476, 481 (2d Cir.1985)*, *aff'd*, *479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986)*, relies heavily on the fact that the CHRO, after conducting a hearing, found probable cause to believe that Defendant had violated Title VII, which probable cause finding, she argues, is admissible to help establish her *prima facie* case of discrimination. In a more recent decision, however, the Second Circuit clarified that it was not adopting an automatic rule of admissibility, as a minority of circuits have done. Instead, the Second Circuit left to the discretion of the trial judge the determination of whether the probative value of the agency determination is substantially outweighed by the danger of unfair prejudice. *Paolitto v. John Brown E. & C., Inc., 151 F.3d 60, 64 (2d Cir.1998)*; *see also Dodson v. CBS Broadcasting, Inc. 423 F.Supp.2d 331, 334 (S.D.N.Y.2006)*. Although this Court makes no ruling on this issue at this time, at oral argument, the Court indicated its reluctance to admit the CHRO findings as evidence in the trial of this case because of the risk of unfair prejudice.

**\*4** Defendant now moves for summary judgment on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2864716 (D.Conn.)
**(Cite as: Slip Copy)**

four grounds:

(1) Many of the events on which Plaintiff relies are time-barred by the 300-day limitations period of Title VII and the 180-day limitations period of FEPA;

(2) Plaintiff cannot establish a *prima facie* case of discrimination or, alternatively, Plaintiff cannot rebut Defendant's legitimate, non-discriminatory reasons for its actions;

(3) Plaintiff did not suffer an adverse employment action; and

(4) Plaintiff was not subjected to a hostile work environment.

### Summary Judgment Standard

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-moving party, it appears that the evidence supporting the non-moving party's case is so scant that a rational jury could not find in that party's favor. *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 86 (2d Cir.1996). A fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The burden of demonstrating the absence of a genuine dispute as to any material fact and entitlement to judgment as a matter of law rests with the party seeking summary judgment-in this case, the Defendant. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Chertkova,* 92 F.3d at 86. Once the moving party has made a showing that there are no genuine issues of fact to be tried, the burden then shifts to the non-moving party to raise triable issues of fact. *Anderson v. Liberty Lobby,* 477 U.S. at 256. Mere con-

clusory allegations will not suffice. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Even when the facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough probative evidence to enable a reasonable jury to return a verdict in its favor. *Anderson v. Liberty Lobby,* 477 U.S. at 248.

The Second Circuit has noted that an extra measure of caution is warranted when granting summary judgment in a discrimination action because direct evidence of discriminatory intent is rare, and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.,* 109 F.3d 130, 135 (2d Cir.1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), *cert. denied,* 534 U.S. 993, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001).

**\*5** Thus, in ruling on Defendant's Motion for Summary Judgment, the Court has construed the facts of record in the light most favorable to Plaintiff and drawn all reasonable inferences in her favor.

### Discussion

Initially, the Court notes that Defendant's counsel and the Court have struggled with the question of what legal theory of discrimination Plaintiff is pursuing in this action-disparate treatment or hostile work environment or both. In her complaint she alleges that she "was subjected to a myriad of adverse employment actions based upon her gender which created a hostile working environment. The unbearable and humiliating conditions of plaintiff's employment were the result of chauvinistic and discriminatory behavior by the defendant, by and through its management." (Pl.'s Compl. ¶ 12). She then cites to the eight incidents discussed above, al-

legedly supporting her claim, all of which except one appear to be disparate treatment claims. At oral argument, Plaintiff clarified that she is asserting both theories, relying on a series of incidents of disparate treatment that cumulatively created a hostile work environment, which ultimately led to her constructive discharge.

*I. Statute of Limitations*

Defendant argues that, as to her Title VII claim, Plaintiff may not rely on any incidents of discrimination occurring prior to January 21, 1997, which is 300 days from the date she dual-filed her charge of discrimination with the CHRO and EEOC, citing *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 109, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Similarly, Defendant asserts that she may not rely on any conduct occurring prior to May 21, 1997, for purposes of her state-law claim, which date is 180 days prior to the date she filed her discrimination charge with the CHRO. Additionally, since she fails to allege any conduct by Defendant occurring after May 21, 1997, Defendant insists that her state-law FEPA claim must be dismissed in its entirety as a matter of law.

*A. Plaintiff's Federal Title VII Claim*

Under Title VII, a charge of discrimination must be filed with the EEOC within 180 days or 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). In this case, because Plaintiff dual-filed her charge with the CHRO and EEOC, the 300-day limitations period would apply. *See* 42 U.S.C. § 2000e-5(e)(1).

As the Supreme Court held in the *National Railroad* case, 536 U.S. at 110, whether Plaintiff may rely on conduct occurring outside of this 300-day period depends on whether Plaintiff's claim is viewed as a disparate treatment claim or hostile work environment claim. To the extent she is asserting a disparate treatment claim, any alleged discriminatory act prior to January 21, 1997, is untimely under Title VII, and no longer actionable. The Supreme Court held:

[D]iscrete discriminatory acts are not actionable if

time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*6 *Id.* at 113. Thus, Plaintiff may not pursue a Title VII disparate treatment claim relating to Defendant's failure to transfer her to a satellite office, which is the only discrete act of disparate treatment alleged that occurred prior to January 21, 1997. This incident, however, may be used by either side as background evidence.

Hostile environment claims, however, are different in kind from discrete acts. Their very nature generally involves repeated conduct. *See 1 B. Lindemann & P. Grossman, Employment Discrimination Law* 348-349 (3d ed.1996) (hereinafter *"Lindemann"* ) ("The repeated nature of the harassment or its intensity constitutes evidence that management knew or should have known of its existence."). A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). The "unlawful employment practice" usually cannot be said to occur on any particular day. It occurs over a series of days or perhaps years. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

time period of the hostile environment may be considered by a court for the purposes of determining liability." *National R.R., 536 U.S. at 117.* "The statute does not separate individual acts that are part of the hostile environment claim from the whole for purposes of a timely filing and liability." *Id. at 118.* "Given, therefore, that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim." *Id.* Thus, in order for a charge to be timely, it only needs to be filed within 180 days or 300 days of any act that is part of the hostile work environment. *Id.; see also Patterson v. County of Oneida, 375 F.3d 206, 220 (2d Cir.2004).*

In the instant case, because some of the acts allegedly contributing to Plaintiff's hostile work environment claim occurred within 300 days of the filing of her charge of discrimination with the EEOC, her federal hostile work environment claim is not time-barred. The Court will consider the entire spectrum of conduct with respect to Plaintiff's hostile work environment claim.

### B. Plaintiff's State-Law FEPA Claim

Defendant asserts that Plaintiff's state-law discrimination claim under FEPA is barred in its entirety by the 180-day limitations period of *Conn. Gen.Stat. § 46a-82(e).* The statute and case law are clear that a claim must be filed within 180 days "after the alleged act of discrimination." *Conn. Gen.Stat. § 46a-82(e); see State v. Commission on Human Rights & Opportunities, 211 Conn. 464, 471-73, 559 A.2d 1120 (1989)* (employee cannot recover for employer's acts that occurred more than 180 days prior to filing). Although "the 180 day time requirement for filing a discrimination petition pursuant to *§ 46a-82(e)* is not jurisdictional, but rather, is subject to waiver and equitable tolling," *Kahn v. Fairfield University, 357 F.Supp.2d 496, 502 (D.Conn.2005)* (citing *Williams v. Commission on Human Rights & Opportunities, 257 Conn. 258, 264, 777 A.2d 645 (2001)*), neither waiver nor equitable tolling applies in the instant case. Defendant has not waived this defense, *see Majewski v.*

*Bridgeport Bd. of Educ., No. CV030406893, 2005 WL 469135, at \*5 (Conn.Super.Ct. Jan.20, 2005),* and Plaintiff has not asserted any basis for equitable tolling.

**\*7** The Connecticut state courts look to federal law for guidance in interpreting FEPA and analyze claims under FEPA in the same manner as federal courts evaluate federal discrimination claims. *State v. Commission on Human Rights & Opportunities, 211 Conn. at 469-70, 559 A.2d 1120; Jackson v. Water Pollution Control Auth., 278 Conn. 692, 705 n. 11, 900 A.2d 498 (2006).* Accordingly, applying the holding of *National Railroad* to Plaintiff's state-law claim, both her disparate treatment and her hostile work environment claims would be barred because Plaintiff has failed to allege any conduct on the part of Defendant occurring on or after May 21, 1997. At that point, Plaintiff had already submitted her letter of resignation, giving two weeks notice. Although she did not actually resign until May 30, 1997, she alleges no conduct by Defendant between May 21st and May 30th that could in any way support a claim of disparate treatment or hostile work environment.

To overcome Defendant's statute of limitations defense, Plaintiff argues that this case falls within the "continuing violation doctrine." This argument must fail for two reasons. First, in order to invoke the continuing violation doctrine, Plaintiff must still establish at least one incident of discrimination within the limitations period. *See Church v. Connecticut Commission on Human Rights & Opportunities, No. CV 980492731S, 1999 WL 1315013, at \*3 (Conn.Super.Ct. Dec.22, 1999); Walker v. Connecticut Commission on Human Rights & Opportunities, No. CV 980490150S, 1999 WL 643369, at \*3 (Conn.Super.Ct. Aug.12, 1999).* Since she has failed to allege any conduct by Defendant within 180 days of the date she filed her charge of discrimination with the CHRO, her state-law claims under FEPA are barred. Second, discrete incidents or even similar multiple incidents of discrimination that do not result from discriminatory policies or mechanisms do not amount to a continuing violation. *See Quinn v. Green Tree Credit*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Corp.,* 159 F.3d 759, 765 (2d Cir.1998). Here, Plaintiff has not alleged nor provided any proof of a discriminatory policy or mechanism by Defendant. Her discrimination claims are based upon a series of discrete acts, none of which occurred within 180 days of her filing her charge of discrimination with the CHRO. Therefore, Plaintiff cannot rely on the continuing violation doctrine to save her otherwise time-barred state-law FEPA claims.

Accordingly, the Court finds that Plaintiff's state-law disparate treatment and hostile work environment claims under FEPA are barred by the 180-day limitations period of Conn. Gen.Stat. § 46a-82(e). Additionally, Plaintiff's disparate treatment claim under Title VII relating to incidents occurring prior to January 21, 1997, is time-barred. The Court grants summary judgment in favor of Defendant as to these claims. However, the Court denies Defendant's motion for summary judgment on statute of limitations grounds as to Plaintiff's Title VII disparate treatment claim involving incidents on or after January 21, 1997, and as to her Title VII hostile work environment claim. Plaintiff may rely on all incidents involving Cordner that occurred during the July 1996 to May 1997 time period for purposes of her hostile work environment claim under Title VII.

*II. Plaintiff's Title VII Disparate Treatment Claims*

**\*8** Defendant argues that it is entitled to summary judgment as a matter of law on Plaintiff's disparate treatment claims because Plaintiff has failed to establish a *prima facie* case of discrimination in that she was not subjected to an adverse employment action and there is no basis for inferring that the actions taken against her were because of her gender. Further, even assuming that Plaintiff carries her *prima facie* burden, Defendant maintains that it is entitled to summary judgment because Plaintiff cannot rebut its proffered legitimate, non-discriminatory explanations for the actions that were taken.

Courts analyze disparate treatment claims under the familiar burden-shifting framework of *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Fitzgerald v. Henderson,* 251 F.3d 345, 356 (2d Cir.2001), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Ferraro v. Kellwood Co.,* 440 F.3d 96, 99 (2d Cir.2006). The plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. If the plaintiff demonstrates a *prima facie* case of discrimination, a presumption of discrimination arises, and the burden shifts to the defendant employer to provide a legitimate, non-discriminatory reason for the action. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Chertkova,* 92 F.3d at 87. This burden is one of production, not persuasion, and involves no credibility assessments. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the defendant makes such a showing, the *McDonnell Douglas* framework-with its presumptions and burdens-disappears, and the sole remaining issue is "discrimination vel non." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To defeat summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995). The plaintiff's burden in this regard "may often be carried by reliance on the evidence comprising the *prima facie* case, without more." *Id.*

In this case, there is no question that Plaintiff is a member of a protected class. Additionally, for purposes of Plaintiff's meeting her *prima facie* burden, the Court will assume that her performance was satisfactory at least prior to Cordner's appointment as her supervisor.

*A. Adverse Employment Action*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Turning to the third element of Plaintiff's *prima facie* case, Plaintiff bears the burden of demonstrating that she suffered an adverse employment action. An adverse employment action is a "materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir.2005).*[FN12] "An adverse employment action may or may not entail economic loss, but there must be a link between the discrimination and some 'tangible job benefits' such as 'compensation, terms, conditions or privileges' of employment." *Alfano v. Costello, 294 F.3d 365, 373 (2d Cir.2002)* (quoting *Karibian v. Columbia Univ., 14 F.3d 773, 778 (2d Cir.1994)).* "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Fairbrother, 412 F.3d at 56.* There is no bright line rule defining what constitutes an adverse employment action. *Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir.1997).* However, based on a review of Second Circuit precedent, the Court finds that the incidents of which Plaintiff complains do not rise to the level of an "adverse employment action" necessary to meet Plaintiff's *prima facie* burden for her disparate treatment claim under Title VII.

> FN12. As discussed *infra,* this decision was abrogated by the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White,*-U.S.-, --- U.S. ----, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), to the extent that it applied this limited definition of "adverse employment action" in the context of a retaliation claim. *See Kessler v. Westchester Couty Dep't of Soc. Servs.,*-F.3d-, 461 F.3d 199, 2006 WL 2424705 (2d Cir. Aug.23, 2006).

**\*9** Plaintiff complains that she was subjected to a "ride along exercise" with Cordner where he criticized and "nit-picked" her work, that her cell phone

privileges were revoked, that she was subjected to several oral counseling sessions concerning her productivity and time-keeping, that she did not receive a new work vehicle, that Cordner called her after her sister's death to inquire as to when she would be returning to work, and that he gave her a documented written warning for leaving her work truck unlocked.[FN13] Ultimately, she claims that she was constructively discharged.

> FN13. Having found that Plaintiff's disparate treatment claim relating to Cordner's refusal to transfer her to a satellite office is time-barred, the Court need not consider whether this would constitute an adverse employment action.

In *Palomo v. Trustees of Columbia University, 170 Fed. Appx. 194, 195 (2d Cir.2006),* the Court held that the plaintiff could not establish a *prima facie* case of discrimination because defendant's failure to reinstate her on a business trip to which she had not even asked to be reinstated, the mailing of holiday cards without her signature during her absence, the temporary reporting line change, the criticism regarding her effort level, and the addition of several new responsibilities to her job description in connection with a larger restructuring did not, individually or collectively, rise to the level of an adverse employment action. In *Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir.2006),* the Court held that a vehicle assignment was not an adverse employment action. In *Fairbrother, 412 F.3d at 56,* the Court held that a transfer to another unit, which did not involve any material difference in responsibilities from plaintiff's prior assignment, was not an adverse employment action. In *Weeks v. New York State (Division of Parole), 273 F.3d 76, 86 (2d Cir.2001),* the Second Circuit held that a "notice of discipline [ ] for misconduct and incompetence for failing to have her handcuffs and weapons" could not constitute an adverse employment action because the plaintiff alleged no facts from which the Court could infer that this notice created a materially adverse change in her working conditions. She does not describe its effect or ramifications, how or why the effect would be serious, whether it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2864716 (D.Conn.)
**(Cite as: Slip Copy)**

went into any file, or even whether it was in writing. It hardly needs saying that a criticism of an employee (which is part of training and necessary to tallow employees to develop, improve, and avoid discipline) is not an adverse employment action.

*Id.* The Court in *Weeks* held that, for similar reasons, the plaintiff's claim that she received a counseling memo for her procedure in taking a parolee into custody was also insufficient, as was her transfer to another office, and the seizure and review of her work files. *Id.* at 86-87. "Again, [plaintiff] does not allege how these actions effected a 'materially adverse change in the terms and conditions of employment.' ' *Id.* at 87; *see also Joseph v. Leavitt,- F.3d-, 2006 WL 2615313, at *3 (2d Cir. Sept.13, 2006)* (holding that the employer's action of putting an employee on administrative leave pending a criminal investigation was not an "adverse employment action"); *but see Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640-41 (2d Cir.2000)* (holding that a transfer is a adverse employment action if it results in a change of responsibilities so significant as to constitute a setback to the plaintiff's career, and finding that a delay in reassigning a teacher and an assignment to a lab with inferior facilities did not constitute an adverse employment action); *de la Cruz v. New York City Human Resources Admin., 82 F.3d 16, 20-21 (2d Cir.1996)* (holding that a transfer from an "elite" unit to one that was "less prestigious" could constitute an adverse employment action).[FN14]

> [FN14. *Rodriguez v. Board of Educ. of Eastchester Union Free School Dist., 620 F.2d 362, 366 (2d Cir.1980)*, cited by Plaintiff, is not to the contrary. In that case the Second Circuit found that a junior high school art teacher's transfer to an elementary school constituted an adverse employment action, even though there were no pecuniary implications because the new position was so "profoundly different ... as to render utterly useless her twenty years of experience and study in developing art programs for middle school children." *Id.* The Court concluded that "[t]his radical change

in the nature of the work [plaintiff] was called upon to perform constitutes interference with a condition or privilege of employment adversely affecting her status within the meaning of the statute." *Id.*

***10** Plaintiff relies on the case of *Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999),* for the proposition that a reprimand can constitute an adverse employment action. *Morris,* however, is inapplicable to the disparate treatment claims in this case. In *Morris,* a town's police chief and his son brought a civil rights action pursuant to *42 U.S.C. § 1983,* alleging that their First Amendment rights had been violated by virtue of the retaliatory actions taken by the town in response to the police chief's protected free speech. Citing *Bernheim v. Litt, 79 F.3d 318, 327 (2d Cir.1996),* another *section 1983* First Amendment retaliation case, the Court held that actions lesser than dismissal, reduction in pay, or demotion in rank may also be considered adverse employment actions in the context of a First Amendment retaliation case. *196 F.3d at 110; see also Coogan v. Smyers, 134 F.3d 479, 483-84 (2d Cir.1998); Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir.2002).* Likewise, in cases involving claims of unlawful retaliation under Title VII, the Courts have applied a lesser standard in determining what constitutes an "adverse employment action." *See Wanamaker, 108 F.3d at 465; Bond v. City of Middletown, 389 F.Supp.2d 319, 332-33 (D.Conn.2005).* This standard, however, does not apply to disparate treatment claims under Title VII, *42 U.S.C. § 2000e-2(a)(1).*

In the recent case of *Burlington Northern & Sante Fe Railway Co. v. White,-U.S.-, --- U.S. ----, ----, 126 S.Ct. 2405, 2411, 165 L.Ed.2d 345 (2006)* ("*White*" ), the Supreme Court explained the rationale for this distinction based upon the differences in the language and purpose of Section 703(a),[FN15] the substantive anti-discrimination provision of Title VII (on which Plaintiff relies in this case), and Section 704(a),[FN16] Title VII's anti-retaliation provision. In *White,* the Supreme Court held that the language of Section 703(a) limits the scope of its provisions to actions that affect

Slip Copy, 2006 WL 2864716 (D.Conn.)
**(Cite as: Slip Copy)**

employment or alter the conditions of the work-place. *Id.* at 2412. "No such limiting words appear in the anti-retaliation provision." *Id.* As to the different purposes of the two provisions, the Court explained that the anti-discrimination provision "seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status." *Id.* "The anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Id.* "To secure the first objective, Congress did not need to prohibit anything other than employment-related discrimination." *Id.* However, because an employer can retaliate against an employee by taking actions not directly related to his or her employment or by causing harm outside the workplace, the anti-discrimination provision is not limited to discriminatory actions that affect the terms and conditions of employment. *Id.; see also Kessler v. Westchester County Dept. of Social Servs.,*-F.3d-, 461 F.3d 199, 2006 WL 2424705, at *9 (2d Cir. Aug.23, 2006) (discussing *White* ); *Zelnik v. Fashion Inst. of Tech.,*-F.3d-, 2006 WL 2623923, at *10 (2d Cir. Sept.14, 2006) (same).

> FN15. Section 703(a) provides:
> It shall be an unlawful employment practice for an employer-
> (1) *to fail or refuse to hire or to discharge* any individual, or otherwise to discriminate against any individual *with respect to his compensation, terms, conditions, or privileges of employment,* because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way *which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee,* because of such individual's race, color, religion, sex, or national origin.
> 42 U.S.C. § 2000e-2(a)(1)(emphasis added in *White,* 126 S.Ct. at 2411).

> FN16. Section 704(a) provides:
> It shall be an unlawful employment practice for an employer *to discriminate against* any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
> 42 U.S.C. § 2000e-3(a) (emphasis added in *White,* 126 S.Ct. at 2411).

**\*11** In the instant case, because Plaintiff's claim of gender-based discrimination arises under Section 703(a) of Title VII, in order to meet her *prima facie* burden, she must show an adverse employment action taken by her employer, one that was sufficiently disadvantageous to constitute a materially adverse change in the terms and conditions of her employment and is more disruptive than a mere inconvenience or an alteration of job responsibilities. *Fairbrother,* 412 F.3d at 56; *Williams v. R.H. Donnelley Corp.,* 368 F.3d 123, 128 (2d Cir.2004). Plaintiff was never demoted, her pay was never decreased, her title was never changed, no benefits were ever taken from her, and she was never transferred. The only "disciplinary" action taken against her was a documented verbal warning in her personnel file, the lowest form of discipline and the first step in a four-step process outlined in the Collective Bargaining Agreement; but there is no evidence that this amounted to a materially adverse change in her employment. None of the actions of which she complains meets this standard.FN17

> FN17. Having found that Plaintiff did not suffer an adverse employment action, the Court need not reach the other issues raised by Defendant, i.e., whether Plaintiff has presented facts to support an inference of gender discrimination and whether Plaintiff has sufficiently rebutted Defendant's proffered non-discriminatory justifications for its actions.

Thus, Plaintiff has not met her *prima facie* burden of showing that she was subjected to an adverse employment action. Accordingly, the Court grants summary judgment in favor of Defendant on Plaintiff's Title VII disparate treatment claim due to her failure to carry her *prima facie* burden.

### III. Plaintiff's Title VII Hostile Work Environment-Constructive Discharge Claim

As discussed above, Plaintiff also seeks relief under Title VII for a hostile work environment created by the cumulative effect of the incidents mentioned above, as well as for a constructive discharge resulting from the hostile work environment. To prevail on a Title VII hostile work environment claim, a plaintiff must establish unwelcome conduct, based on the plaintiff's gender, sufficiently severe or pervasive to alter the conditions of employment and to create a hostile work environment, together with some basis (either vicarious liability or negligence) for imputing liability to the employer. *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.; see also Gallagher v. Delaney,* 139 F.3d 338, 347 (2d Cir.1998); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995).

The Supreme Court has instructed that a court should look to all of the circumstances collectively to determine whether a hostile work environment exists, and set forth a non-exhaustive list of factors that should be considered, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with the employee's work performance. *Harris v. Forklift Systems,* 477 U.S. at 67-68. The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 n. 1, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The Supreme Court has repeatedly emphasized that simple teasing, offhand

comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Usually, a single isolated instance of harassment will not suffice to establish a hostile work environment unless it was "extraordinarily severe." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000). Thus, the plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Id.* (internal quotation marks omitted). "There is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 439 (2d Cir.1999) (internal quotation marks omitted).

**\*12** Proving such a claim "involves showing both 'objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." ' *Feingold v. New York,* 366 F.3d 138, 150 (2d Cir.2004) (quoting *Harris v. Forklift Systems,* 510 U.S. at 21).

In addition, the plaintiff must show that a specific basis exists for imputing the objectionable conduct to the employer. "Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Petrosino v. Bell Atlantic,* 385 F.3d 210, 225 (2d Cir.2004). If the harassment is attributed not to non-supervisory co-workers but to a supervisor with immediate or successively higher authority over the employee, "a court looks first to whether the supervisor's behavior 'culminate[d] in a

tangible employment action' against the employee." *Id.* (quoting *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)* ("*Ellerth*" )). If it did, "the employer will, *ipso facto,* be vicariously liable." *Mack v. Otis Elevator Co.,* 326 F.3d 116, 124 (2d Cir.), *cert. denied,* 540 U.S. 1016, 124 S.Ct. 562, 157 L.Ed.2d 428 (2003). If no such tangible employment action is present, however, an employer will still be liable for a hostile work environment created by a supervisor unless the employer successfully establishes what is commonly referred to as the "*Faragher/Ellerth* defense." [FN18] *Petrosino,* 385 F.3d at 225. That defense requires the employer to show that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth,* 524 U.S. at 765.

> [FN18.] This is also referred to by the courts as the "*Ellerth/Faragher*" defense.

In *Pennsylvania State Police v. Suders,* 542 U.S. 129, 133, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004), the Supreme Court held that to establish "constructive discharge" in a hostile work environment case, the plaintiff bears the additional burden of showing that the abusive work environment became so intolerable that her resignation qualified as a fitting response. Constructive discharge occurs when an employer, rather than directly discharging an individual, deliberately and discriminatorily created work conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign. *Id.* at 141. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 73 (2d Cir.2000).

*13 Defendant argues that Plaintiff's hostile work environment claim must fail as a matter of law because the facts alleged do not rise to the level of a hostile work environment and there is no basis for imputing liability to SNET.

> *A. Were the Incidents Sufficiently Severe and Pervasive?*

After reviewing the testimony of Plaintiff, the Court finds that there is no genuine issue of material fact that Plaintiff perceived Cordner's conduct as sufficiently severe and pervasive to create an abusive work environment. Plaintiff claims that she quit for mental health reasons. She could not stay in her position any more because of Cordner's harassment.

The more difficult question is whether a reasonable person of ordinary sensibilities would so perceive it. On a motion for summary judgment, the question for the Court is whether a reasonable factfinder could conclude, considering all of the circumstances, that "the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Whidbee,* 223 F.3d at 70 (internal quotation marks omitted).

In a recent decision, *Schiano v. Quality Payroll Systems, Inc.,* 445 F.3d 597, 605 (2d Cir.2006), the Second Circuit explained that the determination of whether sexual harassment alters the conditions of employment " 'is not, and by its nature cannot be, a mathematically precise test." ' *Id.* (citing *Harris,* 510 U.S. at 22). It can be determined only by looking at all the circumstances. *Id.* The Court noted that hostile work environment cases present " 'mixed questions of law and fact' that are 'especially well-suited for jury determination." ' *Id.* (quoting *Richardson,* 180 F.3d at 437). Emphasizing that the factors set forth in *Harris* are a non-exhaustive list to be used by the factfinder in making a factual determination as to whether, based on a totality of the circumstances, a hostile work environment existed, the Court held that it was error for the district court to examine each factor in isolation, comparing and contrasting its presence in that case to fact patterns from other cases. *Id.* "Prior cases in which we have concluded that a reasonable juror could find that the work environment was suf-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 15
Slip Copy, 2006 WL 2864716 (D.Conn.)
**(Cite as: Slip Copy)**

ficiently objectively hostile do not 'establish a baseline' that subsequent plaintiffs much reach in order to prevail." *Id.* at 606 (citing *Richardson,* 180 F.3d at 439). The determination as to whether a hostile work environment existed must be made on a case-by-case basis considering "all of the individual facts at hand." *Id.* at 607. Although recognizing that there are cases in which it is clear to both the trial court and reviewing court that after assessing the frequency of the misbehavior, measured in terms of its seriousness, the facts cannot, as a matter of law, be the basis of a successful hostile work environment claim, the Court in *Schiano* cited its earlier decision in *Alfano v. Costello,* 294 F.3d at 377, for the proposition that in some instances it may be more appropriate to overturn a jury verdict after trial than to grant summary judgment beforehand. *Schiano,* 445 F.3d at 608 & n. 5.

**\*14** In this case, Plaintiff relies on eight facially sex-neutral incidents involving her supervisor Cordner, occurring over a ten-month period. She claims that Cordner was arbitrarily imposing on her standards and working conditions that were not being imposed on any of the male service technicians. She says the "harassment" was constant, that he screamed at her so loudly on one occasion that other employees feared for her safety,[FN19] that Cordner was continually subjecting her to excessive criticism, "nit-picking" her about her time records, recording entries in her file about her performance, and that he and his supervisor, Dillman, spent countless hours going over her time sheets just trying to find something to make her look bad. Other male technicians, who had similar problems with their time records, were not subjected to this constant scrutiny. Plaintiff, a ten-year veteran of SNET, was subjected to a ride-along exercise, whereas men with far less seniority and experience were not required to do this. She was given a documented verbal warning for leaving her truck unlocked, whereas other male service technicians did not receive a written warning, even when they had tools stolen from their vehicles. Priority was given to a male service technician for a new work truck. Plaintiff, who had previously received an award for her productivity, was verbally reprimanded when

her production/performance times dropped off, although male technicians were not similarly treated. Her cell phone privileges were revoked for excessive usage. Her co-worker and union steward, Dave Ianiello,[FN20] testified that Cordner was "constantly riding" Plaintiff and that he was trying to make her life as difficult as possible.

> FN19. *See* Note 7, *supra.*

> FN20. The Court recognizes that there may be credibility issues with regard to Ianiello's testimony, given his position as the union steward and the fact that Cordner took certain actions against him, such as revoking his cell phone privileges. For those and other reasons noted by Defendant, a jury may well find Ianiello's testimony unworthy of belief. However, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment. Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment." *Vital v. Interfaith Medical Center,* 168 F.3d 615, 621 (2d Cir.1999); *see also Rodriguez,* 72 F.3d at 1061.

As the Court discussed with Counsel at oral argument, the Court has strong reservations about whether a reasonable person in Plaintiff's circumstances would consider the conduct described above to be sufficiently severe and pervasive so as not only to alter the conditions of employment but to compel her to resign. The Court notes that in a recent case, *Demoret v. Zegarelli,* 451 F.3d at 150, the Second Circuit held that a plaintiff's complaints that her supervisor reviewed her budget with a fine-toothed comb and criticized her for being five minutes late to department meetings, whereas male employees could skip meetings with impunity, did not constitute a hostile work environment.

However, heeding the advice of the Second Circuit in *Schiano* and *Alfano,* when the evidence of record

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2864716 (D.Conn.)
**(Cite as: Slip Copy)**

is viewed cumulatively and in the light most favorable to Plaintiff, the Court concludes that a rational jury could view the totality of these incidents as sufficiently severe as to interfere with Plaintiff's ability to work or to otherwise affect her working conditions, thus constituting a hostile work environment. Additionally, despite strong reservations, the Court finds that a rational jury could find the working conditions so intolerable that a reasonable person would have felt compelled to resign. *See Pennsylvania State Police, 542 U.S. at 147.*

### b. Was The Hostile Work Environment Directed At Plaintiff Because of Her Gender?

**\*15** Defendant next argues that there is no basis in the record for finding that the incidents of which Plaintiff complains were directed at her because of her gender.

Title VII does not prohibit all verbal and physical harassment in the workplace-only discrimination because of sex. A Title VII hostile work environment claim, however, is not limited to sexual advances or sexual behavior targeted at an employee. It also includes non-sexual behavior directed at an employee because of her gender, which is what Plaintiff is claiming in this case. In this type of hostile work environment case, the courts have generally applied the *McDonnell Douglas* burden shifting analysis, requiring the plaintiff to prove a causal connection between the conduct and her gender-i.e., that the hostile conduct was directed at her because of her gender, as opposed to, for example, the harasser's dislike of her as an individual, or the harasser's general misanthropic personality. *Lindermann* at 783. This is often referred to as the "but for" test-but for Plaintiff's gender, she would not have been the object of the harassment. *See Palomo, 170 Fed. Appx. at 196* (granting summary judgment to defendant on plaintiffs' sexual harassment claims, because no reasonable fact-finder could conclude that the supervisor engaged in this behavior toward plaintiffs because they were women, rather than because he considered them his friends).

In *Alfano,* the Second Circuit, in ruling on the de-

fendant's Rule 50 motion for judgment as a matter of law at the close of the evidence, held:

In a hostile work environment case, it may well be a proper exercise of the district court's broad discretion to allow the plaintiff to build her case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent. The plaintiff must, however, establish at trial that incidents, apparently sex-neutral were in fact motivated by bias. Thus, at the close of her case, to the extent that the plaintiff relies on facially neutral incidents to create the quantum of proof necessary to survive a Rule 50 motion for judgment, she much have established a basis from which a reasonable fact-finder could infer that those incidents were infected by discriminatory animus.

294 F.3d at 377. The Court stressed the importance of excluding from consideration those incidents "that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." *Id.* The Court explained that facially neutral incidents may be included among the "totality of the circumstances" "so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." *Id.* at 378 (citing Howley v. Town of Stratford, 217 F.3d 141, 155-56 (2d Cir.2000) (holding that the fact-finder could reasonably infer that facially sex-neutral incidents were sex-based where the perpetrator had previously made sexually derogatory statements)). Finding that the plaintiff had failed to carry this burden with respect to a number of the incidents perpetrated by one supervisor, the Court in *Alfano* was left to consider only those sex-related incidents perpetrated by another supervisor, which it found, as a matter of law, were not sufficient to support a finding of a hostile work environment. *Id.* at 378-79.

**\*16** In this case, because the actions complained of were not of a sexual nature, the burden rests with Plaintiff to show that these actions were directed at her because of her gender. Plaintiff was the only

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2864716 (D.Conn.)
**(Cite as: Slip Copy)**

woman in her crew. She has presented evidence that her supervisor, the perpetrator of these incidents, repeatedly made derogatory comments about women working in the field, and referred to Plaintiff as a "woman who doesn't belong on the job." She has presented evidence that he screamed at her, that he subjected her to excessive supervision, that he "nit-picked" her work, that he engaged in obsessive oversight of her time records, that he took actions against her that were not taken against male employees, that he made repeated notes in her personnel file documenting problems that he was having with her, that male employees were treated more favorably, and that she was told by her co-workers that Cordner was trying to make her life as difficult as possible and that he had a problem with women. (Pl.'s Depo. at 69). It was only after she complained of his harassment that he began counseling male employees and "writing them up" for problems similar to those for which he counseled Plaintiff. (Pl.'s Depo. at 110).

The Court concludes that Plaintiff has presented sufficient evidence of a discriminatory animus on the part of her supervisor from which a reasonable jury could conclude that his actions taken against her were because of her gender. The Court cautions, however, that at trial Plaintiff bears the burden of establishing that each of the incidents on which she relies to support her hostile work environment claim was motivated by gender bias. *See Alfano,* 294 F.3d at 378-79.

### c. Is There a Basis For Imputing Cordner's Conduct to SNET?

Additionally, for Plaintiff's hostile work environment claim to survive summary judgment, she must establish a basis for holding the employer liable, which is determined through traditional agency principles. Since Cordner was her supervisor, the employer, SNET, is subject to vicarious liability.

However, against a claim of a hostile work environment created by a supervisor, the employer may have recourse to the so-called *Faragher/Ellerth* affirmative defense. *Ferraro,* 440 F.3d at 101; *see*

*Faragher,* 524 U.S. at 807; *Ellerth,* 524 U.S. at 765. This defense is comprised of two requirements: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually or discriminatory harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher,* 524 U.S. at 807-08 (1998); *Ellerth,* 524 U.S. at 761; *see also Richardson,* 180 F.3d at 442-43; *Ferraro,* 440 F.3d at 101; *Leopold v. Baccarat, Inc.,* 239 F.3d 243, 245 (2d Cir.2001). This affirmative defense is available only when one of two additional requirements is met: (1) that the supervisor took no "tangible employment action," which involves an official company act, against the employee; or (2) any tangible employment action taken against the employee was not part of the supervisor's discriminatory harassment. *Ferraro,* 440 F.3d at 101; *see also Finnerty v. William H. Sadlier, Inc.,* No. 05-4494-CV, 2006 WL 910399, at *2 (2d Cir. Apr.7, 2006). "Otherwise the employer is strictly liable for the supervisor's misconduct." *Ferraro,* 440 F.3d at 101. The rationale underlying this distinction was explained by the Second Circuit in *Ferraro:*

**\*17** The Supreme Court created the *Faragher/ Ellerth* affirmative defense because it saw a difference between (1) situations in which the supervisor's harassing acts plainly invoked his official power and were therefore undoubtedly aided by the supervisor's agency relationship with the employer and (2) situations in which the use of official power in the supervisor's harassment was less clear and therefore the "aided-by-the-agency" relationship was "insufficiently developed." In the former situation, the official power granted by the employer to the supervisor was used to harass the employee, so the employer is held strictly liable for the supervisor's misconduct and the affirmative defense may not be raised. In the latter situation, it is less certain that the supervisor misused official power to further his discriminatory harassment and that the company could know of the supervisor's misconduct. Accordingly, the Court decided that strict employer liability was inappropriate in such a situation. "Looking

elsewhere for guidance," the Court fashioned an affirmative defense that provides incentives to both employees and employers in furtherance of the conciliatory and deterrent purposes of federal anti-discrimination law. The two elements of this affirmative defense encourage employees to report harassment and employers to institute and maintain "effective preventive and corrective measures."

*Id.* (internal citations omitted).

It is well-established that a hostile work environment, standing alone, does not constitute a tangible employment action. *See Caridad v. Metro-North Commuter Railroad,* 191 F.3d 283, 294-95 (2d Cir.1999), *cert. denied,* 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000). In this case, the only action that could constitute a "tangible employment action" is Plaintiff's alleged constructive discharge. In *Pennsylvania State Police v. Suders,* 542 U.S. at 133, which counsel for both sides oddly neglected to cite, the Supreme Court resolved what had been a split in the circuit courts on the question of whether constructive discharge brought about by a supervisor's harassment constitutes a tangible employment action. *Compare, e.g., Caridad,* 191 F.3d at 294-95 (holding has held that constructive discharge does not constitute a tangible employment action) *with Jaros v. LodgeNet Entertainment Corp.,* 294 F.3d 960, 966 (8th Cir.2002) (holding that constructive discharge qualifies as a tangible employment action). The Supreme Court concluded that an employer does not have recourse to the *Faragher/Ellerth* affirmative defense "when a supervisor's *official act* [FN21] precipitates the constructive discharge." *Pennsylvania State Police,* 542 U.S. at 140 (emphasis added).

> FN21. The Court in *Pennsylvania State Police* reasoned that absent an official act, the extent to which a supervisor's misconduct had been aided by the agency relation was less certain. 542 U.S. at 149. "That uncertainty ... justifies affording the employer the chance to establish, through the *Ellerth/Faragher* affirmative defense, that it should not be held vicariously liable."

> *Id.*

Although this Court has concluded that there are genuine issues of material fact as to whether a reasonable person in Plaintiff's position would have felt compelled to resign because of Cordner's harassment, there is no evidence of an official act on the part of Cordner that led to her resignation. Absent such an official act, under the holding of *Pennsylvania State Police,* Defendant may invoke the *Faragher/Ellerth* affirmative defense to establish why it should not be held vicariously liable. Whether this case is viewed as a hostile work environment case or a hostile work environment/constructive discharge case, Defendant may raise this affirmative defense.

**\*18** An employer satisfies the first prong of the defense if (1) the employer had an anti-discrimination policy as well as a procedure for filing complaints, and (2) the employer "endeavors to investigate and remedy problems reported by its employees." *Caridad,* 191 F.3d at 295. It is undisputed that SNET had a broad anti-discrimination and anti-harassment policy, with complaint procedures, which was contained in the employee Code of Conduct, and that Plaintiff was aware of this policy. The existence of that policy is an important consideration but, standing alone, does not automatically satisfy the first prong of Defendant's affirmative defense. *Id.* at 295. In this case, unlike *Caridad,* and *Finnerty,* there are genuine issues of material fact as to whether Defendant exercised reasonable care in investigating and remedying the hostile work environment of which Plaintiff complained.

Plaintiff testified that, in the past, Defendant had ignored or failed to investigate complaints filed by other female employees. (Pl.'s 2d Depo. at 140). Additionally, when she complained of Cordner's harassment, albeit after she had submitted her letter of resignation, Defendant's investigation of her complaint was cursory at best. Defendant's EEO manager did nothing more than interview Cordner, the alleged perpetrator; and when he did not corroborate Plaintiff's accusations of his harassing conduct, she closed the investigation of Plaintiff's com-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaint as "uncorroborated." Additionally, Plaintiff remained on the job for two weeks after she complained to the EEO manager about Cordner's harassment. There is nothing in the record to indicate that Defendant took any steps whatsoever to correct the harassment. A reasonable jury could find that Defendant's response to Plaintiff's complaint was wholly inadequate and that Defendant did not exercise reasonable care to correct promptly the harassing behavior by Plaintiff's supervisor. Thus, the Court concludes that Defendant has not carried its burden of establishing the first prong of this affirmative defense.

Therefore, finding genuine issues of material fact as to whether Defendant has satisfied the first prong of the *Faragher/Ellerth* affirmative defense, the Court denies Defendant's motion for summary judgment on Plaintiff's Title VII hostile work environment and constructive discharge claims.

The Court cautions, however, the fact that these claims have survived summary judgment does not ensure that they will withstand a Fed.R.Civ.P. 50 motion for judgment as a matter of law after trial. At trial, Plaintiff will bear the burden of proving a hostile work environment based upon incidents that in their totality meet the level of pervasiveness or severity required to establish a hostile work environment, both subjectively and objectively. She will also bear the burden of proving, in support of her constructive discharge claim, "that the abusive working condition became so intolerable that her resignation qualified as a fitting response." *Pennsylvania State Police,* 542 U.S. at 133. At trial, any incidents that do not support an inference of mistreatment must be removed from the equation. *See Alfano,* 294 F.3d at 376. Any incidents that do not support an inference that Plaintiff's treatment was because of her gender will likewise not be considered. *Id.* at 377 (holding that the plaintiff must establish at trial that the sex-neutral incidents of which she complains support an inference that the mistreatment was because of her sex). Ultimately, if Defendant is able to carry its burden of proving that it exercised reasonable care to prevent and correct the hostile work environment and that Plaintiff un-

reasonably failed to avail herself of the preventive or corrective opportunities provided by Defendant, Plaintiff will have to show why she failed to take advantage of these opportunities.

*Conclusion*

**\*19** Accordingly, for the reasons set forth above, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's state-law FEPA claim and her Title VII disparate treatment claim. The Court denies Defendant's Motion for Summary Judgment as to Plaintiff's Title VII hostile work environment claim and constructive discharge claim. Counsel for the parties are directed to confer and to present to the Court within thirty (30) days of the date of this ruling a proposed scheduling order, setting forth a date for the submission of a joint trial memorandum and a date when this case will be ready for trial.

SO ORDERED, this *30th* day of September, 2006, at Bridgeport, Connecticut.

D.Conn.,2006.
Evarts v. Southern New England Telephone Co.
Slip Copy, 2006 WL 2864716 (D.Conn.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 14**

Not Reported in A.2d                                                                                          Page 1
Not Reported in A.2d, 2006 WL 224435 (Conn.Super.), 40 Conn. L. Rptr. 600
(Cite as: Not Reported in A.2d)

Vollemans v. Town of Wallingford
Conn.Super.,2006.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Connecticut,Judicial District of
New Haven.
Peter J. VOLLEMANS, Jr.
v.
TOWN OF WALLINGFORD.
No. CV040286311.

Jan. 10, 2006.

Steele John-Henry Law Offices, Middlefield, for
Peter J. Vollemans.
Howd & Ludorf, Hartford, for Town of Walling-
ford.
TANZER, Judge.

*1 As a result of his termination as superintendent
of Pierce Power Station in Wallingford, Connecticut-
ut, the plaintiff, Peter J. Vollemans, brought this ac-
tion sounding in age discrimination against his em-
ployer, the defendant, the town of Wallingford.[FN1]
In his complaint filed on December 17, 2003, the
plaintiff alleges that he was terminated on January
21, 2003, because of his age, in violation of the
Connecticut Fair Employment Practices Act
(CFEPA), which prohibits employers from discrim-
inating against employees on the basis of age. The
plaintiff further alleges that on or about June 3,
2003, he filed a complaint with the commission on
human rights and opportunities (CHRO) and that on
or about October 28, 2003, the CHRO issued a re-
lease of jurisdiction, authorizing the plaintiff to
commence the action presently before this court.

FN1. As a result of his termination the
plaintiff instituted two actions. On March
12, 2003, the plaintiff filed a three-count
complaint (Docket No. CV 03 283760)
sounding in breach of contract; on Decem-
ber 17, 2003, the plaintiff filed the instant
one-count complaint (Docket No. CV 04
0286311) sounding in age discrimination.

The two cases were consolidated by order
of this court on March 15, 2004.

Now pending is the defendant's motion for sum-
mary judgment. In support of their respective posi-
tions, the parties have submitted memoranda of law
and affidavits.[FN2]

FN2. The defendant has submitted a
memorandum of law in support of his mo-
tion, accompanied by: (1) a copy of the
merit assessment review completed by the
CHRO regarding the plaintiff's complaint
to that agency, (2) a copy of a letter from
the plaintiff's attorney to the defendant's
personnel director, Terence P. Sullivan, (3)
Sullivan's affidavit, and (4) an excerpt
from the plaintiff's deposition. The
plaintiff filed a memorandum of law in op-
position to the motion on May 25, 2005,
accompanied by: (1) a copy of his termina-
tion letter, (2) the plaintiff's affidavit, (3) a
copy of a letter from the town of Walling-
ford to the plaintiff's union representative,
(4) a letter from Raymond F. Smith to Mi-
chael Holmes, (5) a memorandum from
Holmes to Smith regarding additional su-
pervisory assignments, and (6) a memor-
andum from Holmes to Smith regarding
dispatcher/system operations.

*DISCUSSION*

A "motion for summary judgment is designed to
eliminate the delay and expense of litigating an is-
sue when there is no real issue to be tried." *Wilson
v. New Haven,* 213 Conn. 277, 279, 567 A.2d 829
(1989). Practice Book § 17-49 "provides that sum-
mary judgment shall be rendered forthwith if the
pleadings, affidavits and any other proof submitted
show that there is no genuine issue as to any mater-
ial fact and that the moving party is entitled to
judgment as a matter of law ... In deciding a motion
for summary judgment, the trial court must view
the evidence in the light most favorable to the non-

Not Reported in A.2d, 2006 WL 224435 (Conn.Super.), 40 Conn. L. Rptr. 600
**(Cite as: Not Reported in A.2d)**

moving party ... The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law, ... and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Citations omitted; internal quotation marks omitted.) *Barrett v. Montesano, 269 Conn. 787, 791-92, 849 A.2d 839 (2004).* "A material fact has been defined ... as a fact which will make a difference in the result of the case." (Internal quotation marks omitted.) *Buell Industries, Inc. v. Greater New York Mutual Ins. Co., 259 Conn. 527, 556, 791 A.2d 489 (2002).*

The defendant first argues that summary judgment should enter in its favor as to the plaintiff's age discrimination claim because that claim was untimely filed with the CHRO. General Statutes § 46a-82, which governs the filing of complaints before the CHRO, states in subsection (e) that "[a]ny complaint filed [with the CHRO] pursuant to this section must be filed within one hundred and eighty days after the alleged act of discrimination ..." General Statutes § 46a-100 states that "[a]ny person who has *timely* filed a complaint with the Commission on Human Rights and Opportunities in accordance with section 46a-82 and who has obtained a release from the commission ... may also bring an action in the superior court for the judicial district in which the discriminatory practice is alleged to have occurred ..." ..." (Emphasis added.)

**\*2** The defendant argues that the plaintiff was fully aware of his termination as early as November 13, 2002, and possibly even earlier as evidenced by a November 13, 2003 letter from the plaintiff's attorney to the defendant's personnel director stating: "As you probably know, Mr. Vollemans' employment is scheduled to terminate effective on or about December 31, 2002, with the closure of the Power Plant being proffered as the alleged justification for that termination ... The absence of any other reason substantiating the disparate treatment between Mr. Vollemans and the other power plant employees raises a strong presumption that Mr. Vollemans is

not being transferred to another position simply because of his age." (Defendant's Exhibit B.) The defendant argues that the plaintiff's complaint filed with the CHRO on June 3, 2003, was filed more than 180 days from November 13, 2002, the date when the plaintiff clearly was aware of his termination and believed it to be discriminatory.

The plaintiff argues in opposition that his complaint to the CHRO was timely and that the defendant's reliance on the letter from his counsel is misplaced. The plaintiff argues that the discriminatory act that he alleges in his complaint is his actual termination date, which occurred on January 31, 2003, and that he received explicit "final notice" of his termination date on December 13, 2002. He argues that his complaint filed with the CHRO on June 3, 2003, was within 180 days of both the date of his final notice and his termination date.

The parties are clearly at issue as to the second requirement set out in § 46a-100 for bringing an action in superior court-the requirement that the person bringing the court action "has timely filed a complaint with the Commission on Human Rights and Opportunities in accordance with section 46a-82." The answer to the question of whether the plaintiff's complaint to the CHRO was timely is central to this court's ruling on the defendant's motion for summary judgment because in *Williams v. Commission on Human Rights & Opportunities, 257 Conn. 258, 284, 777 A.2d 645 (2001),* our Supreme Court held that although not an issue of subject matter jurisdiction, "the time limit of § 46a-82(e) is mandatory, and thus the commission *could* properly dismiss the plaintiff's complaint if it was not filed within 180 days of the alleged act of discrimination." (Emphasis in original.) The court further stated that "[i]f a time requirement is deemed to be mandatory, it must be complied with, absent such factors as consent, waiver or equitable tolling." *Id.*

The determination of whether the plaintiff's complaint to the CHRO was timely requires this court to interpret § 46a-82(e) and, more specifically, to identify the "alleged act of discrimination" from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 224435 (Conn.Super.), 40 Conn. L. Rptr. 600
**(Cite as: Not Reported in A.2d)**

which to begin counting the one hundred and eighty days allowed for filing a complaint. Generally, "[s]tatutory construction is a question of law ..." (Internal quotation marks omitted.) *Kelo v. City of New London,* 268 Conn. 1, 13, 843 A.2d 500 (2004). Nevertheless, "it is the well established practice of [the Connecticut Supreme Court] to accord great deference to the construction given [a] statute by the agency charged with its enforcement ... [The Supreme Court also has] held that an exception is made when a state agency's determination of a question of law has not previously been subject to judicial scrutiny ... the agency is not entitled to special deference." *Szewczyk v. Dept. of Social Services,* 275 Conn. 464, 474 (2005).

**\*3** The defendant's Exhibit B filed in support of its motion for summary judgment is a copy of the merit assessment review issued by the CHRO relative to the complaint filed by the plaintiff with that agency. The form states that the CHRO is required to conduct a merit assessment review of all complaints pursuant to General Statutes § 46a-83(b), and the purpose of the review is to determine whether the complaint should be retained for a full investigation or be dismissed. The review indicates, at page 3, that the plaintiff's complaint was dismissed because "[t]he complaint is untimely filed. There is documentation in the form of a letter written by the complainant's attorney dated November 13, 2002 which indicates that the complainant was aware that he was scheduled to be terminated as of December 31, 2002. In that the complaint was not filed until June 3, 2003, more than 180 days had elapsed from the date the complainant had first knowledge of his impending termination. Termination is not a continuing violation." Although the CHRO began counting the 180 days allowed for filing a complaint from November 13, 2002, the date on which it determined that the plaintiff had "first knowledge of his impending termination," this court's research has not found, nor have either of the parties directed the court to, any case law indicating that the application of the 180-day requirement in the context presented by this case has been subject to any scrutiny by our appellate courts. This court has, however, found that the issue was previ-

ously and persuasively addressed by Judge Conway in *McDougal v. CT. Comm. On Human R. & Opp.,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV97-0348451 (October 5, 1999, Conway, J.) (25 Conn. L. Rptr. 551). In that action, however, the CHRO took the position that the plaintiff asserts in this case-that the actual termination date rather than the date the plaintiff is informed of the termination triggers the 180-limitation period. Because the *McDougall* decision arose in a different postural context and because our appellate courts have not ruled on the question, the CHRO's finding of untimeliness in this case, arguably, is not entitled to any special deference in deciding the defendant's motion for summary judgment.

In undertaking a determination of the timeliness of the plaintiff's CHRO complaint, this court notes that "[t]he state fair employment practices statute ... is designed to eliminate certain discriminatory practices by employers in the hiring, promotion and discharge of employees ... General Statutes § 46a-82 provides a wide assortment of prophylactic and specific remedies designed both to prevent future discriminatory practices and to accord the victim of past discrimination specific relief. In determining the scope of the relief [courts] are properly guided by the case law surrounding federal fair employment legislation." (Citation omitted.) *Civil Service Commission v. Commission on Human Rights & Opportunities,* 195 Conn. 226, 230, 487 A.2d 201 (1985). "Although the language of [Title VII of the Civil Rights Act of 1964, § 703(a)(1); 42 U.S.C. § 2000e-2(a) ] and that of the Connecticut statute differ slightly, it is clear that the intent of the legislature in adopting 1967 Public Acts, No. 426 (which extended the provisions of the Fair Employment Practices Act ... to prohibit discrimination on the basis of sex) was to make the Connecticut statute coextensive with the federal ... Although we are not bound by federal interpretation of Title VII provisions, [w]e have often looked to federal employment discrimination law for guidance in enforcing our own antidiscrimination statute." (Citations omitted; internal quotation marks omitted.) *State v. Commission on Human Rights & Opportunities,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 224435 (Conn.Super.), 40 Conn. L. Rptr. 600
**(Cite as: Not Reported in A.2d)**

211 Conn. 464, 469-70, 559 A.2d 1120 (1989).

**\*4** In the federal forum the time limitation period in an employment discrimination case begins to accrue at the time of the discriminatory act itself rather than the time wherein its consequences take effect. Moreover, continuity of employment, as arguably occurred in the instant case, is insufficient to prolong the life of an employment discriminations cause of action such as this. See generally *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) and its progeny.

In *Delaware State College v. Ricks,* the question before the United States Supreme Court was whether the respondent, Ricks, had timely complained under the civil rights laws that he had been denied academic tenure because of his national origin. The court noted that "[d]etermining the timeliness of Ricks' ... complaint, and this ensuing lawsuit, requires us to identify precisely the 'unlawful employment practice' of which he complains"; *Delaware State College v. Ricks,* 449 U.S. 250, 257, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); the same identification required to be made by this court. The Supreme Court rejected Ricks' argument that the naming of the 180-day filing requirement began with the actual termination of his employment, noting that "[t]he proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences* of the acts became most painful." *Id., at 258.* The court held that the only discrimination Ricks had alleged was the denial of tenure and thus the filing limitation for that action began at the time the tenure decision was made and communicated to him. *Id., at 258.*

The plaintiff has attempted to distinguish *Delaware State College v. Ricks* from the present case on the basis of the allegation in his complaint that the "alleged discriminatory act" was the defendant's act of terminating him on January 21, 2003. Ricks, who had argued for the use of his termination date for the purposes of calculating the timeliness of his action, had pleaded only the denial of tenure as the alleged discriminatory act, not a discriminatory discharge. Apparently, the plaintiff posits that because

he pleads that the alleged discriminatory act was his termination on January 21, 2003, the situation facing this court is "drastically different from the situation facing the Supreme Court in *Ricks.*" The plaintiff also argues that he did not get "explicit" notice of his termination until he received the December 13, 2002 letter from Raymond F. Smith, the Director of Public Utilities for the defendant. (Plaintiff's Exhibit B.)

This court is not persuaded by the distinction the plaintiff attempts to make. The Supreme Court in *Delaware State College v. Ricks, supra,* in reversing the decision of the Court of Appeals for the Third Circuit, expressly rejected the reasoning of that court, which had determined that the statute of limitations for the respondent's claim in *Ricks* did not commence to run until his termination date. The reasoning of the Court of Appeals that was rejected by the Supreme Court would support the reasoning urged by the plaintiff in the present case: "[A] terminated employee who is still working should not be required to consult a lawyer or file charges of discrimination against his employer as long as he is still working, even though he has been told of the employer's present intention to terminate him in the future." (Internal quotation marks omitted.) *Delaware State College v. Ricks, supra,* 449 U.S. at 255. The Supreme Court noted that the Court of Appeals based its reasoning on its belief that an initial decision to terminate an employee sometimes might be reversed and that a rule focusing on the last day of employment would provide a "bright line guide both for the court and for tie victims of discrimination." (Internal quotation marks omitted.) *Id., at 255-56.*

**\*5** *Delaware State College v. Ricks, supra,* has been cited repeatedly by other federal courts in the context of discrimination claims. For example, in *Flaherty v. Metromail Corp.,* 235 F.3d 133, 136 (2nd Cir.2000), the court, in determining when a claim for constructive discharge occasioned by unlawful discrimination in employment accrues and citing *Ricks,* stated: "It has long been settled that a claim of employment discrimination accrues for statute of limitations purposes on the date the em-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 224435 (Conn.Super.), 40 Conn. L. Rptr. 600
**(Cite as: Not Reported in A.2d)**

ployee learns of the employer's discriminatory conduct." Again citing *Ricks* as authority, the *Flaherty* court stated: "In discriminatory discharge cases ... the illegal act is often the decision to terminate the employee, and the limitations period begins to run on the date that the employer gives definite notice of the decision to the employee." *Id.,* at 137.

In *Economu v. Borg-Warner Corp., 829 F.2d 311, 315 (2nd Cir.1987),* the court pointed out that "the Supreme Court [in *Delaware State College v. Ricks, supra* ] expressly rejected a brightline, last-day-of-work rule ... holding instead that the filing limitation period for claims of employment discrimination commences on the date the allegedly discriminatory decision was made and communicated to [the employee] ... [T]he limitation period begins to run on the date when the employee receives a definite notice of the termination." (Citations omitted; internal quotation marks omitted.) *Id., at 315.* See also *Morse v. University of Vermont, 973 F.2d 122 (2nd Cir.1992)* (proper focus in analyzing timing of accrual in context of discrimination claims is on time of the discriminatory act, not the point at which the consequences of the act become painful).

Under the principles enunciated in the above-noted cases, the alleged discriminatory act for the purposes of the timeliness of the plaintiff's appeal to the CHRO in the present case is the date on which the plaintiff received a definite notice of his termination. As has previously been noted, the defendant's Exhibit B, filed in support of its motion for summary judgment, is a copy of a letter dated November 13, 2002, from the attorney "retained by the plaintiff to represent him in connection with his current employment situation with the Town of Wallingford," as the letter so states. The letter further states that "Mr. Vollemans' employment is scheduled to terminate effective on or about December 31, 2002, with the closure of the Power Plant being proffered as the alleged justification for that termination."

The court is not persuaded by the plaintiff's argument that although he "was aware in November 2002 that his employment was going to end, he was never given *explicit* notice of his termination until he received the letter from Mr. Smith dated December 13, 2002"; (emphasis added); which letter the plaintiff has submitted as Exhibit A to his memorandum of law in opposition to the defendant's motion for summary judgment. Smith's letter itself does not support the plaintiff's argument, because it opens by stating: "This letter will serve as final notice of your termination with the Town of Wallingford ... Your position was funded through December 31, 2002 and therefore you are entitled to vacation, accrued ... Therefore, you will remain on the payroll through one-half day on January 21, 2003." (Emphasis added.) "Final" notice would imply that the plaintiff previously was given notice of his termination, an implication that is supported by the action taken by the plaintiff in retaining a lawyer. The alleged discriminatory act occurred, sometime before November 13, 2002, when the plaintiff was informed of the decision to terminate his employment "on or about December 31, 2003." It is immaterial that he remained on the payroll because of accrued vacation through one-half day on January 21, 2003.

**\*6** The defendant has met its burden to prove that there are no genuine issues of material fact regarding its claim that plaintiff's complaint to the CHRO was untimely filed pursuant to § 46a-82(e). The defendant is entitled to summary judgment as a matter of law.

The motion for summary judgment is granted.^FN3

> FN3. Because the issue of the timeliness of the plaintiff's complaint to the CHRO is dispositive, this court need not and does not address the other grounds advanced by the defendant in support of its motion for summary judgment-that the plaintiff has failed to establish a prima facie case to establish age discrimination and that the defendant has articulated a nondiscriminatory reason for the plaintiff's termination.

Conn.Super.,2006.
Vollemans v. Town of Wallingford

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 6
Not Reported in A.2d, 2006 WL 224435 (Conn.Super.), 40 Conn. L. Rptr. 600
**(Cite as: Not Reported in A.2d)**

Not Reported in A.2d, 2006 WL 224435
(Conn.Super.), 40 Conn. L. Rptr. 600

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 15**

Not Reported in F.Supp.2d                                                      Page 1

Not Reported in F.Supp.2d, 2004 WL 722226 (D.Conn.), 9 Wage & Hour Cas.2d (BNA) 989

**(Cite as: Not Reported in F.Supp.2d)**

Walsh v. Walgreen Eastern Co., Inc.
D.Conn.,2004.

United States District Court,D. Connecticut.
Gregory WALSH, Plaintiff,
v.
WALGREEN EASTERN CO., INC., Defendant
**No. 3:03CV1609(WWE).**

March 25, 2004.

John R. Williams, Norman A. Pattis, Williams &
Pattis, New Haven, CT, for Plaintiff.
Stephen B. Harris, Wiggin & Dana, New Haven,
CT, for Defendant.

*RULING ON DEFENDANT'S MOTION TO DIS-
MISS COUNTS TWO AND THREE OF THE COM-
PLAINT*

EGINTON, Senior J.

**\*1** This is an employment action in five counts,
brought by the plaintiff Gregory Walsh ("Walsh")
against his former employer, Walgreen Eastern Co.,
Inc. ("Walgreen"), in the Superior Court for the Ju-
dicial District of Ansonia/Milford in the State of
Connecticut. Walgreen removed the matter to this
Court based on the allegation in count five of the
complaint that Walgreen violated the Fair Labor
Standards Act of 1938, codified at 29 U.S.C. §§
302 *et seq.*, which is a claim within this Court's ori-
ginal jurisdiction.

Pending before this Court is Walgreen's motion to
dismiss count two of the complaint, in which Walsh
alleges that he was forced to resign in violation of
the public policy of the State of Connecticut as set
forth in Chapter 557 of the Connecticut General
Statutes; and count three of the complaint, which
alleges negligent infliction of emotional distress.
Both are common law claims over which the Court
is exercising supplementary jurisdiction pursuant to
28 U.S.C. § 1367. For the reasons set forth below,
Walgreen's motion to dismiss counts two and three
of the complaint will be granted.

*Facts*

The following facts are taken from the complaint
and from the report of the parties' planning meet-
ing. Walsh is a licensed pharmacist in the State of
Connecticut. Walgreen is an out of state corpora-
tion doing business throughout the State of Con-
necticut. Walsh was employed by Walgreen as a
pharmacist from March 1987 through February
2003. Walsh alleges he was employed under the
terms of an implied contract which provided that
Walsh would be paid a fixed hourly rate for regular
time, and 150% of that rate for overtime, more
commonly called "time and a half." Walsh asserts
that he fully complied with all the terms and condi-
tions of his implied contract of employment, but
during the last 5 1/2 years of his employment with
Walgreen, Walgreen breached the implied contract
by refusing to pay Walsh for the overtime he
worked, which Walsh claims totaled 123 hours over
the 5 1/2 year period.

Because of this refusal by Walgreen to pay Walsh
overtime, Walsh alleges that Walgreen created a
working environment so intolerable that Walsh was
forced to resign involuntarily, which he asserts con-
stituted a termination by Walgreen in violation of
public policy. Walsh also claims economic loss;
negligent infliction of emotional distress; violation
of Connecticut's wage and hour laws; and a viola-
tion of the Fair Labor Practices Act of 1938.

Walgreen alleges that Walsh was a salaried em-
ployee who was paid all compensation that he
earned and to which he was entitled, and that there
was no employment contract between the parties re-
lating to the payment of overtime. Walgreen also
claims that Walsh did not suffer wrongful con-
structive discharge in violation of public policy be-
cause of the existence of adequate statutory remed-
ies, and that Walsh failed to mitigate any of his al-
leged damages.

*Discussion*

Motion to dismiss

Not Reported in F.Supp.2d, 2004 WL 722226 (D.Conn.), 9 Wage & Hour Cas.2d (BNA) 989

**(Cite as: Not Reported in F.Supp.2d)**

The function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984). When deciding a motion to dismiss, the Court must accept as true the well pleaded allegations of the complaint. *Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). In addition, the allegations of the complaint should be construed to the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1973). A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

*Count Two, Wrongful Termination in Violation of Public Policy.*

**\*2** Walsh alleges that by Walgreen's refusal to pay him the overtime pay he claims was due and owing him over a 5 1/2 year period, Walgreen created a working environment so intolerable that Walsh was forced to resign involuntarily, in violation of the public policy of the State of Connecticut. The Court construes this as an allegation of constructive discharge against Walgreen based on the public policy exception to the at will employment doctrine.

Walgreen asserts that it is well established law that the public-policy exception to the doctrine of at will employment is a narrow one. The Court concurs. Construing the allegations of the complaint favorably to Walsh, and accepting them as true, the Court is at a loss to understand why Walsh waited 5 1/2 years to take action on his overtime pay concerns, instead of contacting the state and/or federal agency that regulates this issue. The non-payment of time and a half for overtime worked is not a common law public policy violation, but a matter that is strictly regulated by government agencies. Connecticut's wage and hour laws, codified at Connecticut General Statutes § 31-58 *et seq.,* and the Fair Labor Standards Act of 1938, 29 U.S.C. §§

302 *et seq.,* would have provided Walsh with the remedy he sought if the overtime pay was justified. The Court does not find that the failure of Walgreen to pay Walsh time and a half pay for overtime worked reaches the level of a public policy issue.

Walsh argues that he has lost wages that he would have earned from Walgreen from the time of his termination until the time of his retirement or death, and that the termination of his employment inflicted a far greater injury on him than the mere failure to pay wages. He also argues that the only remedy for failure to pay wages is compensation at proper levels for the hours he worked in the past.

The Court finds that Walgreen did not, by failure to pay Walsh for 123 hours worked over a 5 1/2 year period that were allegedly overtime hours, create a working environment that was so intolerable that Walsh was forced to resign involuntarily. The Court also finds that the claims in counts four and five will provide him with the remedy he seeks, i.e., compensation at proper levels for the hours he worked in the past, should he be successful on those claims.

*Count Three, Negligent Infliction of Emotional Distress*

A claim of negligent infliction of emotional distress as an independent tort is relatively new to Connecticut law. Historically, emotional distress was not compensated at common law in the absence of physical injury or a risk of harm from physical impact. It was not until 1978 that the Connecticut Supreme Court recognized the tort of negligent infliction of emotional distress. *Montinieri v. S. New England Tel. Co.,* 175 Conn. 337, 345, 398 A.2d 1180 (1978).

In count three, Walsh alleges a claim against Walgreen for negligent infliction of emotional distress. To prevail on a claim for negligent infliction of emotional distress in the employment context under Connecticut law, a plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 722226 (D.Conn.), 9 Wage & Hour Cas.2d (BNA) 989
**(Cite as: Not Reported in F.Supp.2d)**

result in illness or bodily harm. *Peralta v. Cendant Corp.,* 123 F.Supp.2d 65, 82 (D.Conn.2000). Connecticut imposes additional requirements when the alleged infliction occurs in the workplace. "Negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process. The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress. The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." *Whitaker v. Haynes Construction Co., Inc.,* 167 F.Supp.2d 251, 256 (D.Conn.2001).

**\*3** Because emotional distress in the workplace is not uncommon, courts have viewed the application of the negligent infliction of emotional distress claims with some alarm, and the Connecticut Supreme Court has stated that "courts should not lightly intervene to impair the exercise of management discretion or to foment unwarranted litigation." To that end, Connecticut courts have held that to be unreasonable, the employer's conduct must be humiliating, extreme, or outrageous. *Miner v. Town of Cheshire,* 126 F.Supp.2d 184, 197 (D.Conn.2002).

In the present case, the defendant asserts that count three should be dismissed because the claim for negligent infliction of emotional distress was not based upon conduct in a termination process, citing the 1997 Connecticut Supreme Court case of *Parsons v. United Technologies Corp.,* 243 Conn. 66, 700 A.2d 655. However, since *Parsons,* the Second Circuit, in dictum, has expressed doubt as to whether the Connecticut Supreme Court would continue to limit the tort of negligent infliction of emotional distress to actions taken in the course of an employee's termination. The Second Circuit speculated that in light of 1993 amendments to the Workers' Compensation Act that excluded coverage for mental and emotional impairment, the Connecticut Supreme Court might permit a claim for negligent infliction of emotional distress in the absence of a termination. Based on the change in the Workers'

Compensation laws, and the Second Circuit's shift in opinion, this Court will not dismiss Dixon's allegation of negligent infliction of emotional distress based on the defendants' assertion that the claim is not based upon conduct in a termination process.

However, the Court does find, based on the ample case law available, much of which was cited in *Miner,* that the threshold to prove negligent infliction of emotional distress is such that the employer's conduct must be unreasonable in the manner in which the employer carries out the employment action, and to be unreasonable, the conduct must be humiliating, extreme, or outrageous. This threshold is extremely high. As stated above, Connecticut courts have held that even an employer's wrongful employment actions are not enough to sustain a claim for negligent infliction of emotional distress. The Court finds that Walsh's allegations do not rise to the required level of unreasonableness to state a claim for negligent infliction of emotional distress. Defendants' motion to dismiss count three will be granted.

*Conclusion*

For the reasons set forth above, Walgreen's motion to dismiss counts two and three of the complaint (Doc. # 12) is GRANTED.

SO ORDERED.

D.Conn.,2004.
Walsh v. Walgreen Eastern Co., Inc.
Not Reported in F.Supp.2d, 2004 WL 722226 (D.Conn.), 9 Wage & Hour Cas.2d (BNA) 989

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 16**

Not Reported in F.Supp.2d                                                                                            Page 1
Not Reported in F.Supp.2d, 2003 WL 2002778 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

Absher v. Flexi Intern. Software, Inc.
D.Conn.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
Rita ABSHER
v.
FLEXI INTERNATIONAL SOFTWARE, INC., et
al.
**No. Civ. 3:02CV171 (AHN).**

April 10, 2003.

*RULING ON MOTION TO DISMISS & MOTION
TO AMEND COMPLAINT*

NEVAS, J.
**\*1** The plaintiff, Rita Absher ("Absher"), brings this Title VII action against her former employer, defendant Flexi International, Inc. ("Flexi"), and its officers and employees Frank Grywalski ("Grywalski"), Kevin Nolan ("Nolan"), Jay Belsky ("Belsky"), and Stefan Bothe ("Bothe"). Absher also alleges claims under the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen.Stat. § 46a-60 *et seq.,* and Connecticut common law.

Presently pending is the defendants' motion to dismiss counts six, seven, fourteen, fifteen and sixteen of the complaint [doc. # 9], and Absher's motion to amend the complaint [doc. # 21]. For the following reasons, the motion to dismiss is GRANTED in part, DENIED in part and DENIED in part as moot. The motion to amend the complaint is GRANTED in part and DENIED in part.

*FACTS*

Absher alleges that during her employment with Flexi she was subjected to a hostile work environment, gender discrimination, sexual harassment and retaliation in violation of Title VII and CFEPA. She also asserts state law claims of breach of contract, breach of implied contract, breach of the covenant of good faith and fair dealing, promissory estoppel, battery, negligent infliction of emotional distress,

intentional infliction of emotional distress, and negligent supervision.

*PROCEDURAL BACKGROUND*

Flexi and the individual defendants moved to dismiss five counts of the complaint: (1) count six, which alleges discrimination in violation of CFEPA against all defendants, (2) count seven, which alleges breach of contract against Flexi, (3) count fourteen, which alleges negligent infliction of emotional distress against all defendants, (4) count fifteen, which alleges intentional infliction of emotional distress against all defendants, and (5) count sixteen, which alleges negligent supervision against Flexi, Nolan, Grywalski and Bothe.

At the time the defendants filed the motion to dismiss, they also filed an answer to the remaining eleven counts of the complaint.

Absher opposed the motion to dismiss. However, while the motion was pending, Absher moved to file an amended complaint. In the proposed amended complaint, Absher realleges and rewords her original Title VII claims of hostile work environment, gender discrimination, and retaliation, her original CFEPA claims of discrimination and retaliation, and her original state law claims of breach of implied contract, breach of the covenant of good faith and fair dealing, promissory estoppel, and assault and battery.

The defendants oppose the proposed rewording of these counts on the grounds that their answer has been filed and Absher has not satisfied the requirements of Fed.R.Civ.P. 15(a).

Further, the proposed amended complaint addresses the five counts of the original complaint that the defendants moved to dismiss. The proposed amended complaint eliminates two counts in their entirety and certain defendants from the other three counts. Specifically, the proposed amended complaint (1) eliminates counts six and seven in their entirety, (2) alleges negligent infliction of emotional distress

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 2002778 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

against Flexi (proposed count thirteen), as opposed to all defendants (original count fourteen), (3) alleges intentional infliction of emotional distress against Belsky (proposed count fourteen), as opposed to all defendants (original count fifteen), and (4) alleges negligent supervision against Flexi (proposed count twelve), and eliminates Nolan, Grywalski and Bothe (original count sixteen).

**\*2** Insofar as the proposed changes cure the deficiencies alleged in the motion to dismiss, the defendants do not object to them. Specifically, the defendants do not object to (1) eliminating counts six and seven of the original complaint, (2) eliminating all defendants except Flexi with regard to the negligent infliction of emotional distress and negligent supervision claims, and (3) restating the intentional infliction of emotional distress claim against Belsky. However, the defendants claim that the re-alleged claims of negligent infliction of emotional distress and negligent supervision against Flexi still fail to state viable claims on which relief may be granted. Thus, Flexi argues that the proposed amendments to these two counts would be futile and should not be allowed.

Finally, Absher's proposed amended complaint adds five entirely new counts: (1) an additional Title VII hostile work environment claim against Flexi (proposed count three), (2) a CFEPA sexual harassment claim against Flexi (proposed count five), (3) an ERISA count against FLEXI (proposed count fifteen), (4) wanton and wilful conduct against Flexi and Belsky (proposed count sixteen), and (5) respondeat superior against Flexi (proposed count seventeen.)

The defendants object to the addition of these new counts. They assert that they are untimely and their addition would cause them undue prejudice.

The defendants conducted some discovery before the motion to amend was filed. On September 13, 2002, they served interrogatories and requests for production on Absher. Absher responded to that discovery on November 13, 2002. Absher served the defendants with interrogatories and requests for

production on three separate occasions, October 3, 2002, November 26, 2002, and December 12, 2002. The defendants responded on December 24, 2002 and January 10, 2003. The motion to amend was filed on January 9, 2003, almost four months before the discovery deadline of April 30, 2003. After the motion to amend was filed, the defendants began, but did not complete, Absher's deposition.

### DISCUSSION

Fed.R.Civ.P. 15(a) provides that in cases such as this where a responsive pleading has been served, a party may amend its pleading only by leave of court or consent of the adverse party. The rule further provides that leave "shall be freely given when justice so requires." *Id.* In *Foman v. Davis,* 371 U.S. 178 (1962), the Supreme Court explained that: if the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of the amendment etc.-the leave should, as the rules require, be 'freely given.'

**\*3** *Foman,* 371 U.S. at 182. The decision whether to grant leave to amend is within the court's sound discretion. *See id.*

Undue prejudice may require denial of an amendment when the new claim would require the opponent to expend significant resources to conduct additional discovery and prepare for trial and when it would significantly delay the resolution of the dispute. *See Richardson Greenshields Sec., Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987); *Encarnacion v. Barnhart,* 180 F.Supp.2d 492, 498-99 (S.D.N.Y.2002). Permitting a proposed amendment also may be unduly prejudicial where discovery has been completed, but that consideration may be mitigated if the new claim arises from a similar set of operative facts and a similar time as the existing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 2002778 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

claims. *See* *Ansan Assocs., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir.1985); *see also* *State Teachers Ret. Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981).

An amendment is futile if it could not withstand a motion to dismiss under Fed.R.Civ.P. 12(b)(6). *See* *Nettis v. Levitt,* 241 F.3d 186 n. 4 (2d Cir.2001). In other words, a proposed amendment need not be allowed if it does not state a claim on which relief can be granted. *See* *Ricciuti v. New York City Transp. Auth.,* 941 F.2d 119, 123 (2d Cir.1991).

With these principles in mind, the court turns to each of Absher's proposed amendments and the defendants' objections.

### A. *The Negligent Infliction of Emotional Distress Claim*

Flexi maintains that the proposed amended claim for negligent infliction of emotional distress should not be allowed because it does not cure the deficiencies raised in the motion to dismiss and thus would be futile. Specifically, Flexi argues that the Connecticut Supreme Court's recent decision in *Perodeau v. City of Hartford,* 259 Conn. 729 (2002), bars this claim in the context of an ongoing employment relationship. Flexi further maintains that the claim should be dismissed with regard to the alleged conduct surrounding the termination of Absher's employment because the facts do not rise to the level of extreme and outrageous conduct that "transgresses the bounds of socially tolerable behavior." *Parsons v. United Tech. Corp.,* 243 Conn. 66, 88-89 (1997); *Moniz v. Kravis,* 59 Conn.App. 704, 709 (2000). The court agrees.

In *Perodeau,* the Connecticut Supreme Court held that an employer may not be found liable for negligent infliction of emotional distress arising out of conduct occurring within a continuing employment context as distinguished from conduct occurring in the termination of employment. 259 Conn. at 762-63.

However, the mere termination of employment, even if wrongful, is not, by itself enough to sustain a claim for negligent infliction of emotional distress. *Parsons,* 243 Conn. at 88-89. To support a cause of action for negligent infliction of emotional distress in the context of terminating an employee, the employer's conduct must involve an unreasonable risk of emotional distress that might result in illness or bodily harm. *Id.* at 88.

**\*4** In the proposed amended claim of negligent infliction of emotional distress, Absher does not allege any conduct pertaining to the termination of her employment. Accordingly, she has not stated a viable claim, and the proposed amended claim set forth in proposed count thirteen is not allowed.

### B. *The Intentional Infliction of Emotional Distress Claim*

In the proposed amended claim of intentional infliction of emotional distress against Belsky, Absher alleges that she suffered and will continue to suffer emotional distress as a result of Belsky's sexually offensive language, conduct, and touching.

To sustain a claim for intentional infliction of emotional distress under Connecticut law, a plaintiff must allege that (1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was a likely result of his conduct, (2) his conduct was extreme and outrageous, (3) his conduct was the cause of the plaintiff's distress, and (4) the emotional distress that the plaintiff sustained was severe. *See* *Appleton v. Board of Ed. of Stonington,* 254 Conn. 205, 210 (2000). With respect to the second element, the court must determine in the first instance if the alleged conduct is sufficiently extreme and outrageous. *See id.*

Conduct is extreme and outrageous if it "exceed all bounds usually tolerated by decent society." *Id.* Liability has been found where the conduct is atrocious and utterly intolerable in a civilized community. For example, conduct has been found sufficient to meet this standard where there was repeated public ridicule based on race. *See Knight v. Southeastern Council,* 2001 Conn. Super Lexis 2732 (Conn.Super.Ct. Sept. 21, 2001).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 2002778 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

The conduct Absher alleges, even if offensive, is simply not sufficiently extreme and outrageous as a matter of law. Accordingly, this claim, as alleged in proposed amended count fourteen, is not allowed.

### C. *The Negligent Supervision Claim*

Flexi asserts that the proposed amended claim for negligent supervision does not cure the defects alleged in the motion to dismiss because Absher still alleges facts that demonstrate that once Absher notified it of Belsky's conduct, it took action to remedy her concerns. Flexi also maintains that it cannot be liable for any alleged conduct that occurred prior to the time it became aware of it. They maintain that in order to state a claim of negligent supervision, a plaintiff must allege that the employer knew or had reason to know that the employee had a propensity to engage in tortious conduct. *See Shanks v. Walker,* 116 F.Supp.2d 311, 314 (D. Conn 2000); *Farricielli v. Bayer Corp.,* 116 F.Supp.2d 280, 286 (D.Conn.1999).

The proposed amendment alleges that Flexi knew of Belsky's offensive conduct because in November, 2000, and several times thereafter, including April 5, 2001, she reported it to Flexi's Director of Human Resources, that other employees had filed claims of sexual harassment, that she complained to Nolan on April 6, 2001, that on April 9, 2001, Grywalski told her that Flexi would not tolerate such conduct, and that she repeatedly complained to Belsky about his offensive conduct, yet Flexi failed to investigate, address or stop his conduct.

**\*5** These allegations sufficiently allege that Flexi knew or had reason to know that Belsky had a propensity to engage in the alleged offensive conduct. Thus, assuming these allegations are true, it does not appear that Absher cannot prove any set of facts in support of her claim that would entitle her to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also Still v. DeBuono,* 101 F.3d 888 (2d Cir.1996). She thus is entitled to offer evidence to support her claim. *See United States v. Yale New Haven Hosp.,* 727 F.Supp. 784, 786 (D.Conn.1990).

Accordingly, the proposed amended count twelve is

allowed.

### D. *The Proposed Reworded Counts*

The defendants object to the proposed amended counts that merely reword and reorganize the original counts because (1) they do not change or add anything of substance, (2) significant discovery has been completed and (3) although the facts were known to Absher when the complaint was filed, she has not offered any explanation for the delay in seeking the amendments.

None of the defendants' claims demonstrate undue prejudice or reason to deny the proposed reworded counts. The right to amend pleadings encompasses the right to make changes in phraseology. *See United States v. United States Trust Co,* 106 F.R.D. 474, 476 (D.Mass.1985); *Farrell v. Hollingsworth,* 43 F.R.D. 362 (D.S.C.1968).

Accordingly, the proposed amendments to original counts one through five and eight through thirteen, as reworded in proposed counts one, two, four, and six through eleven, are allowed.

### E. *The Five Proposed New Counts*

As previously stated, Absher's proposed amended complaint seeks to add an additional Title VII hostile work environment claim, a CFEPA sexual harassment claim, an ERISA claim, a claim of wanton and wilful conduct, and a claim of respondeat superior. The defendants object to these new claims because substantial discovery has been conducted and because none of the counts state claims on which relief may be granted.

#### 1. *The New Title VII Hostile Work Environment Claim*

Flexi objects to the addition of a second Title VII hostile work environment claim as alleged in proposed count three on the ground that significant discovery has already been completed.

However, it appears that this claim arises from the same set of operative facts and the same time frame as set forth in the original complaint. *See Ansan As-*

Not Reported in F.Supp.2d, 2003 WL 2002778 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

_soc.,_ 760 F.2d at 446. Although the defendants assert that some discovery has been conducted, the request to amend was made well in advance of the discovery deadline, and before the defendants completed Absher's deposition. Thus, this new Title VII claim would not require the defendant to expend significant additional resources on discovery and trial preparation and would not significantly delay resolution of the case. _See Marsh v. Sheriff of Cayuga County,_ 36 Fed. Appx. 10 (2d Cir.2002).

In the absence of undue prejudice, the addition of this Title VII hostile work environment as alleged in proposed count three is allowed.

### 2. The CFEPA Sexual Harassment Claim

**\*6** Flexi also objects to the addition of another CFEPA claim of sexual harassment as alleged in proposed count five on the grounds that substantial discovery has already been completed.

As is the case with the new Title VII claim, it also appears that this claim arises from the same set of operative facts and the same time frame as set forth in the original complaint. _See Ansan Assoc.,_ 760 F.2d at 446. Also, the request to add this claim was made well in advance of the discovery deadline, and before the defendants completed Absher's deposition. Thus, this new CFEPA claim would not require the defendant to expend significant additional resources on discovery and trial preparation and would not significantly delay resolution of the case. _See Marsh,_ 36 Fed. Appx. at 10.

Thus, in the absence of undue prejudice, the addition of the CFEPA claim of sexual harassment as alleged in proposed count five is allowed.

### 3. The ERISA Claim

In proposed count fifteen, Absher alleges that Flexi's actions and conduct deprived her of her right to exercise her options under Flexi's January 22, 2001, "Incentive Stock Option Agreement" in violation of ERISA. Flexi maintains that these allegations do not state a claim under ERISA because a stock option agreement is not an employee benefit

plan.

ERISA applies only to employee welfare benefit plans, employee pension benefit plans, or plans which are both. _See_ 29 U.S.C. § 1002(3). A welfare benefit plan is one that provides medical, unemployment, disability, death, vacation, and other specified benefits. _See_ 29 U.S.C. § 1002(1). An employee pension benefit plan is any program or plan that provides retirement income to employees or results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. _See_ 29 U.S.C. § 1002(2). The words "provides retirement income" refer only to plans designed for the purpose of paying retirement income. _See Murphy v. Inexco Oil Co.,_ 611 F.2d 570, 575 (5th Cir.1980). However, payments made by an employer to some or all employees as bonuses for work performed, unless systematically deferred to the termination of covered employment or beyond, or provide retirement income to employees, are excluded from the definition of pension plans. _See_ 29 C.F.R. § 2510, 3-2(c).

A bonus plan is one that does not provide retirement income, but instead serves some other purpose such as providing increased compensation as an incentive or reward for a job well done. _See Hahn v. National Westminster Bank, N.A.,_ 99 F.Supp.2d 275, 279 (E.D.N.Y.2000) (citing _Murphy,_ 611 F.2d at 575). However, a bonus plan may fall within ERISA's definition of pension benefit plans if it provides that payments are systematically deferred to the termination of covered employment or beyond or are designed to provide retirement income. _See id.; see also Emmenegger v. Bull Moose Tube Co.,_ 197 F.3d 927, 932 (8th Cir.1999) (holding that a phantom stock plan was a bonus plan not covered by ERISA where its stated purpose was to provide incentives and compensation for industry and efficiency); _International Paper Co. v. Suwyn,_ 978 F.Supp. 508 (S.D.N.Y.1997) (holding that plan was a bonus plan where its stated purpose was to motivate and reward a group of executives).

**\*7** Here, the complaint does not set forth the terms or the purpose of Flexi's stock option agreement.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2003 WL 2002778 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

Without any information about the plan, the court is unable to determine whether it is a pension benefit plan that is covered by ERISA or a non-ERISA bonus or incentive plan. Thus, looking to the allegations of the complaint, it does not appear that they are insufficient to state a claim under any theory. The ERISA claim, as alleged in proposed count fifteen, is not futile as a matter of law and will be allowed.

### 4. *The Wanton & Wilful Conduct Claim*

Flexi and Belsky maintain that the proposed new count sixteen, which alleges wanton and wilful misconduct, should not be allowed because Absher does not identify the rights she alleges were violated by the alleged conduct, fails to identify the legal theory of liability underlying the claim, and fails to allege the elements of any specific cause of action.

Under Connecticut law, the mere use of the words "wanton conduct" is insufficient to state an actionable claim of reckless and wanton misconduct. *See Kostivk v. Queally,* 159 Conn. 91, 94 (1970). Wanton misconduct is reckless misconduct. It is conduct that involves a reckless disregard of the rights of others or the consequences of one's actions. *See Craig v. Driscoll,* 64 Conn.App. 699, 720-21 (2001). Wilful, wanton or reckless conduct is highly unreasonable conduct that is more than thoughtlessness or inadvertence. *See id.* Moreover, to be legally sufficient, a claim based on wanton or reckless conduct must allege some duty running from the defendant to the plaintiff. *See Sheiman v. Lafayette Bank & Trust Co.,* 4 Conn.App. 39, 44 (Conn.App.Ct.1985).

In the proposed claim of wanton and wilful conduct, Absher does not allege any facts from which such a duty may be proven. Rather, the claim merely alleges a conclusion of law. In the absence of sufficient alleged facts to support a duty and conduct involving a reckless disregard of others, the claim is insufficient as a matter of law. *See id.*

Accordingly, the count purporting to allege a cause of action for wilful and wanton misconduct, as al-

leged in proposed count sixteen, is not allowed.

### 5. *The Respondeat Superior Claim*

Flexi asserts that the proposed new count seventeen, entitled "Respondeat Superior," should not be allowed because it does not invoke any specific law, does not allege the elements of any cause of action, and does not identify any specific conduct supporting the claim. The court agrees.

Under Connecticut law, an employer is liable under the doctrine of respondeat superior for the intentional torts of an employee only if the employee is acting both within the scope of his employment and in furtherance of the employer's business. *See Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 500 (1995). This principle applies whether the plaintiff asserts either willful or negligent tortious conduct. *See Rappaport v. Rosen Film Delivery Sys., Inc.,* 127 Conn. 524, 526 (1941). For respondeat superior to apply, the affairs of the employer must be furthered by the objectionable acts. *See Larsen,* 232 Conn. at 501. "A master is liable only for those torts of his servant ... which have for their purpose the execution of the master's orders or the doing of the work assigned to him to do." *Bradlow v. American Dist. Tel. Co.,* 131 Conn. 192, 196 (1944). Unless the employee was actuated at least in part by a purpose to serve the employer, the employer is not liable. *See A-G Foods, Inc. v. Pepperidge Farm, Inc.,* 216 Conn. 200, 210 (1990).

**\*8** Here, Absher has not alleged that Belsky's acts were within the scope of his employment and in furtherance of Flexi's business interests. Accordingly, she has not stated a claim for relief under the doctrine of respondeat superior, and the proposed new count seventeen is not allowed.

### *CONCLUSION*

For the foregoing reasons, the defendants' motion to dismiss the complaint is GRANTED in part, DENIED in part, and DENIED in part as moot. The plaintiff's motion to amend the complaint is GRANTED in part and DENIED in part. The plaintiff shall file an amended complaint consistent with this

Not Reported in F.Supp.2d, 2003 WL 2002778 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

ruling by May 2, 2003. Thereafter, the parties shall meet and agree to a revised case management plan setting forth a new discovery deadline that will accommodate any additional discovery the defendants deem necessary as a result of the allegations in the amended complaint.

D.Conn.,2003.
Absher v. Flexi Intern. Software, Inc.
Not Reported in F.Supp.2d, 2003 WL 2002778 (D.Conn.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.